<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

D&D ASSOCIATES, INC.,            :
                                 :     CIVIL ACTION NO. 03-1026 (MLC)
        Plaintiff,               :
                                 :     **MEMORANDUM OPINION**
        v.                       :
                                 :
BOARD OF EDUCATION OF            :
NORTH PLAINFIELD, et al.,        :
                                 :
        Defendants.              :
_____:

<u>**COOPER, District Judge**</u>

The defendants Vitetta Group, Inc. ("Vitetta") and Bovis Lend Lease, Inc. ("Bovis") move separately to dismiss the amended complaint insofar as asserted against them pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  The Court will grant in part and deny in part the separate motions.

**BACKGROUND**

**I.    Factual Background**

     **A.    <u>The Parties</u>**

The Court accepts these facts as alleged in the amended complaint.  The plaintiff, D&D Associates, Inc. ("D&D"), is a New Jersey corporation.  Vitetta is a Pennsylvania corporation that performs architectural and design work on public and private construction projects in New Jersey.  Bovis is a North Carolina corporation that performs management work on public and private construction projects in New Jersey.  The defendant Board of

Education of North Plainfield ("Board") is a public body.  The defendant Robert Epstein is an attorney in New Jersey.

B.   D&D's Allegations

The Court accepts these facts as alleged in D&D's amended complaint.  D&D entered into three contracts with the Board whereby D&D would act as "coordinating prime contractor" for renovation and other work.  The contracts (1) covered public works projects at five schools ("Projects"), and (2) were governed by a consolidated Project Manual and General Conditions (collectively, "governing contracts").  The Board also contracted with other contractors.

Vitetta entered into a separate agreement with the Board whereby Vitetta would act as design and supervising architect for the Projects.  Bovis entered into a separate agreement with the Board whereby Bovis acted as construction manager and was designated as the Board's on-site representative.  The Board retained Epstein as "construction counsel" for the Projects.

The defendants brought the Projects to a public bidding process without obtaining, inter alia, necessary approvals, funding, or rights to the land.  The bidding process began in June 2001, with a specification that the Board would issue a notice to proceed by June 29, 2001.  The award of contracts was announced in late July 2001; notices to proceed were issued on July 30, 2001, and D&D received notice on August 3, 2001.

2

D&D expected the milestone and completion dates for the Projects, which had been formulated based on a start date of June 29, 2001, would be adjusted to account for the delays caused by the lack of approvals, funding, and land rights.  The Board and Vitetta insisted on maintaining such dates as set out in the governing contracts.

The Board did not have funds to pay for the Projects until mid-August 2001, when it first received proceeds from a bond sale.  The defendants did not inform D&D that, before the issuance of the notice to proceed, (1) Vitetta had failed to submit final drawings to the local building department for approval, and (2) the Board had not acquired full title to the land or certain necessary approvals.

D&D began work on the Projects with the understanding that Bovis and the Board had submitted the drawings and specifications necessary for all permits and approvals for work to the Borough of North Plainfield.  Bovis directed D&D to place job trailers on site before the necessary permits were issued and assured D&D that the Borough would not stop the work.  But the North Plainfield Building Department issued a stop work order on September 4, 2001, to D&D and all other contractors due to a lack of permits.  This lack of permits was caused by the failure of Vitetta and the Board to submit final drawings to the Borough

3

before September 10, 2001.  The lack of permits affected D&D's ability to work on the Projects.  The permits were issued on October 19, 2001.

Bovis asked D&D, in September 2001, to provide a schedule that the Board could post on its web site to show that the Projects were on schedule.  D&D refused, and responded that the Projects were not on schedule, they had been delayed for an entire summer, and Bovis and Vitetta were substantially to blame.

D&D asked, in early October 2001, for a meeting with the Board and the other co-primes to discuss the scheduling delays. D&D advised the Board, Vitetta, Bovis, and Epstein that the schedule should be adjusted to account for the delays.  On October 18, 2001, D&D made a formal request to extend the time due to the delays, pursuant to the contract terms.  Epstein, on October 19, 2001, issued a notice of default to D&D and its surety on the Projects.  The default-notice letter blamed the delays in commencing work on D&D entirely.

D&D alleges the default letter and a similar letter from Epstein on October 11, 2001, were designed to preempt D&D from raising delay issues and provide a basis for denying payment and extensions of time to D&D.  The letters had the immediate impact of interfering with D&D's bonding capacity and ability to bid on other public works projects.  D&D alleges also that Epstein did

4

Case 3:03-cv-01026-MLC-DEA   Document 86   Filed 09/30/05   Page 5 of 25 PageID: 1308

not have authority to issue default notices under the contracts and that Vitetta did not issue a written certification of default as required by the Contracts.

Vitetta approved a 59-day time extension on December 13, 2001, one month after Epstein refused a request for a 90-day time extension.  Vitetta issued a signed version of this extension on February 5, 2002.

Epstein issued another default notice to D&D's surety on February 25, 2002, requesting a meeting to accelerate the work schedule on the Projects to cure D&D's alleged defaults.  Vitetta subsequently issued a default notice to D&D as well.

D&D and its surety met with the Board, Bovis, Vitetta, and Epstein on March 4, 2002 to discuss accelerating the work on the Projects so the schools could be used in September 2002.  On March 21, 2002, Epstein formally rescinded his default notice. But Vitetta issued a new default notice on April 29, 2002.

D&D alleges the defendants met on or about July 28, 2002, to discuss how to obtain D&D's consent to complete the work ahead of schedule without additional compensation, as well as how false claims of default would pressure D&D to so consent.  D&D alleges further that Earl Hawley of Bovis sent an email to Epstein, Vitetta, and the Board on July 29, 2002, describing the defendants' strategy of using default notices to blackmail D&D

into accelerating the schedule.  D&D alleges also that a Bovis report acknowledges the delays were not D&D's fault.

The Board and D&D reached an agreement on August 6, 2002, whereby (1) D&D would complete certain work on the Projects by September 2002 instead of November 2002 and (2) the Board would rescind the default notices immediately.  D&D alleges that it accelerated its work schedule and met this new milestone, but that Epstein, Vitetta, and the Board continuously threatened to refuse payments to D&D based on delays.

Bovis and Board representatives changed the locks on D&D's trailer and the on-site gates in the presence of a local police officer on February 10, 2003.  D&D alleges that the Board, Bovis, and Epstein invoked the aid of the police to seize papers and property from D&D's trailer.  On the morning of February 11, 2003, D&D's employees and subcontractors were met on-site by Bovis representatives and security guards.  Hawley told these workers that D&D had been terminated.  The workers were directed to collect their personal tools and leave the site.

The Board then "commandeered" D&D's trailer, which was leased by D&D and contained both materials for which the Board had not paid and D&D's own equipment and business records.  The Board refused to assume the trailer rental lease or allow the trailer company to retrieve the trailer.  The Board similarly seized leased scaffolding materials.

D&D received a letter on February 11, 2003, from Vitetta demanding to know why D&D was not performing its work.  Epstein sent a similar letter on the same day, accusing D&D of abandoning its work.  Bovis and Vitetta then contacted D&D's subcontractors and the other co-primes to say that the Board, through Bovis, would complete D&D's work.  Bovis asked the subcontractors to complete the Projects by working directly with Bovis.

The Board terminated D&D by written correspondence from Epstein on March 5, 2003.  D&D alleges the termination was performed in breach of the contracts and without proper cause. D&D alleges the defendants conspired to wrongfully terminate D&D to avoid paying D&D and obscure the defendants' own unlawful conduct and responsibility for causing the delays.

## II.  Procedural Background

D&D brought this action in March 2003.  The Court denied motions by Epstein and Vitetta for summary judgment pursuant to Rule 56 and Bovis's motion to dismiss pursuant to Rule 12(b)(6) on July 28, 2003, and granted D&D leave to amend the complaint. D&D filed the amended complaint on August 27, 2003.

The Court referred the action to the United States Bankruptcy Court on August 29, 2003.  The Court reopened the action here on November 29, 2004.  We denied Epstein's motion for summary judgment on December 23, 2004.  Vitetta and Bovis now separately

move to dismiss the amended complaint insofar as asserted against them.  The Court has heard oral argument thereon.

## DISCUSSION

### I.   Standard of Review for Rule 12(b)(6) Motion

A complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).  On a motion to dismiss, the Court must accept as true all of the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff.  Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001).  "Dismissal of claims under Rule 12(b)(6) is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim upon which relief may be granted."  Jakomas v. McFalls, 229 F.Supp.2d 412, 419 (W.D.Pa. 2002).

The Court, when considering a motion to dismiss, generally considers only the allegations in the complaint, exhibits attached to the complaint, and matters of public record.  Beverly Enters. v. Trump, 182 F.3d 183, 190 n. 3 (3d Cir. 1999).  The Court generally may not "consider matters extraneous to the pleadings."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).  But the Court may consider all documents that are integral to or explicitly relied upon in the complaint.  Id. (quotations and citation omitted.)

## II.  D&D's Amended Complaint

A.  <u>Count One and Count Two</u>

Count One, alleged against all defendants, is for "Civil Rights – Fourth Amendment, Fifth Amendment, Fourteenth Amendment Seizure of Property."  (Am. Compl. Count One.)  D&D alleges the defendants' "seizure of D&D's equipment, trailer, and records with the use of official police personnel without notice and an opportunity to be heard" violated D&D's rights to due process in violation of 42 U.S.C. § ("Section") 1983.  (<u>Id.</u> at ¶¶ 100-102.)

A contract with a state entity may give rise to a property right protected under the Fourteenth Amendment.  <u>Linan-Faye Constr. Co. v. Hous. Auth.</u>, 49 F.3d 915, 931 (3d Cir. 1995).  But not every state contract gives rise to such a right.  <u>Id.</u> at 931-32.  Two general types of contract rights are recognized as property protected by the Fourteenth Amendment:

> (1) where the contract confers a protected status, such as those characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits; or (2) where the contract itself includes a provision that the state entity can terminate the contract only for cause.

<u>Id.</u> at 932 (citations and quotations omitted).  However:

> if every breach of contract by someone acting under color of state law constituted a deprivation of property for procedural due process purposes, the federal courts would be called upon to pass judgment on the procedural fairness of the processing of a myriad of contract claims against public entities. . . . [S]uch a wholesale

9

> federalization of state public contract law seems far
> afield from the great purposes of the due process clause.

Id. (citations and quotations omitted).

D&D's contract with the Board does not fall into either category described in Linan-Faye.  The contracts do not confer protection on D&D characterized by either extreme dependence or permanence, as they are for a single group of public works projects.  Further, the contracts do not provide that the state entity can terminate only for cause.  Indeed, the Board could terminate "for convenience and without cause."  (Gen. Conds., § 14.4.1, Vitetta Mot., Ex. F.)  Thus, D&D's interest does not merit protection under the Fourteenth Amendment.  Thus, we find D&D's contracts with the Board do not give rise to a protected property interest either in the contracts or in the materials, trailer, and records held by D&D pursuant to the contracts.  The Court need not address the requirements of either the due process clause or the equal protection clause, because D&D has failed to demonstrate that the contracts established a property interest that is protected under the Fourteenth Amendment.

Count Two, similarly, alleges a due process violation by all defendants pursuant to Section 1983.  D&D alleges the defendants deprived it of its (1) pre-qualification status for public works contracts, (2) good reputation, and (3) vested and protected interest in its right to bid on public works projects, thus

implicating a protected liberty interest.  (Am. Compl. at 20-24.)
Specifically, D&D alleges the notices of default and other
communications issued by the defendants interfered with its
bonding capacity and ability to bid on other public projects.  We
find the allegations in Count Two, however, like those in Count
One, fail to rise to the level of constitutional violations.

&ldquo;[F]ederal courts are not to view defamatory acts as
constitutional violations.&rdquo;  <u>Boyanowski v. Capital Area Interm.
Unit</u>, 215 F.3d 396, 401 (3d Cir. 2000).  The interest in one&rsquo;s
reputation is neither &ldquo;liberty&rdquo; nor &ldquo;property&rdquo; that is protected
by the due process clause.  <u>Id.</u>  The alleged impairment of
employment opportunities does not imbue a claim based on injury
to one&rsquo;s reputation with a constitutional element.  <u>See</u> <u>id.</u> at
402 (stating although defamation injuries lead to monetary losses
that flow from injury to reputation, as long as such damage flows
from injury caused by defendant to plaintiff&rsquo;s reputation, it may
be recoverable under state tort law, but not as a constitutional
deprivation).  We conclude that the financial loss associated
with an injury to one&rsquo;s bonding capacity similarly is not
constitutionally protected.  We find that D&D&rsquo;s claims in Count
Two are based on alleged injuries to its reputation that may be
recoverable under state tort or contract law.  We find that these
claims do not implicate a protected liberty interest and
therefore will not support a due process claim.

B.   <u>Count Three and Count Four</u>

D&D alleges, in Count Three and Count Four, the defendants
retaliated against it for exercising its First Amendment rights.
(Am. Compl. at 24-26.)  D&D, as a constitutional-retaliation
claimant, must prove (1) it engaged in constitutionally-protected
activity; (2) the government retaliated; and (3) the protected
activity caused the retaliation.  <u>Eichenlaub v. Twp. of Indiana</u>,
385 F.3d 274, 282 (3d Cir. 2004).

1.   <u>Protected Activity</u>

D&D asserts these protected activities:  its (1) refusal to
make false statements for public distribution that the Projects
were on schedule; (2) requests for extensions of time; (3)
attempt to meet with other contractors to discuss scheduling
adjustments; and, (4) commencement of this litigation and various
filings pursuant to this action.  (Am. Compl. at 24-26.)  All
speech is protected by the First Amendment except for certain
narrow categories deemed unworthy of full protection, such as
obscenity, "fighting words," and libel.  <u>Eichenlaub</u>, 385 F.3d at
282-83.  We make a preliminary finding, for the purpose only of
considering these motions to dismiss, that D&D engaged in
constitutionally-protected activity.[1]

---

[1] As noted <u>infra</u>, Vitetta does not argue that D&D did
not engage in protected activity.

2.    <u>Retaliation by Bovis</u>

D&D's retaliation claims against Bovis fail at the second
<u>Eichenlaub</u> step because D&D fails to allege that Bovis retaliated
against it.  While Count Three names "all defendants" in its
heading, D&D alleges only that Epstein, Vitetta, and the Board
issued default letters in retaliation against D&D.  (<u>See</u> Am.
Compl. Count Three.)  D&D names Bovis in the "wherefore" clause
of Count Three, but seeks relief based only on the default
letters and notices from Epstein, Vitetta, and the Board.
Similarly, D&D names Bovis in the "wherefore" clause of Count
Four, but neither names Bovis in the heading for Count Four nor
alleges Bovis participated in issuing the default letters and
notices.  (<u>Id.</u> at Count Four.)  Thus, D&D fails to state a claim
for retaliation against Bovis in Count Three and Count Four, and
those counts as asserted against Bovis will be dismissed.  We
note further that D&D makes no discernible attempt in Count Three
and Count Four to allege that Bovis was a state actor, which
would be a necessary element to a retaliation claim.  <u>See</u>
<u>Eichenlaub</u>, 385 F.3d at 282 (noting second part of three-part
test: plaintiff must prove the <u>government</u> responded with
retaliation) (emphasis added).

3.   <u>Retaliation by Vitetta</u>

D&D alleges Vitetta, acting in concert with the Board, issued default and termination letters in retaliation for D&D's protected activity.  (<u>See</u> Am. Compl. at 24-26.)  Vitetta does not argue (1) D&D's activities were not protected or (2) Vitetta's letters were not issued in retaliation for the protected activity.  (<u>See</u> Vitetta Br.; Vitetta Reply Br.)  Vitetta argues only that it was not a state actor for purposes of D&D's claims.  (<u>Id.</u>)

D&D's allegations of retaliation are sufficient to withstand Vitetta's motion to dismiss.  D&D claims that Vitetta issued the default letters "acting in concert and by agreement, under color of state law, as purported official acts of the Board."  (Am. Compl. at 24-25.)  Vitetta argues D&D cannot show that Vitetta was a state actor.  (Vitetta Br. at 4-10.)  But "[t]he inquiry is not whether [D&D] will ultimately prevail in a trial on the merits, but whether [it] should be afforded an opportunity to offer evidence in support of [its] claims."  <u>Smith v. Weeks</u>, No. 01-6038, 2002 WL 31750203, at *5 (E.D. Pa. Dec. 9, 2002).  Under the "close nexus" test, for example, the inquiry is "whether there is a sufficiently close nexus between the State and the challenged action [of the private party] so that the action of the latter may be fairly treated as that of the State itself."  <u>Id.</u> at *4 (citation and quotations omitted.)  D&D may be able to

14

show there was a close nexus between Vitetta and the Board such
that Vitetta's acts may be attributed to the Board.  <u>Cf.</u> <u>Kost v.</u>
<u>Kozakiewicz</u>, 1 F.3d 176, 184-85 (3d Cir. 1993) (finding no nexus,
as private defendant contracted with private intermediary third
party, not state actor, and thus "had no contact whatsoever with
a state actor and was not one itself").

D&D alleges Vitetta, Epstein, and the Board delayed progress
on the Projects and issued the default notices as part of a
"campaign to blame all of the Projects' problems on D&D's alleged
failure to coordinate the work."  (Am. Compl. at 12.)  Taking
D&D's allegations as true, as we must on a motion to dismiss, the
amended complaint may state a claim of retaliation upon which
relief could be granted.  It would be premature to dismiss D&D's
retaliation claims against Vitetta before allowing D&D the
opportunity to develop evidence in support thereof.  We will not
dismiss Count Three and Count Four as asserted against Vitetta.

C.   <u>Count Six</u>

Count Six is for illegal garnishment without due process.
(Am. Compl. at 28-32.)  D&D alleges the defendants "have
determined to keep materials, equipment and leased items, which
D&D caused to be placed [on-site], without either paying for them,
or allowing D&D and/or its suppliers and subcontractors access to

15

remove them."  (Id., Count Six, at ¶ 7.)  D&D also alleges they withheld payment and garnished funds.  (Id. at ¶ 17 & 28-32.)

But D&D, as discussed supra, does not have a protected property interest in either materials or receiving payment under the contract.  Therefore, we will dismiss Count Six as asserted against Bovis and Vitetta to the extent this count seeks to impose a due process claim.

Count Six also asserts the defendants "deprived D&D of its property without due process of law in direct violation of D&D's rights under New Jersey law."  The only New Jersey law to which this count refers is the New Jersey Trust Fund Law ("NJTFL"), N.J.S.A. § 2A:44-148.  (Am. Compl. Count Six, at ¶ 3.)  Count Seven seeks to recover under the NJTFL as well, and the paragraphs in these counts mirror each other.  (Cf. Count Six ¶¶ 2-7 and Count Seven ¶¶ 2-7; Count Six ¶¶ 8-14 and Count Seven ¶¶ 10-16.)  Count Six fails to allege a violation of any state law other than the NJTFL.  D&D includes a claim under the NJTFL in Count Seven based on the same set of facts alleged in Count Six. Thus, the Court will dismiss Count Six to the extent it seeks to impose liability based on the NJTFL and consider D&D's claim in Count Seven.

D.    Count Seven

Count Seven, asserted against both Bovis and Vitetta, is titled "Quia Timet – New Jersey Law."  (Am. Compl. Count Seven.) The only "New Jersey law" referred to in the text of Count Seven is the NJTFL.  The NJTFL provides:

> All money paid by the state of New Jersey or by any agency, commission or department thereof, or by any county, municipality or school district in the state, to any person pursuant to the provisions of any contract for any public improvement made between any such person and the state or any agency, commission or department thereof, or any county, municipality or school district in the state, shall constitute a trust fund in the hands of such person as such contractor, until all claims for labor, materials and other charges incurred in connection with the performance of such contract shall have been fully paid.

N.J.S.A. § 2A:44-148.

The statutory language states the NJTFL applies to all money "paid" by a state entity in a public improvement project.  See Nat'l Sur. Corp. v. Barth, 95 A.2d 145, 147 (N.J. 1953) (stating statute applies only to money paid by state, and does not impress trust upon funds still in possession of state and not yet paid to contractor).  But Count Seven refers only to funds that have not been paid.  (See Am. Compl. Count Seven, at ¶ 4 ("Defendants have refused to release funds"); id. at ¶¶ 5 -9, 14-15 (alleging defendants withheld funds as liquidated damages assessments against funds due); id. at ¶ 17 (noting Board's "refusal to

disburse such trust funds").)  There is no cause of action under the NJTFL for money not paid by the state.  Count Seven fails to state a claim under the NJTFL, and the Court will dismiss it as to both Bovis and Vitetta.

     E.    <u>Count Nine, Count Ten, Count Thirteen,
            Count Fourteen, & Count Fifteen</u>

Count Nine ("Errors and Omissions"), Count Ten ("Tortious Interference"), and Count Fifteen ("Civil Conspiracy") are asserted against Bovis and Vitetta.  (Am. Compl.)  Count Thirteen ("Fraudulent Inducement") and Count Fourteen ("Fraudulent Inducement, Rescission of Performance Bonds") are asserted against Vitetta.  (<u>Id.</u>)

Vitetta's argument for dismissal of these counts as asserted against it — the Court should decline to exercise supplemental jurisdiction over these state law claims (<u>see</u> Vitetta Br., at 10-11) — is unavailing.  The Court has jurisdiction over D&D's retaliation claims against Vitetta.  Because we will not dismiss those claims, we have supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367.  It appears that even if we were to dismiss the federal claims against Vitetta, we would retain jurisdiction over this action based on the federal claims that

remain against Epstein and the Board, and therefore would exercise supplemental jurisdiction over all other claims that form part of the case or controversy, including the state law claims against Vitetta.

Bovis, similarly, argues only the Court should decline to exercise supplemental jurisdiction over the state law claims asserted against it in Count Nine, Count Ten, and Count Fifteen. (Bovis Br. at 25-26.)  Although we will dismiss D&D's claims against Bovis over which we would have original jurisdiction, i.e. the due process and retaliation claims, as noted supra we retain jurisdiction over this action based on the federal question claims that remain against defendants Epstein, Vitetta, and the Board.  We exercise, in our discretion, supplemental jurisdiction over these state law claims against Bovis.

Neither Vitetta nor Bovis argues that we should dismiss Count Nine, Count Ten, Count Thirteen, Count Fourteen, or Count Fifteen on any basis other than declining to exercise supplemental jurisdiction.  Because both defendants fail to show why these counts should be dismissed, we will deny both motions to dismiss as to Count Nine, Count Ten, Count Thirteen, Count Fourteen, and Count Fifteen.

F.   Count Eleven

Count Eleven alleges libel and slander against all defendants.  (Am. Compl. Count Eleven.)  Generally, a statement is defamatory "if it is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him."  Lynch v. N.J. Educ. Assn., 735 A.2d 1129, 1135 (N.J. 1999).  Bovis and Vitetta argue three grounds for dismissal of Count Eleven: (1) the claims are time-barred, (2) the allegedly defamatory statements were not published to a third party, and (3) the statements are protected by the special-interest privilege.

1.   Statute of Limitations

Bovis argues Count Eleven is time-barred.  (Bovis Br. at 32-34.)  The statute of limitations for libel and slander is one year after the publication thereof.  N.J.S.A. § 2A:14-3.  Bovis argues D&D's original complaint was filed on March 12, 2003 and alleged that Bovis published defamatory statements on March 11, 2002, more than one year earlier.  (Bovis Br. at 32.)

The statute of limitations is an affirmative defense that generally must be pleaded and proved by the defendant.  Niblack v. City of Asbury Park, No. 05-900, 2005 WL 1116056 at *3 (D.N.J. May 11, 2005).  However, a statute of limitations defense may be

20

raised on a motion to dismiss under Rule 12(b)(6), but "only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations. If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (citations and quotations omitted).

The statute of limitations bar is not apparent on the face of the amended complaint, and therefore we will not dismiss Count Eleven on that basis. The amended complaint alleges the defamatory statements were published on April 29, 2002. (Am. Compl. Count Eleven, at ¶ 3.) On this motion to dismiss, we must accept the assertions in the amended complaint as true. We find, for the purposes of this motion only, that the original complaint was filed within the one-year statute of limitations for any alleged defamatory statements published on April 29, 2002.[2]

### 2.   Publication to Third Party

Bovis and Vitetta argue Count Eleven fails to establish a prima facie case of libel or slander because it fails to identify a third party to whom the alleged defamatory statements were made.

---

[2] Bovis suggests D&D disingenuously amended the date of publication alleged in the original complaint to avoid the statute of limitations. (Bovis Br. at 33.) This allegation is better asserted as an affirmative defense and cannot serve as a basis to dismiss on this motion.

(Bovis Br. at 34; Vitetta Br. at 14.)  D&D alleges "through correspondence, public statements, and publications on the Board's website" the defendants published defamatory statements. (Am. Compl. Count Eleven, at ¶ 3.)  D&D, therefore, alleges the defendants made defamatory statements in public and on a publicly-accessible web site.  Bovis and Vitetta fail to provide any legal support for their assertion that D&D must identify a third party with any more particularity than it has done in Count Eleven.  We will not dismiss Count Eleven on this basis.

### 3.   Special-Interest Privilege

Bovis and Vitetta assert the allegedly defamatory statements are privileged under New Jersey's special-interest privilege. (Bovis Br. at 34-37; Vitetta Br. at 14-15.)  "Although a statement may be defamatory, under certain circumstances embodied in the concept of qualified privilege, even defamatory statements will be protected."  Govito v. W. Jersey Health Sys., 753 A.2d 716, 724 (N.J. Super. 2000) (citation and quotations omitted). The special-interest privilege is a "historical, traditional common-law privilege which arises out of a legitimate and reasonable need, in particular situations, for private people to be able freely to express private concerns to a limited and correlatively concerned audience, whether or not those concerns also touch upon the public interest in the broad sense."  Id.

(citation and quotations omitted).  The question of whether a
defamatory statement is privileged is a threshold determination
to be made by a judge rather than a jury.  Id. at 724-25.  The
judge determines "whether the occasion upon which the defendant
published the defamatory matter gives rise to a privilege."  Id.

The content of the allegedly defamatory statements is not
included in the amended complaint, and thus is not before the
Court.  We cannot make the threshold determination of whether the
statements were privileged because at the pleadings stage we do
not have a sufficient record to determine whether the
circumstances of publication give rise to a special-interest
privilege.  Further, assuming arguendo that Bovis and Vitetta may
assert the special-interest privilege, the existence of the
privilege would not be a basis to dismiss.  "The condition or
occurrence of a special-interest privilege, however, is not
absolute.  A plaintiff may overcome this privilege by proving
that the immunized defendant abused its privilege."  Govito, 753
A.2d at 726.  Whether Bovis or Vitetta may have abused any
claimed special-interest privilege is not a question for the
Court to determine on this motion to dismiss:

> A qualified privilege is abused if:  1) the publisher
> knows the statement is false or the publisher acts in
> reckless disregard of its truth or falsity;  2) the
> publication serves a purpose contrary to the interests
> of the qualified privilege;  or 3) the statement is

excessively published.  The privilege will also be
abused if the publisher does not reasonably believe the
matter to be necessary to accomplish the purpose for
which the privilege is given. . . . Abuse of a qualified
privilege must be proven by clear and convincing
evidence.  The jury determines whether the defendant
abused a special-interest privilege.

Id. (citations and quotations omitted.)

The Court cannot determine at this stage in the litigation
whether the allegedly defamatory statements may have given rise
to a special-interest privilege, or whether that privilege may
have been abused.  The Court will not dismiss D&D's defamation
claims on the basis of the special-interest privilege.

G.    Count Twelve

Count Twelve is a claim for conversion.  D&D alleges Bovis
and the Board deprived D&D of property and leaseholds in
equipment, as well as funds owed.  (Am. Compl. at 43.)  Bovis
argues the governing contracts permit Bovis and the Board to
retain possession of certain materials and equipment.  (Bovis Br.
at 39.)  D&D's conversion claim fails as a matter of law, Bovis
argues, because a conversion claim requires the unauthorized
exercise of the right of ownership over the property of another
and the alleged possession was authorized by the governing
contracts.  (Id.)  Bovis further argues that under New Jersey law
an action for conversion of money requires that the money must
have belonged to the plaintiff, and that D&D's claim fails

because the funds at issue did not previously belong to D&D but rather were allegedly owed it pursuant to the contracts. (Id. At 37-38.)  D&D does not oppose these arguments.  (See D&D Opp. Br.)  We find, therefore, that D&D has surrendered its claim of conversion against Bovis and we will dismiss Count Twelve as asserted against Bovis.

## CONCLUSION

The Court, for the reasons stated supra, will grant in part and deny in part the separate motions by Vitetta and Bovis.  The Court will issue an appropriate order and judgment.


    s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

25