**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| D & D ASSOCIATES, INC., | : | CIVIL ACTION NO. 03-1026 (MLC) |
|  | : |  |
| Plaintiff, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| BOARD OF EDUCATION OF NORTH | : |  |
| PLAINFIELD, et al., | : |  |
|  | : |  |
| Defendants. | : |  |

**COOPER, District Judge**

D & D Associates, Inc. ("D&D") commenced this action in 2003 against the Board of Education of North Plainfield ("Board"), Vitetta Group, Inc. ("Vitetta"), Bovis Lend Lease, Inc. ("Bovis"), and Robert C. Epstein ("Epstein").  (Dkt. entry no. 58, Amended Compl.)  D&D alleges, <u>inter alia</u>, (1) federal civil rights violations, (2) violations of the New Jersey Trust Fund Law, N.J.S.A. § 2A:44-148 ("NJTFL"), (3) breach of contract, (4) "errors and omissions", (5) tortious interference with prospective economic advantage, (6) defamation, (7) conversion, (8) fraudulent inducement, (9) civil conspiracy, and (10) malicious abuse of process.  (<u>Id.</u>)[1]

_____

[1] D&D's amended complaint is a "shotgun complaint".  Such complaints "usually create[] a task that can be quite onerous for courts".  <u>Opdycke v. Stout</u>, 233 Fed.Appx. 125, 127 (3d Cir. 2007); <u>see</u> <u>Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellog Corp.</u>, 305 F.3d 1293, 1259 (11th Cir. 2002) (explaining that "[t]he typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its

This Court previously dismissed (1) count 1, count 2, count 6, and count 7 of the amended complaint insofar as asserted against Vitetta, and (2) count 1, count 2, count 3, count 4, count 6, count 7, and count 12 of the amended complaint insofar as asserted against Bovis.  (Dkt. entry no. 87, 9-30-05 Ord. & J.)  Bovis and Vitetta now move separately for summary judgment in their favor on D&D's remaining claims against them, in effect, pursuant to Federal Rule of Civil Procedure ("Rule") 56.  (Dkt. entry nos. 140, 141.)  Similarly, Epstein moves for summary judgment in his favor on all of D&D's claims against him, in effect, pursuant to Rule 56.  (Dkt. entry no. 138.)  Moreover, the Board moves for summary judgment, in effect, pursuant to Rule 56, on count 1, count 2, count 5, count 6, count 7, count 8, count 10, count 11, count 15, and count 16 of the amended complaint insofar as those counts are asserted against it.  (Dkt. entry nos. 143, 196.)[2]

---

predecessors, leading to a situation where most of the counts . . . contain irrelevant factual allegations and legal conclusions . . . [and] the trial court must sift out the irrelevancies, a task that can be quite onerous").

[2] The Court notes that these separate summary judgment motions were (1) adjourned on multiple occasions at the request of the parties, (2) dismissed without prejudice and with leave to renew by letter to afford the parties additional time to prepare responsive briefs.  (See dkt. entry nos. 175, 191, 217, 231, 232, 233, 236, 237; dkt. entry between entry nos. 254 and 255 (noting that oral argument on pending motions for summary judgment adjourned by consent of the parties); dkt. entry between entry nos. 256 and 257 (same).)  Thus, oral argument on these separate motions was not held until nearly one year after the separate motions were originally filed.  (See dkt. entry no. 257.)

For the reasons stated herein, the Court will (1) grant Bovis's motion with respect to count 9 (errors and omissions) and count 15 (civil conspiracy), (2) deny Bovis's motion with respect to count 10 (tortious interference) and count 11 (defamation), (3) grant Vitetta's motion with respect to count 3 (retaliatory termination for exercise of First Amendment rights), count 4 (First Amendment retaliation for seeking redress in federal court), count 9 (errors and omissions), count 11 (defamation), count 13 (fraudulent inducement), count 14 (fraudulent inducement, rescission of performance bonds), and count 15 (civil conspiracy), (4) deny Vitetta's motion with respect to count 10 (tortious interference), (5) grant Epstein's motion with respect to count 1 (civil rights-Fourth Amendment, Fifth Amendment, Fourteenth Amendment seizure of property), count 3 (retaliatory termination for exercise of First Amendment rights), count 4 (First Amendment retaliation for seeking redress in federal court), count 5 (civil rights-intimidation of witness), count 6 (civil rights-illegal garnishment without due process of law), count 7 (quia timet-New Jersey law), count 9 (errors and omissions), count 13 (fraudulent inducement), count 14 (fraudulent inducement-rescission of performance bonds), count 15 (civil conspiracy), and count 16 (malicious abuse of process), (6) deny Epstein's motion with respect to count 2 (liberty interest, destruction of prequalification for public works

3

contracts without due process), count 10 (tortious interference), and count 11 (defamation), (7) grant the Board's motion with respect to count 1 (civil rights-Fourth Amendment, Fifth Amendment, Fourteenth Amendment seizure of property), count 5 (civil rights-intimidation of witness), count 6 (civil rights-illegal garnishment without due process of law), count 7 (quia timet-New Jersey law), count 9 (errors and omissions), count 11 (defamation), count 15 (civil conspiracy), and count 16 (malicious abuse of process), and (8) deny the Board's motion with respect to count 2 (civil rights-liberty interest, destruction of prequalification for public works contracts without due process), count 8 (breach of contract), and count 10 (tortious interference).

**BACKGROUND**

**I.   The Parties**

D&D is a New Jersey corporation with its principal place of business in Jackson, New Jersey.  (Amended Compl., at 1.) Vitetta is a Pennsylvania corporation that performs architectural and design work in connection with public and private construction projects in New Jersey.  (Id.)  Similarly, Bovis is a North Carolina corporation that performs management functions in connection with public and private construction projects in New Jersey.  (Id.)  The Board is a public body with its principal offices in North Plainfield, New Jersey.  (Id.)  Last, Epstein is

an attorney admitted to practice in New Jersey, whose law firm was retained by the Board in connection with certain construction projects.  (<u>Id.</u> at 2-3.)

## II.  Overview of the Board's School Construction Project

The Board, in 2001, requested bids for a $30 million project involving the renovation and expansion of five of its schools ("Project").  (Board Br., at 2.)  The Board retained Epstein's law firm as its counsel in connection with the Project.  (Amended Compl., at 3; D&D's Counter-Stmt. of Facts, at ¶ 4.)  D&D, the lowest bidder for the general construction work, entered into three separate contracts with the Board in connection with this Project: (1) Contract 1A, which covered the East and West End Schools; (2) Contract 1B, which covered Middle High School and the Stoney Brook Schools; and (3) Contract 1C, which covered Somerset Intermediate School.  (Amended Compl., at 3; Board Br., at 2; Bovis Br., at 1; Vitetta Br., at 1; Epstein Br., at 1; <u>see</u> D&D's Counter-Stmt. of Facts, at ¶ 15.)  The contracts were governed by a consolidated Project Manual and General Conditions ("Project Terms & Conditions").  (Amended Compl., at 3; Bovis Br., at 1.)  The contracts required D&D to post performance and payment bonds, which it obtained from American Motorists Insurance Company ("Surety").  (Board Br., at 2.)  The General Indemnity Agreement between D&D and the Surety provides, <u>inter alia</u>, that:

> [i]n the event of a Default, [D&D] do[es] hereby
> assign, transfer and set over to Surety, all of their
> rights under all Bonded Contract(s) including . . . (c)
> all claims and causes of action against any parties to
> the Bonded Contract(s) or against third parties
> relating to the Bonded Contract(s), [and] (d) any sums
> due, or to become due under the Bonded Contract(s) at
> or after the time of such default. . . .

(Dkt. entry nos. 143, 144, Vogt Cert., at ¶ 3; id., Ex. 6,

General Indemnity Agmt., at ¶ 7.)

The Board entered into a contract with Vitetta pursuant to

which Vitetta was to supervise architects and create the

architectural designs for the Project.  (Amended Compl., at 3;

Vitetta Br., at 1 (noting that the Board hired Vitetta as the

architect of record for the Project).)  The Board also entered

into a contract with Bovis pursuant to which Bovis agreed to

perform construction management services in connection with the

Project.  (Amended Compl., at 3; Bovis Br., at 2.)

**III. Overview of Events Underlying this Action**

The Project specifications, which were incorporated into

Contracts 1A, 1B, and 1C between the Board and D&D, required D&D

to provide detailed "critical path method construction schedules"

within a prescribed time period to Bovis, Vitetta, and the other

prime contractors.  (Epstein Br., at 4-5.)  The Board asserts

that D&D defaulted under the Project contracts by failing to

provide the required scheduling information within the prescribed

time period.  (Board Br., at 3; see Bovis Br., at 6 (noting that

"[t]he Project specifications assert that the general

contractor's failure to provide the required scheduling information in a timely fashion constitutes a default under the contract"); Epstein Br., at 5 (same).)

D&D sent a letter to the Board on September 25, 2001 explaining, <u>inter</u> <u>alia</u>, that:

> We are required to submit a 90 day schedule.  We are in the process of working on the schedule but please be aware that this document is going to show substantial delays caused by the architect, with delays in drawings.  Also delays caused by Bovis Lend Lease by informing D&D that there was a verbal for the permits to move the trailers when there is none.  Now there are delays due to the permit issue, whereby there has been three failed inspections on the plumbing waste line at the East End School.

(Dkt. entry nos. 143, 144, Vogt Cert., at ¶ 8; <u>id.</u>, Ex. 8, 9-25-01 Pereira Letter (capitalization omitted).)  Further, D&D sent a letter to Bovis on October 1, 2001 describing initial project delays and noting that it did not issue a 90-day preliminary schedule due to such delays.  (<u>Id.</u>, Ex. 8, 10-1-01 Pereira Letter; <u>see</u> D&D's Counter-Stmt. of Facts, at ¶¶ 28-62 (describing alleged bidding problems that caused Project delays).)  On October 2, 2001, the Board held a meeting with D&D at which (1) the Board agreed to waive the 90-day schedule required by the Project's specifications, and (2) D&D agreed to provide a complete schedule for the Somerset Intermediate School (Contract 1C) on or before October 12, 2001, and schedules for the remaining schools shortly thereafter.  (<u>Id.</u>, Ex. 9, 10-11-01 Epstein Letter.)  Thereafter, Epstein, on behalf of the Board,

sent a letter to D&D stating, _inter alia_, that "D&D's failure to provide [dated] construction schedules constitutes a breach of its contractual obligations", and demanding "that D&D immediately provide the Somerset School schedule and confirm that it will provide _all_ other required schedules by no later than Friday, October 19, 2001." (_Id._ (emphasis in original).)  On October 19, 2001, the Board notified D&D that it was declaring D&D in default pursuant to the Project Terms and Conditions.  (_Id._ at ¶ 5; _id._, Ex. 10, 10-19-01 Epstein Letter.)

D&D, through its counsel, responded to the Board's letters on November 2, 2001.  (Dkt. entry no. 138, Epstein Cert., Ex. 3, 11-2-01 Korzun Letter.)  D&D stated, _inter alia_, that (1) the Board's accusations against D&D and the default notice were unjustified and unfounded, (2) "[t]he need for the time extensions and schedule changes [were] all grounded in the failure of the Board's professionals to provide the contractors (including D&D) with the necessary sealed drawings in a timely fashion so that the Borough's own building department would issue permits for the work to commence", (3) it would be unreasonable for D&D to provide inaccurate, "best-estimate" schedules at this juncture because Bovis and the other contractors are currently attempting to coordinate their schedules to provide the Board with accurate deadlines, (4) there has been a lack of coordination between the Board and Borough personnel, and (5) it

is willing "to act as a conduit and do whatever else [it] can to smooth out and solve the already existing problems, and if possible, prevent new ones from arising." (Id.)  Thus, D&D indicated its intent to continue working with the Board to complete the Project.  (See id.)

The relationship between the parties, however, continued to break down and became more adversarial.  Vitetta sent D&D a letter on February 11, 2002, stating that D&D "is and continues to be in default by reason of its failure to provide conforming schedules" pursuant to the Project specifications, and giving D&D 7 days to rectify the default.  (Dkt. entry nos. 143, 144, Vogt Cert., at ¶ 6; id., Ex. 11, 2-11-02 Johns Letter.)  However, both Vitetta and the Board withdrew their default notices on March 21, 2002 following negotiations among the parties.  (Id. at ¶ 7; see id., Ex. 12, 2-21-02 Epstein Letter.)[3]

Epstein, on behalf of the Board, sent a letter to the Surety on October 22, 2002, explaining that the Project had experienced delays caused principally by D&D, and "[t]he Project architect has recommended that the [Board] withhold from D&D's pending requisitions at least $405,000 to partly cover accrued liquidated damages resulting from D&D's delayed performance."  (Dkt. entry

_____

[3] Vitetta sent D&D a second notice of default on April 29, 2002.  (Id. at ¶ 8; id., Ex. 13, 4-29-02 Myerson Letter.) However, Vitetta also withdrew this default notice after D&D and the Board entered into an "Agreement to Withdraw Default Notice". (Id., Ex. 14, 8-6-02 Myerson Letter.)

no. 138, Epstein Cert., Ex. 6, 10-22-02 Epstein Letter.)  The
Board noted that it was prepared to pay D&D's requisitions
without deducting any liquidated damages, if the Surety agreed
that such payment would not affect the Board's right to proceed
against the bonds.  (Id.; Epstein Br., at 6-7.)  D&D sent a
letter to Epstein on November 20, 2002, (1) acknowledging that
the Board was considering assessing liquidated damages against
it, (2) arguing that Vitetta and Bovis were responsible for the
Project delays, and (3) stating that it would take all necessary
steps to "close down its work at the schools" if the Board
assessed liquidated damages against it.  (Dkt. entry no. 138,
Epstein Cert., Ex. 7, 11-20-02 Korzun Letter.)  Thereafter,
Epstein received a letter from the Surety confirming that it did
not object to the Board paying D&D without deducting liquidated
damages and the bonds would remain in effect after such payments.
(Id., Ex. 8, 12-9-02 Berish Letter.)  Accordingly, the Board paid
D&D's requisitions to avoid further Project delays.  (Epstein
Br., at 7.)

    Vitetta informed the Board in December of 2002 that D&D
still had not complied with the Project specifications and
provided a construction progress schedule and schedule updates
for the Somerset Intermediate School.  (Dkt. entry nos. 143, 144,
Vogt Cert., Ex. 15, 12-3-02 Myerson Letter.)  Specifically,

Vitetta described:

> the continued occurrence of a material breach of the
> contract for construction by D&D at the Somerset
> Intermediate School as of the 10/23/02 schedule update
> prepared by D&D's scheduler.  D&D's schedule updates
> continue to project inaccurate and unrealistic GC
> completion dates for critical path items of work
> required to keep the project moving on a forward basis.
> D&D's schedule updates continue to side durations for
> work items rather than reflect the status of the work
> completed and accurately reflect the remaining
> uncompleted work.

(Id.)  Thereafter, Vitetta, with the Board's authorization,

issued two default notices to D&D stating, inter alia, that D&D

(1) failed to utilize temporary protections and enclosures

necessary to make the Somerset Intermediate School's building

components weather tight, (2) "took no steps to prepare for the

anticipated approval by the Fire Inspector so that the heat could

be turned on immediately after the approvals were given", (3) has

7 days to provide the necessary "Enclosure" and "Heat and

Ventilation" of the building components, and (4) must provide

additional "manpower" in order to provide temporary heat to the

building within the 7 day period.  (Id. at ¶ 10; id., Ex. 16, 1-

27-03 Myerson Fax to Pereira, at 1-2; id., Ex. 16, 1-30-03

Myerson Fax to Pereira, at 2.)

Epstein, on behalf of the Board, informed D&D, its counsel,

and the Surety on February 11, 2003, that the Board intended to

terminate D&D's employment as general contractor under Contract

1C in 7 days based on certifications from Vitetta and Bovis that

11

D&D was in material breach of such contract.  (Id. at ¶ 12; id.,
Ex. 17, 2-11-03 Epstein Letter.)  However, the Board noted that
"[t]ermination may be avoided if, no later than seven days from
receipt of this notice, D&D and/or the Surety furnish to the
Board a plan, which is acceptable to the Board, for curing D&D's
existing defaults and breaches and completing [Contract 1C, the
Somerset Intermediate School]".  (Id., Ex. 17, 2-11-03 Epstein
Letter.)  In response, D&D and its counsel sent letters to the
Board and Vitetta in February 2003 that, inter alia, (1) assert
that D&D was not the cause of any Project delays and was not
responsible for paying liquidated damages, (2) note that when
D&D's employees arrived at the Project site on February 11, 2003
they were informed that D&D had been terminated, and (3) assert
that the Board committed an anticipatory breach, and thus, the
Surety's insurance bond is void.  (Dkt. entry no. 138, Epstein
Cert., Ex. 12, 2-11-03 Pereira Letter to the Board, 2-11-03
Pereira Letter to Vitetta, 2-11-03 Korzun Letter, & 2-13-03
Korzun Letter.)

     The Board, after meeting with D&D on February 20, 2003,
agreed to defer considering whether to terminate D&D until
February 28, 2003 "to allow the parties to address a possible
resolution of D&D's defaults."  (Dkt. entry nos. 143, 144, Vogt
Cert., Ex. 18, 3-4-03 Epstein Letter.)  Also, Epstein, Vitetta,
and Bovis informed D&D in written correspondence that it was not

terminated or barred from the Project site.  (Id.)  Nevertheless, the parties were unable to resolve their disputes, and thus, on March 4, 2003 (1) D&D sent a letter to Vitetta stating that it was abandoning Contract 1C, the Somerset Intermediate School project, (2) the Board terminated D&D's employment as general contractor on Contract 1C pursuant to the Project Terms and Conditions, (3) the Board informed D&D that it no longer had access to the Somerset Intermediate School project site, took possession of the site and all materials and equipment located there, and demanded that D&D immediately turn over all materials and supplies not located at the site that were purchased in connection with Contract 1C, and (4) the Board demanded that the Surety immediately take over and complete Contract 1C.  (Id.)

The Surety and the Board entered into an agreement on May 15, 2003, pursuant to which the Surety agreed, inter alia, that it would take over the work to be performed under Contract 1C and arrange "for the substantial completion of [the work at the Somerset Intermediate School project site] no later than December 12, 2003 and final completion of the [w]ork no later than January 15, 2004, time being of the essence."  (Id., Ex. 19, Surety Takeover Agmt., at 1-2 & ¶ 1.)  The Surety represented and warranted that it was subrogated to and had been assigned (1) D&D's rights in and to the remaining unpaid balance of the original contract sum, and (2) "other funds due or to become due

13

to D&D in connection with [Contract 1C]."  (Id. at ¶¶ 3-4.) The
Surety retained D&D as its completion subcontractor, and D&D
agreed to fully perform and complete all remaining work under
Contract 1C.  (Id., Ex. 20, Completion Agmt., at 1-2 & ¶ 1.)

Epstein, on behalf of the Board, informed D&D, its counsel,
and the Surety on July 11, 2003, that the Board intended to
terminate D&D's employment as general contractor on the two
remaining Project contracts, Contracts 1A and 1B, in 7 days.
(Id. at ¶ 17; id., Ex. 23, 7-11-03 Epstein Letter.)  Epstein
noted that both Vitetta and Bovis had submitted certifications to
the Board that (1) stated that D&D was in material default under
the two remaining Project contracts, (2) specified D&D's
defaults, and (3) advised the Board that sufficient grounds
existed to terminate D&D "for cause" with respect to the
contracts at issue.  (Id., Ex. 23, 7-11-03 Epstein Letter.)
Thereafter, on July 23, 2003, Epstein, on behalf of the Board,
informed D&D that it was terminated with respect to Contracts 1A
and 1B, effective immediately.  (Id., Ex. 24, 7-23-03 Epstein
Letter.)  Epstein also informed D&D that it no longer had access
to the applicable  construction sites, and demanded that the
Surety immediately take over and complete the work to be
performed under Contracts 1A and 1B.  (Id.)

The Surety and the Board entered into two separate
agreements on May 19, 2004, pursuant to which the Surety agreed,

14

inter alia, that it would take over the work to be performed under Contracts 1A and 1B, and arrange "for the substantial completion of [such work] no later than July 15, 2004 and final completion of the [w]ork no later than August 15, 2004, time being of the essence."  (Id., Ex. 25, 1st 5-19-04 Surety Takeover Agmt. (Contract 1A), at 1-2 & ¶ 1; Id., Ex. 26, 2d 5-19-04 Surety Takeover Agmt. (Contract 1B), at 1-2 & ¶ 1.)  The Surety represented and warranted that it was subrogated to and had been assigned (1) D&D's rights in and to the remaining unpaid balance of the original contract sums, and (2) "other funds due or to become due to D&D in connection with the [contracts]."  (Id. at ¶¶ 3-4.)

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The movant bears the initial burden of showing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has met this prima facie burden, the non-movant must "set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).  A non-movant must present actual evidence that raises

15

a genuine issue of material fact and may not rely on mere allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original).  A fact is material only if it might affect the action's outcome under governing law.  Id. at 248.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## II.   Summary Judgment Standard Applied Here

### A.   Count 1

Count 1, which is alleged against all of the defendants, is for "Civil Rights -Fourth Amendment, Fifth Amendment, Fourteenth Amendment Seizure of Property". (Amended Compl., at 3.)[4]  In this count, D&D alleges, inter alia, that (1) on the morning of February 11, 2003, Bovis informed D&D's employees and subcontractors that D&D had been terminated with respect to the

---

[4] The Fourth Amendment protects persons, houses, papers, and effects from being unreasonably searched or seized, and requires probable cause before the issuance of a warrant. Texas v. Brown, 460 U.S. 730, 735 (1983).  However, the Fourth Amendment does permit certain intrusions that are "less severe than full-scale searches or seizures without the necessity of a warrant." Id. at 736.  "[A] Fourth Amendment seizure [occurs] ... when there is a governmental termination of freedom of movement through means intentionally applied." Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989).  After reviewing count 1, the Court finds that it does not assert any claim under the Fourth Amendment.  Instead, we believe count 1 asserts due process violations, which are not governed by the Fourth Amendment.  Also, the Fifth Amendment provides, inter alia, that no person "shall be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V.  "The limitations of the [F]ifth [A]mendment restrict only federal governmental action. . . ." Nguyen v. U.S. Cath. Conf., 719 F.2d 52, 54 (3d Cir. 1983).  Accordingly, the rights provided by the Fifth Amendment do not apply to the actions of state and municipal officials such as the Board.  Leventry v. Watts, No. 06-193, 2007 U.S. Dist. LEXIS 36256, at *7 (W.D. Pa. May 17, 2007) ("[T]he Fifth Amendment restricts the actions of federal officials, not state actors."); Kopchinski v. Green, No. 05-6695, 2006 U.S. Dist. LEXIS 53790, at *2-*3 (E.D. Pa. Aug. 2, 2006) (finding that because defendants were state actors, plaintiff's Fifth Amendment claims could not survive summary judgment).  Thus, the Court concludes that the Fourth and Fifth Amendments are not applicable to D&D's claims in count 1.  To the extent D&D asserts an equal protection violation in count 1, such claim is properly analyzed under the Fourteenth Amendment.

Somerset Intermediate School project, Contract 1C; (2) "the Board commandeered D&D's trailer" and seized materials without compensating D&D for such materials, (3) after locking D&D out of the Somerset Intermediate School project site, "defendants without any warrant seized D&D's business records and job files, which were kept in [its] trailer", (4) on March 5, 2003, "in written correspondence from Epstein, the Board wrongfully terminated D&D from the Somerset Project", and (5) D&D was not terminated according to the procedures set forth in the applicable contracts and was terminated without proper cause. (Id. at 15-17.)  Thus, D&D contends that the "seizure of [its] equipment, trailer, and records with the use of official police personnel without notice and an opportunity to be heard and, otherwise, without due process of law" deprived D&D of its property interests in violation of 42 U.S.C. § ("Section") 1983, and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. (Id. at 18-19 (count 1, ¶¶ 100-102).)

A plaintiff asserting civil rights violations under Section 1983 must establish that the defendant acted under color of state law to cause a deprivation of a right secured by the United States Constitution or the laws of the United States.  Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  Section 1983 does not create substantive rights, but instead provides a remedy for the violation of rights created by other federal laws.  Id.;

18

Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  For a

Section 1983 claim to survive a motion for summary judgment,

there must be a genuine issue of fact as to whether the defendant

(1) acted under color of state law, or (2) deprived the plaintiff

of a federal right.  Groman, 47 F.3d at 633.  "The color of state

law element is a threshold issue; there is no liability under

[Section] 1983 for those not acting under color of law."  Id. at

638.  The Board and Epstein, the only defendants remaining in

count 1, were acting under the color of state law at all times

relevant to the complaint.  Once it has been established that the

defendant acted under color of state law, the Court must identify

the federal right the defendant allegedly violated.  See id. at

633.

     The Due Process Clause of the Fourteenth Amendment provides,

"nor shall any State deprive any person of life, liberty, or

property, without due process of law."  U.S. Const. amend. XIV.

The Due Process Clause protects individuals against two types of

government action.

> So-called "substantive due process" prevents the
> government from engaging in conduct that "shocks the
> conscience," or interferes with rights "implicit in the
> concept of ordered liberty".  When government action
> depriving a person of life, liberty, or property
> survives substantive due process scrutiny, it must
> still be implemented in a fair manner.  This
> requirement has traditionally been referred to as
> procedural due process.

United States v. Salerno, 481 U.S. 739, 746 (1987) (internal

cites omitted) (discussing Fifth Amendment's due process clause, which contains identical language).  To prevail on a substantive due process claim, the plaintiff must be shown to have a "fundamental" property interest or right under the United States Constitution.  Hill v. Bor. of Kutztown, 455 F.3d 225, 235 (3d Cir. 2006).  In analyzing a procedural due process claim, the Court must first determine whether the plaintiff was deprived of a liberty or property interest protected by due process.  Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982); see Atkins v. Parker, 472 U.S. 115, 128 (1985).  The Court, after concluding that the plaintiff was deprived of a liberty or property interest, must determine what process is necessary.  Logan, 455 U.S. at 428; see Atkins, 472 U.S. at 128.

To the extent D&D asserts a substantive due process claim against the defendants, the Court finds that such claim fails because D&D has not alleged or shown conduct by the defendants that was so egregious that it "shocks the conscience" of the Court or "interferes with rights implicit in the concept of ordered liberty."  See Salerno, 481 U.S. at 746.  Moreover, this Court also finds that D&D does not have a viable procedural due process claim against the defendants because it has not demonstrated that it has any property interest protected by due process.

20

Although a contract with a state entity may give rise to a
property right protected under the Fourteenth Amendment, not
every state contract gives rise to such a right. <u>Linan-Faye</u>
<u>Constr. Co. v. Hous. Auth.</u>, 49 F.3d 915, 931-32 (3d Cir. 1995).
Two general types of contract rights are recognized as property
protected by the Fourteenth Amendment:

> (1) where the contract confers a protected status, such
> as those characterized by a quality of either extreme
> dependence in the case of welfare benefits, or
> permanence in the case of tenure, or sometimes both, as
> frequently occurs in the case of social security
> benefits; or (2) where the contract itself includes a
> provision that the state entity can terminate the
> contract only for cause.

<u>Id.</u> at 932 (citation and internal quotations omitted).  However:

> if every breach of contract by someone acting under
> color of state law constituted a deprivation of
> property for procedural due process purposes, the
> federal courts would be called upon to pass judgment on
> the procedural fairness of the processing of a myriad
> of contract claims against public entities. . . .
> [S]uch a wholesale federalization of state public
> contract law seems far afield from the great purposes
> of the due process clause.

<u>Id.</u> (citations and quotations omitted).

This Court, in a memorandum opinion filed on September 30,
2005 ("9-30-05 Memorandum Opinion"), previously determined that
D&D's contracts with the Board do not fall into either of the
<u>Linan-Faye</u> categories because they neither "confer protection on
D&D characterized by either extreme dependence or permanence, as
they are for a single group of public works projects", nor
provide that the Board can only terminate it for cause.  (Dkt.

entry no. 86, 9-30-05 Mem. Op., at 10.)  Thus, the Court held
that "D&D's contracts with the Board do not give rise to a
protected property interest either in the contracts or in the
materials, trailer, and records held by D&D pursuant to the
contracts."  (Id.)  The Court noted that addressing the
requirements of due process or equal protection under the
Fourteenth Amendment was unnecessary because D&D had not
demonstrated that the contracts between it and the Board
constituted property interests protected by the Fourteenth
Amendment.  (Id.)

The analysis set forth in the 9-30-05 Memorandum Opinion
with respect to count 1 pertains equally to all of the
defendants.  Therefore, the Court finds that summary judgment in
favor of Epstein and the Board is appropriate on count 1 of the
amended complaint.[5]

**B.  Count Two**

D&D, in count two, also alleges civil rights violations
against all of the defendants.  (Amended Compl., at 20.)
Specifically, count 2 is for "Civil Rights - Liberty Interest,
Destruction of Prequalification for Public Works Contracts
Without Due Process".  (Id.)  In this count, D&D alleges that (1)
it was prequalified to serve as a general contractor for the New

---

[5] The Court acknowledges that we previously dismissed count
1 of the amended complaint insofar as asserted against Bovis and
Vitetta.  (Dkt. entry no. 87, 9-30-05 Ord. & J.)

Jersey Economic Development Authority ("NJEDA"), (2) the default letters Epstein and the Board sent to D&D interfered with D&D's bonding capacity and its ability to bid on public works projects, and (3) "the Board through its representatives, including Bovis and Vitetta, falsely and willfully published statements to the effect that D&D was performing its work in a sloppy and incomplete manner, was leaving work unfinished, . . . performed defective work", and abandoned the Project.  (Id. at 21-23.)

D&D contends that the defendants' conduct deprived it of certain liberty interests, including its prequalification status for public works contracts, good reputation, and vested interest in its right to bid on public works projects.  (Id. at 23-24.) Thus, D&D contends that the defendants violated its rights under Section 1983 and the Fifth and Fourteenth Amendments.  (Id.)[6]  As noted above, the Board and Epstein, the only defendants' remaining in count 2, were acting under color of state law at all times relevant to the amended complaint.  Accordingly, the Court will analyze whether either the Board or Epstein deprived D&D of its rights under the Fourteenth Amendment in violation of Section 1983.  See Groman, 47 F.3d at 633.

---

[6] As noted above, the Fifth Amendment does not apply to the actions of the Board and Epstein.  Leventry, 2007 U.S. Dist. LEXIS 36256, at *7; Kopchinski, 2006 U.S. Dist. LEXIS 53790, at *2-*3.  Thus, the Court will analyze D&D's due process claims in count two under the Fourteenth Amendment only.

This Court, in the 9-30-05 Memorandum Opinion, concluded, with respect to count 2 that (1) "impairment of employment opportunities does not imbue a claim based on injury to one's reputation with a constitutional element", and (2) D&D's financial loss associated with the alleged injury to its bonding capacity is not constitutionally protected.  (Dkt. entry no. 86, 9-30-05 Mem. Op., at 11.)  Further, the Court noted that reputation alone is not a liberty or property interest protected by the Fourteenth Amendment. See id.  However, stigma to reputation does implicate a liberty interest if it is accompanied by deprivation of some additional right or interest. Hill, 455 F.3d at 236 (describing "stigma-plus test", which applies when an employer disseminates a defamatory impression about an employee in connection with the employee's termination).  The additional right or interest may be job termination even if the employee did not have a protected property interest in such job. Id. at 238.

D&D asserts that its reputation was stigmatized when the defendants (1) told the Surety that D&D was in default without following the procedures for issuance of default set forth in the contracts, (2) "publicized the lockout of D&D and its termination by notifying the police in advance of the termination", and (3) published statements on the Board's website stating that D&D had been terminated for delaying the Project and that D&D had abandoned the Project.  (D&D 3rd Br., at 5-6 (emphasis in

original).)[7]   Moreover, D&D alleges that these statements and accusations were false and damaged its good reputation as a general contractor.  (See Amended Compl., at 22-23.)  Thus, it adequately alleges the "stigma prong" under Hill.  Also, D&D also has alleged deprivations that are sufficiently "weighty" to satisfy the "plus prong" of Hill.  See Hill, 455 F.3d at 238 (citing cases where deprivation to plaintiff along with the stigma was not sufficiently "weighty" to satisfy the "plus prong").  Specifically, D&D contends that the damage to its reputation was accompanied by its termination from the Project contracts and loss of prequalification status with the NJEDA, bonding capacity, and overall ability to bid on other public works contracts.  (See Amended Compl., at 22-23.)

    Viewing the evidence in the light most favorable to D&D, we find that D&D has sufficiently alleged that it has a protected liberty interest in its reputation under the Fourteenth Amendment, and that Epstein and the Board interfered with this interest.  Thus, if D&D can prove its allegations, it is entitled to a name-clearing hearing under Hill.  See Hill, 455 F.3d at

---

    [7] D&D filed four briefs in opposition to the defendants'
separate motions for summary judgment.  Each brief addresses
arguments made by multiple defendants.  In other words, D&D did
not respond to each motion for summary judgment separately.

239.  Accordingly, the Court will deny Epstein and the Board's separate motions for summary judgment with respect to count 2.[8]

### C.   Count 3 and Count 4

D&D, in count 3, alleges that Epstein, Vitetta, and the Board issued the default letters and subsequently terminated D&D because it (1) refused to falsely state that the Project was on schedule, (2) stated that the defendants caused the Project delays, (3) requested extensions of time and compensation, and (4) "attempt[ed] to meet with other prime contractors affected by the defendants' improper actions to form a coordinated attempt to seek scheduling adjustments and other redresses."  (Amended Compl., at 24.)  D&D contends that the defendants' retaliatory conduct violated its rights under the First Amendment and Section 1983.  (Id. at 24-25.)  Similarly, D&D contends in count 4 that the Board, Vitetta, and Epstein retaliated against it for seeking redress in federal court in violation of Section 1983, Section 1985, and the First Amendment.  (Id. at 25.)[9]  Specifically, D&D

---

[8] The Court notes that Hill was decided following the issuance of the 9-30-05 Memorandum Opinion and corresponding Order.  Thus, in light of this decision and our analysis above, we intend to grant D&D leave to move to reinstate count 2 insofar as asserted against Bovis and Vitetta.  However, the Court notes that D&D must establish that Vitetta and Bovis acted under color of state law at all times relevant to count 2 in order to state a claim under Section 1983.  The Court acknowledges that we did not address this issue in the 9-30-05 Memorandum Opinion.

[9] The Court cannot determine what relevance the first and third provisions of Section 1985 have to the factual allegations set forth in count 4 of the amended complaint. See 42 U.S.C. §

alleges that (1) it was still the general contractor on Contracts 1A and 1B on the date it filed the complaint, (2) the defendants admitted that these schools were substantially completed, (3) the Board, Vitetta, and Epstein sent D&D letters stating that it was terminated from Contracts 1A and 1B "in direct retaliation for D&D's commencement of the instant litigation, for filing opposition to defendants' motions to dismiss and for summary

---

1985(1) (prohibiting two or more persons from conspiring to prevent an officer of the United States from performing duties); 42 U.S.C. § 1985(3) (prohibiting two or more persons from conspiring to deprive a person of a right or privilege due to racial animus); Friends & Residents of St. Thomas Twp., Inc. v. St. Thomas Dev., Inc., 176 Fed.Appx. 219, 228 (3d Cir. 2006) (noting that to state a claim under Section 1985(3), the plaintiff must allege (1) a conspiracy between two or more persons, (2) motivated by a racial animus and designed to deprive a person of the equal protection of the laws, (3) an act in furtherance of the conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege). Further, the first clause of Section 1985(2) is inapplicable because D&D has not alleged that any of the defendants prevented or deterred it from physically attending or otherwise presenting testimony in a federal action. See 42 U.S.C. § 1985(2) (prohibiting, inter alia, two or more persons from conspiring to deter by force or intimidation a party or witness from attending or testifying in federal court); Sheehan v. Mellon Bank, N.A., No. 95-2589, 1995 U.S. Dist. Lexis 13457, at *5-*6 (E.D. Pa. Sept. 13, 1995). The second clause of Section 1985(2) is also inapplicable because D&D has not alleged that any of the defendants had any discriminatory or race-based animus. See 42 U.S.C. § 1985(2) (prohibiting, inter alia, two or more persons from conspiring to impede or hinder justice in any state "with intent to deny to any citizen the equal protection of the laws"); Parrott v. Abramsen, 200 Fed.Appx. 163, 165 (3d Cir. 2006) (explaining that the plaintiff, in order to state an "obstruction of justice/access to the courts" claim under Section 1985(2)-(3), must allege that racial or other class-based discriminatory animus underlay the defendant's actions); Sheehan, 1995 U.S. Dist. Lexis 13457, at *6. Thus, the Court believes count 4 is properly analyzed only under Section 1983 and the First Amendment.

judgment in the instant matter, and for proposing to seek a court order for relief, with respect to the [defendants'] refusal to release trust funds" to D&D.  (Id. at 25-26.)

The First Amendment protects a public employee's right to speak as a citizen on matters of public concern under certain circumstances.  Garcetti v. Ceballos, 126 S.Ct. 1951, 1957 (2006).  However, "[a] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."  Id. at 1958.  Accordingly, while the First Amendment prevents public employers from restricting the liberties enjoyed by their employees as private citizens, it does not empower such employees to "constitutionalize the employee grievance."  Id. at 1958-59.

Section 1983 provides for a cause of action when a state actor retaliates against an individual for participating or engaging in conduct protected by the First Amendment.  See Bradshaw v. Twp. of Middletown, 145 Fed.Appx. 763, 766-67 (3d Cir. 2005).  To state a First Amendment retaliation claim, the plaintiff must allege that (1) the plaintiff's conduct was protected by the First Amendment because it addressed a matter of public concern, (2) the plaintiff was retaliated against, and (3) the retaliation was a substantial or motivating factor in the alleged retaliation.  Id. at 767; see Ober v. Brown, 105 Fed.Appx.

28

345, 346-47 (3d Cir. 2004) (explaining that to prevail on a First Amendment retaliation claim the plaintiff must establish that (1) the plaintiff engaged in protected activity, (2) the defendants retaliated in response to the activity, and (3) the defendants could not rebut the claim by showing that they would have taken the same action in the absence of the protected speech).

The employer can rebut the plaintiff's claim by demonstrating that it would have made the same decision absent the protected conduct.  Bradshaw, 145 Fed.Appx. at 767.  A plaintiff's conduct is protected by the First Amendment when it is about a matter of public concern and the employer does not have a justification for treating the employee differently than other members of the general public.  Muzslay v. City of Ocean City, Nos. 05-1335 & 05-1429, 2007 U.S. App. LEXIS 7311, at *7 (3d Cir. Mar. 29, 2007); see Fogarty v. Boles, 121 F.3d 866, 888 (3d Cir. 1997).  This analytical framework, which essentially involves balancing the employee's interests against the government's interests, accommodates the differences between regular employees and independent contractors.  Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 678 (1996).  There is no "difference of constitutional magnitude" between employees and independent contractors in the First Amendment context, and thus, "the same form of balancing analysis should apply to each."  Id. at 684-85 (stating that in order to prevail, the plaintiff

contractor needed to show that the termination of his contract was motivated by his speech on a matter of public concern).

Speech pertains to a matter of public concern if the speech "can be fairly considered as relating to any matter of political, social or other concern to the community." Costello v. City of Brigantine, No. 99-4072, 2001 U.S. Dist. LEXIS 8687, at *63 (D.N.J. June 28, 2001); see Muzslay, 2007 U.S. App. LEXIS 7311, at *7.  Moreover, there can be no cognizable First Amendment claim under Section 1983 in the absence of speech.  Fogarty, 121 F.3d at 890-91 (concluding that the absence of speech was fatal to the plaintiff's claim).  This is true even if the employer discharges the employee based on substantively incorrect information about whether protected statements were made.  See id. at 890.  The Court determines as a matter of law if an activity constitutes protected speech.  However, whether the retaliatory action of the defendant "reached the threshold of actionability under § 1983" is a factual question for the trier of fact.  Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000).

Vitetta and Epstein separately move for summary judgment in their favor on count 3 and count 4 of the amended complaint. (See dkt. entry nos. 138, 141.)  The Court finds that both Vitetta and Epstein are entitled to summary judgment in their favor with respect to count 3 and count 4 because D&D has not shown that it engaged in any conduct protected by the First

Amendment.  See Ober, 105 Fed.Appx. at 346-47 (explaining that to
prevail on a First Amendment retaliation claim the plaintiff must
establish, inter alia, that he or she engaged in protected
activity).  First, neither D&D's alleged refusal to falsely state
that the Project was on schedule, nor its attempts "to meet" with
other contractors affected by the defendants' alleged misconduct
to "form a coordinated attempt to seek scheduling adjustments and
other redresses" involve speech.  (See Amended Compl., at 24.)
Accordingly, this conduct is not protected by the First
Amendment.  See Fogarty, 121 F.3d at 890-91 (concluding that the
absence of speech was fatal to the plaintiff's claim).

        D&D's requests for time extensions and compensation, and its
statements that the defendants caused all Project delays are also
not protected because such statements do not address matters of
public concern.  Instead, such statements pertained solely to
D&D's own employment situation and circumstances surrounding its
contracts with the Board.  See Muzslay, 2007 U.S. App. LEXIS
7311, at *8 (agreeing with the district court that the
plaintiff's objections regarding the abrogation of his authority
involved only his personal employment situation, and thus, were
not protected by the First Amendment).  Although the community
has an interest in having its public schools renovated and
expanded in a proper and efficient manner, D&D's requests for
compensation or additional time to complete portions of the

Project, and assertions that other parties are causing Project
delays, relate specifically to D&D's employment and its
relationship with the other contractors, not the Project in
general.  These statements were (1) not intended for the public
to hear but were directed only to the defendants, (2) merely
requests that would benefit only D&D if granted or defenses to
accusations that D&D was delaying the project, which would
benefit only D&D if accepted, and (3) not related to any
political, social, or other concern of interest to the community.
See Costello, 2001 U.S. Dist. LEXIS 8687, at *63.  Thus, the
Court concludes that they were not statements about matters of
public concern deserving First Amendment protection.

D&D's commencement of this action, allegations in the
complaint, and statements in its briefs in opposition to the
defendants' various motions to dismiss and motions for summary
judgment also do not constitute matters of substantial public
concern.  See Sobel v. Marcocci, No. 87-1965, 1988 U.S. Dist.
LEXIS 10163, at *7-*8 (E.D. Pa. 1988) (concluding that neither
plaintiffs allegations against one of the defendants in a
previously filed defamation complaint, nor the actual filing of
the previous complaint constituted speech on a matter of public
concern).  D&D's statements and conduct in this action do not
relate to any matter of political, social, or other concern to
the community, but instead relate to matters of personal interest

32

to D&D and address the individual circumstances of its termination from the Project.  See id.  Such circumstances do not invoke any subject involving the defendants that can be characterized as a matter of public concern.  Therefore, because D&D has not pointed to any speech protected by the First Amendment, summary judgment is appropriate on its First Amendment retaliation claims insofar as such claims are asserted against Epstein and Vitetta.

**D.   Count 5**

D&D alleges that James Hanick, a Bovis employee, prepared a report admitting that D&D was substantially performing its work at the East End and West End Schools and was not the cause of Project delays.  (Amended Compl., at 27.)  D&D further alleges that (1) Epstein stated that he intends to object to production of this report, and (2) Epstein and the Board's superintendent confronted Earl Hawley, a Bovis employee, and demanded to know how D&D learned about this report, emails Hawley sent to the Board, and other documents supporting D&D's contentions.  (Id.)  Thus, D&D contends in count 5 that Epstein and the Board acted in concert "to prevent and deter, by force, and intimidation, or threat, Hawley from testifying fully and truthfully in this case" in violation of Section 1985.  (Id. at 27-28.)

Section 1985(1), Section 1985(3), and the second clause of Section 1985(2) have no relevance to the factual allegations set forth in count 5 of the amended complaint.  Specifically, D&D has

33

not alleged that Epstein and the Board conspired to (1) prevent
an officer of the United States from performing duties, (2)
deprive a person of a right or privilege due to racial animus, or
(3) impede or hinder justice in any state with a discriminatory
or other class-based animus.  See 42 U.S.C. §§ 1985(1)-(3);
Griffin v. Breckinridge, 403 U.S. 88, 102 (1971) (stating that
Section 1985(3) requires the plaintiff to show that the defendant
had some kind of invidiously discriminatory motivation); Friends
& Residents of St. Thomas Twp., Inc., 176 Fed.Appx. at 228
(noting that to state a claim under Section 1985(3), the
plaintiff must allege (1) a conspiracy between two or more
persons, (2) motivated by a racial animus and designed to deprive
a person of the equal protection of the laws, (3) an act in
furtherance of the conspiracy, and (4) an injury to person or
property or a deprivation of a right or privilege); Parrott, 200
Fed.Appx. at 165 (explaining that in order for the plaintiff to
state an "obstruction of justice/access to the courts" claim
under Section 1985(2)-(3), the plaintiff must allege that racial
or other class-based discriminatory animus underlay the
defendant's actions).  Thus, D&D's allegations in count 5 of the
amended complaint fall under the first clause of Section 1985(2).

Section 1985(2) provides, in relevant part:

If two or more persons in any State or Territory
conspire to deter, by force, intimidation, or threat,
any party or witness in any court of the United States
from attending such court, or from testifying to any

34

> matter pending therein, freely, fully, and truthfully,
> or to injure such party or witness in his person or
> property on account of his having so attended or
> testified . . . .

42 U.S.C. § 1985(2).  This statute is intended to protect

potential witnesses and jurors, as well as parties to the

litigation.  Heffernan v. Hunter, 189 F.3d 405, 410-11 (3d Cir.

1999).  To establish a claim under Section 1985(2), a plaintiff

must show "(1) a conspiracy between two or more persons (2) to

deter a witness by force, intimidation or threat from attending

court or testifying freely in a matter, which (3) results in

injury to the plaintiff[]."  McGovern v. Jersey City, No. 98-

5186, 2005 U.S. Dist. LEXIS 38644, at *48 (D.N.J. Jan. 6, 2006).

D&D asserts that Epstein engaged in the conspiracy to

intimidate and harass Hawley by (1) calling Hawley to discuss how

D&D obtained a copy of an email from Bovis to Epstein, Vitetta,

and the Board, and (2) drafting an affidavit for Hawley to sign,

which stated that "he had told Epstein and the Superintendent

that he had not voluntarily given the email to D&D."  (Dkt. entry

no. 238, D&D Counter-Stmt. of Facts, at ¶¶ 135-140.)  D&D notes

that at his deposition, Hawley claimed he was unable to recall

what happened with respect to that email.  (Id. at ¶ 140.)  Thus,

D&D argues that a jury could conclude that the Board's

superintendent and Epstein successfully intimidated Hawley from

testifying truthfully in support of D&D's claims.  (Id. at ¶

141.)

Actions taken by an attorney while acting within the scope of the attorney-client relationship are not susceptible to characterization as a conspiracy under Section 1985.  Heffernan, 189 F.3d at 413.  "The challenged activity may violate the canons of ethics, but so long as it is within the scope of representation, it does not eliminate the exemption from a conspiracy charge under [Section] 1985."  Id. (concluding that attorney's statements on camera and information he revealed in press releases was obviously aimed at discrediting a witness, but because he was acting within scope of his representation, his activities could not be characterized as conspiracy).  Here, Epstein was acting within the scope of his representation of the Board when he called Hawley to discuss the email D&D obtained and drafted the Hawley affidavit.  Thus, regardless of whether Epstein's conduct was appropriate under the circumstances or Hawley felt intimidated by Epstein, Epstein's actions are exempted from a conspiracy charge under Section 1985.  See Heffernan, 189 F.3d at 413.  Therefore, summary judgment is appropriate in favor of Epstein and the Board on D&D's witness intimidation claim under Section 1985(2) because D&D cannot establish any conspiracy between two or more persons.

**E.   Count 6**

Count 6 of the complaint is entitled "Illegal Garnishment Without Due Process of Law".  (Amended Compl., at 28.)  In this

count, D&D alleges, <u>inter alia</u>, that the defendants have (1)
refused to release funds to satisfy the lawful claims of the
laborers, subcontractors, and suppliers that D&D hired in
connection with the Project and in violation of the NJTFL, (2)
"determined to keep materials, equipment and leased items, which
D&D caused to be placed [on-site at the various schools], without
either paying for them or allowing D&D and/or its suppliers and
subcontractors access to remove them", (3) garnished funds owed
to D&D by assessing liquidated damages, and (4) "seized funds
under their claimed garnishment theory without any due process of
law". (<u>Id.</u> at 28-30.)

      The Court, as discussed in more detail <u>supra</u>, has already
determined that D&D does not have a constitutionally protected
property interest in either the materials purchased in connection
with the Project or receiving payments pursuant to the Project
contracts. (<u>See </u>dkt. entry no. 86, 9-30-05 Mem. Op., at 16.)
Thus, Epstein and the Board are entitled to summary judgment in
their favor on count 6 to the extent it asserts due process
claims.[10] Moreover, to the extent that count 6 attempts to
assert a claim under the NJTFL, such claim will be analyzed under
count 7, which is entitled "Quia Timet-New Jersey Law" and
contains paragraphs essentially alleging a NJTFL violation that

_____

      [10] The Court previously dismissed count 6 insofar as
asserted against Bovis and Epstein. (<u>See</u> dkt. entry no. 86, 9-
30-05 Mem. Op., at 16; dkt. entry no. 87, 9-30-05 Ord. & J.)

are identical to paragraphs contained in count 6.  (<u>Compare</u>
Amended Compl., count 6, at §§ 2-7 <u>with</u> <u>id.</u>, count 7, at §§ 2-7.)
D&D does not allege that the defendants violated any other state
or federal law in count 6.  (<u>See</u> D&D 1st Br., at 27-30
(discussing only the NJTFL in connection with count 6 of the
complaint).  Accordingly, the Court will grant summary judgment
in favor of Epstein and the Board on count 6 of the amended
complaint.

**F.   Count 7**

Count 7, which is asserted against all defendants, is
entitled "Quia Timet—New Jersey Law".  (Amended Compl., at 32.)
The only "New Jersey law" referenced in count 7 is the NJTFL,
which provides:

> All money paid by the state of New Jersey or by any
> agency, commission or department thereof, or by any
> county, municipality or school district in the state,
> to any person pursuant to the provisions of any
> contract for any public improvement made between any
> such person and the state or any agency, commission or
> department thereof, or any county, municipality or
> school district in the state, shall constitute a trust
> fund in the hands of such person as such contractor,
> until all claims for labor, materials and other charges
> incurred in connection with the performance of such
> contract shall have been fully paid.

N.J.S.A. § 2A:44-148.  This provision protects parties who
provide labor and materials necessary for an independent
contractor to fulfill its obligations under a contract with a
government entity.  <u>Titan Stone, Tile & Masonry, Inc. v. Hunt
Constr. Group, Inc.</u>, No. 05-3362, 2007 U.S. Dist. LEXIS 19489, at

38

*36 (D.N.J. March 20, 2007).  Thus, when a government entity pays money to a public contractor, a trust fund is created for the benefit of such contractor's laborers and materialmen.  Id.  D&D, however, was not a laborer or materialman seeking payment from the general contractor of money held in trust for its benefit. Instead, D&D was the general contractor on the Project, and thus, all payments it received from the Board created a trust for the benefit of its subcontractors, laborers, and suppliers.

D&D asserts, inter alia, that (1) it hired laborers and entered into agreements with subcontractors and suppliers in connection with the Project, (2) the defendants "have refused to release funds to satisfy the lawful claims of these laborers, subcontractors, and suppliers", (3) it "fears and apprehends that it has suffered and will continue to suffer actual injury in that trust monies and funds associated with the [Project] are not available", (4) the defendants have assessed liquidated damages against D&D and withheld payments owed to D&D even though large portions of these payments were "trust funds for the benefit of D&D's laborers and suppliers", and (5) the defendants are attempting "to penalize D&D by 'cross-collateral' the Board's claims against D&D as to each of the three contracts . . . with the contract proceeds due to D&D on all three contracts". (Amended Compl., at 32-34.)  However, a trust is not created under the NJTFL until the government entity pays the general

39

contractor.  Accordingly, while the NJTFL's protects a surety who pays the general contractor's indebtedness to the laborers and material providers and then seeks to recoup such payments from the general contractor, it does not provide any protection for the general contractor with respect to money the contractor is owed from the government entity.  See Montefusco Excavating & Contracting Co., Inc. v. County of Middlesex, 414 A.2d 961, 964 (N.J. 1980) (noting that the NJTFL (1) was intended primarily to benefit sureties, and (2) applies only to monies that have already been paid to the contractor).  Therefore, D&D, as general contractor on the project, cannot assert any NJTFL claim against the Board or the other defendants.  The Court will grant summary judgment in favor of the Board and Epstein on D&D's NJTFL claim.[11]

**G.   Count 8**

D&D alleges that (1) it agreed to supply labor and materials for the Project, (2) it furnished such labor and materials and they were accepted by the Board, (3) it conferred a benefit on the Board, and (4) the Board breached its contracts with D&D "by refusing to make payments to D&D, improperly interfering with the performance of D&D's work, improperly demanding extra work through unpriced 'field directives' to avoid the formal change

---

[11] The Court previously dismissed count 7 insofar as asserted against Bovis and Vitetta.  (See dkt. entry no. 86, 9-30-05 Mem. Op., at 18; dkt. entry no. 87, 9-30-05 Ord. & J.)

order process, improperly threatening defaults and terminations, and improperly terminating D&D's work on Contracts 1A, 1B, and 1C." (Amended Compl., at 36-37.)  Thus, D&D asserts a breach of contract claim against the Board.  (Id.)

The Board asserts that when D&D defaulted under the Project contracts, all sums due or to become due under such contracts were assigned to the Surety pursuant to the General Indemnity Agreement between D&D and the Surety.  (Board Br., at 10.)  Thus, the Board asserts that only the Surety can bring claims against the Board for breach of the Project contracts or to recover sums due under the contracts.  (Id.)  The Board states that this conclusion is confirmed by (1) the Takeover Agreements between the Board and the Surety, which provide that the Surety has sole rights to the contract balances, (2) the Completion Agreement between D&D and the Surety, in which D&D reaffirmed the Surety's right to receive all payments due under Contract 1C, (3) the proof of claim the Surety filed in D&D's bankruptcy case, in which it expressly asserts its subrogation rights, (4) the Surety's present state court action against the Board in which it seeks to recover balances due under the Project contracts, and (5) the doctrine of equitable subrogation.  (Id. at 11.)

D&D, in contrast, argues that although the Indemnity Agreement gives the Surety the ability to exercise certain rights otherwise belonging to D&D, "[t]hey have never done this, and has

41

[sic] not sought to do so in the present action." (D&D 4th Br., at 13.) D&D contends that the Surety has not (1) asserted any right to D&D's claims in this action, or (2) sought to exercise any assignment of D&D's claims. (Id.) Thus, according to D&D, "[t]he [S]urety's position was and is that D&D is entitled to assert its affirmative claims so long as the surety's interests as subrogated payment and performance bond surety in any recovery by D&D are recognized". (Id. at 13-14.)

Under New Jersey law, the initial question of whether a contract is ambiguous is a question of law for the Court. See Harborview Yacht Sales, L.L.C. v. Ocean Yachts, Inc., 500 F.Supp. 2d 462, 466 (D.N.J. 2007) (citing New Jersey appellate division and district court cases). If the Court determines that a contract's language is clear, then the contract's interpretation is also a question of law. However, if the contract's language is unclear or susceptible to multiple meanings, then the contract's interpretation is a question of fact. Id. (stating that if a contract provision has at least two reasonable interpretations, the issue must be presented to a jury).

In evaluating whether a contract is ambiguous, the court should "consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993)

(discussing rules of contract interpretation in context of interpreting a collective bargaining agreement); Harborview Yacht Sales, L.L.C., 500 F.Supp.2d at 466; N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Serv., Inc., Nos. 84-0152 & 92-3860, 2006 U.S. Dist. LEXIS 40999, at *12 (D.N.J. June 21, 2006). A contract term is not ambiguous simply because the parties disagree about its construction. TIG Ins. Co. v. Combustion Eng'g, Inc., 366 F.Supp.2d 224, 231 (D.N.J. 2005). However, a contract term is considered ambiguous if it is susceptible to reasonable alternative interpretations or more than one meaning. Id.; N.J. Dep't of Envtl. Prot., 2006 U.S. Dist. LEXIS 40999, at *12. If the Court concludes that a term is ambiguous, it "must determine the intent of the parties to ascertain the meaning of the contract." N.J. Dep't of Envtl. Prot., 2006 U.S. Dist. LEXIS 40999, at *12. This requires consideration of the structure of the contract, the bargaining history, and the conduct of the parties. Id. at *12-*13.

The General Indemnity Agreement between D&D and the Surety provides that "in the event of Default", D&D "does assign, transfer and set over to the Surety" all of its rights under the Project contracts, including "all claims and causes of action against any parties to the [Project contracts]". (Dkt. entry nos. 143, 144, Vogt Cert., at ¶ 3; id., Ex. 6, General Indemnity Agmt., at ¶ 7.) This Court finds that this provision is

susceptible to more than one reasonable interpretation.  See TIG
Ins. Co., 366 F.Supp.2d at 231; N.J. Dep't of Envtl. Prot., 2006
U.S. Dist. LEXIS 40999, at *12.  Specifically, it is unclear
whether the provision has any temporal limitation (e.g., whether
it applies to claims arising before the default occurs).
Further, the phrase "in the event of Default" could encompass (1)
the Board's declaration that D&D is in default, whether or not
the Board followed the procedures set forth in the applicable
contract or the Project Terms & Conditions before declaring such
default, (2) a letter from either Vitetta or Bovis stating that
D&D is in default, (3) a judicial determination that a default
has occurred, or (4) commencement of an action alleging a default
or facts that would lead a reasonably prudent person to deduce
that a default has occurred.

The General Indemnity Agreement defines "default" as, inter
alia, an instance or condition in which the Indemnitors,
including D&D, "forfeit, breach, abandon, default or be declared
in default on any bonded contract".  (Dkt. entry no. 144, Vogt
Cert., Ex. 6, General Indemnity Agmt., at 1.)  Such definition,
however, does not provide any additional explanation for what is
meant by the term "in the event of Default".  Moreover, genuine
issues of material fact also exist regarding whether the Board
properly declared D&D in default and when such default occurred.
(Dkt. entry nos. 143, 144, Vogt Cert., at ¶ 5; id., Ex. 10, 10-

19-01 Epstein Letter (notifying D&D that the Board was declaring it in default under the Project Terms and Conditions); dkt. entry no. 138, Epstein Cert., Ex. 3, 11-2-01 Korzun Letter (stating, inter alia, that the Board's accusations against D&D and the default notice were unjustified and unfounded); dkt. entry nos. 143, 144, Vogt Cert., at ¶ 6; id., Ex. 11, 2-11-02 Johns Letter (noting that Vitetta sent D&D a letter on February 11, 2002, stating that D&D "is and continues to be in default"); id., Ex. 12, 2-21-02 Epstein Letter (noting that both Vitetta and the Board withdrew their default notices on March 21, 2002); id., Ex. 16, 1-27-03 Myerson Fax to Pereira, at 1-2 & 1-30-03 Myerson Fax to Pereira, at 2 (stating that Vitetta, with the Board's authorization, issued two additional default notices to D&D); id., Ex. 18, 3-4-03 Epstein Letter (noting that, on March 4, 2003, the Board terminated D&D as general contractor on Contract 1C); id., Ex. 24, 7-23-03 Epstein Letter (terminating D&D with respect to Contracts 1A and 1B); dkt. entry no. 238, D&D's Counter-Stmt. of Facts, at ¶¶ 77-141 (asserting facts suggesting that the defendants declared D&D in default "in order to coerce it into providing free construction work in retaliation for D&D's refusal to mislead the public and in retaliation for D&D's exercise of its contractual and legal rights" (capitalizations omitted)).)

In light of these material factual issues and the ambiguities in the General Indemnity Agreement, this Court will deny the Board's motion for summary judgment with respect to D&D's breach of contract claim.

### H.   Count 9

Count 9 of the complaint is entitled "Errors and Omissions", and is asserted against Vitetta, Bovis, and Epstein.  (Amended Compl., at 37.)  In this count, D&D asserts, <u>inter</u> <u>alia</u>, that (1) Vitetta, Bovis, and Epstein (1) owed it a duty of care, (2) breached their duties of care, and (3) proximately caused D&D to suffer damages.  (<u>Id.</u> at 38-39.)  D&D argues that count 9 does not use the term negligence, but instead asserts claims for breach of contract and tortious interference with contract.  (D&D 1st Br., at 14, 18).  However, D&D then addresses the applicability of the "New Jersey Affidavit of Merit Statute" and instances where negligence may be inferred.  (<u>Id.</u> at 15-17 (describing situations where New Jersey law requires an affidavit of merit to establish negligence and noting that negligence may be inferred when an architect's design fails to satisfy statutory and regulatory requirements); <u>id.</u> at 19 (explaining that the New Jersey Affidavit of Merit Statute does not apply if breach of professional duty is within the knowledge of the common person); <u>id.</u> at 20 (describing instance where attorney who prepared public bid documents was later held liable in negligence for

construction delays).)   Thus, D&D's opposition to Vitetta, Bovis,
and the Board's separate motions for summary judgment contains
contradictory statements and assertions regarding the claims
underlying count 9.

    This Court finds, after reviewing the parties' submissions
and viewing the applicable evidence in the light most favorable
to D&D, that summary judgment in favor of Vitetta, Bovis, and
Epstein is appropriate with respect to count 9.   Insofar as count
9 attempts to assert a breach of contract claim, such claim must
fail because D&D never entered into any contract with either
Vitetta, Bovis, or Epstein.   Indeed, D&D acknowledges that "there
is no suggestion of privity of contract or the professional
breach of a contractual duty arising out of any agreements
between D&D, Epstein, and/or Bovis."   (Id. at 18, 20.)

    To the extent D&D argues that count 9 asserts a tortious
interference with contract claim, the Court notes that count 9
does not contain any allegations pertaining to such a claim.
(See Amended Compl., at 37-39 (count 9, which only alleges that
Vitetta, Bovis, and Epstein breached certain duties they owed to
D&D).)   See Angrisani v. Capital Access Network, Inc., 175
Fed.Appx. 554, 557 (3d Cir. 2006) (explaining that in order to
state a tortious interference with contract claim, the plaintiff
must show (1) intentional or malicious interference "with a
prospective or existing economic or contractual relationship with

a third party", (2) that the interference caused a loss of prospective gain, and (3) damages).  Also, D&D has not offered any evidence establishing the elements of a tortious interference with contract claim, including any evidence suggesting that Bovis, Vitetta, or Epstein committed any of the acts referenced in count 9 with malice.  See Cox v. Simon, 651 A.2d 476, 483 (N.J. App. Div. 1995) ("A plaintiff must prove actual interference with a contractual relationship, malice, and actual damages to succeed on a claim of intentional interference with a contractual relationship.").[12]  Thus, the Court finds that count 9 fails to the extent that it attempts to assert a tortious interference with contract claim.

The Court also finds that count 9 fails to the extent that it asserts a negligence claim against Vitetta, Bovis, or Epstein because D&D has not complied with the requirements of the New Jersey Affidavit of Merit Statute, N.J.S.A. § 2A:53A-26, et seq. The Affidavit of Merit Statute provides that a plaintiff alleging

---

[12] In its briefs in opposition to the motions for summary judgment, D&D makes only the following blanket assertion in support of its tortious interference with contract claim under count 9: "Bovis's now-admitted role in the D&D lockout involving the local police, as well as its acquiescence in what its own internal communications recognized as a 'blackmail' scheme against D&D, more than suffice to make out a proper claim against it for tortious interference with contract."  (D&D 1st Br., at 19.)  However, count 9 does not refer in any way to D&D's "lockout" or any internal communications.  Instead, a very liberal reading of count 9 suggests that it references only allegedly negligent conduct by Vitetta, Bovis and Epstein.

negligence by a licensed person in a profession or occupation must:

> within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices.

N.J.S.A. § 2A:53A-27.  The court may grant an additional sixty days to file the affidavit, if the plaintiff demonstrates "good cause.  Id.  The plaintiff need not comply with this affidavit requirement if the plaintiff provides a sworn statement that (1) the plaintiff sent a written request for medical records to the defendant, (2) the defendant failed to provide the requested medical records within 45 days of the request, and (3) the requested medical records have a "substantial bearing" on preparation of the affidavit.  N.J.S.A. § 2A:53A-28.

"The overall purpose of the statute is to require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified at an early stage of litigation."  Cornblatt, P.A. v. Barow, 708 A.2d 401, 412 (N.J. 1998).  If the plaintiff fails to submit the required affidavit or a statement that the defendant did not provide requested medical records, then the plaintiff is deemed to have failed to state a cause of action.  N.J.S.A. § 2A:53A-29.  Thus, failure to submit an affidavit of merit results

49

in dismissal of the plaintiff's negligence or malpractice claim and such dismissal is with prejudice.  See Cornblatt, P.A., 708 A.2d at 415 (explaining that dismissal based on plaintiff's failure to submit affidavit of merit would be with prejudice absent extraordinary circumstances).

D&D alleges that Vitetta, Bovis, and Epstein breached their duties of care by, inter alia, failing to (1) fairly and impartially design, supervise, and administer the Project, (2) disclose the Board's problems in obtaining bond and grant funding, (3) disclose the Board's delays in submitting sealed final drawings sufficient to obtain building permits, and obtaining title to the land at issue, (4) provide sealed drawings, and (5) provide D&D with written directions after requesting work changes.  (Amended Compl., at 38-39.)  D&D also alleges that these defendants committed scheduling, design, and management errors.  (Id. at 39.)  However, D&D has failed to submit an affidavit from a licensed architect, construction manager, or attorney stating that the care, skill, or knowledge of these defendants did not meet professional standards.  See N.J.S.A. § 2A:53A-28.  D&D also has not submitted a sworn statement that it sent a written request for records having a substantial bearing on preparation of the affidavit.  See N.J.S.A. § 2A:53A-28.

D&D argues that its malpractice claims in count 9 pertain to matters of common knowledge to lay persons, and thus, no affidavit is necessary.  (See D&D 1st Br., at 15-25.)  See Acosta v. Pace Local I-300 Health Fund, No. 04-3885, 2007 U.S. Dist. LEXIS 9464, at *13 (D.N.J. Feb. 9, 2007) (noting that "to the extent a claim for professional negligence involves common knowledge, plaintiffs are excused from filing an Affidavit of Merit").  However, the common knowledge exception to the Affidavit of Merit requirement applies only when "jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts."  Acosta, 2007 U.S. Dist. LEXIS 9464, at *13.  Here, the average layperson would not have common knowledge sufficient to understand the various responsibilities and procedures involved in a complicated construction project, such as the Project underlying this action.  Further, the common knowledge exception is unavailable where, as here, the alleged misconduct involves licensed professionals exercising their professional responsibility and judgment.  Id. at *20.  Thus, the Court concludes that D&D has not established, through an expert or otherwise, the applicable duty of care that an architect, project manager, and construction attorney would owe to the general contractor under the circumstances of this case, or how the

defendants here breached such duties.  Therefore, we will grant summary judgment in favor of Bovis, Vitetta, and Epstein with respect to count 9.

## I.  Count 10

D&D, in count 10 of the complaint, alleges that the defendants published false statements on the Board's website, which suggest that D&D performed sloppy, incomplete, and defective work, refused to comply with its obligations, left work unfinished, and abandoned the Project.  (Amended Compl., at 40.) D&D asserts, <u>inter alia</u>, that through this conduct the defendants intentionally interfered with its "performance of its contracts, its business arrangements with its subcontractors and suppliers, and its bonding relationship with [the Surety]." (<u>Id.</u>)  More specifically, D&D asserts that, as a result of the defendants' conduct, it lost its $40 million bonding capacity and ability to bid on other public works contracts in New Jersey.  (<u>Id.</u> at 41.) Thus, D&D contends that the "defendants have intentionally and deliberately interfered with [its] prospective economic advantage".  (<u>Id.</u>)

"An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling or occupation free from undue influence or molestation." <u>Printing Mart-Morristown v. Sharp Elecs. Corp.</u>, 563 A.2d 31, 36 (N.J. 1989) (citations and internal quotations omitted).  To

establish a tortious interference with prospective economic advantage claim, the plaintiff must demonstrate (1) a reasonable expectation of economic advantage, (2) that the defendant intentionally and malicious interfered with that expectation, (3) a causal connection between the defendant's interference and the plaintiff's loss of a prospective gain, and (4) damages. Espinosa v. County of Union, 212 Fed.Appx. 146, 157 (3d Cir. 2007); see Printing Mart-Morristown, 563 A.2d at 37.[13]  With

---

[13] Vitetta argues that count 10 and count 11 should be dismissed insofar as asserted against it because (1) "[t]he only publications attributable to Vitetta are its default notices and project correspondence", and (2) "[s]uch statements were made in the course of [it] carrying out its contractual responsibilities with the project Owner and are protected by Qualified Immunity." (Vitetta Br., at 28-29.)  However, a review of the case law cited by Vitetta in support of this argument did not reveal any situation where a court determined that qualified immunity insulated a defendant from liability for tortious interference. Instead, the cases cited by Vitetta discuss qualified immunity only in the context of a defamation claim.

Epstein, in contrast, argues that the Court should grant summary judgment in his favor on count 10 because his communications that form the basis of this count are protected by the attorney litigation privilege. (Epstein Br., at 12-26). However, the attorney litigation privilege does not protect the default notices and termination letters Epstein sent to D&D before it commenced this action because such communications were not "sent in connection with a judicial proceeding and not intended to achieve the objects of any litigation." Source Entm't Group, LLC v. Baldonado & Assocs., P.C., No. 06-2706, 2006 U.S. Dist. LEXIS 39209, at *21-22 (D.N.J. May 31, 2007).  The litigation privilege permits an attorney to publish defamatory statements if such statements "(1) [were] made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) have some connection or logical relation to the action." Id. at 22 (citation and internal quotation omitted).  New Jersey law extends the privilege to statements

respect to the first element, the plaintiff must show that it had

a "protectable right".  Printing Mart-Morristown, 563 A.2d at 37.

Such right need not arise from an enforceable contract, but

"there must be allegations of fact giving rise to some

'reasonable expectation of economic advantage'" or demonstrating

that "plaintiff was in 'pursuit' of business."  Id. (citation

omitted).  The "prospective economic relation" also may include:

> prospective quasi-contractual or other restitutionary
> rights or even the voluntary conferring of commercial
> benefits in recognition of a moral obligation.
>
> * * *
>
> Included are interferences with the prospect of
> obtaining employment or employees, the opportunity of
> selling or buying land or chattels or services, and any
> other relations leading to potentially profitable
> contracts.

Id. at 39 (citing Restatement (Second) of Torts (1979)).

The second element requires that the defendant acted with

"malice", which is not defined literally as ill will toward the

plaintiff.  Id. at 37 (citation omitted).  Instead, for purposes

of this tort, "malice" means that "the harm was inflicted

---

made during settlement negotiations, conferences with an attorney
regarding litigation, and discussions with a witness during a
personal injury litigation.  Id.  Here, however, the default and
termination letters, as well as the statements on the Board's
website had no direct relevance to any judicial or quasi-judicial
proceeding.  The Court will not extend the privilege to all
situations where the relationship between the parties is
contentious or adversarial, and it is possible that one of the
parties will commence an action in the future.

intentionally and without justification or excuse." Id.
Accordingly, the relevant inquiry is whether the defendants'
conduct was sanctioned by the "rules of the game." Harper-
Lawrence, Inc. v. United Merchants & Mfrs., Inc., 619 A.2d 623,
630 (N.J. App. Div. 1993).  Moreover, under the third element,
the plaintiff must show that "if there had been no
interference[,] there was a reasonable probability that the
victim of the interference would have received the anticipated
economic benefits." Printing Mart-Morristown, 563 A.2d at 37
(alteration in original and citation omitted); Leslie Blau Co. v.
Alfieri, 384 A.2d 859, 865 (N.J. App. Div. 1978) (citation
omitted).

A tortious interference with prospective economic advantage
claim is a separate and distinct cause of action from a tortious
interference with contract claim.  Floorgraphics, Inc. v. News
Am. Mktg. In-Store Servs., Inc., No. 04-3500, 2006 U.S. Dist.
LEXIS 70834, at *17 (D.N.J. Sept. 29, 2006).[14]  It requires the
plaintiff to demonstrate that it reasonably expected to receive

---

[14] We have already determined that D&D has not provided any
evidence suggesting that Vitetta, Bovis, or Epstein tortiously
interfered with the Project contracts between D&D and the Board.
See Count 9, supra.  Further, the Board cannot be held liable for
any alleged interference with the Project contracts between it
and D&D because it was a party to such contracts.  Emerson Radio
Corp. v. Orion Sales, Inc., 253 F.3d 159, 173 (3d Cir. 2001)
(explaining that a tortious interference with contract claim
cannot be directed at a person or entity that is a party to the
contract).

an economic advantage, rather than the existence of an actual contract.  Id. at *17-*18.  Thus, neither the Project contracts between D&D and the Board nor D&D's agreements with its subcontractors and suppliers can form the basis of its tortious interference with prospective economic advantage claim.

To the extent D&D's tortious interference with prospective economic advantage claim is based on its loss of bonding capacity, we find that genuine issues of material fact preclude summary judgment on such claim insofar as asserted against all of the defendants.  Specifically, material factual issues exist regarding whether (1) at the time the defendants engaged in the allegedly interfering conduct, the Surety was capable of issuing bonds to D&D, (2) each of the defendants issued the default notices and posted the comments about D&D on the Board's website with the intent of hindering D&D's attempts to bid on future public works projects, and (3) each of the defendants acted with malice.  (See dkt. entry no. 238, D&D's Counter-Stmt. of Facts, at ¶ 210 (noting that the Surety was authorized to issue bonds in New Jersey as of April 2004 but transferred certain accounts to another surety); id., Ex. 58, 4-2-04 Dep't of Banking & Ins. Cert. of Authority (stating that the Surety is licensed to transact in New Jersey through May 2005); id., Ex. 21, Periera Aff., at ¶¶ 31-32 (stating that when Epstein learned that the Surety would not consider bonding D&D on other large projects

while its dispute with the Board continued, Epstein said, "Good.
I want you to concentrate only on my jobs."); id., Ex. 56,
Bambino Stmt., at 16-17 (noting that Epstein's letters were
intended to prevent D&D from having other bonded contracts); id.
at ¶¶ 114-122 (explaining, inter alia, that the defendants knew
that the default letters would affect D&D's bonding capacity);
Amended Compl., at 40-41; dkt. entry nos. 143, 155, Vogt Cert.,
Ex. 37, 6-24-03 Fed. Reg. Notice (stating that the Surety's
certificate of authority to issue federal bonds terminated on 6-
24-03); Board Br., at 26 (arguing that D&D cannot establish that
the Board knew its default and termination notices would
interfere with D&D's bonding capacity); id. at 27-28 (arguing
that D&D cannot establish that the Board acted with malice in
issuing the default letters); dkt. entry nos. 143, 144, Vogt
Cert., Exs. 9 & 10, 10-11-01 & 10-19-01 Epstein Letters
(explaining that the basis for defaulting D&D was its failure to
provide construction schedules).)[15]   Therefore, the Court will

---

[15] The Court does not agree with the defendants' assertion
that D&D has stated only a speculative economic advantage with
which the defendants' allegedly interfered.  D&D's "protectable
right" would be its relationship with the Surety and ability to
obtain bonding for public contracts, not the specific contract it
might obtain through such bonding.  See Printing Mart-Morristown,
563 A.2d at 37 (noting that the plaintiff need only demonstrate
that "[it] was in 'pursuit' of business.").  A plaintiff need not
allege specific lost business opportunities in support of its
tortious interference claim.  Floorgraphics, Inc., 2006 U.S.
Dist. LEXIS 70834, at *18.  Nevertheless, as noted above, a
factual dispute exists regarding whether D&D would have been able
to obtain bonding from the Surety during the applicable time
period.

deny the defendants' separate motions for summary judgment with respect to count 10 of the amended complaint.

**J.   Count 11**

Count 11 of the amended complaint is entitled "Libel and Slander".  (Amended Compl., at 41.)  In this count, D&D alleges, inter alia, that the defendants falsely and negligently published statements in correspondence and on the Board's website, which state that D&D's work in connection with the Project was defective, sloppy, and incomplete, and that D&D ultimately abandoned the Project.  (Id. at 41-42.)  D&D further alleges that these statements (1) injured its honesty, integrity, morality, and commercial reputation, (2) were published intentionally, recklessly, and maliciously, and (3) constitute libel or slander per se because they pertain to D&D's trade and business practices.  (Id. at 42.)  Thus, D&D contends that the "defendants intentionally and deliberately slandered and defamed [it]". (Id.)

D&D, in one of its briefs in opposition to the defendants' separate motions for summary judgment, lists the following statements as underlying its defamation claim: (1) the October 11, 2001 notice of default letter sent by Epstein, on behalf of the Board, to D&D and the Surety, which states that D&D caused the Project delays; (2) the October 19, 2001 default letter sent by Epstein, on behalf of the Board, to D&D and the Surety, which

states that D&D caused the Project delays; (3) the February 25, 2002 default notice sent by Epstein to the Surety, which references the need to "cure" D&D's "defaults"; (4) the April 29, 2002 default letter issued by Vitetta and sent to the Surety, among others; (5) a May 8, 2002 letter sent by a representative of the Surety, which "re-emphasizes" D&D's alleged defaults; (6) the March 5, 2003 Epstein letter stating that D&D is formally terminated from the Project and requesting that the Surety perform the remainder of D&D's work on the Project; and (7) "[w]eb pages prepared by [Bovis] and posted by the Board on their website dated March 10, 2003 [and republished on March 24, 2003, April 7, 2003, and May 19, 2003], accusing D&D of 'abandoning' its work despite the Board's and Bovis' lockout of D&D in February 2003."  (D&D 4th Br., at 14-15.)  D&D asserts that it was a private figure at all times related to the amended complaint, and thus, the Court should review these statements using a negligence standard rather than the "actual malice" standard applicable to statements made about limited purpose public figures.  (Id. at 15-17.)  However, D&D argues, in the alternative, that it has offered sufficient evidence establishing that the defendants acted with malice when they made the above statements.  (Id. at 21.)

"A defamatory statement is one that is false and injurious to the reputation of another or exposes another person to hatred,

contempt or ridicule or subjects another person to a loss of the good will and confidence in which he or she is held by others." Espinosa v. County of Union, No. 01-3655, 2005 U.S. Dist. LEXIS 36563, at *47 (D.N.J. Aug. 30, 2005.) (citations and internal quotations omitted).  To state a defamation claim under New Jersey law, a plaintiff must show that (1) the defendant made a defamatory statement of fact about the plaintiff, (2) the statement was false, (3) the defendant communicated the statement to a third party, and (4) the statement damaged the plaintiff. See id.; Arista Records, Inc. v. Flea World, Inc., 356 F.Supp.2d 411, 424 (D.N.J. 2005).  Whether a statement is one of fact or opinion is a question of law for the Court.  Arista Records, Inc., 356 F.Supp.2d at 425.  Further, with respect to the falsity of the statement:

> A plaintiff in a private concern defamation case can prevail upon showing negligence on the part of the defendant[].  In contrast, defamation is difficult[] to prove when the statements at issue revolve around matters of public concern.  Speech concerning matters of public concern is afforded strict First Amendment protection.  Moreover, public officials and public figures are afforded lessened degrees of protection against libel and defamation, and statements concerning such figures will be actionable only where they were made with "actual malice" – knowingly false or made with reckless disregard for their untruth.

Costello, 2001 U.S. Dist. LEXIS 8687, at *45-*46.

New Jersey law employs an expansive approach to determining the types of government employees who constitute public figures. Id. at *47-*49 (concluding that appointee to high-profile

government position, who was involved in matters affecting public
health, was a public figure).  Also, "actual malice" must be
shown by clear and convincing evidence that the defendant knew
the statement was false or acted with reckless disregard for its
falsity.  Id. at *49-*50; see DeAngelis v. Hill, 847 A.2d 1261,
1268 (N.J. 2004) (noting that when the plaintiff is a public
official, the plaintiff must establish that the defendant
published a false statement with knowing or reckless disregard
for the truth).  It has "nothing to do with hostility or ill
will; rather it concerns [a] publisher's state of knowledge of
the falsity of what he published, not at all upon his motivation
in publishing it."  DeAngelis, 847 A.2d at 1270 (citations and
internal quotations omitted) (alteration in original).  Truth is
a complete defense to a defamation claim.  Id.; Espinosa, 2005
U.S. Dist. LEXIS 36563, at *49.

The default notices, default and termination letters, and
statements on the Board's website about D&D's performance of its
obligations pertain to a public controversy, namely the dispute
over the problems and delays surrounding the renovation of
certain public schools.  See McDowell v. Paiewonsky, 769 F.2d
942, 948 (3d Cir. 1985) (stating that in determining whether a
plaintiff is a limited purpose public figure, a court must
consider whether the alleged defamation involved a matter of
public controversy).  D&D, the Project's general contractor, was

extensively involved in that controversy.  See id. (stating that
in determining whether a plaintiff is a limited purpose public
figure, a court must consider the nature and extent of the
plaintiff's involvement in the controversy).  Further, "[w]hen an
individual undertakes a course of conduct that invites attention,
even though such attention is neither sought nor desired, he may
be deemed a public figure."  Id. at 949.

D&D bid and performed general construction work on the
Project, which undoubtedly received significant attention from
the North Plainfield community.  Also, D&D likely received public
attention in the past because it performed work on other public
construction projects, including other school renovation
projects.  (See Amended Compl., at 41.)  Therefore, we conclude
that D&D was transformed into a public figure for the limited
purpose of performing its work under the Project contracts, and
thus, it must show that the defendants' statements about it were
made with actual malice.  See McDowell, 769 F.2d at 948-50
(concluding that architect on public building projects was a
limited purpose public figure).

D&D has (1) specifically set forth the defendants' allegedly
defamatory factual statements, (2) shown that such statements
were communicated or sent to a third party, such as the Surety
and the public at large, and (3) sufficiently alleged that the
statements damaged it because, inter alia, they destroyed its

bonding capacity and ability to obtain new public works contracts.  (See Amended Compl., at 42.)  See Espinosa, 2005 U.S. Dist. LEXIS 36563, at *47;  Arista Records, Inc., 356 F.Supp.2d at 424.

With respect to the falsity of the statements at issue, the Court finds that viewing the evidence in the light most favorable to D&D, a reasonable jury could conclude that the Board, Bovis, and Epstein made the statements at issue with actual malice. Specifically, D&D has offered evidence showing, inter alia, that (1) the Board awarded D&D the general construction contracts one month after the date D&D was supposed to be issued a notice to proceed, and thus, it knew that the Project was behind schedule from its inception, (2) the defendants denied D&D and the other contractors' initial requests for extensions, (3) the defendants did not obtain permits for the Project from the North Plainfield Building Department before the Project commenced, (4) the Project Manual required the contractors to have begun work before their contracts had been executed, (5) the Building Department issued a stop work order in September 2001 because there were no Project permits, (6) a Bovis representative noted in June of 2002 that "they know Vitetta screwed up" and D&D "was doing everything possible to get the schools open", and (7) a Bovis representative noted that the Board's approach to handling its disputes with D&D could be viewed as "blackmail".  (Dkt. entry no. 238, D&D's

Counter-Stmt. of Facts, at ¶¶ 39, 48-49, 54, 56, 58, 125, 135.)
Therefore, D&D has presented evidence from which a reasonable
jury could conclude that Bovis, the Board, and Epstein knew that
D&D did not cause the Project delays or perform incomplete and
defective work on the dates they issued the default notices,
default and termination letters, and published the statements
about D&D's performance on the Board's website, and thus, their
statements were knowingly false.  Costello, 2001 U.S. Dist. LEXIS
8687, at *45-*46 (defining "actual malice" as knowingly false).[16]

The Board, however, is entitled to unqualified immunity with
respect to D&D's defamation claim even if its members did act
with actual malice in publishing the statements on its website
and sending the various letters at issue.  See Seal Tite Corp. v.
Bressi, 712 A.2d 262, 266 (N.J. App. Div. 1998).  In Seal Tite,
the plaintiff corporation performed public road alignment and
construction projects.  Id. at 263.  It encountered various
problems in performing a project on a county road that ran
through the defendant township.  Id.  The problems caused delays

---

[16] Epstein argues that the court should grant summary
judgment in his favor on count 11 because his communications that
form the basis of this count are protected by the attorney
litigation privilege.  (Epstein Br., at 12-26).  However, as
discussed supra in footnote 13, the attorney litigation privilege
does not protect the default notices and termination letters
Epstein sent to D&D before it commenced this action because such
communications were not "sent in connection with a judicial
proceeding and not intended to achieve the objects of any
litigation."  Source Entm't Group, LLC, 2006 U.S. Dist. LEXIS
39209, at *21-22.

and safety concerns, and received public attention.  Id.  As a
result, the township's mayor and committee drafted a resolution
that, inter alia, urged the county "to take whatever actions are
necessary to delete [the plaintiff] from its bidding list in the
future in order to avoid the disastrous problems which have
occurred in connection with this contract".  Id. at 263-64.  In
response, the plaintiff commenced an action against the Township
and the individual committee members asserting, inter alia, a
defamation claim.  Id. at 264.  The defendants moved for summary
judgment and the trial court granted the motion.  Id.

The appellate division affirmed the trial court's ruling.
Id. at 266.  In doing so, the court noted that under the New
Jersey Tort Claims Act, N.J.S.A. § 59:2-10, "a public entity is
not liable for acts of public employees constituting actual
malice or willful misconduct, absent specific contrary statutory
authority."  Id.; see N.J.S.A. § 59:2-10 ("A public entity is not
liable for the acts or omissions of a public employee
constituting a crime, actual fraud, actual malice, or willful
misconduct.").  Accordingly, the court determined that the
township would be entitled to summary judgment "even if the
individual defendants could be found to have acted with actual
malice."  Seal Tite Corp., 712 A.2d at 266.[17]  Thus, applying the

---

[17] The court ultimately held that the plaintiff had not
established that the resolution was issued with actual malice.
Id.

Seal Tite reasoning here, the Board is entitled to qualified immunity under the New Jersey Tort Claims Act, N.J.S.A. § 59:2-10, with respect to D&D's defamation claim.  The Court will grant summary judgment in favor of the Board on D&D's defamation claim.

The Court will also grant summary judgment in favor of Vitetta on D&D's defamation claim.  The Court has reviewed the portion of D&D's brief discussing its defamation claim, and we have determined that Vitetta did not make or have any identifiable involvement with any of the statements that D&D asserts form the basis of this claim.  (See D&D 4th Br., at 14-15; dkt. entry no. 141, Neilio Cert., Ex. K, Excerpt from Periera Dep., at 471-72 (stating in response to question about whether anyone from Vitetta "falsely or willfully published any statements with respect to D&D's performance on this Project", "I don't know that they published anything in the press themselves, no").)  Instead, D&D's allegations pertain only to Bovis, the Board, and Epstein.  (See D&D 4th Br., at 14-15.)  Accordingly, the Court will grant summary judgment in favor of Vitetta with respect to count 11 of the amended complaint.[18]  In light of this determination, we need not address whether any qualified immunity protects Vitetta from D&D's defamation claim.  (See Vitetta Br., at 27-31.)

_____

[18] D&D does not list any of the default notices issued by Vitetta in its list of statements underlying its defamation claim.  (See id. at 14.)

**K.   Count 13 & Count 14**

D&D asserts, in count 13, that (1) the Board, Vitetta, and Epstein failed to disclose the Board's "problems and delays in obtaining bond funding, grant funding, and submitting sealed final drawings sufficient to permit building permits to issue", (2) these facts were material to D&D's decision to bid on the Project and enter into Contracts 1A, 1B, and 1C, (3) D&D would not have bid on the Project had it known about these concealed facts, (4) "[t]he concealment of the true facts by defendants was done with the specific intent that plaintiff and others would rely on the information supplied by defendants in preparing their bids and evaluating the projects", and (5) D&D and the Surety relied on the Board, Vitetta, and Epstein's material misrepresentations and omissions to their detriment.  (Amended Compl., at 44.)  Moreover, in count 14 D&D argues that the Court should declare the performance bonds posted by it and the Surety for Contracts 1A, 1B, and 1C void as a result of the Board, Vitetta, and Epstein's fraudulent conduct.  (Id. at 45.) Similarly, D&D argues that it and the Surety are entitled to restitution for any costs and damages they incurred before discovering the defendants' fraudulent conduct.  (Id.)

Only Vitetta and Epstein move for summary judgment on count 13 and count 14.  Vitetta argues, inter alia, that D&D has not (1) set forth any evidence demonstrating that either the bond or

grant funding were delayed, Vitetta knew that such funding was delayed, or that Vitetta had a duty to disclose information about the bond and grant funding to the Project contractors, and (2) offered expert evidence suggesting that Vitetta deviated from its standard of professional care and practice in carrying out the applicable duties, including its duty to submit the sealed drawings.  (Vitetta Br., at 32.)  Similarly, Epstein argues, in addressing count 9, count 13, and count 14 together, that D&D's claims "are supported by no expert testimony at all and D&D can proffer no competent evidence to support the allegations that Epstein owed a duty to Plaintiff or deviated from accepted standards of care in any regard."  (Epstein Br., at 27; see id. at 33.)

The same legal standard governs common law fraud, fraudulent inducement, and fraudulent misrepresentation claims.  Darrick Enter. v. Mitsubishi Motors Corp., 05-4359, 2007 U.S. Dist. LEXIS 72956, at *7 (D.N.J. Sept. 28, 2007).  To establish a fraud claim under New Jersey law, a plaintiff must show that (1) the defendant made a material misrepresentation of a currently existing or past fact, (2) the defendant knew or believed the statement was false, (3) the defendant intended for the plaintiff to rely on the misrepresentation, (4) the plaintiff relied on the misrepresentation, and (5) the plaintiff was damaged.  Angrisani v. Capital Access Network, Inc., 175 Fed.Appx. 554, 556 (3d Cir.

2006); see Darrick Enter., 2007 U.S. Dist. LEXIS 72956, at *7.
However, "[s]tatements as to future or contingent events, as to
expectations and probabilities, or as to what will be or is
intended to be done in the future, do not constitute
misrepresentations even though they turn out to be false, at
least where they are not made with intent to deceive, and where
the parties have equal means of knowledge." Angrisani, Inc., 175
Fed.Appx. at 556.  Further, "puffery" and "ill-defined opinions"
also do not constitute misrepresentations.  Id.

The economic loss doctrine prevents a plaintiff from
recovering in tort for economic losses flowing from a contract.
Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618
(3d Cir. 1995).  However, "[n]o New Jersey Supreme Court case
holds that a fraud claim cannot be maintained if based on the
same underlying facts as a contract claim." Gleason v. Norwest
Mortg., Inc., 243 F.3d 130, 144 (3d Cir. 2001).  Nevertheless,
the distinction between fraud in the inducement and fraud in the
performance of a contract remains relevant to the application of
the economic loss doctrine in New Jersey.  Specifically, courts
have continued to affirm "the conceptual distinction between a
misrepresentation of a statement of intent at the time of
contracting, which then induces detrimental reliance on the part
of the promisee, and the subsequent failure of the promisor to do
what he has promised." Lo Bosco v. Kure Eng'g Ltd., 891 F.Supp.

69

1020, 1032 (D.N.J. 1995).  Thus, New Jersey federal and state courts permit fraud claims to proceed with a breach of contract claim when the fraud arises out of fraud in the inducement or pre-contractual misrepresentations.  Vukovich v. Haifa, Inc., No. 03-737, 2007 U.S. Dist. LEXIS 13344, at *24 (D.N.J. Feb. 28, 2007).  Accordingly, the "mere 'subsequent failure of the promisor to do what he has promised' is not recoverable in tort." Id.

The alleged misstatements and omissions underlying D&D's fraudulent inducement claims pertained to funding for the Project, and whether the defendants submitted sealed final drawings and obtained the requisite building permits.  (See Amended Compl., at 44.)  Because these alleged misstatements and material omissions were made before D&D entered into the Project contracts, count 13 and count 14 assert fraud in the inducement claims, which this Court may consider alongside D&D's breach of contract claim.  See Vukovich, 2007 U.S. Dist. LEXIS 13344, at *24.  Therefore, D&D's fraudulent inducement claims are not barred by the economic loss doctrine.

This Court finds, however, that D&D has not established that either Vitetta or Epstein made any material misrepresentations or omissions with respect to a currently existing fact, which they intended D&D to rely upon.  Angrisani, 175 Fed.Appx. at 556. Instead, with respect to Vitetta's involvement with the Project funding and sealed drawings, D&D asserts only that (1) Vitetta

submitted "what was supposed to be a set of sealed construction
plans and specifications" to the North Plainfield Building office
in April 2001, (2) the North Plainfield Building office did not
approve the April 2001 plans because they were missing key
elements, (3) the Borough Construction Office directed the
defendants to submit new permit applications, (4) instead of
resubmitting the permit applications, Vitetta met with Epstein's
associate "to discuss revisions to the construction contract" and
discussed with Epstein the "issues for bidding", and (5) Vitetta
did not advise D&D that the Project's contract bids were over
budget.  (Dkt. entry no. 238, D&D's Counter-Stmt. of Facts, at ¶¶
17-19, 21, 41 and exhibits referenced therein.)

    With respect to Epstein's involvement with the Project
funding and sealed drawings, D&D asserts only that (1) Epstein's
office redrafted the construction contracts in light of certain
issues, including the defendants' failure to obtain the building
permits, and drafted a letter "regarding bidding prior to
obtaining official approval; research regarding consequences of
violating N.J.A.C. 6:22-1.7", (2) Epstein wrote an article, which
notes that construction claims may be caused by, inter alia, late
drawings or permits, or inadequate drawings or specifications,
and (3) Epstein did not advise D&D that the Project's contract
bids were over budget.  (Id. at ¶¶ 21-22, 40-41.)  These
allegations do not point to any misrepresentations made by either

Vitetta or Epstein, but instead suggest that they acted negligently or improperly.

The remainder of D&D's factual allegations and supporting evidence pertaining to problems in obtaining bond funding, grant funding, and building permits relate only to the Board's conduct. (E.g., id. at ¶ 29 ("The Board had not resolved the title issues and no further attempts had been made to obtain code compliance. None of these facts were mentioned within the bid documents."); id. at ¶ 31 ("[T]he contract specifications contained a specific representation that the Board recognized that design approvals were 'precedent' to work at the site; that the Board, itself, would be responsible for obtaining them; and that there would be no delay.").) Thus, D&D has not asserted that either Vitetta or Epstein made any representations to it that misstated a currently existing or past fact or omitted information necessary to not make their statement false or misleading. Instead, it seems D&D had no contact with either Epstein or Vitetta before the Board accepted its bid and executed Contracts 1A, 1B, and 1C. D&D has offered evidence suggesting only that the Board issued the bid documents and made statements, which misrepresented presently existing facts regarding the Project's funding and permit requirements. Therefore, summary judgment is appropriate on D&D's fraudulent inducement claims insofar as such claims are asserted against Vitetta and Epstein.

**L.   Count 15**

Count 15 of the amended complaint is entitled "Civil Conspiracy". (Amended Compl., at 45.)  In this count, D&D alleges that the "defendants entered into a combination [sic] with a real agreement, common design and unlawful purpose to be achieved by unlawful means to deprive plaintiff of its property, and destroy its business." (Id. at 46.)  Further, D&D contends that it suffered special damages as a result of the defendants' unlawful conspiracy. (Id.)

To state a civil conspiracy claim, a plaintiff must establish: "(1) a combination of two or more persons; (2) a real agreement of confederation with a common design; (3) the existence of an unlawful purpose; and (4) proof of special damages." Morganroth & Morganroth v. Norris, McLaughlin, & Marcus, P.C., 331 F.3d 406, 414 (3d Cir. 2003) (citation omitted).  An agreement to commit a wrongful act does not, by itself, support a civil conspiracy claim. Id.  Instead, at least one of the co-conspirators must commit a tortious act in furtherance of the conspiracy. Id.  Accordingly, the "gist of the claim, is not the unlawful agreement but the underlying wrong which absent the conspiracy, would give a right of action." Engineered Framing Sys., Inc. v. Vescom Structures, Inc., No. 05-1461, 2005 U.S. Dist. LEXIS 26295, at *15 (D.N.J. Nov. 1, 2005) (citation and internal quotations omitted).

D&D does not articulate any basis for its conspiracy claim in either its four briefs in opposition to the defendants' separate motions for summary judgment or its counter-statement of facts.  Specifically, D&D has not (1) provided any evidence suggesting that one of more of the defendants entered into an agreement to commit an unlawful act or engaged in any discussions that could be construed as an agreement, (2) specifically identified an unlawful act that any defendant committed in furtherance of the alleged conspiracy, and (3) identified its "special" damages.  See Morganroth & Morganroth, 331 F.3d at 414.  In contrast, D&D makes only the vague and conclusory allegation that the defendants entered into "a real agreement" with the intent of depriving D&D of its property and destroying its business "by unlawful means".  (Amended Compl., at 46.)  However, D&D cannot, rely on this mere allegation to defeat a motion for summary judgment.  "[T]he burden is on the [non-movant], not the [C]ourt, to cull the record and affirmatively identify genuine, material factual issues sufficient to defeat a motion for summary judgment."  Morris v. Orman, No. 87-5149, 1989 U.S. Dist. LEXIS 1876, at *25-*26 (E.D. Pa. Mar. 1, 1989).  Thus, the Court concludes that D&D has failed, by definition, to bring to this Court's attention any evidence that could conceivably raise any genuine issue of material fact as to its conspiracy claim.  Therefore, the Court holds that entering summary judgment in

favor of the defendants on D&D's conspiracy claim is "appropriate" in this case.  See Anchorage Assocs. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990) (noting that a movant is not automatically entitled to summary judgment simply because the non-movant fails to oppose the motion, and stating that an unopposed motion should only be granted "if appropriate").[19]

**M.   Count 16**

D&D alleges, in count 16 of the amended complaint, that the Board and Epstein (1) "engaged in malicious abuse of process in proceedings which have adversely affected [D&D's] legally protected interests", (2) acted with malice, and (3) caused D&D to suffer "a special grievance, to wit, wrongful interference with and destruction of its liberty and property interests." (Amended Compl., at 46.)  Also, D&D asserts that the Board and Epstein engaged in malicious prosecution when they (1) "created an arbitration scheme in which [they] purported to 'direct' Vitetta to arbitrate all claims as a final arbiter", and (2) filed "a Third Party Complaint in the P.J. Smith matter to institute and compel the arbitration."  (D&D 2d Br., at 23,

_____

[19] The Court notes that even if D&D had established its conspiracy claim, such claim would still fail insofar as asserted against Epstein because at all times relevant to the amended complaint, he acted in his professional capacity as the Board's counsel.  Heffernan, 189 F.3d at 413 (3d Cir. 1999) (determining, in the context of a Section 1985 claim, that an attorney acting with the scope of representation is exempted from a conspiracy charge).

27.)[20]  D&D also asserts that the Board and Epstein are liable

for abuse of process because after filing the arbitration, they:

> repeatedly abused the judicial process of this Court
> and the Bankruptcy Court by advising such courts that
> they intended to proceed (and would file for leave to
> do so) with the arbitration and, thereby adjudicate and
> prove the Board's claims of offsets [sic] and
> counterclaims that would justify [their] refusal to pay
> D&D (or D&D's subcontractors and sureties).

(Id. at 28.)  D&D notes that the Board did not move for leave to

proceed with the arbitration or assert any counterclaim

justifying its refusal to pay D&D.  (Id.)  Moreover, D&D asserts

that the Board and Epstein abused the arbitration proceedings "to

try to entice other co-primes into joining the conspiracy to

shift the blame for the delays in the [P]roject from the

defendants, themselves, to D&D."  (Id.)

To prevail on a common law malicious prosecution claim, the

plaintiff must show that (1) the defendant instituted

proceedings, (2) without probable cause, (3) but with malice, and

(4) such proceedings terminated in the plaintiff's favor.  Wiltz

v. Middlesex County Prosecutor's Office, No. 06-3610, 2007 U.S.

App. LEXIS 22470, at *11 (3d Cir. Sept. 19, 2007).  The first

element, which requires a showing that the defendant commenced

proceedings against the plaintiff, "is not met when [a] defendant

_____

[20] "[T]he P.J. Smith matter" refers to an action pending in
the Superior Court of New Jersey captioned: P.J. Smith Electrical
Contractors, Inc. v. North Plainfield Board of Education, dkt. no
SOM-L-23-05 (the "Smith Action").

76

merely approves or silently acquiesces in the acts of another,
[but] it may be met by proof that defendant took 'some active
part in instigating or encouraging the prosecution'". Wiltz v.
Middlesex County Prosecutor's Office, No. 05-3915, 2006 U.S.
Dist. LEXIS 46821, at *25 (D.N.J. July 10, 2006), aff'd 2007 U.S.
App. LEXIS 22470.  Moreover, a malicious prosecution action "does
not lie until a termination of such prosecution in favor of the
party prosecuted." State v. Donovan, 40 A.2d 546, 548 (N.J.
1945).

        D&D has not established the first element of a malicious
prosecution claim in connection with the Smith Action.  Although
the Board filed a third-party complaint in the Smith Action
naming D&D and the Surety as third-party defendants, such
complaint was never served on D&D and was subsequently dismissed.
(Dkt. entry no. 248, Supplemental Vogt Decl., at ¶ 7.)  Thus,
neither the Board nor its counsel, Epstein, "instituted
proceedings" against D&D in the Smith Action.  See Wiltz, 2007
U.S. App. LEXIS 22470, at *11.  Further, D&D has not established
the fourth element of a malicious prosecution claim with respect
to the arbitration proceedings conducted by Vitetta among the
Board and the Project contractors.  Although the arbitration
commenced in 2003, all claims involving D&D that were subject to
the arbitration were stayed shortly thereafter because D&D filed
a bankruptcy petition.  (Dkt. entry no. 248, Supplemental Vogt

Decl., at ¶ 3; id., Ex. B, Vitetta Arb. Mem. (noting that Vitetta would not hear any further claims by D&D or against D&D unless so ordered by the bankruptcy court).)  Accordingly, D&D cannot show that the arbitration proceedings terminated in its favor.[21]

Malicious prosecution and malicious abuse of process are distinct causes of action.  Baglini v. Lauletta, 768 A.2d 825, 831 (N.J. App. Div. 2001).  To establish a malicious abuse of process claim, the plaintiff must show (1) "improper, unwarranted and perverted use of process after it was issued", and (2) that the defendant committed "further acts, which reveal a motive to coerce or oppress the plaintiff."  Found. Credit Funds, LLC v. Branch Banking & Trust Co., No. 06-893, 2006 U.S. Dist. LEXIS 92457, at *4 (D.N.J. Dec. 21, 2006).  "It is not sufficient for a malicious abuse of process claim that the 'litigation is inspired by malicious or other improper motives.'"  Component Hardware Group, Inc. v. Trine Moulding Corp., 05-891, 2007 U.S. Dist.

---

[21] The Court notes that criminal prosecutions rather than civil actions usually form the basis of a malicious prosecution claim, but the courts have not expressly prohibited plaintiffs from basing such claims on civil proceedings.  See, e.g., Marable v. W. Pottsgrove Twp., 176 Fed.Appx. 275, 280-81 (3d Cir. 2006) (stating that to establish a claim for malicious prosecution, a plaintiff must prove that "(1) the defendants initiated criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding").

LEXIS 54900, at *12 (D.N.J. July 27, 2007).  Instead, the
defendant litigator must "perform further acts after the issuance
of process which represent the perversion or abuse of the
legitimate purposes of that process."  Id.  Such "further acts"
include attachment, execution, garnishment, sequestration
proceedings, arrest, and criminal prosecution.  Baglini, 768 A.2d
at 832.

D&D has not alleged that either the Board or Epstein
committed any "further acts" with respect to the Smith Action or
the Vitetta arbitration.  As noted above, the Board did not serve
its third-party complaint in the Smith Action on D&D and that
complaint was later dismissed.  (Dkt. entry no. 248, Supplemental
Vogt Decl., at ¶ 7.)  Accordingly, neither the Board nor Epstein
can be said to have taken any steps "after the issuance of
process" because service of process was not effectuated on D&D.
See Component Hardware Group, Inc., 2007 U.S. Dist. LEXIS 54900,
at *12.  Similarly, neither the Board nor Epstein had an
opportunity to commit any acts that could be construed as
perverse or abusive with respect to the arbitration proceedings
because all claims involving D&D that were subject to the
arbitration were stayed shortly after the arbitration proceedings
commenced in 2003.  See id.  Although the Board and Epstein may
have advised this Court and the Bankruptcy Court that they
intended to move for leave to proceed with the arbitration with

79

respect to the claims the various contractors had against D&D, such statements of intention do not constitute "further acts" sufficient to establish an abuse of process claim.  (<u>See</u> D&D 2d Br., at 28.)

D&D also has not provided any evidence suggesting that the Board or Epstein used the arbitration proceedings to "entice" other Project contractors to blame D&D for the Project delays, or explained how the personal opinions of the other Project contractors has any relevance here.  (<u>See id.</u>)  Thus, neither the Board nor Epstein proceeded with the arbitration insofar as it pertained to D&D or took any other demonstrable steps that were intended to coerce or injure D&D.  <u>See</u> <u>Component Hardware Group,</u> <u>Inc.</u>, 2007 U.S. Dist. LEXIS 54900, at *13.  Therefore, the Court will grant summary judgment in favor of the Board and Epstein with respect to D&D's malicious prosecution and malicious abuse of process claims.

CONCLUSION

The Court, for the reasons stated <u>supra</u>, will (1) grant Bovis' motion with respect to count 9 (errors and omissions) and count 15 (civil conspiracy), (2) deny Bovis' motion with respect to count 10 (tortious interference) and count 11 (defamation), (3) grant Vitetta's motion with respect to count 3 (retaliatory termination for exercise of First Amendment rights), count 4 (First Amendment retaliation for seeking redress in federal

court), count 9 (errors and omissions), count 11 (defamation),
count 13 (fraudulent inducement), count 14 (fraudulent
inducement, rescission of performance bonds), and count 15 (civil
conspiracy), (4) deny Vitetta's motion with respect to count 10
(tortious interference), (5) grant Epstein's motion with respect
to count 1 (civil rights-Fourth Amendment, Fifth Amendment,
Fourteenth Amendment seizure of property), count 3 (retaliatory
termination for exercise of First Amendment rights), count 4
(First Amendment retaliation for seeking redress in federal
court), count 5 (civil rights-intimidation of witness), count 6
(civil rights-illegal garnishment without due process of law),
count 7 (quia timet-New Jersey law), count 9 (errors and
omissions), count 13 (fraudulent inducement), count 14
(fraudulent inducement-recision of performance bonds), count 15
(civil conspiracy), and count 16 (malicious abuse of process),
(6) deny Epstein's motion with respect to count 2 (liberty
interest, destruction of prequalification for public works
contracts without due process), count 10 (tortious interference),
and count 11 (defamation), (7) grant the Board's motion with
respect to count 1 (civil rights-Fourth Amendment, Fifth
Amendment, Fourteenth Amendment seizure of property), count 5
(civil rights-intimidation of witness), count 6 (civil rights-
illegal garnishment without due process of law), count 7 (quia
timet-New Jersey law), count 9 (errors and omissions), count 11

81

(defamation), count 15 (civil conspiracy), and count 16
(malicious abuse of process), and (8) deny the Board's motion
with respect to count 2 (civil rights-liberty interest,
destruction of prequalification for public works contracts
without due process), count 8 (breach of contract), and count 10
(tortious interference).  Thus, the following counts remain
against each defendant:

     Bovis - count 10, count 11

     Vitetta - count 10

     Epstein - count 2, count 10, count 11

     The Board - count 2, count 3, count 4, count 8, count
     10, count 12, count 13, count 14.

The Court will issue an appropriate order and judgment.[22]


                                  s/ Mary L. Cooper
                             **MARY L. COOPER**
                             United States District Judge

Dated: <u>December 20, 2007</u>

---

    [22] D&D's cross motion to bar "the assertion of any
counterclaim for liquidated or other damages, and assertion of
claims or defenses of setoff or recoupment" will be denied as
moot.  (Dkt. entry no. 209; <u>see</u> dkt entry nos. 245 & 254, 2-2-07
Mag. Judge. Ord. & 4-26-07 Ord. (affirming same).)