**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                 :
D&D ASSOCIATES, INC.,            :
                                 :   CIVIL ACTION NO. 03-1026 (MLC)
        Plaintiff,               :
                                 :        MEMORANDUM OPINION
        v.                       :
                                 :
BOARD OF EDUCATION OF            :
NORTH PLAINFIELD, et al.,        :
                                 :
        Defendants.              :
_____  :
```

**COOPER, District Judge**

This matter comes before the Court on the motion of the plaintiff, D&D Associates, Inc. ("D&D"), to compel the production of documents and overrule claims of privilege and attorney work product.  (Dkt. entry no. 413, Mot. to Compel.)  The defendant Board of Education of North Plainfield (the "Board") opposes the motion.  (Dkt. entry no. 417, Board Br.)  The Court heard oral argument on the motion on April 21, 2011.  For the reasons that follow, the Court will deny in part the motion, order production of certain documents for in camera review, and hold in abeyance the remainder of the motion pending such in camera review.

**BACKGROUND**

The facts of this case are well-known to the parties and will be briefly summarized here.  The Board, in 2001, requested bids for a $30 million project for the renovation and expansion of five schools in its District (the "Project").  D&D Assocs., Inc. v. N. Plainfield Bd. of Educ., No. 03-1026, 2007 WL 4554208,

at *2 (D.N.J. Dec. 21, 2007).  The Project was funded in part by grants from the New Jersey Economic Development Authority ("NJEDA").  D&D, as the lowest bidder for the general construction work, became the general contractor for the Project. Id.  The contracts between D&D and the Board for this construction work required D&D to post performance and payment bonds, which D&D obtained from American Motorists Insurance Company (the "Surety").  Id.  The Board also entered into contracts with defendant Vitetta Group, Inc. ("Vitetta") for architectural design and supervision of the Project, and with defendant Bovis Land Lease, Inc. ("Bovis") to perform construction management services for the Project.  Id.  Defendant Robert Epstein ("Epstein"), an attorney, served as counsel to the Board in connection with the Project.  Id.

Delays plagued the Project from the outset, and Epstein, on behalf of the Board, issued a letter to D&D on October 19, 2001, advising that D&D was in default of its obligations under the contracts.  Id. at *3.  (See dkt. entry no. 417, Vogt Decl., Ex. 3.)[1]  D&D attempted to continue to perform the construction work,

_____

[1] As will be discussed herein, whether Epstein was acting on behalf of the Board in issuing the default notices in his capacity as the Board's attorney, or was acting ultra vires as, in effect, a municipal policymaker for purposes of D&D's cause of action brought pursuant to 42 U.S.C. § ("Section") 1983, is at issue in the case, and the factual summary provided here is not intended to constitute a finding of fact having preclusive or adjudicative effect.

but the parties' relationship became more adversarial, resulting in further default notices, a decision by the Board to terminate D&D's employment as the general contractor for the Project, and a lockout of D&D from the construction sites in February 2003. 2007 WL 4554208, at *4-6.  The Board then entered into Takeover Agreements with the Surety whereby the Surety would complete the construction work originally contracted to D&D.  Id.

The current motion revisits a motion to compel brought by D&D and decided by the Magistrate Judge on July 28, 2006, addressing whether defendants improperly asserted the attorney-client privilege and work product doctrine with regard to certain withheld documents.  (Dkt. entry no. 126, D&D Mot. to Compel; dkt. entry no. 179, 7-28-06 Order.)  D&D argued that the defendants, including the Board, Epstein, Bovis, and Vitetta could not assert a "common interest" or "joint defense" type privilege as to all communications among them, given that the defendants' interests may be adverse to one another.[2]  The

_____

[2] Insofar as any party suggested that the defendants might claim a joint-defense privilege, it is a misnomer, as the "old joint-defense," which applied only to criminal defendants, has been supplanted by the modern "common interest" or "community of interest" privilege, which applies in "civil and criminal litigation, and even in purely transactional contexts."  In re Teleglobe Commc'ns Corp., 493 F.3d 345, 364 & n.20 (3d Cir. 2007) (citing Restatement (Third) of the Law Governing Lawyers § 76 (2000), comment b).  (See, e.g., dkt. entry no. 420, Song Decl., Ex. F, 2-16-06 Letter from Board's counsel to D&D's counsel asserting that documents pertaining to and consisting of a Standstill Agreement executed between the Board and Bovis were "protected under the joint defense privilege and common interest

3

defendants responded that their common interests were sufficient to assert such a privilege, disclosure among one another did not waive the privilege, and the work product doctrine covers documents predating the litigation because all parties involved should have reasonably anticipated litigation from the start of the Project in September 2001.

The Board has produced seven privilege logs, which have been referred to in this litigation as Privilege Logs A-G:

Privilege Log A:    Documents from Bovis's paper files
                    stored at the Somerset School

Privilege Log B:    Documents from Bovis's electronic
                    files

Privilege Log C:    Documents from McManimon & Scotland
                    (Board's bond counsel)

Privilege Log D:    Documents from Vitetta Group's
                    files

Privilege Log E:    Documents from the Board's offices

Privilege Log F:    Documents withheld by Greenberg
                    Traurig (Epstein's documents)

Privilege Log G:    Documents withheld by Greenberg
                    Traurig (Epstein's emails)

(Dkt. entry no. 413, Korzun Decl., Exs. A-G.)  The Magistrate Judge held a hearing on July 13, 2006, and determined that the

---

doctrine"; but cf. dkt. entry no. 224, Board Br. in Opp'n to Pl. Appeal at 26-28 (arguing that "common interest doctrine" preserves the attorney-client privilege for documents disclosed to Bovis or Vitetta, because those parties are within the same "community of interest" as the Board).)

documents listed in Privilege Logs C, E, and F were "clearly privileged in their entirety," whereas documents listed in Privilege Logs A, B, and D were variously "clearly privileged," "clearly not privileged," or "unclear."  (Vogt Decl., Ex. 39, 7-13-06 Hr'g Tr.; 7-28-06 Order at 2-4 & Table.)[3]  D&D and the Board cross-moved for reconsideration of the 7-28-06 Order, and the Magistrate Judge held a hearing on August 18, 2006, reviewing <u>in camera</u> a number of documents previously held to be "clearly not privileged" or "unclear."  (Vogt Decl., Ex. 41, 8-18-06 Hr'g Tr. at 53:17-54:9, 69:5-6, 70:6-15.)  The Magistrate Judge entered an Order on September 13, 2006, reflecting privilege rulings as to these documents.  (Dkt. entry no. 199, 9-13-06 Order.)

The Magistrate Judge's 9-13-06 Order granting in part and denying in part the cross motions for reconsideration ruled that

> communications between the Board, Bovis, Vitetta and Epstein as of September 21, 2001, are deemed to be either attorney-client privileged or to be attorney work product, as of that date.  The Court finds this date (9-21-01) as the date by which litigation was being contemplated for purposes of fixing the date that litigation was reasonably anticipated.

(9-13-06 Order at 2-3.)

D&D appealed the Magistrate Judge's 7-28-06 and 9-13-06 decisions pertaining to D&D's motion to compel.  (Dkt. entry no.

---

[3]  Privilege Log G was not addressed at this time.

203, Appeal.)  On appeal, D&D challenged the propriety of the 9-21-01 "anticipation of litigation" cutoff date and argued, inter alia, that (1) any privilege was waived by the Board's failure to timely produce a privilege log; (2) any joint defense privilege would be improper, insofar as the defendants had entered into a Standstill Agreement, not a Joint Defense Agreement; (3) documents disclosed to the NJEDA are public records and cannot be privileged; and (4) there is no basis for considering Bovis and Vitetta, "construction professionals" working on a project for the Board, "litigation consultants" of the Board or Epstein. (Dkt. entry no. 203, Pl. Br. Supp. Appeal at 14-23, 26-27; dkt. entry no. 225, Pl. Br. Supp. Mot. to Supplement Record on Appeal at 4-5, 12-15, 20.)

D&D's appeal of the Magistrate Judge's discovery rulings was denied without prejudice, along with several other motions, on October 17, 2006.  (Dkt. entry no. 217.)  D&D did not renew this "appeal" until October 22, 2009.  (Dkt. entry no. 342, Mot. to Supplement Discovery.)  The Magistrate Judge denied that appeal, styled as a motion to supplement discovery, as moot on January 22, 2010, finding that D&D had failed to timely renew its appeal within the time directed by the Court.  (Dkt. entry no. 394, 1-22-10 Order.)  D&D moved for reconsideration and appealed the 1-22-10 Order.  (Dkt. entry nos. 395, 396.)  The Court affirmed the Magistrate Judge's order, noting that the Magistrate Judge had

correctly ruled that there was no earlier appeal pending from the
Magistrate Judge's 2006 orders on discovery issues.  (Dkt. entry
no. 411, 6-28-10 Order; dkt. entry no. 416, 6-28-10 Hr'g Tr. at
5:3-12.)  Procedural problems surrounding D&D's motion to
supplement discovery notwithstanding, the Court advised the
parties at a June 28, 2010 hearing that it would allow D&D to
file a new motion for production of documents and state which
documents it was currently seeking.  (Dkt. entry no. 416, 6-28-10
Hr'g Tr. at 6:15-17.)

The Court observed at that hearing that, in light of
evolving case law regarding when a private attorney retained to
provide legal representation to a municipal body can be
considered to have acted "under color of state law" for purposes
of Section 1983, it would re-visit the privilege rulings in order
to ensure a fully developed record for consideration of Epstein
and D&D's cross-motions for summary judgment.  (6-28-10 Hr'g Tr.
at 7:8-20.)  See Majer v. Twp. of Long Branch, No. 06-2919, 2009
WL 3208419, at *8-9 (D.N.J. Sept. 30, 2009) (observing that
whether attorney representing municipality can be held liable
under Section 1983 "depends on whether he was working as an
attorney," and that such attorney "becomes a state actor by going
beyond the traditional attorney-client relationship," i.e., one
who decides official government policies such that his conduct
may be fairly attributable to the municipality).

D&D accordingly filed the current motion to compel production of documents and overrule claims of privilege.  Bovis and Vitetta have, throughout the course of these discovery disputes, maintained no position as to whether any particular documents are privileged or constitute attorney work product, except to the extent they acquiesce in the Board, as the holder of the privilege, claiming the same.  (See dkt. entry no. 131, Vitetta Resp. to D&D Mot. to Compel; 8-18-06 Hr'g Tr. at 16:5-25 (statements of counsel for Vitetta and Bovis explaining that privilege was being asserted by the Board); Vogt. Decl., Ex. 37, 5-15-06 Hr'g Tr. at 50:18-51:25, 53:1-55:10.)

D&D moves for production of all documents not previously produced listed in Privilege Logs A, B, C, and D.  (Dkt. entry no. 413, Proposed Order Granting Pl.'s Mot. to Compel & Overruling Claims of Privilege ("Pl. Proposed Order") at 1-2; Korzun Decl. at ¶ 40.)  D&D also seeks production of a majority of the documents listed in Privilege Logs E, F, and G, arguing, inter alia:  (1) the Board waived the attorney-client privilege through disclosure to third parties; (2) the protection of the work product doctrine is unavailable as to documents created by or for Bovis or Vitetta; (3) the defendants' proposed testimony regarding an alleged "consensus decision" among the defendants to terminate D&D acts as a waiver as to all documents relating to such "consensus decision," pursuant to Federal Rule of Evidence

502(a); (4) the Board waived the privilege by asserting defenses including (a) qualified immunity, (b) a lack of notice under the New Jersey Tort Claims Act, or (c) D&D was afforded a name-clearing hearing; (5) the crime-fraud exception to the attorney-client privilege; (6) the Board should produce all documents to D&D that it produced to the Surety in a state-court action brought by the Surety against the Board; and (7) the Board waived the privilege with respect to communications to, by, or about certain subcontractors.  (Korzun Decl. at ¶ 41 & Table.)

**DISCUSSION**

**I.   Applicable Legal Standards**

**A.   Attorney-Client Privilege**

Communications between an attorney and a client are protected by the attorney-client privilege, the purpose of which is to promote frank discussions between a client and his or her attorney to allow the attorney to best represent the client. Fisher v. United States, 425 U.S. 391, 403 (1976).  The burden of establishing the existence of a privilege falls on the party asserting the privilege.  In re Bevill, Busler & Shulman Asset Mgmt. Corp., 805 F.2d 120, 126 (3d Cir. 1986).  The central inquiry in determining if the privilege applies is whether the client made the communication for the purpose of obtaining legal advice.  In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 805 (Fed. Cir. 2000); see In re Teleglobe Commc'ns Corp., 493 F.3d

9

345, 359 (3d Cir. 2007) (stating that attorney-client privilege protects from disclosure "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client") (citing Restatement (Third) of the Law Governing Lawyers § 68 (2000)). "Privileged persons" include "the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." In re Teleglobe, 493 F.3d at 359 (citing Restatement (Third) of the Law Governing Lawyers § 70).

The privilege can be waived if the privileged information is communicated to outside parties. Id. at 361. But disclosure to the agent of the attorney or client does not constitute a waiver, if the agent is acting in a capacity relevant to the client's obtaining legal advice, such as facilitating the comprehension of communications between the attorney and the client. In re Grand Jury Investigation, 918 F.2d 374, 384 (3d Cir. 1990) ("[T]he presence of third parties, if essential to and in furtherance of the communication, should not void the privilege."); Sunnyside Manor, Inc. v. Twp. of Wall, No. 02-2909 (MLC), dkt. entry no. 42, 12-22-02 Mem. Op. at 4-5. The designation of the third party as a witness for trial does not preclude a party from claiming attorney-client privilege as to the privileged information. Id. at 8.

10

The "common-interest" privilege is an extension of the attorney-client privilege providing an exception to the general rule that voluntary disclosure of an attorney-client communication to a third party waives the attorney-client privilege; it "protects communications made between attorneys when all members of the community share a common legal interest in the shared communication." La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp., 253 F.R.D. 300, 309 (D.N.J. 2008); accord In re Teleglobe, 493 F.3d at 364 (discussing "community-of-interest" privilege, also called "common-interest" privilege). The parties' common legal interest need not be identical, but merely substantially similar. Graco, Inc. v. PMC Global, Inc., No. 08-1304, 2011 WL 666048, at *20 (D.N.J. Feb. 14, 2011); Restatement (Third) of the Law Governing Lawyers § 76, comment e ("The communication must relate to the common interest, which may be either legal, factual, or strategic in character. The interests of the separately represented clients need not be entirely congruent."). The fact that parties with common interests may also have some adverse interests does not destroy the common-interest privilege as to communications regarding the common interest. Eisenberg v. Gagnon, 766 F.2d 770, 787-88 (3d Cir. 1985).

The applicability of the attorney-client privilege is determined on a case-by-case basis. Upjohn Co. v. United States,

449 U.S. 383, 396 (1981).  A court, in determining the
applicability of the privilege, may make rulings on the basis of
the information in the privilege log, or may conduct an in camera
review.  In re Grand Jury Investigation, 445 F.3d 266, 269 (3d
Cir. 2006); In re Bevill, 805 F.2d at 125 (noting that in camera
review is frequently the only way to resolve whether the
privilege asserted applies) (citing United States v. Nixon, 418
U.S. 683 (1974)).

> **B.   Work Product Doctrine**

The work product doctrine protects "the confidentiality of
papers prepared by or on behalf of attorneys in anticipation of
litigation," with the aim of promoting the adversary system "by
enabling attorneys to prepare cases without fear that their work
product will be used against their clients."  Westinghouse Elec.
Corp. v. Republic of Phil., 951 F.2d 1414, 1428 (3d Cir. 1991).
The doctrine is expressed in Federal Rule of Civil Procedure
("Rule") 26(b)(3), providing that "documents and tangible things
that are prepared in anticipation of litigation or for trial by
or for another party or its representative (including the other
party's attorney, consultant, surety, indemnitor, insurer, or
agent)" are not discoverable, absent a showing of "substantial
need for" the otherwise relevant  materials and inability to
obtain their substantial equivalent by other means without undue
hardship.  Fed.R.Civ.P. 26(b)(3)(A).

12

The work product doctrine's protections, like the attorney-client privilege, may be waived by intentional disclosure to a third party, but "the purpose behind the work-product doctrine requires a court to distinguish between disclosures to adversaries and disclosures to non-adversaries, and it is only in cases in which the material is disclosed in a manner inconsistent with keeping it from an adversary that the work-product doctrine is waived." In re Chevron, 633 F.3d 153, 165 (3d Cir. 2011) (citation and quotations omitted).

The party claiming the protections of the work product doctrine has the burden of proving that the materials were prepared in anticipation of litigation. Sharp v. Gov't of V.I., 77 Fed.Appx. 82, 85 (3d Cir. 2003). Materials can be fairly identified as prepared in anticipation of litigation "as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." Id. Work product prepared in the ordinary course of business does not fall within the doctrine. Id.

### C.   Crime-Fraud Exception

The party seeking to apply the crime-fraud exception to the attorney-client privilege must make a prima facie showing that (1) the client was intending to commit or committing a fraud, and (2) the attorney-client communications were in furtherance of the fraud. In re Grand Jury Subpoena, 223 F.3d 213, 217 (3d Cir.

2000).  If this threshold is met, the Court should conduct an <u>in camera</u> review of the allegedly privileged communications to determine whether they fall within the crime-fraud exception, and "the party invoking the privilege has the absolute right to be heard by testimony and argument."  <u>Haines v. Liggett Group, Inc.</u>, 975 F.2d 81, 96-97 (3d Cir. 1992); <u>see also</u> <u>United States v. Trenk</u>, 385 Fed.Appx. 254, 257 (3d Cir. 2010).

## II.  Legal Standards Applied Here

### A.  Attorney-Client Privilege

#### 1.  Waiver of Attorney-Client Privilege as to Documents and Communications Among and Between the Board, Epstein, Bovis, and Vitetta

The Magistrate Judge upheld the Board's "claims of privilege as to conversations, communications and documents between the Board, Epstein, Bovis, and Vitetta," finding that Bovis and Vitetta were agents of the Board by the terms of their contracts with the Board, including for purposes of conveying information for formulating litigation strategy.  (9-13-06 Order at 3.)  The Magistrate Judge thus concluded that disclosure of documents to Bovis or Vitetta did not destroy the attorney-client privilege or fall outside of the work product doctrine.  (<u>Id.</u>)  The Board has maintained throughout this litigation that communications among the Board, its attorney, Bovis, and Vitetta "that involve legal strategy" are protected from discovery as privileged.  (Board Br. at 18-19.)  D&D contends that Bovis and Vitetta are not

14

"'clients' within Epstein and his firms' representation of the Board," such that documents to or from Bovis or Vitetta constitute "communications with third parties" outside the scope of the attorney-client privilege.  (Pl. Br. at 20.)

We agree with the Magistrate Judge's conclusion that documents to or from Bovis or Vitetta do not automatically fall outside the scope of the privilege, insofar as the withheld documents were disclosed to Bovis or Vitetta out of necessity for the Board and its counsel to "obtain informed legal advice." Westinghouse, 951 F.2d at 1424.  Under the terms of their contracts with the Board, both Bovis and Vitetta served as representatives and agents of the Board in connection with the Project.  (See Board Br. at 6-8.)  The attorney-client privilege is not waived where disclosure is made to an "'agent' assisting the attorney in giving legal advice to the client." Westinghouse, 951 F.2d at 1424.  The Court's review of the Privilege Logs indicates that the documents withheld by the Board on the basis of the attorney-client privilege disclosed to or by Bovis or Vitetta are the type of communications that would "help facilitate" Epstein's representation of the Board, and insofar as Bovis and Vitetta are agents of the Board, they are appropriately considered "privileged persons," disclosure to whom does not waive the privilege.  See In re Teleglobe, 493 F.3d at 359; see also SmithKline Beecham Corp. v. Apotex Corp., 232 F.R.D. 467,

15

476-77 (E.D. Pa. 2005) ("Presence of a third-party, such as a
consultant, does not destroy the attorney-client privilege where
that party is the client's agent or possesses 'a commonality of
interest with the client.'") (quoting In re Grand Jury
Investigation, 918 F.2d at 386 n.20).

D&D does not argue that any specific documents in Privilege
Logs A, B, C, or D should be produced due to waiver of the
attorney-client privilege, but rather moves for a blanket
production of all documents not previously produced.  Reviewing
these Privilege Logs, we find no documents previously held to be
privileged that should now be produced by reason of disclosure to
a third party.[4]  Our analysis therefore ends as to the question
of waiver by operation of disclosure to Bovis or Vitetta with
respect to those documents, and we turn to D&D's remaining
arguments regarding the Privilege Logs.

An example of a document D&D argues must be produced due to
waiver of the attorney-client privilege, ostensibly due to
disclosure to Bovis or Vitetta, is document 172 in Privilege Log
E, which consists of the Board's records.  This is an email from

_____

[4] See Privilege Log A, documents 11-13, 17-18, 36-37, 39,
45, 58; no documents in Privilege Log B, as the Magistrate Judge
previously ordered production of all documents withheld for
attorney-client privilege; Privilege Log C, not at issue here
because D&D is estopped from arguing in favor of production of
documents listed therein due to its previous concession that such
documents are privileged, see infra at 19-20; Privilege Log D,
documents 22, 72, 147, 171, 277, 356, 368, 369, 378.

Epstein to Lew Myerson and Ritchard Sherman of Vitetta, C.C. Smith of Bovis, and Marilyn Birnbaum and Tim Stys of the Board, described in the Privilege Log as "Email advice re: responsibility of the Board for acts [o]f the prime contractors." (Privilege Log D at 16.)  It is representative of many of the other documents listed in Privilege Logs E, F, and G that D&D argues should be produced due to waiver simply because Bovis or Vitetta employees authored the document or were among the recipients.  We will not order production of such documents on this basis, insofar as Bovis and Vitetta are agents of the Board for purposes of the Project and, by extension, this litigation. They share a commonality of interest with the Board, such that disclosure to them of otherwise attorney-client privileged documents does not operate as a waiver of the privilege held by the Board.[5]

---

[5]  We hold that the Board did not waive the attorney-client privilege as to these documents by means of disclosure to a third party:

Privilege Log E:  23, 27, 34-35, 37, 41, 45, 47-48, 52-53, 56-57, 62, 67, 81-82, 92, 109, 133, 143, 153, 163, 172, 179-180, 195, 197, 201-203, 222, 228, 277-280, 308, 310, 321, 356.

Privilege Log F:  37, 43-44, 74, 85-86, 94, 99-101, 124, 165, 178, 201, 242, 248, 253-254, 257, 260-261, 272, 274, 285-286, 437.

Privilege Log G:  2, 13, 16, 19, 25, 27, 30, 36, 40, 42, 45-46, 50-52, 55, 62, 66, 87, 96-98, 100, 103-104, 106, 110, 112, 119-120, 128-130, 137, 148-151, 153, 158, 165-167, 171, 175-177, 199, 201, 209, 220, 222,

It is difficult, however, for the Court to assess the Board's ability to properly withhold documents as attorney-client privileged where the identity of a party to the communication is not discernable to the Court.  The description of each document in a privilege log must contain sufficiently detailed information "to allow the court to determine whether the elements of the attorney-client privilege . . . have been established," including "dates, authors, and recipients."  SmithKline Beecham Corp., 232 F.R.D. at 475.  We therefore concur with D&D that it is "unclear" whether the attorney-client privilege applies to the following documents in Privilege Log E insofar as they either (1) do not identify an author or recipient, (2) do not identify an attorney as a party to the communication, or (3) identify a person unknown to the Court:  78, 127, 132, 275, 398, 399.  (Korzun Decl. at 21, Table.)  We also question the applicability of the privilege to the following documents, due to a lack of clarity as to the identity and role of a recipient such that disclosure to a third

---

230-235, 241, 243, 248, 256-260, 268-269, 271, 274-277, 279-280, 282-283, 286-287, 289, 293-295, 297-303, 306-330, 333, 338, 340-354, 357-358, 361-363, 366, 369, 371-372, 376, 378-379, 381, 385-386, 393-395, 397-398, 400, 406-409, 411-412, 414-415, 421-424, 428-436, 440-441, 443-450, 452-456, 458-460, 462-465, 467-472, 474, 478-506, 508-514, 516-538, 540-554, 556, 558-560, 562, 564-565, 567-569, 571-580, 582-583, 585, 589, 592, 594-595, 597, 603-604, 606-631, 633-634, 637, 640-655, 658-673, 675-677, 683-699, 703, 705-706, 708, 712-714, 716-727, 729, 731, 734-739, 741-743, 745, 747, 751-752, 755, 762-766.

party may have waived the privilege:  Privilege Log E, documents
32-33 (Theodore Gast), 352 (Kara Lahey Egan and Craig Freid);
Privilege Log F, documents 398-400 (Suplee Clooney & Co.), 531
(Isabel Sarola); Privilege Log G, documents 417 (Mark Revello),
539 (All offices - Construction Safety Group), 586 (Patrick
Boyle), 638 (Gary Wilson), 674, 733, 744 (Megan Murray), 728
(Barbara Ranieri).  The Court will therefore review these
documents in camera and order the Board to provide identifying
information for the preceding individuals.  However, to the
extent D&D continues to argue that the attorney-client privilege
and work product doctrine are waived due to the Board's failure
to timely produce Privilege Logs until ordered to do so by the
Magistrate Judge, we find this issue was within the Magistrate
Judge's case management discretion and will not be revisited
here. (See Pl. Proposed Order at ¶ A; dkt. entry no. 420, Pl.
Reply Br. at 7-8.)

### 2. Waiver of Attorney-Client Privilege as to Communications with the Board's Bond Counsel, McManimon & Scotland

D&D conceded during the July 13, 2006 hearing before the
Magistrate Judge that all of the documents listed in Privilege
Log C, documents from the files of the Board's bond counsel,
McManimon & Scotland, were privileged.  (7-13-06 Hr'g Tr. at
20:4-6; 8-18-06 Hr'g Tr. at 44:2-5.)  We therefore find that D&D
is estopped from now contending that communications between the

Board and its bond counsel are not protected by the attorney-client privilege and seeking production of the documents listed in Privilege Log C.[6]  In any event, the Court would not order the production of documents listed in Privilege Log C due to a lack of support for D&D's novel theory that a conflict of interest exists between the Board and its bond counsel.  (Pl. Br. at 21-22; Board Br. at 39-40.)[7]

### B.   Work Product Doctrine

#### 1.   Work Product Doctrine Applicability as to Documents in Bovis and Vitetta's Files or Documents Prepared by or for Bovis or Vitetta

D&D contends that the Court should overrule the Board's claim of work product protection as to documents in Bovis and Vitetta's files, "including extensive correspondence with Bovis and Vitetta prior to and during the Project."  (Pl. Br. at 25.) Many of these documents "were either created by, or constituted directions to Bovis and Vitetta."  (Id. at 26.)  While Epstein is a party to a vast majority of these documents, others were not sent to Counsel.  (Id.; see, e.g., Privilege Log D, Documents from Vitetta's Files, document 119, Lewis Myerson of Vitetta to

---

[6] The Board does not assert that any documents listed in Privilege Log C were withheld due to the work product doctrine.

[7] The case cited by D&D, Application of Cnty. of Bergen, N.J. for Approval to Dissolve Bergen Cnty. Util. Auth., 268 N.J. Super. 403, 407-08 (N.J. App. Div. 1993), pertains to the need for an attorney to "avoid even the appearance of impropriety which may arise when he acts as an adversary against a former or existing client," which is not an issue in this case.

Marilyn Birnbaum of the Board, "Email of draft letter re: D&D defaults with respect to Contract C," held "clearly privileged" as work product by Magistrate Judge.)  D&D contends that the Bovis and Vitetta file documents must be produced because the Board "intends for Bovis and Vitetta's witnesses to give their opinions about D&D's alleged deficiencies and contractual breaches and to justify their course of action, based upon their beliefs about D&D."  (Pl. Br. at 27.)  D&D asserts that "work product claims" as to Bovis and Vitetta documents "should be analyzed under Rule 26(b)(4), which establishes the work product privilege for non-testifying experts."  (Id.)

We reject D&D's contention that Rule 26(b)(4) provides the applicable paradigm here.  See In re Cendant Corp. Sec. Litig., 343 F.3d 658, 664-65 (3d Cir. 2003) ("Rule 26(b)(3) provides work product protection independently of Rule 26(b)(4)(B).").  Moreover, for reasons similar to those underlying our finding that disclosure of documents to or by Bovis or Vitetta did not waive the attorney-client privilege, we decline to find a waiver of the work product protection here, based on the relationship between the Board, Bovis, and Vitetta.  The Board and its attorney "relied on Vitetta and Bovis to keep them apprised of Project events and issues," which the Privilege Logs indicate included giving updates for the Board and its attorney to formulate a litigation strategy regarding D&D's alleged default

21

and resulting termination.  (Board Br. at 8; see, e.g., Privilege
Log B (Bovis work product documents including liquidated damage
summaries); Privilege Log D, documents 37-40 (Vitetta work
product documents including emails to the Board and Bovis
discussing "D&D's defaults" and "D&D performance problems");
Privilege Log E, document 58 (Bovis-authored "Memo re: Critical
Issues regarding delays").)

    Documents prepared in anticipation of litigation by a
party's representative, including an agent, are entitled to the
same protection from disclosure in discovery as work product
prepared by the party's attorney or the party itself.
Fed.R.Civ.P. 26(b)(3); In re Cendant Corp. Sec. Litig., 343 F.3d
at 665 (stating that non-attorney litigation consultants' advice
may be considered work product requiring "a showing of
exceptional circumstances in order for it to be discoverable").
Accordingly, the Board is entitled to assert that documents
prepared by Epstein, Bovis, or Vitetta fall within the
protections of the work product doctrine.  The Court will not
order production of documents sought by D&D on the basis of "no
Bovis or Vitetta work product."  (Korzun Decl. at 21-23, Table.)

    More generally, we find no indication that the Board is
currently asserting, as suggested by D&D, the work product
doctrine as to "documents created in the ordinary course of
business."  (Id. at 28.)  The Board produced "over 150,000 pages

of Project documents for inspection" and asserted work product protection only as to documents it perceived as prepared in anticipation of litigation, as opposed to the documents "reflecting actual Project events."  (Board Br. at 8-10.)  D&D has not made the requisite showings of (1) "substantial need" for particular work product materials and (2) inability to obtain the equivalent without undue hardship.  Fed.R.Civ.P. 26(b)(3)(A)(ii); Upjohn, 449 U.S. at 401-02.

### 2. Work Product Doctrine Applicability in Light of Certifications Made to the NJEDA

D&D contends that the Board is estopped from contending that documents prepared by Bovis or Vitetta were "in anticipation of litigation" because the Board's business administrator "certified that all of Vitetta's, Bovis's, and even Epstein's work between 2000 and 2003 was for the construction itself and not for litigation, since litigation costs are ineligible for reimbursement" by the NJEDA pursuant to the conditions for the construction grants from the NJEDA that partially funded the Project.  (Pl. Br. at 18, 28; Korzun Decl. at ¶ 20.)  We do not find this to be a valid basis for overruling the Board's claims of work product protection.  Whether attorney's fees are for "construction" as opposed to "litigation" under the NJEDA's grant agreements is a separate issue from the scope of work product protection under Rule 26(a)(3), and we decline D&D's invitation to conflate the two.  (Pl. Br. at 27-28; Board Br. at 44.)

We further observe that the Board's submission of invoices to the NJEDA does not operate as a broad waiver of the work product doctrine because the NJEDA is not adverse to the Board. See Cooper Hosp./Univ. Med. Ctr. v. Sullivan, 183 F.R.D. 119, 129 (D.N.J. 1998) ("Disclosures to non-adversaries do not waive the [work product doctrine]."). D&D has not shown that disclosure of billing invoices to the NJEDA "enable[d] an adversary to gain access to the information" it now seeks. See Westinghouse, 951 F.2d at 1428.

### 3. Litigation "Reasonably Anticipated" as of September 21, 2001 Date for Purposes of Work Product Doctrine

D&D challenges the use of September 21, 2001, as the date as of which litigation could be reasonably anticipated. (Pl. Br. at 28-29.) The Magistrate Judge determined, based on a review of the record and having held three hearings on privilege issues, that "the line of demarcation fairly stated" as the date on which litigation would have been reasonably anticipated was September 21, 2001, "the first day of fall." (8-18-06 Hr'g Tr. at 33:12-15.) Notably, Epstein and counsel for D&D were already involved in discussions at that point, "so it was reasonable to assume there would be litigation." (8-18-06 Hr'g Tr. at 33:20-22; id. at 37:7-38:5 (observing that "once people engage lawyers that's a reasonable time to think that litigation is definitely anticipated").)

24

The Court agrees with the Magistrate Judge that there is support in the record for the concept that the parties could have reasonably anticipated litigation as of September or October 2001. (5-15-06 Hr'g Tr. at 35:18-21; Vogt Decl., Ex. 25, Tattoli Dep. at 293:4-5, 366:21-367:25; 7-13-06 Hr'g Tr. at 11:10-25.) Therefore, we will not disturb the Magistrate Judge's "line of demarcation" for purposes of applying the work product doctrine.

### C. Documents Relating to the Alleged "Consensus Decision" Made by Defendants to Default D&D and Terminate D&D from the Project

D&D contends that the Board has waived the attorney-client privilege as to documents relating to the alleged "consensus decision" of the defendants to default and terminate D&D from the Project by listing such documents as exhibits to be introduced at trial in the proposed pretrial submissions, and by operation of Epstein's proposed testimony, in his own defense, regarding communications with the Board, Bovis, and Vitetta. (Pl. Br. at 2-5; Korzun Decl. at ¶¶ 9-16 & Exs. L-M.)[8]  D&D therefore

---

[8] Epstein continues to serve as co-counsel of record in defense of the Board in this litigation, and contends that he will not need to testify as a witness regarding the claims against the Board, Bovis, and Vitetta.  Epstein is separately represented in defense of the claims asserted by D&D against Epstein individually in this same litigation.  That situation has prompted pretrial motions by Epstein for severance or a separate trial of D&D's claims against him, by the Board to bifurcate the trial, and by D&D to disqualify Epstein from serving as counsel for the Board at trial.  (Dkt. entry no. 326, Epstein Mot. to Sever; dkt. entry no. 327, D&D Mot. to Disqualify Counsel; dkt. entry no. 328, Board Mot. to Bifurcate.)  We will deal with those motions in due course, and do not address them in this opinion.

contends that the defendants' evidentiary proffers constitute an intentional waiver of the attorney-client privilege under Federal Rule of Evidence 502, requiring complete disclosure of <u>all</u> materials pertaining to this "consensus decision."  (Pl. Br. at 6-8.)  Fed.R.Evid. 502(a) (stating that intentional waiver of privilege requires disclosure of all related subject matter if in fairness ought to be considered together).  D&D also suggests that the defendants' proposed testimony waives any claim to work product protection.  (Pl. Br. at 26.)

We reject D&D's argument that Epstein's proposed testimony operates to waive the <u>Board's</u> attorney-client privilege or work product protection.  As an initial matter, we observe that D&D's remaining claims against the Board do not implicate the issue of Epstein's role as an attorney.  Neither the Board nor Epstein have voluntarily raised the "consensus decision" issue; rather, it is a topic necessitated by D&D's decision to sue Epstein, the Board's attorney, and Epstein's need to have the Board explain what happened as part of his defense.  Generally, a party's mere accusation that an attorney overstepped his bounds cannot force the client's waiver of the attorney-client privilege.[9]

---

[9] An exception would be the rare case where the plaintiff can make a prima facie showing sufficient to invoke a court's <u>in camera</u> review to consider the crime-fraud exception  to the attorney-client privilege.  This is not such a case.  (<u>See infra</u> at 37-39.)

It appears to the Court that D&D's assertion of a Majer-type claim against Epstein, seeking damages under Section 1983 against a private attorney representing a municipal body for alleged due process violations, exacerbates the tension between the attorney-client privilege and Epstein's need to defend himself for purposes of determining whether Epstein can be considered a state actor.  This tension, which we recognize here, apparently presents a matter of first impression.  In Majer, the conduct at issue involved an in-person meeting at which the defendant attorney "appeared [to the plaintiff] to be running the township" and allegedly unilaterally terminated a municipal pilot program that had given the plaintiff the right to place "open house" signs in the public right-of-way, such that questions of attorney-client privilege were not implicated.  Majer, 2009 WL 3208419, at *2, *9-10.  But faced with the question here, in a context where the alleged ultra vires conduct took place behind closed doors and, apparently, through written communication, we think that public policy dictates that there must be ways to adjudicate a Majer claim against an attorney other than forcing a municipal defendant to waive its attorney-client privilege.  Accordingly, we hold that for the defendants to indicate through their pretrial submissions that witnesses will testify as to the general fact that a consensus existed among the defendants to default and terminate D&D from the Project does not act as a

waiver of the privilege with respect to otherwise privileged internal documents detailing the process by which that "consensus" was reached.

D&D also contends that it is entitled to production of documents exchanged between Epstein and Bovis or Vitetta because the Board has waived any attorney-client privilege as to such documents by stating that it will call Bovis or Vitetta employees to testify at trial as to the Board's decision to default D&D, allegations of D&D's poor performance, and recommendations made to the Board not to pay D&D's requisitions as liquidated damages. (Pl. Proposed Order at ¶ G(2)-(3).)  The Court fails to see how this proposed testimony waives the attorney-client privilege held by the Board or otherwise requires production of documents reflecting "recommendations made to the Board."  While the reasons for the default and nonpayment of D&D must be provided, the legal advice given by Epstein, who may have sought input from the Board's agents Bovis and Vitetta in giving such advice, remains privileged absent a showing that the Board intends to expressly rely on a particular privileged document at trial.  D&D has not identified any documents not yet produced by the Board that the Board will rely on at trial.

Documents created by or constituting directions to Epstein, Bovis, or Vitetta in anticipation of litigation similarly remain protected by the work product doctrine, notwithstanding the

28

defendants' evidentiary proffers.  We see no grounds for a waiver
of either the work product doctrine or attorney-client privilege
by reason of the proposed pretrial submissions insofar as the
defendants necessarily had to communicate among one another
regarding problems with the Project, and D&D has not shown that
it is entitled to either "contemporaneous statements and
discussions on these topics" or "Bovis's full documentation of
what was happening."  (Pl. Br. at 26.)  The reasons for D&D's
default and termination must be produced, and have, in the form
of the communications to D&D informing D&D of the same, as well
as construction records.  However, the documents reflecting
Bovis, Vitetta, or Epstein's recommendations to the Board about
litigation strategy or the implications of the status of the
Project, including a recommendation to the Board not to pay D&D's
requisitions in anticipation of liquidated damages, need only be
produced to the extent any defendant intends to rely on such
documents at trial.[10]

   D.   **Waiver of Attorney-Client Privilege or Work Product
        Doctrine Through Disclosure to Third Parties Other Than
        Bovis or Vitetta**

        1.   **School Construction Law and Open Public Records
             Act**

-------------------

     [10] Any issue pertaining to the Board's "inadvertent"
previous withholding of documents it now intends to use at trial
appears to have been resolved, and to the extent D&D implies this
constitutes a basis for a broad waiver of the Board's ability to
claim attorney-client privilege or work product protection, we
disagree.  (Korzun Decl., Exs. L-M.)

D&D contends that the Board may not assert a privilege as to documents listed in Privilege Logs A, B, and D (Bovis and Vitetta documents) insofar as they are public records under the New Jersey School Construction Law, N.J.S.A. § 52:27D-130, and thus are discoverable by operation of the Open Public Records Act ("OPRA"), N.J.S.A. § 47:1A-1 et seq.  (Pl. Br. at 13-15.)

The law requiring a permit for construction of buildings, including public school facilities, provides that applications for a construction permit "shall be filed with the enforcing agency and shall be a public record."  N.J.S.A. § 52:27D-130. D&D also points to a regulation, providing that a public school district undertaking a capital improvement project must maintain on file a wide range of project-related documents for possible review by certain government entities, in support of its argument for a broad-based waiver of the attorney-client privilege as to "public records."  (Pl. Br. at 13-14 (citing 33 N.J.R. 3482 (Oct. 1, 2001) (amending N.J.A.C. § 6A:26-4.7)).)  We find D&D's public records argument unpersuasive.

OPRA provides that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest."  N.J.S.A. § 47:1A-1.  OPRA expressly exempts from the definition of a government record "any record within the attorney-client privilege."  Id. § 47.1A-1.1.

OPRA further provides that its provisions "shall not abrogate or erode any . . . grant of confidentiality heretofore established or recognized by . . . statute, court rule, or judicial case law, which privilege or grant of confidentiality may duly be claimed to restrict public access to a public record or government record."  N.J.S.A. § 47:1A-9.  Attorney-client privileged documents and attorney work product are therefore beyond OPRA's reach.  See Paff v. Div. of Law, 988 A.2d 1239, 1244 (N.J. App. Div. 2010) (holding that "state agencies requesting legal advice from their attorneys concerning the exercise of the statutory responsibilities they are required by law to discharge are entitled to receive legal advice from their attorneys on a confidential basis").

We find no legal basis for determining that the Board has somehow waived the attorney-client privilege by operation of OPRA.  Absent such a threshold showing, we decline to order production of any documents on the theory that they could be made publicly available under OPRA and/or the New Jersey statutes and regulations governing school construction.

### 2.    Documents Produced to the School Construction Commission

D&D contends that the Board's attorney-client privilege was lost by operation of submission of daily billing reports of Epstein and his law firm colleagues to the School Construction Commission ("SCC") from 2000 to 2003.  (Pl. Br. at 31.)  D&D

31

states that the SCC allowed D&D to review and copy these billing records as public records, which detail the factual and legal issues the attorneys researched, whom they spoke with, on what topics, and the correspondence and drafts of correspondence they prepared.  (Id.)  D&D argues that any claim of privilege as to these underlying documents is "unjustified."  (Id.)

D&D has not provided copies of these billing records for the Court to review in order to determine whether the Board could be deemed to have intentionally waived the attorney-client privilege as to documents or communications alluded to in the billing records.  D&D does not specify any withheld documents it claims should be produced by reason of the disclosure of billing records to the SCC.  Nor does D&D cite any case, statute, or rule in support of its argument.  While the billing records themselves are obviously not privileged because they have been produced to the SCC, we find no basis for a waiver of attorney-client privilege or the work product doctrine as to all work performed by attorneys detailed in the records.  See, e.g., In re Questex Media Grp., Inc., No. 09-13423, 2009 WL 7215695, at *16 (Bankr. D. Del. Oct. 26, 2009) (ordering that "the provision of [counsel's] invoices shall not constitute any waiver by the [client] . . . of the attorney-client privilege or any of the benefits of the attorney work product doctrine"); cf. Montgomery Cnty. v. Micro Vote Corp., 175 F.3d 296, 304 (3d Cir. 1999)

(holding that attorney billing records were privileged "because they reveal the nature of the services [the attorney] rendered"). We therefore will not order production of documents based on the Board's submitting attorney billing records to the SCC.

**E.   Waiver Due to Defenses Asserted by Defendants**

**1.   Qualified Immunity**

D&D contends that the Board has waived the attorney-client privilege and work product doctrine due to assertion of a qualified immunity defense.  (Pl. Br. at 31-32.)  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  However, as D&D notes, the qualified immunity defense is not available to the Board to assert.  (Pl. Br. at 31 n.15.)  See Carlino v. Gloucester City High Sch., 57 F.Supp.2d 1, 33 (D.N.J. 1999) (observing that the "Gloucester City Board of Education, as a municipal entity, . . . is not entitled to qualified immunity"); see generally Owen v. City of Independence, 445 U.S. 622, 635-50 (1980).

D&D acknowledges that this defense is "unpleaded" by both the Board and Epstein.  (Pl. Br. at 31.)  D&D's contention that Epstein has asserted a qualified immunity defense is inaccurate, as Epstein's summary judgment brief makes no mention of the

doctrine.  (Pl. Br. at 32-33; dkt. entry no. 347, Epstein Br.
Supp. Summ. J.)  Qualified immunity is only available to
government officials, and Epstein vehemently contends that he is
not a state actor amenable to suit under Section 1983.  (Epstein
Br. Supp. Summ. J. at 7-8.)

The Board's reference to qualified immunity in its summary
judgment brief is limited to a legal argument that the
constitutional right D&D alleges was violated was not "clearly
established" until 2006.  (Dkt. entry no. 348, Board Br. Supp.
Summ. J. at 31-32.)  We therefore reject D&D's assertion that the
Board's fleeting reference to the doctrine of qualified immunity
and the existence vel non of a "clearly established right" would
waive the privilege as to all communications among the defendants
relating to how they reached their "decisions against D&D."  (Pl.
Br. at 31-32.)  Notwithstanding that Epstein has not, in fact,
asserted a qualified immunity defense, because the attorney-
client privilege and work product doctrine are held and asserted
by the Board, we would find that if Epstein did implicate such a
defense, it would not act as a waiver as to the Board.  To hold
otherwise would allow a plaintiff to simply sue any attorney
retained by a municipal entity in order to pierce that entity's
attorney-client privilege and work product protections.[11]  The

---

[11] Children First Found., Inc. v. Martinez, No. 04-927, 2007
WL 4344915 (N.D.N.Y. Dec. 10, 2007), cited by D&D, is
distinguishable.  (Pl. Br. at 32-33.)  There, a state attorney

Court therefore will not order production of documents based on the Board's meritless assertion in its summary judgment brief that it is entitled to qualified immunity from D&D's claim for "stigma-plus" damages.  (Board Br. Supp. Summ. J. at 31-32.)

### 2.   Lack of Notice Under the Tort Claims Act

D&D contends that the Board's "unpleaded affirmative defense under the New Jersey Tort Claims Act" waives the privilege as to all the defendants' communications about whether the Board had notice and an opportunity to investigate D&D's claims.  (Pl. Br. at 36.)  D&D therefore seeks production of all withheld documents comprising "communications among the defendants initiated to discuss" the letters D&D claims suffice as adequate notice under the Tort Claims Act, "or form a response thereto."  (Id. at 39-40.)

------

was sued along with other state defendants who raised a qualified immunity defense.  The state attorney, in response to the plaintiff's motion to compel, filed a cross motion seeking waiver of the privilege as to documents her co-defendant state actors sought to protect, so that she could attempt to show that either her participation in the challenged decision-making was reasonable, or that she played no role in the challenged decision itself.  2007 WL  4344915, at *1-4, *16.  The court determined that the attorney's "interest in defending herself is so compelling that it outweighs the State Defendants' interest in maintaining confidentiality." Id. at *16-18.  Epstein and the Board's interests are not adverse to each other in the way the state  attorney and remaining state defendants in Martinez were. The defendants' common theory that the decision to default and terminate D&D was made by "consensus" is consistent with Epstein's contention that he acted in a traditional role as an attorney and not a municipal decisionmaker and, as discussed above, does not require a waiver of the attorney-client privilege or work product doctrine.

We find no basis for such a waiver.  The letters authored
and referred to by D&D speak for themselves.  Moreover, the Court
is at a loss to find support in the record that the Board
asserted the defense of lack of notice under the Tort Claims Act
in its summary judgment motion.  (See Pl. Br. at 37 n.16 (stating
that the Board "argued in its reply summary judgment brief" that
the Court should consider D&D's alleged lack of notice under the
Tort Claims Act).)

The only remaining tort claim asserted against the Board is
Count 10, which alleges intentional interference with prospective
economic advantage.  The elements of such a claim are (1) a
reasonable expectation of economic advantage, (2) the defendant
intentionally and maliciously interfered with that expectation,
(3) a causal connection between the defendant's interference and
the plaintiff's loss of a prospective gain, and (4) damages.
Printing Mart-Morristown v. Sharp Elecs. Corp., 563 A.2d 31, 37
(N.J. 1989).  The Board has argued in support of its motion for
summary judgment that the Tort Claims Act bars D&D's tortious
interference claim insofar as asserted against it because "a
public body cannot form the scienter necessary to establish
intentional tortious conduct."  (Dkt. entry no. 389, Board Reply
Br. Supp. Summ. J. at 32, 35 (citing Farris v. Cnty. of Camden,
61 F.Supp.2d 307, 345-46 (D.N.J. 1999)); see also Board Br. at
29.)  The Board's summary judgment briefs do not even cite the

notice provision of the Tort Claims Act, N.J.S.A. § 59:8-8.  (<u>Cf.</u>
Pl. Br. at 36-37 ("[A]ny lack of notice defense under N.J.S.A. §
59:8-8 was waived by failing to plead it as a specific
affirmative defense.").)  D&D's argument as to waiver allegedly
caused by a defense "not properly in the case at all" is
irrelevant, and the Court will not order production of documents
on this basis.  (Pl. Br. at 37.)

### 3.  Opportunity for a Name-Clearing Hearing

D&D contends that the Board has waived the attorney-client
privilege and work product protection by asserting a defense that
D&D's due process claims are barred because it "never requested a
name-clearing hearing" or, in the alternative, that D&D was
afforded a name-clearing opportunity.  (Pl. Br. at 40.)  We have
considered D&D's argument and find that it lacks merit, and
therefore decline to order the Board to produce "Epstein's
evaluation of D&D's correspondence and oral statements," as well
as Epstein's work product in association with the alleged
"hearing."  (<u>Id.</u> at 41.)  Any contentions of D&D or the Board
regarding such a hearing can be resolved based upon the
communications exchanged between those adverse parties, which of
course were never privileged communications.

### F.  Crime-Fraud Exception to the Attorney-Client Privilege

D&D seeks a ruling that the crime-fraud exception to the
attorney-client privilege applies to "[c]ommunications

37

perpetuating unlawful or tortious misconduct" on the part of the Board and/or Epstein.  (Pl. Br. at 34-35.)  D&D argues that "the Court previously found that D&D has presented triable tort claims against" the Board and Epstein, so it "has met its prima facie burden of showing the possibility that some of the communications may have served to perpetuate tortious conduct or shelter violations of state laws and regulations designed to protect contractors."  (Pl. Br. at 35.)

The Magistrate Judge "rejected . . . out of hand" D&D's argument that any documents not produced fell within the crime-fraud exception to the attorney-client privilege, stating that "there was absolutely no basis in [D&D's] papers or oral submissions for such an application."  (8-18-06 Hr'g Tr. at 77:14-21.)  We concur.  D&D cites neither legal nor record support for its contention that the Court's denial of the defendants' separate motions for summary judgment with respect to its intentional interference claim acts as a waiver of the attorney-client privilege or otherwise suffices to carry D&D's burden of making a prima facie showing that (1) the client was intending to commit or committing a fraud, and (2) the attorney-client communications were in furtherance of the fraud.  In re Grand Jury Subpoena, 223 F.3d at 217.  (See dkt. entry no. 264, 12-21-07 Mem. Op. at 56-58.)  "Such a prima facie showing 'requires presentation of evidence which, if believed by the

factfinder, would be sufficient to support a finding that the elements of the crime-fraud exception were met.'" Graco, Inc., 2011 WL 666048, at *18 (emphasis added) (quoting Haines, 975 F.3d at 95-96).

It appears that the Board, as a municipal entity, cannot commit a tort with a scienter requirement. See Farris, 61 F.Supp.2d at 345-46; see also N.J.S.A. § 59:2-10 ("A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."). A bald allegation of fraud or tortious conduct against the Board will therefore not suffice to break open the attorney-client privilege. D&D has not made the necessary showing to trigger an in camera review of documents to search for evidence of the Board using Epstein in furtherance of a fraud. Such a search would be a nullity, given that fraudulent or tortious intent cannot be imputed to the Board.

G.   **Documents Produced to or Relating to D&D's Surety**

D&D states that in a state court case brought by its Surety against the Board, American Motorists Insurance Co. v. North Plainfield Board of Education, No. SOM-L-543-05 (N.J. Super. Ct. Apr. 12, 2005), the Board was ordered to produce certain documents to the Surety that the Board has withheld here, and has since refused to identify the documents it produced to the Surety. (Korzun Decl. at ¶ 36.) D&D thus argues that the Board

39

should produce to D&D all documents that were produced to the Surety in that case.  (Pl. Proposed Order at ¶ F.)  On a related note, D&D argues that because the Board has stated that it intends to call witnesses to testify regarding the completion of the work by the Surety under certain Takeover Agreements, and has argued that Takeover Agreements preclude D&D's claims for compensation and damages, the Board "has waived any claim over any document relating to the decision to demand a takeover, the drafting of the takeover agreement and its dealings with D&D's surety."  (Pl. Proposed Order at ¶ G(4).)  D&D does not provide support for either of these arguments in its opening or reply briefs.

Documents reflecting the Board's "dealings with D&D's surety" may be discoverable to the extent they are relevant and have been put in issue by the Board's proposed trial proofs. However, D&D has not shown that court-ordered disclosure of documents to the Surety in the state court action should operate as a waiver here in light of Federal Rule of Evidence 502(c), which provides:

> (c) Disclosure made in a State proceeding.-- When the disclosure is made in a State proceeding and is not the subject of a State-court order concerning waiver, the disclosure does not operate as a waiver in a Federal proceeding if the disclosure:
>
> > (1)  would not be a waiver under this Rule if it had been made in a Federal proceeding; or

> (2)   is not a waiver under the law of the State
>        where the disclosure occurred.

Fed.R.Evid. 502(c).   D&D cites no legal support for its argument
that the Board must identify to D&D which documents it produced
to the Surety, and submits no documentation beyond the bare
contention that "the Board was ordered to produce certain
documents to the surety, AMIC, which are claimed here to be
privileged."  (Korzun Decl. at ¶ 36.)  The Court therefore will
not order a wholesale production of documents claimed privileged
here on the basis of production of documents in the state court
action brought by the Surety.

As to the Takeover Agreements, we agree with D&D's general
proposition that communications between the defendants and the
Surety may be relevant and not privileged insofar as the Board
intends to introduce testimony "regarding the Takeover Agreements
between the Board and D&D's surety, pursuant to which the surety
took over the Project. . . [and] completion of the work by the
surety."  (Korzun Decl., Ex. H, Board Proposed Witness List at 2-
3; see also Ex. N, Board's Proposed Contested Facts at 16
(listing facts regarding "Takeover Agreements and Outstanding
Work"); Pl. Proposed Order at ¶ G(4).)

D&D has not, however, identified any privileged material the
Board intends to use that would support a broad subject-matter
waiver as to all documents referencing "[i]ssues relating to
surety matters."  Many of the documents D&D argues should be

produced are draft documents not sent to the Surety, requests for attorney advice, or legal strategy among and between Epstein and other attorneys working with him, the Board, Bovis, and Vitetta, and need not be produced.  Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir. 1994) (describing waiver where a "client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication" and noting that "[a]dvice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner") (emphasis added).

D&D argues, for example, that the work product protection has been waived as to document 69 in Privilege Log E, insofar as it comprises "[i]ssues relating to surety matters." (Korzun Decl. at 21, Table.)  Although that document is described as a "Fax . . . explaining to Bonding Co. the problems with D&D," it was authored by Epstein and sent to representatives of the Board, Bovis, and Vitetta only, suggesting that it may be a draft document neither disclosed to third parties, nor in issue with respect to the Board's proposed trial testimony.  (See also, e.g., Privilege Log G, document 158, "Advice re: draft response letter to surety.")

We therefore uphold the Board's claims of attorney-client privilege and/or work product protection as to the following

documents D&D has identified as comprising "issues relating to surety matters":

> Privilege Log E:  69, 118, 119, 120, 125, 130, 154, 163, 170, 176, 194, 195, 197, 201, 202, 213, 215, 222, 236, 280, 298, 310, 318, 319, 321.

> Privilege Log F:  274, 296, 299, 320, 321, 325, 429, 430, 441, 442, 472, 473, 500, 515.

> Privilege Log G:  5, 36, 39, 46, 50, 51, 63, 64, 85, 87, 95, 97, 98, 112, 132, 133, 139, 148, 150, 158, 167, 171, 177, 209, 221, 222, 230, 231, 248, 296, 306, 310, 313, 322, 327, 330, 334, 347, 349, 350, 355, 357, 362, 367, 380, 381, 450, 451, 463, 464, 465, 466, 472, 482, 484, 485, 487, 488, 489, 492, 508, 509, 544, 545, 562, 564, 571, 574, 585, 588, 712-718, 720, 721.

The Court will review the following documents in camera, with an intention to order production of underlying documents to or from nonparties referenced in the privilege log, with privileged communications redacted, although the Board should instruct the Court whether the referenced documents have already been produced to D&D:  Privilege Log E, documents 182, 259, 320, 322, 323; Privilege Log F, document 157; Privilege Log G, document 6.  The Court will also review the following documents in camera and order the Board to identify the corporate or organizational affiliation of the listed individuals: Privilege Log E, document 388 (James Ferruci); Privilege Log G, documents 475 (Gregory Weyant), 476 (Jill Burke).

### H. Documents From or Relating to Subcontractors P.J. Smith or Edwards Engineering

D&D seeks in its proposed order a ruling that the Board waived any privilege claim as to "communications with" Project subcontractor P.J. Smith, as well as "any work product commenting upon the HVAC or electrical work," and further seeks to order the Board to produce to D&D "all documents produced to P.J. Smith in the separate litigation pending in the Superior Court of New Jersey," P.J. Smith Elec. Contractors, Inc. v. North Plainfield Bd. of Educ., No. SOM-L-23-05 (N.J. Super. Ct. Jan. 5, 2005). (Pl. Proposed Order at ¶ G(6).)  The proposed order also asserts that the Board waived "any work product claim over" work done by Edwards Engineering and any privilege claim over communications between Edwards Engineering and the Board's counsel by stating that it intends to call Edwards Engineering's proprietor as a witness at trial.  (Pl. Proposed Order at ¶ G(5).)

D&D does not address this relief sought in its brief, and unlike its argument regarding "issues relating to surety matters," the Table listing different alleged bases for waiver does not specify which documents D&D contends are discoverable because they were by or related to either P.J. Smith or Edwards Engineering.  (Korzun Decl. at 21-23, Table.)  The Court will decline to order a wholesale production of documents produced in the P.J. Smith action for the same reasons discussed above with respect to the Surety action.  (See supra at 39-40.)

Furthermore, because D&D has not identified any claimed privileged material the Board intends to use at trial involving P.J. Smith or Edwards Engineering, it has not shown a basis for a broad subject-matter waiver of the attorney-client privilege or work product doctrine.  Rhone-Poulenc Rorer Inc., 32 F.3d at 863. The Court has already noted in connection with D&D's "surety" argument that it will review in camera document 182 of Privilege Log E, which refers to and apparently attaches a letter from Sam Gaccione of P.J. Smith to Lewis Myerson of Vitetta, because such letter would not necessarily be privileged.  The Court will not grant any further relief with respect to P.J. Smith or Edwards Engineering, because no claimed privileged documents in this category have been specified by D&D.

### I.  Remaining Arguments

D&D's remaining arguments lack merit and do not require further discussion here.  See United States v. Dupree, 617 F.3d 724, 728 (3d Cir. 2010); Leveto v. Lapina, 258 F.3d 156, 160 (3d Cir. 2001).  These remaining arguments include D&D's assertions that the Board must produce: (1) "what consultations and work product Epstein, individual Board employees, or Bovis/Vitetta had with the Board itself with respect to D&D," other than Board meeting minutes, due to the Board's argument that any misconduct by its agents or employees was not part of any official policy (Pl. Br. at 36; Pl. Proposed Order at ¶ G(9)); (2) attorney-

client privileged communications, because the Board has asserted
an "advice of counsel" defense (Pl. Proposed Order at ¶ G(8));
and (3) "documents that should have been produced as part of
expert discovery" (Korzun Decl. at ¶ 42).  D&D's argument that
the Board's review and redaction of Vitetta and Bovis files was
improper and sanctionable under New Jersey law is specious.  (Pl.
Br. at 9-11.)  As explained in the briefs, the Board was
transparent in conducting a privilege review of its own files and
those of Bovis and Vitetta.  (Board Br. at 32-22.)

### CONCLUSION

For the foregoing reasons, D&D's Motion to Compel Production
of Documents and Overrule Claims of Privilege will be denied in
part, with the Court intending to review certain documents in
camera before determining whether the Board has properly withheld
the same.  The Court will issue an appropriate Order.


　　　　　s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


Dated:   May 13, 2011

46