**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                  :
D & D ASSOCIATES, INC.,           :    CIVIL ACTION NO. 03-1026 (MLC)
                                  :
      Plaintiff,                  :    MEMORANDUM OPINION
                                  :
      v.                          :
                                  :
BOARD OF EDUCATION OF NORTH       :
PLAINFIELD, et al.,               :
                                  :
      Defendants.                 :
                                  :
```

**COOPER, District Judge**

D & D Associates, Inc. ("D&D") commenced this action in 2003 against the Board of Education of North Plainfield (the "Board"), Vitetta Group, Inc. ("Vitetta"), Bovis Lend Lease, Inc. ("Bovis"), and Robert C. Epstein ("Epstein"). (Dkt. entry no. 58, Am. Compl.) Certain claims have been adjudicated in previous motion practice. (Dkt. entry no. 87, 9-30-05 Order & J.; dkt. entry no. 265, 12-21-07 Order & J.) The remaining causes of action asserted against the defendants are as follows: count 2 (civil rights - destruction of prequalification for public works contracts), against Epstein and the Board; counts 3 and 4 (civil rights - retaliation under the First Amendment and 42 U.S.C. § 1983 ["Section 1983"]), against the Board; count 8 (breach of contract), against the Board; count 10 (tortious interference), against Bovis, Vitetta, Epstein, and the Board; count 11 (defamation), against Bovis and Epstein; count 12 (conversion),

against the Board; and counts 13 and 14 (fraudulent inducement), against the Board.

The parties have fully briefed and presented oral argument on separate motions for summary judgment. (Dkt. entry nos. 409, 440; dkt. entry no. 441, 10-4-11 Hr'g Tr.) Epstein moves for summary judgment in his favor on D&D's remaining claims against him, pursuant to Federal Rule of Civil Procedure ("Rule") 56. (Dkt. entry no. 429, Epstein Mot.) The Board moves for summary judgment in its favor on D&D's remaining claims against it, pursuant to Rule 56. (Dkt. entry no. 430, Board Mot.) Vitetta moves for summary judgment in its favor on D&D's remaining claim against it, pursuant to Rule 56. (Dkt. entry no. 431, Vitetta Mot.) Bovis moves for summary judgment in its favor as to count 11, the defamation claim, only. (Dkt. entry no. 436, Bovis Mot.)

D&D moves for summary judgment in its favor on count 2 as to Epstein and the Board, and to reinstate count 2 against Vitetta and Bovis. (Dkt. entry no. 432, D&D Mot. on Count 2.) D&D separately moves for summary judgment in its favor on count 8 against the Board, and for sanctions based on the Board's assertion of counterclaims for liquidated damages. (Dkt. entry no. 433, D&D Mot. on Count 8.)

For the reasons stated herein, the Court will (1) grant in part and deny in part Epstein's motion, (2) grant the Board's motion, (3) deny Vitetta's motion, (4) deny Bovis's motion, (5)

2

deny D&D's motion with respect to count 2, and (6) deny D&D's motion with respect to count 8.

## BACKGROUND

### I.   The Parties

D&D is a New Jersey corporation with its principal place of business in Jackson, New Jersey. (Am. Compl. at 1.) Vitetta is a Pennsylvania corporation that performs architectural and design work in connection with public and private construction projects in New Jersey. (Id. at 1-2.) Similarly, Bovis is a North Carolina corporation that performs management functions in connection with public and private construction projects in New Jersey. (Id. at 2.) The Board is a public body with its principal offices in North Plainfield, New Jersey. (Id.) Epstein is an attorney admitted to practice in New Jersey, who, along with the firms with which Epstein is or was affiliated, was retained by the Board to serve as "construction counsel" for its school construction projects. (Id. at 2-3; dkt. entry no. 347-2, Epstein Br. at 1.)

### II.  Overview of the Board's School Construction Project

The Board, in 2001, requested bids for a project involving the renovation and expansion of five of its schools ("Project"). (Dkt. entry no. 348-2, Vogt Decl., at ¶ 2.) In July 2001, D&D was awarded three separate contracts (collectively, the "contracts") with the Board in connection with this Project: (1)

3

Contract 1A, which covered the East End and West End Elementary Schools; (2) Contract 1B, which covered Middle/High School and the Stony Brook Elementary School; and (3) Contract 1C, which covered Somerset Intermediate School. (Am. Compl. at 3; Vogt Decl. at ¶ 6; dkt. entry no. 371-3, Board Resp. to D&D Stmt. Facts Supp. Count 8 Mot. at ¶ 14.) The contracts were governed by a consolidated Project Manual and General Conditions ("Project Terms & Conditions"). (Am. Compl. at 3; Vogt Decl. at ¶ 7 & Ex. 2, General Conditions.) The contracts required D&D to post performance and payment bonds, which it obtained from American Motorists Insurance Company, a subsidiary of Kemper Insurance Companies ("Surety"). (Vogt Decl. at ¶ 8 & Ex. 3, Performance and Payment Bonds; dkt. entry no. 381-1, D&D Resp. to Bd. Stmt. Facts at 37; dkt. entry no. 378, Hollender Cert., Ex. SS, Performance and Payment Bonds.)[1] In connection with those bonds, D&D executed a General Indemnity Agreement ("GIA") in favor of the Surety. (Vogt Decl. at ¶ 9 & Ex. 4, GIA; D&D Resp. to Bd. Stmt. Facts at 37 (noting that GIA was executed both by Michael Tattoli ("Tattoli"), D&D's President, on behalf of D&D, and by Tattoli and his wife individually).) The GIA provides, inter alia, that:

---

[1] While Exhibit 3 to the Vogt Certification includes only the Performance and Payment Bonds for Contract 1A, Exhibit SS of the Hollender Certification includes the Performance and Payment Bonds for Contract 1A, Contract 1B, and Contract 1C.

> [i]n the event of a Default, [D&D] do[es] hereby
> assign, transfer and set over to Surety, all of their
> rights under all Bonded Contract(s) including . . . (c)
> all claims and causes of action against any parties to
> the Bonded Contract(s) or against third parties
> relating to the Bonded Contract(s), [and] (d) any sums
> due, or to become due under the Bonded Contract(s) at
> or after the time of such default. . . .

(GIA at ¶ 7.)

The Board entered into a contract with Vitetta pursuant to which Vitetta was to supervise architects and create the architectural designs for the Project.  (Am. Compl. at 3; dkt. entry no. 349-1, Vitetta Br. at 1 (noting that the Board hired Vitetta as the architect of record for the Project); dkt. entry no. 349-2, Neilio Cert., Ex. A, Owner Architect Contract; dkt. entry no. 379-1, D&D Resp. to Vitetta Stmt. Facts at ¶ 2 (stating that the Owner Architect Contract "went through several revisions over the course of the Project").)  The Board also entered into a contract with Bovis pursuant to which Bovis agreed to perform construction management services in connection with the Project. (Am. Compl. at 3; dkt. entry no. 436, Bovis Br. at 3 & Saharic Cert., Ex. B, Owner Management Contract; dkt. entry no. 437-2, D&D Resp. to Bovis Stmt. Facts at 2.)

D&D contends that although Vitetta was aware that the Project could not be bid on until the Borough of North Plainfield's Construction Office had approved the plans for the Project, the Board sought bids in May 2001 without Construction Office approval, and the bid package specified that work would

begin "no later than 6-29-01."  (Dkt. entry no. 351-6, D&D Stmt. Facts Supp. Count 8 Mot. at ¶¶ 8-9.)  D&D notes that the General Conditions governing the contracts required that the Board "will secure and pay for necessary design approvals and other approvals related to permanent facilities and required precedent to applications for permits for work at the site."  (D&D Stmt. Facts Supp. Count 8 Mot. at ¶ 10; D&D Count 8 Exs., Ex. 3, General Conditions at Art. 2.2.3, 3.7.)  Tattoli asserts that

> D&D learned that the Board and Vitetta delayed completion of sealed drawings and plans, only after I had signed the contract and the Board had issued the Notice to Proceed.  The building department refused to give D&D a building permit and told us the plans had already been rejected before.  I was surprised because . . . school projects are not supposed to be open for bidding until the plans have been approved. . . .

(D&D Count 8 Exs., Ex. 11, 8-10-06 Tattoli Decl. at ¶ 6.)

## III. **Overview of Events Underlying this Action**

### A.   **Default Notices**

The Project specifications, which were incorporated into Contracts 1A, 1B, and 1C between the Board and D&D, required D&D to provide detailed "critical path method construction schedules" within a prescribed time period to Bovis, Vitetta, and the other prime contractors.  (Dkt. entry no. 347-1, Epstein Stmt. Facts at ¶ 9; dkt. entry no. 347-3, LaSala Cert., Ex. 4, Construction Schedules.)  On October 11, 2001, Epstein, on behalf of the Board, sent a letter to D&D stating, <u>inter</u> <u>alia</u>, that "D&D's

6

failure to provide construction schedules constitutes a breach of its contractual obligations" under the Project specifications, and demanding "that D&D immediately provide the Somerset School schedule and confirm that it will provide <u>all</u> other required schedules by no later than Friday, October 19, 2001."  (Dkt. entry no. 348-1, Board Stmt. Facts at ¶ 9; Vogt Decl., Ex. 5, 10-11-01 Epstein Letter; Epstein Stmt. Facts at ¶¶ 10-13; D&D Stmt. Facts Supp. Count 8 Mot. at ¶ 25; D&D Count 8 Exs., Ex. 16.)  On October 19, 2001, the Board notified D&D that it was declaring D&D in default pursuant to the Project Terms and Conditions. (Vogt Decl., Ex. 6, 10-19-01 Epstein Letter; D&D Stmt. Facts Supp. Count 8 Mot. at ¶ 25; D&D Count 8 Exs., Ex. 17.)

D&D, through its counsel, responded to the Board's letters on November 2, 2001.  (Vogt Cert., Ex. 7, 11-2-01 Korzun Letter.) D&D stated, <u>inter</u> <u>alia</u>, that (1) the Board's accusations against D&D and the default notice were unjustified and unfounded, (2) "[t]he need for the time extensions and schedule changes [were] all grounded in the failure of the Board's professionals to provide the contractors (including D&D) with the necessary sealed drawings in a timely fashion so that the Borough's own building department would issue permits for the work to commence", (3) none of the problems contributing to D&D's inability to provide schedules on time were within D&D's control, or within its contractual duties, (4) it would be unreasonable for D&D to

provide inaccurate, "best-estimate" schedules at this juncture because Bovis and the other contractors are currently attempting to coordinate their schedules to provide the Board with accurate deadlines, (5) there has been a lack of coordination between the Board and Borough personnel, and (6) it is willing "to act as a conduit and do whatever else [it] can to smooth out and solve the already existing problems, and if possible, prevent new ones from arising." (Id.; see also 8-10-06 Tattoli Aff. at ¶¶ 5-7.)  Thus, D&D indicated its intent to continue working with the Board to complete the Project.  (See 11-2-01 Korzun Letter.)

The relationship between the parties continued to break down, even though the Project went forward.  Vitetta sent D&D a letter on February 11, 2002, stating that D&D "is and continues to be in default by reason of its failure to provide conforming schedules" pursuant to the Project specifications, and giving D&D seven days to rectify the default.  (Vogt Cert., Ex. 8, 2-11-02 Johns Letter.)  Epstein, on behalf of the Board, notified the Surety on February 25, 2002, that D&D was "presently . . . in default under the general contract, as a result of its failure to provide required schedules for the Project."  (Vogt Cert., Ex. 9, 2-25-02 Epstein Letter.)  However, the Board withdrew its default notice on March 21, 2002, following negotiations among the parties.  (Vogt Cert., Ex. 10, 3-21-02 Epstein Letter.)

Vitetta sent D&D a letter on April 29, 2002 ("4-29-02 Myerson Letter"), advising it that D&D was in default under the Project Terms & Conditions and making certain demands, inter alia, for a detailed work plan and that D&D's Project Manager, Ken Pereira ("Pereira"), be removed from the Project.  (Vogt Cert., Ex. 11, 4-29-02 Myerson Letter; dkt. entry no. 353-5, D&D Count 2 Exs., Ex. 18, 7-2-03 Pereira Aff. at ¶ 1 (stating that Pereira acted as superintendent and project manager for D&D on the Project).)  D&D responded, taking exception to Vitetta's personnel demand and emphasizing that "D&D remains ready to complete the project . . . according to the recover [sic] schedule" and stating that "D&D is not responsible for the delays to this project," but rather delays could be attributed to (1) unfavorable weather conditions, (2) failure to receive a sealed working set of drawings, which were contractually required to be provided before the start of the contract, and (3) problems experienced by the steel subcontractor.  (Vogt Cert., Ex. 12, 5-6-02 Tattoli Letter.)  D&D suggested that the end date of the Project should be extended by five months "because of these extraordinary delays which were beyond D&D's control."  (Id. at 2.)  The Surety, having received notice of both the 4-29-02 Myerson Letter and the 5-6-02 Tattoli Letter in response, wrote Epstein on May 8, 2002, to advise that "it would be helpful to

have a response from Vitetta to D&D's detailed letter."  (Vogt
Cert., Ex. 13, 6-8-02 Berish Letter.)

Vitetta advised Dr. Marilyn Birnbaum ("Birnbaum"),
Superintendent of the Board, in a letter dated June 5, 2002, that
D&D's "performance to-date is seriously deficient with regard to
their scheduling responsibilities, and with regard to their
performing the Contractor for General Construction's Special
Responsibilities . . . . constitut[ing] a substantial breach of
the Contract Documents."  (Vogt Cert., Ex. 14, 6-5-02 Myerson
Letter.)  Vitetta followed up with a July 25, 2002 letter to
Birnbaum, again certifying that D&D's performance "continues to
be seriously deficient," notwithstanding that D&D had "improved
their performance by advancing the submission of missing required
submittals."  (Vogt Cert., Ex. 15, 7-25-02 Myerson Letter.)[2]

---

[2] In the interim, a meeting was held in the Board's offices
on June 12, 2002, attended by representatives of Bovis, Vitetta,
D&D, and the Board, to discuss rescinding the default notice.
(D&D Resp. to Bd. Stmt. Facts at 101; D&D Stmt. Facts Supp. Count
8 Mot. at ¶¶ 45-46; dkt. entry no. 354-12, D&D Count 2 Exs., Ex.
43, C.C. Smith Dep. at 91:2-11, 98:15-99:2 (stating that Smith,
of Bovis, told Pereira, of D&D, at the June 12, 2002 meeting
"that [D&D] made a real push, and the strategy we had to try to
make this work for everybody was to have them demonstrate before
the meeting that if they really . . . aggressively pursued [the
Project], we thought it was perfectly possible for them to finish
this thing by September").)  Smith testified that it was
suggested at this meeting that the Board would "waive" "over a
million dollars" in liquidated damages if Tattoli "g[a]ve his
word . . . that he'd turn over those schools by September," and
that "[w]e had the bonding company on the phone ready to slam
[D&D] out of business."  (D&D Stmt. Facts Supp. Count 8 Mot. at
¶¶ 45-46; dkt. entry no. 351-8, D&D Count 8 Exs., Ex. 23, Smith
Dep. at 87:7-88:4.)

However, Vitetta's 4-29-02 notice of default was withdrawn by letter of August 6, 2002.  (Vogt Cert., Ex. 17, 8-6-02 Myerson Letter; see also id, Ex. 18, Agreement to Withdraw Default Notice dated 8-6-02 (stating that upon execution of the agreement, the Board "will direct Vitetta to withdraw the Notice of Default").)

Epstein, on behalf of the Board, sent a letter to the Surety on October 22, 2002, explaining that the Project had experienced delays caused principally by D&D, and "[t]he Project architect has recommended that the [Board] withhold from D&D's pending requisitions at least $405,000 to partly cover accrued liquidated damages resulting from D&D's delayed performance."  (Vogt Cert., Ex. 21, 10-22-02 Epstein Letter; D&D Stmt. Facts Supp. Count 8 Mot. at ¶ 65.)  The Board noted that it was prepared to pay D&D's requisitions without deducting any liquidated damages, if the Surety agreed that such payment would not affect the Board's right to proceed against the bonds.  (Id.)  The Surety advised Epstein that it did not object to payment of D&D's requisitions without deductions for any liquidated damages, and the bonds would remain in effect according to their terms.  (Vogt Cert., Ex. 23, 10-28-02 Berish Letter.)  The following month, Vitetta again advised Bovis that it was recommending that the Board consult Epstein as to whether liquidated damages should be withheld from D&D's pending requisitions.  (Vogt Cert., Ex. 24, 11-15-02 Myerson Letter.)

D&D sent a letter to Epstein on November 20, 2002, (1) acknowledging that the Board was considering assessing liquidated damages against it, (2) arguing that Vitetta and Bovis were responsible for the Project delays, and (3) stating that it would take all necessary steps to "close down its work at the schools" if the Board assessed liquidated damages against it. (Vogt Cert., Ex. 25, 11-20-02 Korzun Letter.) Thereafter, Epstein again received a letter from the Surety confirming that it did not object to the Board paying D&D without deducting liquidated damages and the bonds would remain in effect after such payments. (Vogt Cert., Ex. 27, 12-9-02 Berish Letter.)

Vitetta informed the Board in December of 2002 that D&D still had not complied with the Project specifications and provided a construction progress schedule and schedule updates for the Somerset Intermediate School. (Vogt Cert., Ex. 26, 12-3-02 Myerson Letter.) Specifically, Vitetta described:

the continued occurrence of a material breach of the contract for construction by D&D at the Somerset Intermediate School as of the 10-23-02 schedule update prepared by D&D's scheduler. D&D's schedule updates continue to project inaccurate and unrealistic GC completion dates for critical path items of work required to keep the project moving on a forward basis. D&D's schedule updates continue to side [sic] durations for work items rather than reflect the status of the work completed and accurately reflect the remaining uncompleted work.

(Id.) Thereafter, Vitetta, with the Board's authorization, issued two default notices to D&D stating, inter alia, that D&D

12

(1) failed to utilize temporary protections and enclosures necessary to make the Somerset Intermediate School's building components weather-tight, (2) "took no steps to prepare for the anticipated approval by the Fire Inspector so that the heat could be turned on immediately after the approvals were given", (3) has seven days to provide the necessary "Enclosure" and "Heat and Ventilation" of the building components, and (4) must provide additional "manpower" in order to provide temporary heat to the building within the 7 day period.  (Vogt Cert., Ex. 30, 1-27-03 Myerson Letter; see also id., Ex. 31, 1-30-03 Myerson Letter (stating that D&D's continued failure to provide temporary heat in accordance with contract documents continued to be detrimental to the progress of the work and directing D&D to provide additional manpower to fulfill the directives of the 1-27-03 Letter).)  Bovis, in a letter to Birnbaum dated February 7, 2003, advised the Board that D&D "is in gross and continuing default of" Contract 1C and recommended that the Board "consider the Termination and replacement of" D&D on the Somerset Intermediate School project.  (Vogt Cert., Ex. 32, 2-7-03 Smith Letter.) Vitetta likewise recommended that the Board terminate D&D under the terms of the General Conditions applicable to Contract 1C. (Vogt Cert., Ex. 33, 2-11-03 Myerson Letter.)

13

**B.    Termination Notices**

Epstein, on behalf of the Board, informed D&D, its counsel, and the Surety on February 11, 2003, that the Board intended to terminate D&D's employment as general contractor under Contract 1C in seven days based on the certifications from Vitetta and Bovis that D&D was in material breach of such contract.  (Vogt Cert., Ex. 34, 2-11-03 Epstein Letter; D&D Stmt. Facts Supp. Count 8 Mot. at ¶ 65.)  However, the Board noted that "[t]ermination may be avoided if, no later than seven days from receipt of this notice, D&D and/or the Surety furnish to the Board a plan, which is acceptable to the Board, for curing D&D's existing defaults and breaches and completing [Contract 1C, the Somerset Intermediate School]."  (Id.)  In response, D&D's counsel sent a letter to the Board, inter alia, (1) noting that when D&D's employees arrived at the Project site on February 11, 2003, they were informed that D&D had been terminated and told to collect their things and leave at once, (2) rejecting Vitetta's contention that D&D abandoned the job site, and (3) asserting that the Board committed an anticipatory breach, such that (a) D&D was relieved of further performance, and (b) the Surety's insurance bond is void.  (Vogt Cert., Ex. 36, 2-12-03 Pereira Letter.)

A February 14, 2003 letter from Vitetta to the Board advised that "[a]lthough there were erroneous statements made by the

14

Bovis . . . representative on-site to D&D with regard to their termination on 2-11-03, any such statements were clarified by Vitetta and the Board's attorney on the same date." (Vogt Cert., Ex. 37, 2-14-03 Myerson Letter.) The letter further stated that insofar as D&D had not responded to either Bovis or Vitetta's inquiries as to D&D's intention with regard to resuming work at the Project sites, it saw "[t]he issue" as "D&D's abandonment of this project, which is contributing to their other defaults to which they are on 'Notice.'" (Id. (stating that once D&D failed to work on the Projects for 10 days, another basis for default would exist).)

The Board, after meeting with D&D on February 20, 2003, agreed to defer considering whether to terminate D&D until February 28, 2003 "to allow the parties to address a possible resolution of D&D's defaults." (Vogt Cert., Ex. 40, 3-4-03 Epstein Letter.) Also, Epstein, Vitetta, and Bovis informed D&D in written correspondence that it was not terminated or barred from the Project site. (Id.) Nevertheless, the parties were unable to resolve their disputes, and thus, on March 4, 2003 (1) D&D sent a letter to Vitetta stating that it was abandoning Contract 1C, the Somerset Intermediate School project, (2) the Board terminated D&D's employment as general contractor on Contract 1C pursuant to the Project Terms and Conditions, (3) the Board informed D&D that it no longer had access to the Somerset

15

Intermediate School project site, took possession of the site and all materials and equipment located there, and demanded that D&D immediately turn over all materials and supplies not located at the site that were purchased in connection with Contract 1C, and (4) the Board demanded that the Surety immediately take over and complete Contract 1C.  (Id.)  In a separate letter also dated March 4, 2003, Pereira advised Vitetta that, in D&D's opinion, the Board breached the contracts by (1) not extending the contract for delays beyond D&D's control, (2) failing to pay D&D amounts due, (3) misusing construction change directives, (4) through Bovis, interfering with D&D's ways, means, and methods, and (5) improperly terminating D&D on February 11, 2003, and denying D&D access to the site and equipment.  (Vogt Cert., Ex. 41, 3-4-03 Pereira Letter.)  However, Pereira also advised that D&D would continue to work to obtain substantial completion of the projects covered by Contracts 1A and 1B.  (Id.)

Pereira advised D&D's subcontractors and suppliers by letter dated March 11, 2003, that (1) "D&D had issued a Fourteen Day Stop Work Notice on February 10, 2003, due to the fact that [it] had not been paid since November," (2) the Board's response was to issue a termination letter and request to the Surety to complete the work, and (3) this termination was improper.  (Vogt Cert., Ex. 43, 3-11-03 Pereira Letter.)  The letter asked that the subcontractors and suppliers "stick by" D&D, and contact D&D

16

in the event that the Board or Bovis attempted to have the subcontractors work directly for the Board.  (Id.)

Epstein, on behalf of the Board, informed D&D, its counsel, and the Surety on July 11, 2003, that the Board intended to terminate D&D's employment as general contractor on the two remaining Project contracts, Contracts 1A and 1B, in seven days. (Vogt Cert., Ex. 48, 7-11-03 Epstein Letter.)  Epstein noted that both Vitetta and Bovis had submitted certifications to the Board that (1) stated that D&D was in material default under the two remaining Project contracts, (2) specified D&D's defaults, and (3) advised the Board that sufficient grounds existed to terminate D&D "for cause" with respect to the contracts at issue. (Id.; see also Vogt Cert., Ex. 44, 6-11-03 Hawley Letter; Ex. 45, 6-11-03 Myerson Letter; Ex. 46, 7-7-03 Hawley Letter; Ex. 47, 7-7-03 Myerson Letter.)  Thereafter, on July 23, 2003, Epstein, on behalf of the Board, informed D&D that it was terminated with respect to Contracts 1A and 1B, effective immediately.  (Vogt Cert., Ex. 49, 7-23-03 Epstein Letter.)  Epstein also informed D&D that it no longer had access to the construction sites, and demanded that the Surety immediately take over and complete the work to be performed under Contracts 1A and 1B.  (Id.)

C.    "Construction Updates"

The Board published "Construction Updates" on its website regarding the Project.  (Board Stmt. Facts at ¶ 10; Vogt Cert.,

17

Ex. 50, Construction Updates.)  Postings made to the website on
March 20, April 7, and May 19, 2003, stated that D&D had been
terminated from the Somerset Intermediate School project
(Contract 1C) "due to a lack of performance and abandonment of
the jobsite."  (Id.; dkt. entry no. 347-3, LaSala Cert., Ex. 12,
3-10-03 Construction Update ("The general contractor has been
terminated from the Somerset School project due to a lack of
performance and abandonment of the jobsite.  The Board of
Education has issued the notice of termination to the general
contractor's surety and demanded that the surety assume
responsibility for the remaining work.").)

  D.   **Takeover Agreements**

  The Surety and the Board entered into an agreement on May
15, 2003, pursuant to which the Surety agreed, inter alia, that
it would take over the work to be performed under Contract 1C and
arrange "for the substantial completion of [the work at the
Somerset Intermediate School project site] no later than December
12, 2003 and final completion of the [w]ork no later than January
15, 2004, time being of the essence."  (Vogt Cert., Ex. 74,
Surety Takeover Agmt. at 1-2 & ¶ 1.)  The Surety represented and
warranted that it was subrogated to and had been assigned (1)
D&D's rights in and to the remaining unpaid balance of the
original contract sum, and (2) "other funds due or to become due
to D&D in connection with [Contract 1C]."  (Id. at ¶¶ 3-4.)  The

Surety retained D&D as its completion subcontractor, and D&D agreed to fully perform and complete all remaining work under Contract 1C.  (Vogt Cert., Ex. 75, Completion Agmt., at 1-2 & ¶ 1.)  D&D continued to work on the remaining school projects under Contract 1A and Contract 1B throughout the spring of 2003.  (D&D Resp. to Bd. Stmt. Facts at 128.)

The Surety and the Board entered into two separate agreements on May 19, 2004, pursuant to which the Surety agreed, inter alia, that it would take over the work to be performed under Contracts 1A and 1B, and arrange "for the substantial completion of [such work] no later than July 15, 2004 and final completion of the [w]ork no later than August 15, 2004, time being of the essence."  (Vogt Cert., Ex. 77, 1st 5-19-04 Surety Takeover Agmt. (Contract 1A), at 1-2 & ¶ 1; Id., Ex. 78, 2d 5-19-04 Surety Takeover Agmt. (Contract 1B), at 1-2 & ¶ 1.)  The Surety represented and warranted that it was subrogated to and had been assigned (1) D&D's rights in and to the remaining unpaid balance of the original contract sums, and (2) "other funds due or to become due to D&D in connection with the [contracts]."  (Surety Takeover Agreements at ¶¶ 3-4.)  D&D contends that under the Project Terms and Conditions, the Board "had no power to assign D&D's contractual rights."  (D&D Resp. to Bd. Stmt. Facts at 132; Count 2 Exs., Ex. 30, General Conditions [same as Vogt Cert., Ex. 2], Article 13.2.)

19

**E.   D&D's Bonding Capacity Before, During, and After the Projects**

Certain claims asserted by D&D are premised on its contention that the Board's issuance of default notices to it and the Surety "interfer[ed] with D&D's bonding capacity," which had the effect of making it ineligible for pre-qualification status with the New Jersey Economic Development Authority ("NJEDA"), which in turn allegedly interfered with D&D's ability to obtain other work.  (Am. Compl. at 20-24.)  The Board offers the testimony of Thomas Henn ("Henn"), who was an underwriter at Kemper responsible for the D&D account, to elucidate the effect of the Project on D&D's relationship with the Surety.  (Board Stmt. Facts at ¶ 11; Vogt Cert., Ex. 51, Henn Dep.; D&D Resp. to Bd. Stmt. Facts at 90.)  D&D offers the testimony of Henn's counterpart, D&D's bond broker Mike Babino ("Babino"), as being more "authoritative" on the subject of D&D's pre-existing bonding capacity.  (Henn Dep. at 6:24-7:2; D&D Resp. to Bd. Stmt. Facts at 54, 91; D&D Count 2 Exs., Ex. 6, Babino Dep.)

**1.   Relationship with the Surety**

The Board emphasizes that the Surety was not obligated to give D&D, or any contractor, any particular bond at any particular time, but rather each bond request was considered individually at the time the bond request is received.  (Board Stmt. Facts at ¶ 13; Henn Dep. at 26:13-27:10.)  Babino also testified that if a contractor's putative bid "exceed[s] the

program parameters established by the bonding company, then they would be looked at on a special submit basis, which is often what happens, because bonding companies typically like to set up a surety program that's smaller than the normal level that they would go to."  (Babino Dep. at 6:20-7:6.)

Prior to undertaking the Project, the largest single bonded project D&D had undertaken as a general contractor was a $10 million project.  (Board Stmt. Facts at ¶ 14; Henn Dep. at 36:7-37:20, 78:21-79:3.)  Babino testified at his deposition that at the beginning of 2001, the Surety had regarded D&D's bonding capacity for school construction projects as $10 million per single project, and $20 million aggregate.  (Babino Dep. at 7:14-22; id. at 27:11-13 (same).)  Each of the three contracts comprising the Project were separately bonded, in the amounts of $4,340,000 (Contract 1A), $3,950,000 (Contract 1B), and $7,230,000 (Contract 1C), respectively.  (D&D Resp. to Bd. Stmt. Facts at 92; Hollander Cert., Ex. SS, Performance and Payment Bonds; cf. Henn Dep. at 37:3-5 ("the maximum job at that point in time was $12 million, which is what they were on in North Plainfield").)  Babino testified that he recalled that the Surety "was very happy" to extend bond credit for the Projects, insofar as it was "well within the parameters of the bond program," or the $20 million aggregate limit that the Surety had in place for

D&D at the time D&D bid on the Projects.  (Babino Dep. at 11:2-11.)[3]

---

[3] D&D asserts variously that D&D's pre-Project aggregate bonding capacity was either $30 million, $40 million, or "the potential for the issuance of a single bond up to $30" million with an aggregate limit of $40 million.  (D&D Resp. to Bd. Stmt. Facts at 92-93 (characterizing Babino's deposition testimony as stating that D&D's aggregate bonding limit was $40 million and Henn's deposition testimony as stating that the Surety, "under certain circumstances," would have favorably considered up to a $30 million bond for D&D); id. at 108.)  The Court's examination of the record, particularly the citations provided by D&D (e.g., "Bambino [sic] Statement [sic] at 6," see D&D Resp. to Bd. Stmt. Facts at 108), does not support these assertions with respect to the Surety.

The $30 million figure in Henn's testimony was in reference to a hypothetical situation, "just us[ing] D&D for example." (Henn Dep. at 24:23-25:5 ("[L]et's say they had a 30-million-dollar program, you probably wouldn't give [a bond on a $12 million job immediately after a $10 million job] to them, or you may, because of the complexity of what their backlog is").)

It appears that the $40 million figure refers to the surety affidavit submitted in 2002 as part of D&D's "Request for Classification" to the New Jersey Department of Project Management and Construction ("DPMC"), discussed infra, in which the Surety asserted: "Reserving our rights to practice our normal underwriting functions, we are prepared to provide favorable consideration for the suretyship on behalf of D&D Associates, Inc. covering construction contracts for $40,000,000 in the aggregate amount of outstanding contracts."  (Vogt Cert., Ex. 68, D&D 5-13-02 DPMC App.)  Babino explained that the actual prequalification amount with respect to the Surety "would almost never match what the surety affidavit said.  It would more normally be half of that."  (Babino Dep. at 13:18-20.)  This explanation is consistent with Babino's testimony that he recalled D&D's aggregate bonding capacity prior to the Projects to be $20 million.  (Babino Dep. at 7:14-22; see also Vogt Cert., Ex. 63, Tattoli Dep. at 106:5-13 (stating that Tattoli never requested a bonding line greater than $19 million).)

The Court rejects D&D's assertion that "a jury could conclude that Henn's testimony indicates D&D's bonding capacity could have included up to $30,000,000 bonds," because on its face, it does not say as much, although the Court acknowledges that the three bonds underwriting the Project are entirely consistent with a $10 million per project, $20 million aggregate

The problems associated with the Project, including the 4-29-02 default notice, had an "immediate impact" on D&D's ability to obtain further bonding for other projects.  (Babino Dep. at 12:9-16; D&D Resp. to Bd. Stmt. Facts at 96.)  The record shows that as of June 2002, the Surety had declined to support D&D's putative bid on a $7.2 million project, deeming it "too large a project in view of [D&D's] default scenario with the 3 bonded North Plainfield Projects." (Vogt Cert., Ex. 62, 6-14-02 Faust E-Mail.)  The Surety indicated at that time that it was "likely to only consider much smaller, filler type projects until the North Plainfield jobs are complete," in order to not "add significantly to the backlog until that task is accomplished." (Id.; see D&D Resp. to Bd. Stmt. Facts at 97.)  In July 2002, Babino requested that Henn consider bonding D&D for "a project larger than the others [D&D] has been permitted to bid recently," a project estimated at $12 million, to which Henn made the notation, "No way; $5MM and under only," meaning the Surety had decided to limit individual bonds to $5 million.  (Vogt Cert., Ex. 53, 7-19-02 Babino Fax; Henn Dep. at 77:10-78:10.)

After Vitetta's 4-29-02 default notice was withdrawn on August 6, 2002, the Surety was so advised, and thereafter, the Surety increased D&D's individual project bonding limit from $5

bonding program, insofar as the three separate bonds are each under $10 million and total $15,520,000.  (D&D Resp. to Bd. Stmt. Facts at 94.)

million to $7 million per project.  (Board Stmt. Facts at ¶¶ 16-
17; Vogt Cert., Ex. 55, 8-9-02 Babino Fax; id., Ex. 56, 8-20-02
Henn E-Mail; id., Ex. 57, 9-3-02 Boone E-Mail (approving D&D's
bonding request for $6.9 million bid but stating that a $10
million bond "would be out of the question"); Henn Dep. at 109:5-
10; D&D Resp. to Bd. Stmt. Facts at 103 (noting that D&D's
available cash and marketable securities also affected Surety's
decision to approve the increase in D&D's bonding limit).)
However, D&D was not the low bidder on that or any other project,
so the Surety did not write any additional performance bonds for
D&D after those pertaining to the Project.  (Babino Dep. at
24:14-24.)  Tattoli asserts that because "Epstein issued his
first default letter before D&D could get the first construction
permit, and then issued another default soon after the revoking
of the first default, D&D could not bid other public jobs during
the entire period on which D&D worked on the North Plainfield
schools."  (8-10-06 Tattoli Aff. at ¶ 12; see also D&D Resp. to
Bd. Stmt. Facts at 97-98 (discussing difficulties D&D encountered
in bidding on other projects during 2002).)

D&D's masonry subcontractor filed six mechanics' liens
against the Project in October 2002.  (Vogt Cert., Ex. 58, 10-25-
02 Byfield Letters & Notices of Mechanics' Lien Claims; Hollander
Cert., Ex. FF, 12-9-02 Discharge of Municipal Mechanics' Lien

Claim.)[4]  D&D took the position that those liens had been "filed
illegally" insofar as it appeared D&D had been paying the
subcontractor in advance, yet the subcontractor was not paying
its suppliers, and requested that the Surety issue lien release
bonds so that work on the Project could continue.  (Vogt Cert.,
Ex. 61, 10-31-02 Babino Letter.)  As of December 2002, the Surety
advised D&D that, having evaluated its position in bonding D&D
for future bids, it had decided that

> the comfort level required to extend millions of
> dollars of support in future work to [D&D] is, at best,
> lacking.  At this juncture, with the continuing
> problems that plague D&D on the North Plainfield
> contract and the unknown future, we have decided to
> take the conservative approach and limit our exposure
> until events warrant otherwise. . . . [O]ur position
> will hinder D&D's ability to bid new work, however
> until the successful completion of North Plainfield is
> achieved we feel as if we have no other choice but to
> halt any further extension of surety credit.

(Vogt Cert., Ex. 62, 12-6-02 Henn Letter.)  The additional
exposure to the Surety created by the lien release bonds was
"possibly" a factor in this decision.  (Henn Dep. at 130:16-
131:12.)  Other factors in this decision apparently included (1)
Vitetta's recommendation to Bovis, and by extension, the Board,

---

[4] Despite the masonry subcontractor apparently withdrawing
its municipal mechanics' lien filings sometime in December 2002,
D&D asserts that the subcontractor "later filed new, and even
more frivolous liens," which were "ultimately found frivolous by
the Bankruptcy Court" in In re D&D Associates v. P&C
Construction, et al., Adv. Proc. No. 04-1263 (Bankr. D.N.J.).
(Hollander Cert., Ex. PP, 4-18-07 Order of Final J. by Default.)

in October 2002 that liquidated damages be withheld from D&D's
monthly requisitions, and (2) concerns about D&D's "internal
controls" and its ability to manage the projects it had.  (Henn
Dep. at 137:21-138:21; Vogt Cert., Ex. 20, 10-14-02 Myerson
Letter; id., Ex. 57, 9-3-02 Boone E-Mail ("[D&D's] internal cost
accounting systems are lacking"); D&D Resp. to Bd. Stmt. Facts at
106-07.)  After December 2002, no further bond credit was
extended from the Surety to D&D, and approximately a year later,
the Surety went out of the surety business altogether, selling
its bonding portfolio to Arch Insurance.  (Board Stmt. Facts at
¶¶ 23-24; Henn Dep. at 9:17-10:15, 139:13-141:2.)

### 2.   Status With State Agencies

#### a.   NJEDA/DPMC Applications for Prequalification

D&D, prior to its involvement with the Project, was
prequalified with the New Jersey Division of Property Management
and Construction ("DPMC," formerly known as the New Jersey
Division of Building and Construction) as a general construction
contractor, as well as more specifically with the NJEDA to carry
out projects under the New Jersey Educational Facilities
Construction and Financing Act ("NJEFCFA").  (Board Stmt. Facts
at ¶ 25; D&D Resp. to Bd. Stmt. Facts at 108; Tattoli Dep. at
106:14-25.)  Pursuant to the NJEFCFA, a contractor holding a
current valid classification issued by the DPMC could request
that the NJEDA accept that classification on an interim basis by

submitting a short form to the NJEDA, along with a copy of their current "Notice of Classification" issued by the DPMC. (Hollander Cert., Ex. RR, D&D 10-25-00 Req. for Classification to NJEDA; Vogt Cert., Ex. 65, D&D 2-24-00 Req. for Classification to DPMC.)  D&D made such an applications in 2000. (Id.)  The separate NJEDA classification was required by law in order for a contractor to bid on a school facilities project.  (D&D Resp. to Bd. Stmt. Facts at 109 (citing P.L. 2000, c. 72 (C.18A-7G-1 et al.)).)

### b.   2000 and 2001 Applications

The DPMC approved D&D's request for classification as a general construction contractor in the aggregate amount of $40 million for the period March 7, 2000 - June 30, 2001.  (Vogt Decl., Ex. 66, 3-2-00 Not. of Classification.)  The following year, D&D was approved in the aggregate amount of $35 million for the period July 1, 2001 - June 30, 2002.  (Vogt Cert., Ex. 67, 6-22-01 Not. of Classification.)

### c.   2002 Application

D&D's 2002 application was submitted on or about May 13, 2002.  (Vogt Cert., Ex. 68, 5-13-02 Req. for Classification to DPMC; D&D Resp. to Bd. Stmt. Facts at 111.)  The Board notes, and D&D does not dispute, that the 2002 application was therefore made subsequent to D&D and the Surety receiving Vitetta's 4-29-02 default notice (though D&D disputes that the letter "constitutes

a true and accurate default notice"). (Board Stmt. Facts at ¶ 34; D&D Resp. to Bd. Stmt. Facts at 111; Tattoli Dep. at 118:10-19.)

The 2002 application was not signed by Tattoli on the first page as required, though he did sign the second page, which was notarized with an apparent scrivener's error giving the date as May 13, 2001. (Board Stmt. Facts at ¶ 36; D&D Resp. to Bd. Stmt. Facts at 112; Hollander Cert., Ex. HH, Sipos Dep. at 16:13-17:25; Tattoli Dep. at 124:7-16, 125:12-14 (stating that omission of signature on first page of 2002 application "wasn't done on purpose"); Tattoli Dep. at 126:9-127:6 (stating that Tattoli "ha[d] no idea" why the notary stamp was dated May 2001, when application was submitted in May 2002).)

The application includes the question "Has any agency of government experienced delay in completion, additional expense, liens or claims filed against the performance or payment bonds in the past five years?" to which D&D answered "No." (5-13-02 Req. for Classification to DPMC at 2.) D&D takes the position that this statement was "true when submitted." (D&D Resp. to Bd. Stmt. Facts at 113; Tattoli Dep. at 122:21-23, 123:15-19; but see D&D Resp. to Bd. Stmt. Facts at 72 (stating that on May 6, 2002, "D&D provided a detailed response and documented response to the allegations of [the 4-29-02 Myerson Letter], identifying delays from permitting problems, delays in the design of steel through

January 2002, and other factors which would justify a five month delay," and "requested that the defaults be rescinded").)   The Board points out that as of May 13, 2002, Vitetta had issued a default notice to the Surety on April 29, 2002, which was not withdrawn until August 6, 2002. (Board Stmt. Facts at ¶ 41.) Regardless, D&D's 2002 application was approved by the DPMC for general construction prequalification in the aggregate amount of $40 million for the period June 10, 2002 - June 30, 2003.  (Vogt Cert., Ex. 69, 6-24-02 Not. of Classification.)

### d.   2003 Application

The record contains an incomplete application to the DPMC by D&D dated June 30, 2003.  (Vogt Cert., Ex. 70, 6-30-03 Req. for Classification to DPMC.)  From the face of the document, it is evident that it is incomplete insofar as (1) the first page is not signed by Tattoli; (2) the second page, while signed by Tattoli, is not notarized; and (3) the Surety Affidavit page is blank.  (Id.)

Tattoli testified that after the Board terminated Contract 1C for the Somerset Intermediate School on March 4, 2003, "there was no sense in submitting" prequalification applications to the DPMC because D&D was no longer able to obtain bonding.  (Tattoli Dep. at 134:10-20, 144:4-23; Board Stmt. Facts at ¶¶ 43-44.)  His deposition testimony regarding the 2003 application indicated that in light of being unable to obtain bonding, any effort by

29

D&D to renew its prequalification with the DPMC would essentially be futile, but his "secretary gave it another try" nonetheless. (Tattoli Dep. at 151:5-152:2, 154:20-25, 157:6-25.)  He testified that he did not actually recall the 2003 application.  (Tattoli Dep. at 158:10-18; Board Stmt. Facts at ¶ 46; D&D Resp. to Bd. Stmt. Facts at 121.)

D&D's office manager, Sylvia Blackmore, testified that she had tried to obtain a surety certification through Babino for the 2003 application, but Babino was unable to do so "because of the default letters."  (D&D Resp. to Bd. Stmt. Facts at 121; Hollander Cert., Ex. II, Blackmore Dep. at 110:15-114:25.) Regardless, Blackmore apparently prepared the 2003 application, "probably" used Tattoli's signature stamp on the second page of the application, and submitted the application knowing it was deficient insofar as it lacked current financial statements and a surety affidavit.  (Blackmore Dep. at 116:4-119:20, 120:7-121:18.)[5]

---

[5] Tattoli gave the following testimony regarding the signature on the second page of the 2003 application, contended by D&D to have been stamped there by Blackmore (D&D Resp. to Bd. Stmt. Facts at 121):
> Q: Is that your signature at the bottom of the second page?
> A: Yes, it is.
> Q: Did you sign that document?
> A: Yes.
> Q: On June 30, 2003?
> A: Yeah.

(Tattoli Dep. at 147:19-25; but see id. at 158:17-18 ("Could be my signature.  Could be the stamp in the office.").)

The DPMC Office of Contractor Classification informed D&D via letter dated August 19, 2003, that D&D's Request for Classification was incomplete, and required the following information: signature on page one, notarization of page two, completed surety affidavit, and current financial statements. (Vogt Cert., Ex. 71, 8-19-03 Letter.)  The letter further advised that "[i]f these deficiencies are not remedied by Friday, August 29, 2003, your Request for Classification will be deemed withdrawn."  (Id.)  Neither Blackmore nor Tattoli responded to the 8-19-03 Letter on behalf of D&D.  (Tattoli Dep. at 155:2-6; Blackmore Dep. at 124:11-16 ("We had no financial statement and we didn't have the surety, so there was no sense in resubmitting it.").)  Subsequently, the DPMC advised D&D that, having received no response to the 8-19-03 Letter, the DPMC deemed D&D's application to be withdrawn.  (Vogt Cert., Ex. 72, 9-2-03 Letter.)

### e.   Post-2003 Status

D&D asserts that it has not submitted any new Requests for Classification to the DPMC for prequalification as a general construction contractor, insofar as it "has been unable to submit such an application because [of] the defendants' continued stigmatization of D&D."  (D&D Resp. to Bd. Stmt. Facts at 125.)  The record indicates that D&D has sought and gotten approval as a subcontractor on public works projects.  (Board Stmt. Facts at ¶

31

54; Tattoli Dep. at 160:11-161:23; Vogt Cert., Ex. 73, 6-1-04 NJ
Dep't of Labor Application for Public Works Contractor
Registration.)  Tattoli testified that although D&D can no longer
work as a general contractor on public works projects in New
Jersey, it can and does continue to work as a subcontractor on
public works.  (Tattoli Dep. at 164:8-165:16.)[6]  The Board offers
D&D's tax returns from the years 2003-2008 to show that D&D
"continues in business as a construction contractor," citing
reported "gross receipts or sales," but D&D points out that the
tax returns actually show that D&D suffered ordinary income
losses in each of those years.  (Vogt Cert., Exs. 86-91, Tax
Returns; Board Stmt. Facts at ¶ 55; D&D Resp. to Bd. Stmt. Facts
at 128.)

## IV.  Related Proceedings

### A.    D&D Bankruptcy

D&D petitioned for Chapter 11 bankruptcy relief on August
15, 2003, and the Bankruptcy Court approved D&D's reorganization
plan on January 19, 2005.  In re D&D Assocs., Bankr. No. 03-33177
(KCF), dkt. entry no. 183, 1-19-05 Order.  (Vogt Cert., Ex. 79,
1-19-05 Order.)  The Surety filed a proof of claim in the

---

[6] Tattoli provided a Declaration in which he stated that
from "2003 through 2006, and continuing to the present, D&D has
not had any bonding line, and thus cannot bid any public work as
a general contractor.  Although D&D was still qualified to do
subcontract work on public projects, the subcontract work D&D did
get was all on private commercial projects."  (Hollander Cert.,
Ex. Z, 11-20-09 Tattoli Decl. at ¶ 6.)

bankruptcy proceedings, asserting that under the GIA, the Surety
and not D&D owns "any and all [indiscernible] contractual rights
which those parties might have relating to such bonded projects."
(Vogt Cert., Ex. 80, Proof of Claim.)  D&D denies that the Surety
"has been assigned, or exercised any option to assume D&D's
affirmative claims," specifically, D&D's claims arising out of
the construction contracts with the Board.  (D&D Resp. to Bd.
Stmt. Facts at 133.)

### B.   Insurance Action

The Board brought an action in state court, later removed to
this Court, against its general liability insurance carrier,
Zurich American Insurance Company ("Zurich"), seeking specific
performance of Zurich's duty to defend the Board in this action
as well as damages for breach of contract and breach of the duty
of good faith and fair dealing due to Zurich's alleged refusal to
defend and indemnify the Board against the D&D action ("Insurance
Action").  N. Plainfield Bd. of Educ. v. Zurich Am. Ins. Co., No.
05-4398 (MLC).  Zurich filed a third-party complaint against
National Union Insurance Company ("National Union") seeking a
declaration that an Errors and Omissions policy issued by
National Union to the Board provided primary coverage to the
Board in the D&D Action, and the Board subsequently amended its
complaint to seek to compel National Union to defend and

indemnify it in the D&D action.  No. 05-4398, dkt. entry no. 96, Am. 3d Party Compl.; dkt. entry no. 42, Amendment to the Compl.

The Court found that an exclusion for claims "arising out of breach of contract" relieved National Union of its duty to defend and indemnify the Board with respect to count 2, count 3, count 4, count 10, count 12, count 13, and count 14 of the Amended Complaint in the D&D action.  No. 05-4398, dkt. entry no. 93, 5-15-08 Mem. Op. at 34-35 (finding "that D&D's other remaining claims against the Board grew out of the same alleged misconduct underlying D&D's breach of contract claim"); dkt. entry no. 222, 3-17-11 Opinion; dkt. entry no. 223, 3-17-11 Order (denying motion for reconsideration of the 5-15-08 Mem. Op. and accompanying Order); dkt. entry no. 228, 4-13-11 Order of Final J.  That matter is currently on appeal to the United States Court of Appeals for the Third Circuit.  N. Plainfield Bd. of Educ. v. Zurich Am. Ins. Co., Case No. 11-2323 (3d Cir. filed May 20, 2011) (oral argument scheduled for April 23, 2012).

## DISCUSSION

### I.   Summary Judgment Standard

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56 provides that summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a). In making this determination,

the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor." United States ex rel. Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

The summary judgment standard is not affected when the parties file cross motions for summary judgment. Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987). If review of cross motions for summary judgment reveals no genuine disputes of material fact, then judgment will be entered "in favor of the party deserving judgment in light of the law and undisputed facts." Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998).

## II.  Count Two - Procedural Due Process (Board, Epstein)

D&D, in count two, alleges civil rights violations against all of the defendants.  That count currently remains pending against the Board and Epstein only, though D&D moves to reinstate count 2 against Bovis and Vitetta.  (Am. Compl. at 20; dkt. entry no. 264, 12-21-07 Mem. Op. at 26 (denying Board and Epstein's separate motions for summary judgment on count 2 and noting an intention "to grant D&D leave to move to reinstate count 2 insofar as asserted against Bovis and Vitetta"); dkt. entry no. 350, D&D Mot. on Count 2.)

35

Section 1983 provides a private right of action against anyone who, acting under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988).  Count 2 seeks redress pursuant to Section 1983 for alleged due process violations under the Fourteenth Amendment relating to deprivation of certain liberty interests, including its prequalification status for public works contracts, good reputation, and vested interest in its right to bid on public works projects, but does not assert any property interest based on, e.g., the contracts pertaining to the Project. (Am. Compl. at 20-24.)  See Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008) ("In order to determine whether the Borough's actions . . . deprived Dee of due process, we must first ask whether the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property.'") (internal quotation omitted).  A due process claim of the type asserted here by D&D is referred to as a "stigma-plus" claim, insofar as to succeed, "a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest."  Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006) (emphasis in original) (citing Paul v. Davis, 424 U.S. 693, 701 (1976)).

36

D&D alleges that (1) it was prequalified to serve as a general contractor for the NJEDA, (2) the default letters Epstein and the Board sent to D&D and the Surety interfered with D&D's bonding capacity and its ability to bid on public works projects, and (3) "the Board through its representatives, including Bovis and Vitetta, falsely and willfully published statements to the effect that D&D was performing its work in a sloppy and incomplete manner, was leaving work unfinished, . . . performed defective work", and abandoned the Project.  (Am. Compl. at 21-23.)

Though the Court previously ruled that D&D had adequately alleged a "stigma-plus" claim against the Board and Epstein, insofar as it contended that "damage to its reputation was accompanied by its termination from the Project contracts and loss of prequalification status with the NJEDA, bonding capacity, and overall ability to bid on other public works contracts," the Court advised the parties that that ruling is subject to revisitation, now that discovery is complete, and in light of intervening changes to the law.  (12-21-07 Mem. Op. at 25 (citing Am. Compl. at 22-23); dkt. entry no. 325, 9-16-09 Scheduling Order; dkt. entry no. 410, 6-28-10 Order; dkt. entry no. 416, 6-28-10 Hr'g Tr. at 5:25-6:15, 7:11-8:7, 14:12-15:15.)  Therefore, D&D's contention that the Board's current motion for summary judgment on D&D's due process claims is essentially an improper

attempt to re-argue the rulings of the 12-21-07 Memorandum
Opinion and Order is of little moment.  (D&D Opp'n to Board Mot.
at 22-23.)

### A.   Liberty Interest in Reputation

To state a due process claim for deprivation of a liberty
interest in reputation, as D&D asserts in count 2, "a plaintiff
must show a stigma to his reputation plus deprivation of some
additional right or interest."  McCarthy v. Darman, 372 Fed.Appx.
346, 351 (3d Cir. 2010).  In other words, damage to reputation
"is actionable under 42 U.S.C. § 1983 only if it occurs in the
course of or is accompanied by a change or extinguishment of a
right or status guaranteed by state law or the Constitution."
Clark v. Twp. of Falls, 890 F.2d 611, 619 (3d Cir. 1989).

A liberty interest deprivation occurs in the public
employment context where the employer "creates and disseminates a
false and defamatory impression about the employee in connection
with his termination. . . .  The creation and dissemination of a
false and defamatory impression is the 'stigma,' and the
termination is the 'plus.'"  Hill, 455 F.3d at 236 (internal
quotation and citation omitted).  When a plaintiff satisfies the
"stigma-plus" test, "the employee is entitled to a name-clearing
hearing."  Id.

**B.   Stigma**

To satisfy the "stigma" part of the test, a plaintiff must show that "the purportedly stigmatizing statement(s) (1) were made publicly, . . . and (2) were false." Id. (internal citations omitted).  The Court will assume without finding that D&D can establish stigma, as there is at least a factual dispute between the parties as to whether the defendants' statements regarding D&D's ability to meet deadlines and "abandonment" of the jobsite were false.  (See, e.g., dkt. entry no. 350-2, D&D Br. Supp. Count 2 Mot. at 19 (arguing that contentions in Construction Updates that D&D "abandoned" the jobsite are false because, in fact, Bovis and the Board had locked D&D out of the site).)

**C.   Plus**

The "plus" prong is typically satisfied by a plaintiff's loss of employment.  Hill, 455 F.3d at 237.  Although the "stigma-plus" test may be satisfied even if, as a matter of state law, the plaintiff lacks a property interest in the job he lost, see id. at 238, the "plus" prong may also be satisfied in cases where the "plus" is something less drastic than termination, so long as it is "sufficiently weighty," i.e., the deprivation of a constitutionally protected property interest.  Dee, 549 F.3d at 234.

39

The Court notes, however, "the possibility of a future contract with a municipality is not a property interest that warrants procedural due process protection." Mun. Revenue Servs., Inc. v. McBlain, 347 Fed.Appx. 817, 826 (3d Cir. 2009). A property interest warranting due process protection has been recognized as existing with respect to two types of contract rights:  where (1) the contract confers a protected status, such as in the case of receipt of welfare benefits or continued tenure in the public school employment context, or (2) the contract itself includes a provision that the state entity can terminate the contract only for cause.  Linan-Faye Constr. Co., Inc. v. Hous. Auth. of City of Camden, 49 F.3d 915, 932 (3d Cir. 1995) (citing Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1399 (3d Cir. 1991)).

The General Conditions applicable to the contracts between D&D and the Board provide that D&D may be terminated for cause. (General Conditions, Art. 14.2.)  "Cause" was defined to include, inter alia, failing to (1) supply enough properly skilled workers or proper materials, (2) make payment to subcontractors for materials or labor, and (3) being "otherwise guilty of substantial breach of a provision of the Contract Documents." (General Conditions, Art. 14.2.1.1, 14.2.1.2, 14.2.1.4.)  Vitetta certified to the Board that cause for termination existed on these three grounds, and the Board ultimately cited Article

14.2.1 in terminating the contracts.  (Dkt. entry no. 371-6,
Birnbaum Decl., Ex. B, 2-26-03 Board Resolution (authorizing
termination of Contract 1C); Vogt Cert., Ex. 33, 2-11-03 Myerson
Letter (certification of Vitetta to Board that D&D was in
material breach and should be terminated under Articles 14.2.1.1,
14.2.1.2, and 14.2.1.4).)  However, the General Conditions also
permit the Board's termination "for convenience and without
cause."  (General Conditions, Art. 14.4.1.)  Thus, we have
considered the possibility that the contracts gave rise to a
constitutionally-protected property right, but we conclude that
such a right does not come into play in this instance, where the
contract itself does <u>not</u> include a provision that "the state
entity can terminate the contract <u>only</u> for cause."  <u>Unger</u>, 928
F.2d at 1399 (emphasis added); <u>cf.</u> <u>Dee</u>, 549 F.3d at 230-31
(finding that collective bargaining agreement constraining
municipality from disciplining or discharging employees without
"just cause" "created a constitutionally protected property
interest in not being suspended without just cause.").  (<u>Accord</u>
dkt. entry no. 86, 9-30-05 Mem. Op. at 10.)

D&D also argues that its due process rights were violated
because "the Board violated the grant agreements," referring to
contracts between the Board and the NJEDA providing for NJEDA
funding of the Project, entered into in July 2001.  (D&D Opp'n to
Board Mot. at 40; dkt. entry no, 350-3, D&D Stmt. Facts Supp.

Count 2 Mot. at ¶¶ 5-12; D&D Count 2 Exs., Exs. 1-5 (Grant
Agreements for each school).)   However, D&D failed to plead this
claim in count 2 of the Amended Complaint, which refers to the
NJEDA pre-qualification program's requirement that D&D report any
adverse actions taken by a Board of Education on a project to be
submitted as part of the contractor's submission of subsequent
bids.   (Am. Compl. at 20-23; cf. id. at 17-18.)   Moreover, D&D
has not cited any case supporting the proposition, and the Court
declines to find, that D&D has a constitutionally-protected
property interest in the Grant Agreements, to which it is not a
party.[7]   The reporting requirements imposed on the Board in the
Grant Agreements or NJEFCFA regulations are for the benefit of
the public fisc, not putative contractors.   See Bd. of Regents v.
Roth, 408 U.S. 564, 577 (1972) ("To have a property interest in a
benefit, a person clearly must have more than an abstract need or
desire for it.   He must have more than a unilateral expectation
of it.   He must, instead, have a legitimate claim of entitlement
to it.").   (See dkt. entry no. 350-2, D&D Br. Supp. Count 2 Mot.
at 26-31, citing Franklin Contracting Co. v. New Jersey, 365 A.2d
952 (N.J. App. Div. 1976), which involved a claim for breach of

_____

[7] The parties dispute whether D&D is a third-party
beneficiary of the Grant Agreements.   (Dkt. entry no. 371, Board
Opp'n Br. at 11-12; dkt. entry no. 386-1, D&D Reply Br. Supp.
Count 2 Mot. at 4.)

contract and wherein the plaintiff did not assert a constitutional due process claim.)

D&D is not a government employee, but rather an independent contractor.  See Baraka v. McGreevey, 481 F.3d 187, 206 & n.14 (3d Cir. 2007).  (See dkt. entry no. 348-9, Board Br. at 12 (citing General Conditions, Art. 2.5.2, 3.3.1-3.3.4).)  While the Court rejects the Board's suggestion that independent contractors doing business with governmental entities categorically may not maintain a due process claim (see Board Br. at 11-12), the mere fact of the Board's termination of Contract 1C will not suffice as the "plus" in a stigma-plus claim for deprivation of a liberty interest the way it would in the case of an employee such as the firefighter suspended by the municipality in Dee, the former borough manager who brought suit against the borough in Hill, or the untenured public college professor in Board of Regents v. Roth, all of whom were public employees.  See Linan-Faye, 49 F.3d at 432 (citing S & D Maint. Co. v. Goldin, 844 F.2d 962 (2d Cir. 1988)) ("although the consequential damages of an alleged breach may be severe, this fact alone cannot convert" a contractor's claim against a municipality "into a deprivation of liberty").[8]

---

[8] Stringer v. Henry, 435 F.3d 268 (3d Cir. 2006), relied upon by D&D, is inapposite, as it does not involve a due process claim.  (See D&D Opp'n to Board Mot. at 28.)  In Municipal Revenue Services, the Third Circuit considered the merits of substantive and procedural due process claims brought by a contractor against government entities, but ultimately concluded that the district court did not err in dismissing the claims

This Court concludes that based upon the undisputed record evidence, D&D's contracts with the Board did not confer a constitutionally protected property interest that could suffice as the "plus" to the alleged damage to D&D's reputation.

### D.   Causation - State Action

The Court finds that there is an insufficiently direct causal connection between the alleged stigmatizing statements by the Board and its agents and the alleged injury of losing bonding capacity with the Surety, prequalification status with the NJEDA and/or DPMC, and the ability to work on public works projects, because as the Board is not responsible for or even capable of either granting prequalification status or bonding D&D.  See, e.g., Mun. Revenue Servs., Inc., 347 Fed.Appx. at 826 ("[T]he loss of a business opportunity is insufficient to establish the . . . 'plus' requirement"); Sullivan v. N.J. Div. of Gaming Enforcement, 602 F.Supp. 1216, 1222 (D.N.J. 1985) ("[T]he sine qua non of a 'stigma-plus' suit is that the 'plus' must be the result of state action directly affecting the plaintiff's rights or status under the law.  The fact that state action may be involved in the 'stigma' (i.e., defamation) is not of itself sufficient to maintain the action."); see also Am. Consumer Publ'g Ass'n, Inc. v. Margosian, 349 F.3d 1122, 1126 (9th Cir.

---

because, inter alia, the plaintiff had failed to establish the "plus" part of a stigma-plus claim.  347 Fed.Appx. at 826.

2003) ("[T]he 'stigma-plus' test requires that the defamation be accompanied by an injury <u>directly caused</u> by the Government, rather than an injury caused by the act of some third party in reaction to the Government's defamatory statements."); <u>Libertelli v. Parell</u>, No. 86-2752, 1989 WL 43662, at *4 (D.N.J. Mar. 21, 1989) ("Even if plaintiff could assert some sort of liberty interest by coupling a defamation with a loss of employment not otherwise protected, his claim must fail . . . because any loss of employment resulted from the acts of private parties, not the government officials. . . . [T]he 'plus' in a 'stigma-plus' suit for a deprivation of liberty must be the direct result of state action."). D&D attempts to distinguish these cases as involving "private employees and general consumer retail businesses" as opposed to public contractors, but this view fails to appreciate that with respect to the NJEDA and/or DPMC, D&D was simply a private business seeking prequalification status from those agencies, in a similar position to the plaintiffs in <u>American Consumer</u>, <u>Sullivan</u>, and <u>Libertelli</u>, whereas it was a public contractor with respect to the Board and the other school districts with which it contracted. (Dkt. entry no. 381, D&D Opp'n to Board Mot. at 38 n.9.)

D&D's alleged injuries flow from the <u>Surety's</u> unwillingness to provide further bonding and D&D's subsequent determination that seeking prequalification status would be futile in light of

its inability to obtain bonding, not directly from the actions of
the Board.  (See D&D Opp'n to Board Mot. at 25 ("The defendants'
actions in deliberately attacking [D&D's] prequalification status
and ability to bid other projects by attacking D&D's bonding line
served as a surreptitious means to destroy that status without a
hearing.") (emphases added); id. at 39.)  D&D's claims are more
appropriately framed in the context of breach of contract,
defamation, and tortious interference with economic advantage,
rather than a constitutional deprivation of a protected liberty
interest, given its inability to make out a cognizable "stigma-
plus."  Sullivan, 602 F.Supp. at 1221-23.

        We therefore find that the alleged "plus" part of D&D's
claim--the inability to obtain pre-qualified status with the
NJEDA and/or DPMC, completely separate agencies from the Board,
due to its inability to obtain bonding from the Surety, and the
loss of putative future construction contracts--will not suffice
to trigger entitlement to a name-clearing hearing under Hill, and
thus no deprivation of a liberty interest without due process
occurred.  The Court will enter judgment in favor of the Board
and Epstein on count 2, and will deny D&D's motion to reinstate
count 2 as to Bovis and Vitetta.[9]

        [9] Because the Court finds no constitutional violation as to
count 2, we need not address whether (1) the Board could be held
liable pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658,
691 (1978), or (2) whether Epstein, Bovis, and Vitetta could be
considered to have acted "under color of state law," with respect

### III. Count 3 and Count 4 - First Amendment Retaliation (Board)

D&D, in count 3, alleges that the defendants issued the
default letters and subsequently terminated D&D because D&D (1)
refused to state falsely that the Project was on schedule, (2)
stated that the defendants caused the Project delays, (3)
requested extensions of time and compensation, and (4)
"attempt[ed] to meet with other prime contractors affected by the
defendants' improper actions to form a coordinated attempt to
seek scheduling adjustments and other redresses." (Am. Compl. at
24.) D&D contends that the defendants' retaliatory conduct
violated its rights under the First Amendment and Section 1983.
(Id. at 24-25.) Similarly, D&D contends in count 4 that the
defendants retaliated against it for seeking redress in federal
court in violation of Section 1983, Section 1985, and the First
Amendment. (Id. at 25-26.)[10] These two counts remain pending
against the Board only. (See 12-21-07 Mem. Op. at 30-32
(granting judgment in favor of Epstein and Vitetta on count 3 and

---

to count 2. Assuming without finding that Epstein, Bovis, and
Vitetta could be considered state actors for purposes of Section
1983, they would be entitled to qualified immunity on count 2 on
the basis that no constitutional violation occurred. Pearson v.
Callahan, 555 U.S. 223, 232 (2009).

[10] The Court previously held, and still maintains, that
count 4 is properly analyzed under Section 1983 and the First
Amendment, and that Section 1985 is inapplicable. (See 12-21-07
Mem. Op. at 26-27 & n.9.)

count 4, finding that "D&D has not shown that it engaged in any conduct protected by the First Amendment").)

The Court finds it appropriate to revisit its previous ruling that the bringing of this action and D&D's affirmative statements regarding Project scheduling, delays, requests for extensions of time, and attempts to meet with other contractors, did not constitute speech pertaining to matters of public concern. (See 12-21-07 Mem. Op. at 30-31.) The Court therefore declines to simply enter judgment in favor of the Board on these two counts on the basis of law of the case, as urged by the Board. (Board Br. at 34-35; see 6-28-10 Hr'g Tr. at 14:12-15:15.) However, for the reasons discussed below, the Court ultimately reaches the same conclusion: D&D cannot show that it engaged in protected First Amendment activity.

The First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits the government from, inter alia, "abridging the freedom of speech, or . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. Here, count 3 implicates the Speech Clause, while count 4 implicates the Petition Clause.

Section 1983 provides for a cause of action when a state actor retaliates against an individual for participating or engaging in conduct protected by the First Amendment. See Bradshaw v. Twp. of Middletown, 145 Fed.Appx. 763, 766-67 (3d

48

Cir. 2005).  To prevail on its constitutional retaliation claims, D&D must prove that (1) it engaged in constitutionally-protected activity, (2) the government responded with retaliation, and (3) the protected activity caused the retaliation.  <u>Miller v. Mitchell</u>, 598 F.3d 139, 147 (3d Cir. 2010) (citing <u>Eichenlaub v. Twp. of Indiana</u>, 385 F.3d 274, 282 (3d Cir. 2004)).

The First Amendment's guarantee of freedom of speech "protects government employees from termination <u>because of</u> their speech on matters of public concern"; speech on merely private employment matters is not protected.  <u>Bd. of Cnty. Comm'rs v. Umbehr</u>, 518 U.S. 668, 675 (citing <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983)); <u>accord</u> <u>Borough of Duryea, Pa. v. Guarnieri</u>, 131 S.Ct. 2488, 2493 (2011) ("When a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke <u>as a citizen</u> on a matter of public concern.  If an employee does not speak as a citizen, or does not address a matter of public concern, a federal court is not the appropriate forum. . . .") (quotation and citation omitted) (emphasis added).  For First Amendment protection purposes, independent contractors are treated the same as public employees.  <u>Umbehr</u>, 518 U.S. at 673.

The First Amendment right of a public employee or an independent contractor speaking on a matter of public concern is to be weighed against "'the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its employees.'" Guarnieri, 131 S.Ct. at 2493 (quoting Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968)).  When employees "make statements pursuant to their official duties," they are not "speaking as citizens for First Amendment purposes," such that the speech is not of public concern and the First Amendment does not prohibit as retaliatory subsequent employer discipline.  Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).

The requirement that speech be of public concern in order to merit First Amendment protection, long applied to cases arising under the Speech Clause, now applies to claims of violation of the Petition Clause as well.  Guarnieri, 131 S.Ct. at 2494-25 (abrogating San Filippo v. Bongiovanni, 30 F.3d 424, 443 (3d Cir. 1994), which held that an employee was entitled to First Amendment protection for any "non-sham" litigation against government employer).

### A.   Count 3

D&D asserts that the Board's actions violated its First Amendment right to be free from compelled speech, with respect to the schedules sought by the defendants.  See Miller, 598 F.3d at 151 ("Government action that requires stating a particular message favored by the government violates the First Amendment

right to refrain from speaking.").  (D&D Opp'n to Board Mot. at
83.)

### 1.  Public Concern

Speech addresses a "matter of public concern when it can be
fairly considered as relating to any matter of political, social,
or other concern to the community." Labalokie v. Capital Area
Intermed. Unit, 926 F.Supp. 503, 507 (M.D. Pa. 1996) (citing
Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993)).
Whether speech can be so characterized is determined by its
content, form, and context.  Connick, 461 U.S. at 147-48.

D&D argues that the Board's attempt to compel it to create
unrealistic construction schedules was a matter of public concern
because the fact that the Board wanted to publish the schedule
"on the Board's website shows that the Board felt that the
scheduling was a critical issue of public interest to the
community" as opposed to a private matter between D&D and the
Board.  (D&D Opp'n to Board Mot. at 84.)  D&D declined to provide
such a schedule, and advised the Board, in a letter to Birnbaum
dated September 25, 2001, that (1) the schedule D&D intended to
provide would show substantial delays caused by Vitetta and
Bovis, based on delays in drawings and permits, respectively; (2)
the schedule being requested by Bovis on behalf of the Board
would have a "severely negative impact on the school board"; and
(3) D&D strongly suggested a meeting "between [the Board], the

other primes, the architect and Bovis to discuss such delays and
the extension of time needed to complete this project."  (D&D
Count 2 Exs., Ex. 48, 9-25-01 Pereira Letter.)  This letter
apparently forms the basis of count 3.  (Am. Compl. at 24.)

That the issues identified by D&D in the 9-25-01 Pereira
Letter are of "public concern" is shown by minutes from a meeting
of the Board on October 3, 2001.  The October 3, 2001 Board
meeting was attended by "approximately 20 members of the staff
and public," and the minutes reflect that members of the public:
(1) "asked for an update on the trailer/construction issue"; (2)
"asked for an update on the building program"; (3) "requested
. . . an update on the construction project"; (4) "expressed
dissatisfaction with the construction issue"; and (5) "questioned
whether the one-year plan was still in effect and who would be
the point of contact at the Board for further questions."  (D&D
Count 2 Exs., Ex. 49, 10-3-01 Board Minutes.)  That Board meeting
also featured a presentation by Bovis's project manager regarding
the Project, advising the public and the Board that "a schedule
is being developed with a September, 2002 occupancy date" and
"[p]roblems have been encountered with code official inspections
due at least partially to the fact that the inspectors are part-
time workers."  (Id. at 2.)  These minutes strongly indicate the
public concern in the timing and progress of the Project, and
address the same topics raised by Pereira in the 9-25-01 Letter.

52

See, e.g., Bieluch v. Sullivan, 999 F.2d 666, 671 (2d Cir. 1993)
(finding that state trooper's "speech concerned tax expenditures,
town budgets, school construction, and the right to petition for
referenda -- matters of utmost public concern"); Labalokie, 926
F.Supp. at 507-08 (statements of terminated independent
contractor criticizing educational authority official for
mismanagement "asserted the wrongdoing of a public official and
related to Plaintiff's employment in a manner of more than
personal interest").

### 2.   Citizen Speech vs. Official Duties

The infirmity with D&D's theory, despite the content at
issue -- school construction -- clearly being of public concern,
is that the context and form do not show that D&D was acting as a
citizen, as opposed to within the scope of its official duties,
which is a prerequisite to satisfying the first element of First
Amendment retaliation along with public concern.  Guarnieri, 131
S.Ct. at 2493.  Bieluch and Labalokie both illustrate this
distinction.

Bieluch involved a state trooper's speech at "town hall
meetings" and his involvement in "community taxpayer
organizations."  999 F.2d at 671-72 (denying summary judgment to
defendant where state trooper's "actions . . . contributed to
debate on public issues" and trooper "clearly had the right to
express his views as an individual on public issues").  The

Labalokie court observed, in denying a motion to dismiss, that
the plaintiff's statement was made at a board meeting of the
defendant, "outside the confines of Plaintiff's daily work
environment."  926 F.Supp. at 508.  In both instances, the
plaintiffs were significantly more removed from their official
duties when making the statements at issue than D&D is here.
Even when it is undisputed that "statements were made on a matter
of public concern," an employee does not engage in protected
activity when those statements are made "pursuant to . . .
official duties."  Morris v. Phila. Hous. Auth., No. 10-5431,
2011 WL 3273475, at *11 (E.D. Pa. July 29, 2011) (granting motion
to dismiss where many instances of plaintiff's "allegedly
protected speech came in response to . . . orders to perform
certain assignments," and plaintiff objected to the nature of the
assignments).

     We note that the cases of "compelled speech" relied upon by
D&D do not involve the public employee/contractor context, but
rather the public school context, such that the requirement that
D&D show that it was speaking (or refusing to speak) in its
capacity as a citizen, not an employee, is not alleviated.  (D&D
Opp'n to Board Mot. at 82-83, citing Miller v. Skumanick, 605
F.Supp.2d 634 (M.D. Pa. 2009), aff'd sub nom Miller v. Mitchell,
598 F.3d 139 (3d Cir. 2010), and Rumsfeld v. Forum for Academic
Inst'l Rights, Inc., 547 U.S. 47, 63 (2006).)  Cf. Garcetti, 547

U.S. at 425 (addressing dissent's concern that holding "may have important ramifications for academic freedom," but noting that Garcetti majority did not "decide whether [it] would apply in the same manner to a case involving speech related to scholarship or teaching").  The cases cited by D&D for the proposition that "whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law," do not involve "compelled speech," but rather state troopers' affirmative statements in the course of investigations of their employer's practices.  (D&D Opp'n to Board Mot. at 82, citing Reilly v. City of Atl. City, 532 F.3d 216, 227-28 (3d Cir. 2008) and Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007).)

The evidence relied upon by D&D in support of its First Amendment retaliation claims does not support a finding that D&D was engaging in constitutionally-protected speech as a citizen. The record sets forth that D&D and the Board and/or its agents were in communication regarding the schedules sought by the Board on September 25, October 1, October 11, and October 19, 2001, and that a school board meeting addressing the same issues occurred on October 3, 2001.  (D&D Count 2 Exs., Ex. 45, 10-1-01 Pereira Letter; Ex. 48, 9-25-01 Pereira Letter; Ex. 49, 10-3-01 Board Minutes; Ex. 50, 10-11-01 Epstein Letter; Ex. 51, 10-19-01 Epstein Letter.)  D&D contends that the Board was motivated to

make its requests that D&D provide certain construction schedules
to be presented to the public because the Superintendent
allegedly told Pereira that the Board "wanted to show no delays"
and the Superintendent felt that her "reputation was on the
line." (D&D Count 2 Exs., Ex. 33, Pereira Dep. at 126:6-127:16.)
However, there is no indication that the Board sought favorable
construction schedules to present on its website from D&D as a
citizen; rather, it sought schedules from D&D in its capacity as
the general contractor on the Project. D&D was required to
provide construction schedules to the Board pursuant to the
contracts governing the Project. (General Conditions, Art.
3.10.1 (regarding Contractor's duty to "prepare and submit . . .
a Contractor's Construction Schedule for the Work"); id. at
3.10.5, 3.10.6; 9-25-01 Pereira Letter ("As per our contract we
are required to submit a 90 day schedule. . ."); 10-11-01 Epstein
Letter (discussing D&D's "contractual obligations" to provide
schedules).)

Thus, viewing D&D's claims in count 3 either as speech
relating to public concern in the form of, e.g., the 9-25-01
Pereira Letter advising the Board that it would not provide the
construction schedules sought and in fact attributed the delays
to Bovis and Vitetta, or as a refusal to engage in "compelled
speech" with which it disagreed, D&D has not provided any
evidence that would allow a factfinder to make the requisite

56

conclusion that D&D was not acting as an employee in the scope of its official duties.  There is no evidence of D&D attempting and being thwarted by the Board of "contribut[ing] to public debate"; rather, it was concerned, as a contractor, with matters personal to it.  Garcetti, 547 U.S. at 419 (quoting Pickering, 391 U.S. at 573); Connick, 461 U.S. at 147.  (See also 12-21-07 Mem. Op. at 32.)

Because D&D cannot show that it engaged in protected First Amendment activity as a citizen with respect to count 3, the Court does not reach the questions of government retaliation and causation.

**B.  Count 4**

D&D, in count 4, asserts that it was retaliated against for filing the Complaint in this action.  (Am. Compl. at 25-26.)  D&D filed the Complaint in April 2003, while it was still performing work under Contracts 1A and 1B.  (Id. at 25.)  D&D alleges that there was a causal connection between its service of "voluminous responsive papers in opposition to defendants' motions" for summary judgment on July 3, 2003, and letters purporting to terminate D&D from Contract 1A and Contract 1B issued on July 11, 2003.  (Id. at 26; see Vogt Cert., Ex. 48, 7-11-03 Epstein Letter.)  D&D argues that these responsive papers "indicated that D&D's litigation would raise and expose the Board's, Epstein's, Vitetta's and Bovis' violations of public bidding statutes, and

57

financial and political favoritism among themselves."  (D&D Opp'n
to Board Mot. at 94.)  According to D&D, its filings caused the
Board, via Epstein, to withdraw an agreement for completion of
the remaining schools, abrogating a June 18, 2003 resolution of
the Board that would have allowed D&D to complete the remaining
work under those contracts.  (Id. at 95.)

The same standard, as noted previously, applies to count 4
as count 3: D&D must show that by bringing this action and
serving the responsive papers, it engaged in protected First
Amendment activity by petitioning "as a citizen on a matter of
public concern."  Guarnieri, 131 S.Ct. at 2493, 2500.  "If a
public employee petitions as an employee on a matter of purely
private concern, the employee's First Amendment interest must
give way, as it does in speech cases."  Id. at 2500.

We find that D&D's claims in this action are brought in its
capacity as an employee/independent contractor involving matters
particular to it, though the relationship between D&D and the
Board concerned a subject of inherently public concern, school
construction.  The subject matter alone of the dispute between
D&D and the Board is insufficient to confer First Amendment
protection, and this action does not "advance a political or
social point of view beyond the employment context."  See Pa.
State Troopers Ass'n v. Pawlowski, No. 09-1748, 2011 WL 4592786,
at *4 (M.D. Pa. Sept. 30, 2011) (quoting Guarnieri, 131 S.Ct. at

2501).  Accordingly, much for the same reasons as the Court
articulated with respect to count 3, we will grant judgment in
favor of the Board as to the First Amendment retaliation claims.

## IV.  Count 8 - Breach of Contract (Board)

D&D asserts a breach of contract claim against the Board,
asserting, _inter alia_, the Board breached its contracts with D&D
"by refusing to make payments to D&D, improperly interfering with
the performance of D&D's work, improperly demanding extra work
through unpriced 'field directives' to avoid the formal change
order process, improperly threatening defaults and terminations,
and improperly terminating D&D's work on Contracts 1A, 1B, and
1C."  (Am. Compl. at 36-37.)

The Board asserts that D&D assigned all its rights under the
contracts to the Surety, pursuant to the GIA entered into between
D&D and the Surety, such that only the Surety can bring claims
against the Board for breach of the Project contracts or to
recover sums due under the contracts.  (Board Br. at 35.)  The
Board acknowledges that the Court previously found that the GIA
term providing that "in the event of Default", D&D "does assign,
transfer and set over to the Surety" all of its rights under the
Project contracts, including "all claims and causes of action
against any parties to the [Project contracts]," is susceptible
to more than one reasonable interpretation, and so denied the
Board's prior motion for summary judgment on this claim.  (12-21-

07 Mem. Op. at 43-46 (discussing GIA at ¶ 7); Board Br. at 36.) However, the Board urges that the Court now "construe the GIA based upon its language and the available extrinsic evidence." (Board Br. at 35-36.)  The Board further contends that even if D&D is not barred from asserting a breach of contract claim against it by reason of assignment to the Surety, D&D cannot meet its burden of proving breach of contract absent expert testimony as to liability.  (Id. at 40.)

    D&D also moves for judgment in its favor on count 8.  (Dkt. entry no. 351, D&D Mot. on Count 8; dkt. entry no. 351-5, D&D Count 8 Br.)  D&D contends that the evidence shows that the Board was in breach of the contracts from the outset of the Project with respect to a failure to provide it with approved plans, sealed construction drawings, and construction permits.  (D&D Count 8 Br. at 2-3.)  D&D further argues that the Board breached the contracts by "(1) improperly defaulting D&D without proper legal or contractual authorization, and . . . (2) improperly withholding the full amounts payable in D&D's requisitions." (Id. at 21.)  In opposition to the Board's motion with respect to count 8, D&D argues that the Board "has no justification for denying payment to D&D based on the Takeover Agreements," because it never assented to an assignment of its rights under the contracts to the Surety.  (D&D Opp'n to Board Mot. at 75-78.)

### A.    Relevant Principles of Contract Interpretation

Determining whether a contractual provision is clear or ambiguous is the first step of contract interpretation.  <u>Heffron v. Adamar of N.J., Inc.</u>, 270 F.Supp.2d 562, 570 (D.N.J. 2003).  A contract is ambiguous if it is capable of more than one interpretation.  <u>Pacitti v. Macy's</u>, 193 F.3d 766, 773 (3d Cir. 1999).  Even where a contractual provision appears to be clear on its face, it is appropriate for a court to "consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation."  <u>Heffron</u>, 270 F.Supp.2d at 571 (quotation and citation omitted).  Extrinsic evidence may include "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning."  <u>Id.</u> (quotation and citation omitted).  If the contract as a whole is susceptible to more than one reading, it is for the factfinder to resolve; where it is unambiguous, the court interprets the contract as a matter of law.  <u>Pacitti</u>, 193 F.3d at 773.

The Board urges the Court to consider the parties' course of dealing in support of its interpretation of the GIA.  (Board Br. at 36-39.)  Specifically, the Board contends that "the only pertinent extrinsic evidence is the conduct of D&D and the Surety, which irrefutably reflects their understanding that, as the result of the declared defaults and terminations by the

61

Board, all rights and claims arising under the contracts belong to the Surety." (Id. at 39.)  A course of dealing "is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct," and unless otherwise specified, "gives meaning to or supplements or qualifies their agreement."  Restatement (Second) of Contracts § 223.  Writings that are part of the same transaction are to be interpreted together, and a contract's meaning, "[w]herever reasonable," is to be "interpreted as consistent with . . . any relevant course of performance, course of dealing, or usage of trade."  Restatement (Second) of Contracts § 202(2),(5).

**B.  General Indemnity Agreement**

The GIA was entered into between the Surety and the Indemnitors, Michael Tattoli on behalf of D&D and Michael and Dolores Tattoli individually, "for the purpose of indemnifying Surety . . . for any Bonds . . . which Surety may have issued or may hereafter issue, or on which Surety otherwise becomes surety."  (GIA at 1.)  The GIA defines "Default" to include "[a]n instance or condition in which Indemnitors, or any of them . . . forfeit, breach, abandon, default or be declared in default on any Bonded Contract."  (Id.)  "Bonded Contract" is defined as a "contract for which Surety issues or has issued a Bond."  (Id.)

62

There is no dispute that Contracts 1A, 1B, and 1C constitute "Bonded Contracts." (See Hollander Cert., Ex. SS, Performance and Payment Bonds.)

The GIA further provides:

6.   SURETY'S RIGHTS RE: DEFAULT – In the event of a Default, Surety shall have the right, but not the obligation, to take possession of the work under any and all Bonded Contracts, and complete or consent to the completion of such Bonded Contracts at the expense of the Indemnitors.

7.   ASSIGNMENTS: In the event of a Default, Principal and Indemnitors do hereby assign, transfer and set over to Surety, all of their rights under all Bonded Contract(s) including . . . (c.) all claims and causes of action against any parties to the Bonded Contract(s) or against third parties relating to the Bonded Contract(s), (d.) any and all sums due, or to become due under the Bonded Contract(s) at or after the time of such Default. . . . In the event of a Default, each of Principal and Indemnitors hereby appoint and designate Surety or it's [sic] authorized representative as their respective Attorneys-in-Fact to endorse and sign in the name of Principal or Indemnitor, as payee or otherwise, all documents and all checks, drafts, warrants or other instruments made or issued in connection with the Bonded Contract(s). Surety shall have the right to receive, collect and disburse the proceeds of all such checks, drafts or warrants.

(GIA at 1-2 (emphasis added).)  The GIA, entered into on June 27, 2000, applies by its own terms to the contracts governing the Project, insofar as (1) they are "Bonded Contracts," (2) the GIA itself purports to apply to all future bonds the Surety might issue, and (3) the GIA was modified on August 10, 2001, to

clarify the contingent personal indemnity of the Tattolis but
stated that the parties understood and agreed to be bound by "all
of the original conditions" of the GIA.  (Vogt Cert., Ex. 80,
Surety Proof of Claim in In re D&D Associates, Inc., dated 12-23-
01, Ex. A, GIA & Modification.)[11]

The Board proffers that "[i]n defining a 'default' as an
instance where D&D is 'declared in default on any Bonded
Contract,' the GIA assignment provisions clearly were triggered
by the letters terminating D&D's three contracts with the Board."
(Board Br. at 36 (internal citation omitted).)  These letters are
(1) the March 4, 2003 letter from Epstein to D&D and the Surety,
terminating D&D from Contract 1C and demanding that the Surety
"immediately take over and complete the Somerset School Project,
pursuant to the performance bond issued to the Board," and (2)
the July 23, 2003 letter from Epstein to D&D and the Surety,
terminating D&D from Contract 1A and Contract 1B and demanding
that the Surety "immediately take over and complete the Projects,
pursuant to the performance bonds issued to the Board."  (Vogt
Cert., Ex. 40, 3-4-03 Epstein Letter; id., Ex. 49, 7-23-03
Epstein Letter.)  Both letters reference a previous Notice of
Proposed Termination advising that "D&D is in material default

---

[11] The Court notes that Contracts 1A, 1B, and 1C, as well as
the Payment and Performance Bonds, were all entered into on June
30, 2001, shortly before the modification of the GIA.  (Vogt
Cert., Ex. 1, Contract 1A; Vogt Decl. at ¶ 6 & n.1; Hollander
Cert., Ex. SS, Payment and Performance Bonds.)

under" the contracts, issued to D&D and the Surety pursuant to
Articles 2.4 and 14.2 of the General Conditions, which require
seven days' notice to D&D and the Surety.  (Id.; see also Vogt
Decl., Ex. 35, 2-11-03 Epstein Letter; id., Ex. 48, 7-11-03
Epstein Letter.)

The Court finds that when read together with the General
Conditions governing the Bonded Contracts and considered in light
of the parties' course of dealing, the term "to be declared in
default of any Bonded Contract" unambiguously refers to the
termination of D&D from the Project by reason of default,
following the notice procedure outlined in the General
Conditions.  (General Conditions, Art. 2.4.1, 14.2.2; 3-4-03
Epstein Letter; 7-23-03 Epstein Letter.)  Whereas the Court
previously found that there was a genuine issue of material fact
"regarding whether the Board properly declared D&D in default and
when such default occurred," we now note that the GIA requires
only the declaration of default, not a procedurally proper and
justified default, to trigger the assignment of "any and all sums
due, or to become due under the Bonded Contract(s) at or after
the time of such Default" under paragraph 7 of the GIA.  (GIA at
¶ 7(d).)[12]  "At or after the time of such Default" is consistent

---

[12] Although the Board suggests that the preceding clause,
7(c), of paragraph 7 should apply here to bar all of D&D's claims
in this action, we find that language too broad and ambiguous to
apply here at the summary judgment stage, and need not be
addressed with respect to count 8, because clause (d), covering

with the language of the termination letters themselves, which demanded an "immediate" takeover of the Project by the Surety. This also comports with the law governing the rights of a surety in the event of a contractor's default.  See In re Modular Structures, Inc., 27 F.3d 72, 74 n.1 (3d Cir. 1994) ("The surety on a construction surety bond guarantees to the owner that the contractor will finish the job.  If the contractor defaults, the surety performs the work, mitigates loss by its performance, and pays the subcontractors and suppliers.  In performing this function, the surety 'stands in the shoes' of other parties to the construction project through use of the equitable doctrine of subrogation. . . . When, on default of the contractor, it pays

---

"all sums due . . . at or after the time of such Default," bars D&D's breach of contract claim, such that the meaning of clause 7(c) need not be resolved.  (GIA at 2, ¶ 7; Board Br. at 39.) Furthermore, clause 7(c) is not supported by evidence of the parties' course of dealing as clause 7(d) is.  The Takeover Agreement for Contract 1C expressly provides that the Surety "is subrogated to and has been assigned (a) all of D&D's rights in and to the Contract Balance, and (b) any other funds due or to become due to D&D in connection with the Contract."  (Vogt Cert., Ex. 74, Takeover Agreement for Contract 1C at ¶ 4.)  In contrast, the Takeover Agreement provides that "all rights, remedies, claims or defenses which D&D and/or Surety have against [the Board] are hereby expressly reserved. . . . Nothing in this Takeover Agreement is intended, or shall be construed, as a waiver of any rights, remedies, claims or defenses of Surety or D&D against [the Board]."  (Id. at ¶ 13.)  Furthermore, the Takeover Agreement provides that the making of the Takeover Agreement itself "is not intended" as an admission as to liability by D&D, nor a waiver of its rights, "if any, to contest the validity or propriety of the termination of the Contract by [the Board] or any remedies, claims or defenses with respect to any such rights."  (Id. at ¶ 14.)

all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it.") (citing Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co., 411 F.2d 843, 847-49 (1st Cir. 1969)).

The parties' course of dealing after the 3-4-03 Epstein Letter declaring the default was issued also supports such an interpretation:  the Board and the Surety entered into the Takeover Agreement for Contract 1C, D&D and the Surety entered into the Completion Agreement, and the Surety filed a Proof of Claim in D&D's bankruptcy and an action in state court against D&D to recover balances allegedly due to it under the contracts. (Board Br. at 37; Vogt Cert., Ex. 75, Completion Agreement; id., Ex. 80, Proof of Claim; id., Ex. 83, Compl. in Am. Motorists Ins. Co. v. N. Plainfield Bd. of Educ., No. L-543-05 (N.J. Superior Ct., Somerset County).)

The Takeover Agreement for Contract 1C expressly provides that the Surety "is subrogated to and has been assigned (a) all of D&D's rights in and to the Contract Balance, and (b) any other funds due or to become due to D&D in connection with the Contract."  (Vogt Cert., Ex. 74, Takeover Agreement for Contract 1C at ¶ 4.)  The Completion Agreement notes that (1) the GIA was executed in partial consideration for the issuance of the Bonds, (2) the Board declared D&D in default and terminated Contract 1C as of March 4, 2003, (3) D&D disputed the propriety of the

declaration of default, and (4) D&D acknowledged the Surety's rights under the GIA, "including but not limited to Surety's assignment right to receive all payments due or to become due under the Contract, . . . a Default under the GIA having occurred."  (Completion Agreement at 1-3.)

The Surety's Proof of Claim in the bankruptcy proceeding and Complaint in the state court action brought by the Surety against the Board also evince the parties' course of conduct as proceeding on the understanding that D&D had assigned its rights under the contracts to the Surety once default was declared and the contracts were terminated.  The Proof of Claim asserts subrogation rights against D&D for "any and all lien <u>or</u> <u>contractual</u> rights which any of these parties might have relating to [the] bonded projects."  (Proof of Claim, Schedule at 3 (emphasis added).)  In the Complaint in its state court action against the Board, the Surety alleged:

> 18.  Each of the Takeover Agreements expressly provides that American Motorists ["Surety"] was willing to exercise its option to arrange for the completion of the work remaining under the corresponding contract on the condition that it was assured by the Board that in doing so it would receive payment in accordance with the contracts and the Takeover Agreements of the remaining contract balance of each contract.

> 19.  Under the terms of the parties' agreements, [Surety] was subrogated to and had been assigned all of D&D's rights in and to the contract balances any other funds due or to become due to D&D in connection with the D&D Contracts.

(Vogt Cert., Ex. 83, Compl. at ¶¶ 18-19.)  That Complaint alleged breach of contract of the Takeover Agreements by the Board, stating that it "arranged for and paid for the completion of the remaining work and submitted Requisitions in accordance with the terms of Contract 1C and the Takeover Agreement," yet the Board (1) refused to make payments, notwithstanding Vitetta's approval of the requisitions, and (2) "unlawfully rejected" the Surety's lien bonds.  (Id. at ¶¶ 29, 33-34; see also id. at ¶¶ 44 (Contract 1A), 54 (Contract 1B).)

### C.   D&D's Arguments

D&D argues that the assignment of its rights to "all sums due" under the contracts in the event of a default to the Surety is at odds with (1) Article 13.2.1 of the General Conditions, (2) Article 14.4 of the General Conditions, and (3) New Jersey state law governing school construction contracts.  Each argument lacks merit.

Article 13.2.1 of the General Conditions, "Successors and Assigns," prohibits the Board and D&D from "assign[ing] the Contract as a whole without written consent of the other." (General Conditions, Art. 13.2.1.)  However, the GIA predates the contracts, and specifically contemplated the assignment of rights in future contracts to the Surety, such that no subsequent assignment would be necessary.  See Restatement (Second) of Contracts, § 330, comment d ("In general a contract to give

69

security is specifically enforceable as between the parties even as to rights arising after the contract is made."). Additionally, interpreting and enforcing clause (d) of paragraph 7 of the GIA does not conflict with the General Conditions' prohibition on assignment of "the Contract as a whole."  As the Court noted previously, the Takeover Agreements acknowledge an assignment of "all D&D's rights in and to the Contract Balance, and . . . any other funds due or to become due to D&D in connection with the Contract," but reserved D&D's (and the Surety's) remaining rights.  (Takeover Agreement ¶¶ 4, 13-14.) The Takeover Agreements do not assign "the Contract as a whole" so as to contravene Article 13.2.1 of the General Conditions.

Nor do the provisions regarding "Termination for Convenience" in the General Conditions aid D&D's breach of contract claim.  (D&D Opp'n to Board Mot. at 76-77; General Conditions at Art. 14.4.)  The Board never purported to terminate D&D "for convenience," though D&D contends that is precisely what happened and that the "cause" was a pretext.  D&D contends that these provisions precluded the Board from entering into the Takeover Agreements with the Surety.  However, because the Board terminated D&D from the Project for cause, not convenience, these provisions are inapplicable to the parties' subsequent course of action, which included entering into the Takeover Agreements.

70

D&D also relies on N.J.S.A. § 18A:18A-40.1 to argue that the Board illegally refused to remit monthly payments based on its belief that it might be in a position to assess liquidated damages at the conclusion of the Project. (D&D Opp'n to Board Mot. at 75-76.) That statute provides that

> Any contract, the total price of which exceeds $100,000.00, entered into by a board of education involving the construction, reconstruction, alteration, repair or maintenance of any building, structure, facility or other improvement to real property, shall provide for partial payments to be made at least once each month as the work progresses, unless the contractor shall agree to deposit bonds with the board of education pursuant to [N.J.S.A. § 18A:18A-40.2].

N.J.S.A. § 18A:18A-40.1.

D&D's characterization of this statute as governing a board of education's actions subsequent to entering into a contract governed by the Public School Contracts Law is wrong. The statute governs the content of such contracts themselves, and as the Board points out, the contracts were in compliance with this statute prohibiting parties from entering into a contract that would permit a board of education to make payments to a contractor less than once a month: "Provided that an Application for Payment is received by the Architect not later than the 15th day of a month, the Owner shall make payment to the Contractor no later than the 10th day of the following month." (Vogt Cert., Ex. 1, Contractor Agreement between the Board and D&D, Art. 5.1, Progress Payments.)

71

We conclude that insofar as the GIA assigned all of D&D's rights under the "Bonded Contract[s]" for "sums owing" under those contracts, D&D may not pursue its claim for breach of Contracts 1A, 1B, and 1C in this Court or elsewhere.  That claim belongs to the Surety in consideration of the Bonds and the assignment clause regarding "sums due and owing" under the contracts, which was triggered by the Board's default and termination of D&D under those contracts.  The Court will grant the Board's motion for summary judgment, and deny D&D's cross motion for summary judgment on count 8.

## V.   Count 10 - Tortious Interference (Board, Epstein, Vitetta)

D&D, in count 10, alleges that the defendants published false statements on the Board's website suggesting that D&D performed sloppy, incomplete, and defective work, refused to comply with its obligations, left work unfinished, and abandoned the Project.  (Am. Compl. at 40.)  D&D asserts, inter alia, that through this conduct the defendants intentionally interfered with its "performance of its contracts, its business arrangements with its subcontractors and suppliers, and its bonding relationship with [the Surety]."  (Id.)  More specifically, D&D asserts that, as a result of the defendants' conduct, it lost its $40 million bonding capacity and ability to bid on other public works contracts in New Jersey.  (Id. at 41.)  Thus, D&D contends that

the "defendants have intentionally and deliberately interfered with [its] prospective economic advantage."  (Id.)

"An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling or occupation free from undue influence or molestation." Printing Mart-Morristown v. Sharp Elecs. Corp., 563 A.2d 31, 36 (N.J. 1989) (citations and internal quotations omitted).  To establish a tortious interference with prospective economic advantage claim, the plaintiff must demonstrate (1) a reasonable expectation of economic advantage, (2) that the defendant intentionally and malicious interfered with that expectation, (3) a causal connection between the defendant's interference and the plaintiff's loss of a prospective gain, and (4) damage.  Espinosa v. County of Union, 212 Fed.Appx. 146, 157 (3d Cir. 2007); see Printing Mart-Morristown, 563 A.2d at 37.  "Malice," for purposes of this tort, means that "the harm was inflicted intentionally and without justification or excuse."  Printing Mart-Morristown, 563 A.2d at 37.

The Court previously denied the defendants' separate motions for summary judgment with respect to count 10.  (12-21-07 Mem. Op. at 56-57.)  The Court found that D&D had shown that it had a reasonable expectation of economic advantage in its bonding relationship with the Surety, but could not proceed on its alternate theories of "performance of its contracts" and

73

"business arrangements with its subcontractors and suppliers."
(12-21-07 Mem. Op. at 54-56 & n.14; Am. Compl. at 40.)   The Court
finds no reason to diverge from that determination at this
juncture.   Additionally, there is no dispute as to the fact that
D&D has suffered damages insofar as, e.g., it is no longer
prequalified by the NJEDA as a general contractor.   Cf. supra at
43-45 (discussing how injury to D&D was insufficiently direct to
support a due process claim against the Board).   Therefore, only
the second and third elements of tortious interference--
intentional and malicious interference, and causation--are at
issue herein.

Although count 10 remains pending against Bovis, Bovis does
not move for summary judgment with respect to this claim.   The
Board, Epstein, and Vitetta each separately move for judgment in
their favor on the tortious interference claim.   The Court
considers each motion in turn.

**A.   The Board**

The Board contends that it is entitled to judgment in its
favor on count 10 because it is entitled to unqualified immunity
under the New Jersey Tort Claims Act ("TCA"), N.J.S.A. § 59:2-10
("A public entity is not liable for the acts or omissions of a
public employee constituting a crime, actual fraud, actual
malice, or willful misconduct").   The Court agrees.   Because
malice is an element of tortious interference, and as a matter of

law cannot be entertained by the Board as a public entity, summary judgment in favor of the Board on count 10 is appropriate.  See Farris v. Cnty. of Camden, 61 F.Supp.2d 307, 345-46 (D.N.J. 1999) (quoting ABB Daimler-Benz Transp. (N. Am.), Inc. v. Nat'l R.R. Passenger Corp., 14 F.Supp.2d 75, 90 (D.N.J. 1998) (stating "the NJTCA clearly bars claims for fraud, conspiracy to defraud, and tortious interference" against public entities) (emphasis added)); see also Trafton v. City of Woodbury, 799 F.Supp.2d 417, 444-45 (D.N.J. 2011); Isetts v. Borough of Roseland, No. ESX-L-2480-02, 2005 WL 2334363, at *13 (N.J. Super. Ct. Sept. 22, 2005).  See also infra at 92-93.

### B.  Epstein

Epstein moves for judgment in his favor on count 10 on the bases that (1) D&D cannot prove causation, because D&D's inability to obtain bonding was immaterial in light of D&D's own withdrawal of its prequalification application; (2) D&D cannot argue that submission of a prequalification application would have been futile, because D&D submitted an application after the Surety cut off bonding to D&D; and (3) Epstein is entitled to immunity under the TCA on the basis that the Board is immune, pursuant to N.J.S.A. § 59:3-1(c) ("A public employee is not liable for an injury where a public entity is immune from liability for that injury").  (Epstein Br. at 21-24.)

D&D opposes Epstein's motion, contending that (1) the record demonstrates that Epstein's default letters set in motion the chain of events that destroyed its relationship with the Surety; (2) Epstein has not presented evidence supporting a finding that he is a "public employee" for purposes of TCA immunity; and, in effect, (3) Epstein was not within the scope of his employment as attorney to the Board when committing the allegedly tortious acts, "such as the July 2003 default, which he issued just after the Board formally resolved to enter into a forbearance agreement with D&D."  (Dkt. entry no. 380, D&D Opp'n to Epstein Mot. at 29-35.)

Epstein's claim of immunity under the TCA is subject to limitations.  First, he must establish that he is a "public employee."  While "township attorneys" have been deemed public employees under the TCA, it is not apparent under that precedent whether as a matter of law an attorney retained to represent a school board is a public employee.  Stoeckel v. Twp. of Knowlton, 902 A.2d 930, 942-43 (N.J. App. Div. 2006) (accepting premise that township attorney was public employee under TCA, and considering and rejecting possibility that attorney might have owed a duty to plaintiff outside the scope of attorney's employment by the township); see N.J.S.A. § 59:1-3 ("'Employee' includes an officer, employee, or servant . . . who is authorized to perform any act or service; provided, however, that the term

does not include an independent contractor. . . . 'Public
employee' means an employee of a public entity.").[13]  Second,
assuming Epstein is a public employee for TCA purposes, the TCA
provides that a public employee is not entitled to share in the
immunity of the public entity "if it is established that his
conduct was outside the scope of his employment <u>or</u> constituted a
crime, actual fraud, actual malice or willful misconduct."
N.J.S.A. § 59:3-14 (emphasis added).  More broadly, but
consistent with the TCA, "if an employee or agent is acting on
behalf of his or her employer or principal, then no action for
tortious interference will lie. . . If, on the other hand, the
employee or agent is acting outside the scope of his or her
employment or agency, then an action for tortious interference
will lie."  <u>DiMaria Constr., Inc. v. Interarch</u>, 799 A.2d 555, 568
(N.J. App. Div. 2001).

The record shows that at the beginning of 2001, the Surety
had regarded D&D's bonding capacity for school construction
projects as $10 million per single project, and $20 million
aggregate.  (Babino Dep. at 7:14-22; <u>id.</u> at 27:11-13 (same).)  In
December 2002, the Surety advised D&D that "until the successful

---

[13] Whereas the term "public employee" under the First
Amendment retaliation analysis as used in reference to D&D in our
discussion of counts 3 and 4 applied equally to government
employees and independent contractors, pursuant to <u>Umbehr</u>, 518
U.S. at 673, the definition of "public employee" under the TCA,
as raised by Epstein with respect to counts 10 and 11, excludes
independent contractors.  N.J.S.A. § 59:1-3.

completion of North Plainfield is achieved we feel as if we have
no other choice but to halt any further extension of surety
credit." (Vogt Cert., Ex. 62, 12-6-02 Henn Letter.)  Epstein, on
behalf of the Board, sent letters to D&D and the Surety on
October 19, 2001 and February 25, 2002, advising that D&D was in
default.  (Vogt Cert., Ex. 6, 10-19-01 Epstein Letter; id., Ex.
9, 2-25-02 Epstein Letter.)

There is evidence in the record that could suggest that
Epstein was acting beyond the scope of his authority and/or with
malice in the course of events leading to D&D's eventual
termination from the Project.  For instance, D&D's bond broker
Mike Babino testified that during a March 4, 2002 meeting to
discuss default letters issued by Epstein in February 2002,
Epstein "was the one who ran the whole meeting," and when
"someone brought up . . . the fact that that default letter had a
serious impact on [D&D's] bonding," Epstein "said, 'That was my
intent.  That's why I sent the letter.  I knew that would prevent
him from doing additional bonded work.  I wanted him to
concentrate on this project in North Plainfield alone and not
take on other work.'"  (D&D Count 2 Exs., Ex. 6, Babino Dep. at
17:6-16; see also D&D Count 2 Exs., Ex. 18, Pereira Aff. at ¶
32.)  Babino noted that he was paraphrasing Epstein's alleged
statements, and Epstein denies that he said this.  (Babino Dep.
at 17:16-17; Board Resp. to D&D Stmt. Facts Supp. Count 8 Mot. at

¶ 40 (citing dkt. entry no. 371-4, 2d Vogt Cert., Ex. 15, Epstein
Dep. at 206:10-207:4).)  C.C. Smith of Bovis testified that
during this March 4, 2002 meeting, the defendants "had the
bonding company on the phone ready to slam [D&D] out of business.
. . . [I]f we defaulted him he had lost his bonding capacity.  He
wouldn't be able to do any other work.  So that's what the
meeting was all about."  (D&D Count 8 Exs., Ex. 23, Smith Dep. at
87:23-88:4.)

Birnbaum attests that all default notices and termination
letters, while authored by Epstein, were discussed and approved
in advance by Board officials.  (LaSala Cert., Ex. 5, Birnbaum
Cert. at ¶¶ 3-4.)  However, D&D points to evidence that Epstein
may have been acting unilaterally and without Board approval with
respect to, e.g., the October 19, 2001 letter and the February
25, 2002 letter.  (Dkt. entry no. 380-1, D&D Resp. to Epstein
Stmt. Facts at ¶¶ 13, 15.)

The Court also finds that D&D has established at least a
disputed issue of fact regarding a causal connection between
Epstein's sending default letters to the Surety and D&D's
subsequent inability to obtain bonding and prequalification
status.  (See, e.g., 8-10-06 Tattoli Aff. ¶¶ 7-12.)  The fact
that D&D, through either its principal or as an unauthorized act
by a clerical worker, may have submitted an incomplete
prequalification application to the DPMC in 2003 "just to try" is

not dispositive as establishing some kind of intervening cause
that would in and of itself preclude liability for tortious
interference with prospective economic advantage.  See supra at
29-30.

In light of the existence of the foregoing factual disputes,
the Court will deny Epstein's motion for summary judgment on
count 10.

### C.   Vitetta

Count 10 is the only remaining count currently pending
against Vitetta.  (Vitetta Br. at 3.)  Vitetta contends that
judgment must be entered in its favor on the tortious
interference with prospective economic advantage claim because
(1) D&D cannot establish that Vitetta's actions caused the
alleged damages; and (2) Vitetta did not act with malicious
intent.  (Id. at 7-11.)  D&D responds that "Vitetta's actions, in
conjunction with those of Epstein, were the proximate cause of
the damage to D&D's bonding capacity" and that Vitetta sent D&D
and the Surety a default notice on February 11, 2002.  (Dkt.
entry no. 379, D&D Opp'n to Vitetta Mot. at 5.)

As with Epstein, a factual dispute exists as to both
malicious intent and causation that precludes the entry of
judgment in Vitetta's favor on this claim.  Regarding malice, D&D
proffers that Vitetta may have been motivated by self-interest to
falsely certify to the Board that D&D was in default for failing

to provide construction schedules, because D&D has argued that the initial Project delays were the result of Vitetta's failure to timely produce sealed drawings as required by the contracts. (8-10-06 Tattoli Aff. at ¶ 5.)  With respect to causation, D&D points to the testimony of Thomas Henn as establishing that one of the factors in the Surety's December 2002 decision to no longer extend bond credit to D&D was Vitetta's recommendation to Bovis and the Board that the Board begin withholding payments to D&D on the basis that liquidated damages were "mounting daily." (Henn Dep. at 135:8-17, 138:2-5; Vogt Cert., Ex. 20, 10-14-02 Myerson Letter.)  Additionally, the record is replete with instances of Vitetta issuing letters that were sent as notices of default to D&D, certifications to the Board of D&D's default, and/or notification to the Surety.  (See, e.g., Vogt Cert., Ex. 11, 2-11-02 Myerson Letter; Ex. 11, 4-29-02 Myerson Letter; Ex. 14, 6-5-02 Myerson Letter; Ex. 16, 7-25-02 Myerson Letter.)

If Vitetta is shown to have been acting with malice in its own self-interest in advising the Board and/or the Surety that D&D was in default, it will be considered to have acted outside the scope of its employment or agency with the Board, and may be held liable for tortious interference with prospective economic advantage.  DiMaria, 799 A.2d at 570.  Accordingly, the Court will deny Vitetta's motion for judgment in its favor on count 10.

**VI.   Count 11 - Defamation (Bovis, Epstein)**

Count 11 of the Amended Complaint is entitled "Libel and Slander."  (Am. Compl. at 41.)  In this count, D&D alleges, <u>inter alia</u>, that the defendants falsely and negligently published statements in correspondence and on the Board's website, which state that D&D's work in connection with the Project was defective, sloppy, and incomplete, and that D&D ultimately abandoned the Project.  (<u>Id.</u> at 41-42.)  D&D further alleges that these statements (1) injured its reputation for honesty, integrity, morality, and its commercial reputation, (2) were published intentionally, recklessly, and maliciously, and (3) constitute libel or slander <u>per se</u> because they pertain to D&D's trade and business practices.  (<u>Id.</u> at 42.)  Thus, D&D contends the "defendants intentionally and deliberately slandered and defamed" it.  (<u>Id.</u>)

This claim is currently pending as to Epstein and Bovis only.  The Court previously found the Board entitled to unqualified immunity under the TCA, N.J.S.A. § 59:2-10.  (12-21-07 Mem. Op. at 64-66.)  The Court also granted summary judgment in favor of Vitetta on the defamation claim, finding that "Vitetta did not make or have any identifiable involvement with any of the statements that D&D asserts form the basis of this claim."  (<u>Id.</u> at 66.)

82

To state a defamation claim under New Jersey law, a plaintiff must show that the defendant (1) made a false and defamatory statement concerning the plaintiff; (2) communicated the statement to a third party; and (3) had a sufficient degree of fault.  Mangan v. Corp. Synergies Grp., Inc., No. 10-5829, 2011 WL 3328785, at *2 (D.N.J. Aug. 1, 2011).  Whether a statement is susceptible of defamatory meaning--"false and injurious to the reputation of another," or "exposes another person to hatred, contempt, or ridicule" or "a loss of the good will and confidence" in which he or she is held by others--is a question of law for the Court.  Higgins v. Pascack Valley Hosp., 158 N.J. 404, 426 (1999) (quotations and citations omitted).

The requisite degree of fault is a negligence standard when the plaintiff is a private person.  Mayflower Transit, LLC v. Prince, 314 F.Supp.2d 362, 376 (D.N.J. 2004).  However, when the plaintiff is a public figure, or the plaintiff is a private person and the allegedly defamatory statements relate to a legitimate matter of public concern, the plaintiff must demonstrate "actual malice" on the part of the defendant.  Id. (citing Sisler v. Gannett Co., 104 N.J. 256, 266 (1986)).

The Court previously found that "D&D was transformed into a public figure for the purpose of performing its work under the Project contracts, and thus, it must show that the defendants' statements about it were made with actual malice."  (12-21-07

83

Mem. Op. at 62.)  The Court finds no basis for revisiting that ruling at this juncture.  See Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 139 N.J. 392, 411-12 (1995) (stating that actual malice standard applies to matters involving "business activities that . . . intrinsically involve a legitimate public interest").

The "actual malice" standard requires that the plaintiff prove by clear and convincing evidence that the defendant knew the statement was false or acted with reckless disregard for its falsity.  See Mangan, 2011 WL 3328785, at *5; DeAngelis v. Hill, 180 N.J. 1, 13 (2004).  It has "nothing to do with hostility or ill will; rather it concerns [a] publisher's state of knowledge of the falsity of what he published, not at all upon his motivation in publishing it."  DeAngelis, 180 N.J. at 17 (citations and internal quotations omitted) (alteration in original).  Truth is a complete defense to a defamation claim. Arista Records, Inc. v. Flea World, Inc., 356 F.Supp.2d 411, 425 (D.N.J. 2005).

### A. Epstein

Epstein moves for judgment in his favor on this claim, on the basis that D&D "cannot demonstrate that the statements made in the termination letters issued by Epstein in his capacity as counsel for the Board were false."  (Epstein Br. at 2.) Additionally, Epstein submits that even if D&D could prove that

84

the statements at issue are demonstrably false, judgment must still be entered in his favor because:  (1) as a matter of law, statements that "an employee poorly performed her duties or acted in an improper manner" are not defamatory; (2) D&D cannot show the requisite actual malice; and (3) Epstein, acting within the scope of his duties as the Board's attorney, is a "public employee" entitled to the same TCA immunity previously afforded the Board.  (Id. at 26-30.)

D&D responds that (1) the evidence does not support a finding that Epstein is a "public employee," but rather served as special construction counsel to the Board, (2) TCA immunity is an affirmative defense not previously raised by Epstein, and (3) the TCA immunity claimed by Epstein does not extend to negligence or willful torts.  (Dkt. entry no. 380, D&D Br. Opp'n to Epstein Mot. at 32-34.)

For the reasons stated with respect to count 10, Epstein is not entitled to summary judgment on the basis of the Board's TCA immunity, because the TCA expressly excepts "actual malice or willful misconduct" by public employees from that immunity.  N.J.S.A. § 59:3-14; Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 586-87 (2009) (affirming reinstatement of defamation claim where actual malice standard applied such that, if plaintiff could meet applicable standard, "that proof would make the immunity protection inapplicable").

85

**B.   Bovis**

Bovis also moves for judgment in its favor on D&D's defamation claim only.  (Dkt. entry no. 436, Bovis Mot. on Count 11.)  Bovis contends in support of its motion that it is entitled to the same immunity enjoyed by the Board under the TCA, insofar as, generally, "those who contract with a public entity are 'entitled to share the immunity' for 'incidental injuries necessarily involved in the performance of the contract.'"  (Dkt. entry no. 436-1, Bovis Br. at 8 (citing Rodriquez v. N.J. Sports & Exposition Auth., 193 N.J. Super. 39, 45 (N.J. App. Div. 1983)).)

D&D argues that "TCA immunity does not appear in the answer filed by Bovis, with respect to any of D&D's tort claims," and because it has not been affirmatively pleaded, any claim to such immunity has been waived.  (Dkt. entry no. 437, D&D Opp'n to Bovis Mot. at 4.)  See Leang, 198 N.J. at 582 ("[T]he public employee has the burden to plead and prove his immunity under the TCA.") (emphasis added).  While D&D's argument provokes the surprisingly mysterious question of whether Bovis did, in fact, plead TCA immunity, the issue is moot for the reasons already stated as to Epstein:  the TCA excepts immunity for employees who act with actual malice.  Id. at 586-87.[14]

_____

[14] The Court has reviewed both the copy of Bovis's Answer filed as an exhibit to D&D's attorney's certification in opposition to Bovis's motion for summary judgment, and the docket

C.    **Ruling as to Epstein and Bovis**

The Court previously found that with respect to the falsity of the statements at issue and viewing the evidence in the light most favorable to D&D, a reasonable jury could conclude that the Board, Bovis, and Epstein made the statements at issue with actual malice.  (12-21-07 Mem. Op. at 63-64.)  The same evidence offered by D&D in support of that finding remains in the record now to create a factual dispute over whether, e.g., the default letters to the Surety and the Construction Updates made available to the public contained knowingly false information regarding D&D's performance of the Project.

C.C. Smith of Bovis testified that the School Construction Updates were normally drafted by James Hancik, a Bovis employee; reviewed with Earl Hawley, another Bovis employee; and sometimes Pereira.  (D&D Count 2 Exs., Ex. 43, Smith Dep. at 53:20-54:7.) The draft updates would then be presented to Birnbaum or Harry Cottrell of the Board for their input, and "later the School Board's attorney got involved," although Smith could not precisely recall when the attorney got involved, nor did he characterize the nature or extent of the attorney's involvement.

---

entry in the adversary proceeding in the Bankruptcy Court, and finds that both versions of the Answer are missing page 34, which apparently contains Bovis's seventh through fifteenth separate defenses.  (Dkt. entry no. 437-1, Korzun Decl., Ex. E, Bovis Answer; Adv. Proc. No. 03-2429 (KCF), dkt. entry no. 27, Bovis Answer (Bankr. D.N.J. filed Feb. 17, 2004).)

(Smith Dep. at 54:8-56:8.)  With respect to the various default letters, the defendants' position that decisions were reached "by consensus" to default and terminate D&D from the Project obscure who acted with what knowledge, and thus precludes summary judgment on count 11.  (See Birnbaum Decl., Ex. A, 8-9-05 Birnbaum Cert. at ¶¶ 3-4.)  That Bovis and Epstein were aware of D&D's positions regarding the initial delays to the Project is evident from the record.  (See, e.g., D&D Count 2 Exs., Ex. 59, Bovis Progress Report; Vogt Cert., Ex. 7, 11-2-02 Letter from D&D's counsel to Epstein.)

Therefore, the Court will deny Bovis and Epstein's separate motions for summary judgment as to count 11.

## VII. Count 12 - Conversion (Board)

D&D asserts in count 12 that the Board and Bovis "acted in concert to deprive D&D of certain property in equipment . . . and other items on the job sites without allowing D&D to retrieve such equipment and materials," converting them to their own use, and further converted "funds which are properly due and owing to plaintiff and its suppliers, subcontractors and laborers for work performed and materials supplied and accepted by defendants." (Am. Compl. at 43.)  This claim is currently pending against the Board only.  (See 9-30-05 Mem. Op. at 24-25 (finding that D&D "surrendered its claim of conversion against Bovis" by not opposing Bovis's arguments in support of its motion to dismiss).)

The Board contends that "all counts other than Count Eight should be dismissed under the economic loss doctrine," noting that the Court found for purposes of the insurance coverage dispute between the Board and its insurance carrier that all remaining claims against the Board in this action fell within a policy exclusion for claims "arising out of breach of contract." (Board Br. at 1-2 (citing N. Plainfield Bd. of Educ. v. Zurich Am. Ins. Co., No. 05-4398, dkt. entry no. 93, 5-15-08 Mem. Op. at 33-36).)  However, the Court finds that the economic loss doctrine bars only D&D's claim for conversion.[15]

The economic loss doctrine prevents a plaintiff from recovering in tort for economic losses flowing from a contract. Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995).  Whether a tort claim can be asserted alongside a

---

[15] The Board cites no authority for the proposition that the economic loss doctrine bars claims brought under Section 1983, and improperly conflates the Court's ruling in the insurance coverage dispute with a substantive analysis of D&D's remaining causes of action.  The Court previously found, with respect to Bovis and Vitetta's separate motions for summary judgment on count 13 and count 14, that D&D's fraudulent inducement claims are not barred by the economic loss doctrine, and would still so hold.  (12-21-07 Mem. Op. at 70.)  Tortious interference with prospective economic advantage is extrinsic to the contracts at issue, and therefore count 10 is not barred by the doctrine, either.  (Id. at 55-56 & n.14.)

D&D's opposition to the Board's motion argues that the economic loss doctrine "does not supersede the specific right of a party to recover economic losses arising from defamation, misrepresentation and fraud torts, and tortious interference with contractual relationships and beneficial opportunities," but nowhere addresses the doctrine's application to its conversion claim.  (See D&D Opp'n to Board Mot. at 19.)

breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties.  Arcand v. Brother Int'l Corp., 673 F.Supp.2d 282, 308 (D.N.J. 2009).  The actions complained of in count 12 are expressly provided by the terms of the contract, specifically, Article 14.2 of the General Conditions, and therefore are not extrinsic to the contract between D&D and the Board.  (See General Conditions at Art. 14.2.2 (stating that if conditions for terminating the Contract exist, the Owner may "take possession of the site and all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor"); id. at 14.2.3 ("When the Owner terminates the Contract . . . the Contractor shall not be entitled to receive further payment until the Work is finished.").)  The Court therefore finds that the Board is entitled to entry of judgment in its favor on count 12.

The Court also observes that with respect to the alleged conversion of funds "properly due and owing" to D&D, "[a]n action for conversion will not lie in the context of a mere debt."  Am. Rubber & Metal Hose Co., Inc. v. Strahman Valves, Inc., No. 11-1279, 2011 WL 3022243, at *7 (D.N.J. July 22, 2011) (explaining that "[b]ecause a monetary loss can be repaid in whole by other money, allegedly converted money is deemed a mere debt unless there is a requirement that the 'identical money' be paid" (citing Kam Int'l v. Franco Mfg. Co. Inc., No. 10-2733, 2010 WL

90

5392871, at *5 (D.N.J. Dec. 22, 2010)).  Because D&D has not
alleged or shown that it is entitled to "funds due and owing" it
on anything but a contractual basis, the Board is entitled to
judgment in its favor on the conversion claim on that basis as
well.  Adv. Enters. Recycling, Inc. v. Bercaw, 869 A.2d 468, 472
(N.J. App. Div. 2005).

**VIII.  Count 13 & Count 14 - Fraudulent Inducement (Board)**

     D&D asserts in count 13 that (1) the Board failed to
disclose "problems and delays in obtaining bond funding, grant
funding, and submitting sealed final drawings sufficient to
permit building permits to issue"; (2) these facts were material
to D&D's decision to bid on the Project and enter into Contracts
1A, 1B, and 1C; (3) D&D would not have bid on the Project had it
known about these concealed facts; (4) "[t]he concealment of the
true facts by defendants was done with the specific intent that
plaintiff and others would rely on the information supplied by
defendants in preparing their bids and evaluating the projects";
and (5) D&D and the Surety relied on the Board's material
misrepresentations and omissions to their detriment.  (Am. Compl.
at 44.)  In count 14, D&D argues that the Court should declare
the performance bonds posted by it and the Surety for Contracts
1A, 1B, and 1C void as a result of the Board, Vitetta, and
Epstein's fraudulent conduct.  (Id. at 45.)  Similarly, D&D
argues that it and the Surety are entitled to restitution for any

costs and damages they incurred before discovering the defendants' fraudulent conduct.   (Id.)

The Court previously granted summary judgment in favor of Epstein and Vitetta on count 13 and count 14, on the basis that neither Epstein nor Vitetta had any contact with D&D before the Board accepted D&D's bid and executed Contracts 1A, 1B, and 1C, such that neither could have made any representations that could have fraudulently induced D&D to bid on the Project or execute the contracts.   (12-21-07 Mem. Op. at 71-72.)   The Board now moves for judgment in its favor on these claims, arguing that (1) D&D ratified the contracts by completing the Project and substantially performing the contract, and so cannot now seek rescission; and (2) fraudulent scienter cannot be imputed to the Board as a matter of law, pursuant to the TCA.   (Board Br. at 46-48.)   D&D responds that because "N.J.S.A. 2A:58B-3 expressly states that there should be no limits on a contractors' remedy for delays to its performance created by public entities," its fraud claims should not be dismissed.   (Dkt. entry no. 381, D&D Opp'n to Board Mot. at 72.)   The Board responds that D&D (1) confuses N.J.S.A. § 2A:58B-3 with N.J.S.A. § 18A:18A-41, and (2) does not address the Board's arguments.   (Dkt. entry no. 389, Board Reply Br. at 36-37.)[16]

---

[16] N.J.S.A. § 2A:58B-3 simply defines "public entity" and "contractor" for purposes of civil actions involving public works liability.

92

To establish a claim for fraudulent misrepresentation under New Jersey law, a plaintiff must show (1) a material misrepresentation of a currently existing or past fact, (2) with knowledge of its falsity and with the intention that the other person rely on it, (3) reasonable reliance, and (4) resulting damages.  Flaster/Greenberg P.C. v. Brendan Airways, LLC, No. 08-4333, 2009 WL 1652156, at *8 (D.N.J. June 10, 2009).  This second element requires D&D to show that the Board "acted with scienter."  Farris, 61 F.Supp.2d at 345.

However, under New Jersey law, the scienter necessary to a fraud claim cannot be imputed to a public entity, which the parties do not dispute the Board is.  Id. at 345-46 (stating that a public corporation cannot form tortious intent, such as malice or scienter, and granting summary judgment in favor of county on common law fraud claim); see also N.J.S.A. § 59:2-10 ("A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct"); id., comment ("This provision . . . adopts the concept . . . that:  'a public corporation such as a city or other public body, by reason of its being an artificial legal entity created by law to perform limited governmental functions, cannot entertain malice, as a public corporation'"); ABB Daimler-Benz Transp. (N. Am.), Inc., 14 F.Supp.2d at 90 (stating "the NJTCA clearly bars claims for fraud, conspiracy to defraud, and

tortious interference" against public entities, and noting that comments to New Jersey statutes "are not given simply deference but something close to binding effect") (emphasis added).

D&D's argument that New Jersey law "specifically allows D&D's fraud claim to go forward" is unavailing.  Nothing in N.J.S.A. § 18A:18A-41 is in conflict with the principle of law relied upon by the Board.  N.J.S.A. § 18A:18A-41 provides that a contract made pursuant to the Public School Contracts Law purporting to "limit a contractor's remedy for the contracting unit's bad faith, active interference, tortious conduct, or other reasons uncontemplated by the parties that delay the contractor's performance," shall be void and unenforceable.  This statute would therefore potentially be relevant to a breach of contract claim, not a claim for fraudulent inducement.  To the extent D&D suggests in its opposition brief that the Board is "in clear violation of N.J.S.A. 2A:58B-3," the Court observes that counts 13 and 14 are styled as common law fraudulent inducement claims, not for violation of a state statute, and that the statute specified does not provide a basis for relief in any event.  (D&D Opp'n to Bd. Mot. at 74.)

The Court therefore finds it unnecessary to address for purposes of resolving count 13 and count 14 whether D&D ratified the contracts, and will enter judgment in favor of the Board on the fraudulent inducement claims.

## IX.  D&D's Motion for Sanctions

D&D moves for sanctions in conjunction with its motion for summary judgment on Count 8, and seeks an award of "costs and counsel fees for repeatedly having to play legal 'whack-a-mole' to tamp down [the Board's] repeated efforts to assert a barred counterclaim" regarding the Board's alleged liquidated damages. (D&D Count 8 Br. at 28.)  D&D further seeks "a finding of contempt and a finding that the Board's actions in reasserting its barred counterclaims violate this Court's prior orders and the orders of the Bankruptcy Court."  (Id.)

"It is well settled that the inherent power of the court to sanction misconduct by attorneys or parties before the court should be invoked only in extraordinary circumstances to remedy abuse of the judicial process." United States v. Lightman, 988 F.Supp. 448, 466 (D.N.J. 1997).  The Court finds no extraordinary circumstances here that would warrant an award of sanctions, and D&D's request for an award of attorneys' fees will be denied.[17] In light of the Court's ruling on count 8, any other sanctions or

---

[17] See Bd. Resp. to D&D Stmt. Facts Supp. Count 8 Mot. ¶ 84 ("The Board has not asserted any affirmative claim for liquidated damages against D&D, nor does the Board have any claims/counterclaims or affirmative defenses of setoff or recoupment.  Rather, the Board's pretrial submissions [dkt. 351-1, 10-30-09 Korzun Decl., Exs. A & B] reflect that during the course of the Project, Vitetta advised the Board that its contracts with D&D called for it to withhold payment on D&D's payment applications if accrued liquidated damages exceeded contract balances and that Vitetta recommended that the Board withhold payment on certain requisitions.").

relief sought by D&D with respect to the Board's purported assertion of liquidated damages or recoupment will be denied as moot.

## CONCLUSION

The Court, for the reasons stated <u>supra</u>, will (1) grant Epstein's motion as to count 2; (2) deny Epstein's motion as to counts 10 and 11; (3) grant the Board's motion; (4) deny Vitetta's motion; (5) deny Bovis's motion; (6) deny D&D's motion for summary judgment on count 2 and for leave to reinstate count 2 against Bovis and Vitetta; and (7) deny D&D's motion for summary judgment on count 8 and for sanctions against the Board.

The remaining claims in this action are count 10 (tortious interference), insofar as it is asserted against Bovis, Epstein, and Vitetta; and count 11 (defamation), insofar as it is asserted against Bovis and Epstein.  These are both state law tort claims. Additionally, it appears that the remaining parties are not diverse.  In the absence of any remaining federal claims, the Court will exercise its discretion and decline to exercise supplemental jurisdiction over the remaining claims.  28 U.S.C. § 1367(c)(3); <u>see</u> <u>New Rock Asset Partners, L.P. v. Preferred Entity Advancements</u>, 101 F.3d 1492, 1504 (3d Cir. 1996); <u>see also</u> <u>Annulli v. Panikkar</u>, 200 F.3d 189, 203 (3d Cir. 1999), <u>overruled on other grounds</u>, <u>Rotella v. Wood</u>, 528 U.S. 249 (2000) (finding that district court did not abuse its discretion in dismissing

pendent state law claims without prejudice after entering summary judgment in favor of defendant on federal claims on eve of trial, and noting that (1) discovery obtained could be used in pursuit of state law claims pending in state court, (2) plaintiff and his lawyers "knowingly risked dismissal of his pendent claims when they filed suit in federal district court and invoked the Court's discretionary supplemental jurisdiction power," and (3) comity favored allowing the state court to hear the state law claims).

The Court will issue an appropriate order and judgment.


                                        s/ Mary L. Cooper
                                **MARY L. COOPER**
                                United States District Judge


Dated:    March 30, 2012