UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| D&D ASSOCIATES, INC., | : | CIVIL ACTION NO. 03-1026 (MLC) |
|  | : |  |
| Plaintiff, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| BOARD OF EDUCATION OF | : |  |
| NORTH PLAINFIELD, et al., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

**COOPER, District Judge**

## INTRODUCTION

Defendant Robert C. Epstein ("Epstein") seeks an award of attorneys' fees and costs (collectively, "Defense Costs") against Plaintiff, D&D Associates, Inc. ("D&D") under 42 U.S.C. § 1988 ("Section 1988"). (Dkt. 500; dkt. 500-1 at 5.)[1] Epstein moves for this relief on all civil rights claims brought by D&D against him under 42 U.S.C. § 1983 ("Section 1983"). (Id. at 11.) Epstein requests a determination as to D&D's liability on this motion, and would seek to quantify the relief in subsequent proceedings. (Dkt. 519 at 12 ("[T]ime records will show the resources expended in moving to dismiss the various civil rights claims…."); see also dkt. 515 at 6.)[2]

---

[1] The Court will cite to the documents filed on the Electronic Case Filing System ("ECF") by referring to docket entry numbers by the designation of "dkt." Pincites reference ECF pagination.

[2] Epstein is defended and indemnified on this motion by his former law firm, Duane Morris, LLP ("Duane Morris"). (Dkt. 500-1 at 5 n.1.) Duane Morris is to receive any fee awarded by this Court. (Id.)

The parties fully briefed this motion, and presented oral argument on March 25, 2015 and May 22, 2015.  (Dkt. 524; dkt. 527.)  The Court, for the reasons that follow, will:

(1)     award Defense Costs on Count One accrued after April 13, 2006 under Section 1988;

(2)     deny Defense Costs on Count Two under Section 1988; and

(3)     award Defense Costs on Count Three and Count Four under Section 1988.

## DISCUSSION

## I.     FACTUAL HISTORY

### A.     The Parties

#### 1.     Parties to this Motion

D&D is a New Jersey general construction contracting company with its principal place of business in Jackson, New Jersey.  (Dkt. 58 at 1, 3.)  Epstein is an attorney who practices construction law in New Jersey.  (Id. at 2–3.)  He served as counsel for the Board of Education of North Plainfield ("the Board") during the pendency of this action. (Id. at 3; dkt. 500-1 at 5.)

#### 2.     Other Parties to this Action

The three other defendants in this action – the Board, Bovis Lend Lease, Inc. ("Bovis"), and Vitetta Group, Inc. ("Vitetta") – are relevant, in part, to the Court's analysis here.  (See dkt. 500-1 at 7–11.)[3]  The Court, for that reason, will discuss those defendants only to the extent necessary to address the arguments raised by the parties to

---

[3] The Court will refer to the Board, Epstein, Bovis, and Vitetta collectively as Defendants.

this motion.  The Board is a public body with its principal offices in North Plainfield,

New Jersey.  (See dkt. 58 at 2.)  The Board oversees school construction projects in the

North Plainfield school district.  (See id. at 3.)

Bovis and Vitetta negotiated settlements in this action, and are not parties to this

motion.  (See dkt. 489; dkt. 490.)  The factual and procedural background regarding

D&D's claims against Bovis and Vitetta, however, are relevant in part to the arguments

of the parties here.[4]  Bovis is a North Carolina corporation that performs management

functions related to public and private construction projects in New Jersey.  (See dkt. 58

at 2.)  Vitetta is a Pennsylvania corporation that performs architectural and design work

in connection with public and private construction projects in New Jersey.  (Id. at 1–2.)

**B.      Factual Background**

**1.      The Project**

The Court assumes the parties' familiarity with the pertinent facts, and therefore

provides a brief summary here.[5]  The Board requested bids for a $30 million construction

project ("the Project") to renovate and expand five schools in North Plainfield in 2001.

(Dkt. 264 at 5.)  D&D won the bid, and executed five contracts (collectively, "the Project

Contracts") to govern the construction plans for the Project.  (Id.)

The Board also executed contracts related to the Project with Bovis and Vitetta.

(Dkt. 499-3 at 3–4.)  The Board hired Bovis to perform construction management

---

[4] The Court will discuss the relevancy of the procedural history as to D&D's claims against
Bovis and Vitetta infra Secs.II–III.

[5] This Court's Memorandum Opinion, dated March 30, 2012, provides a detailed overview of the
complex factual background in this action.  (See dkt. 442 at 3–32.)

services in connection with the Project.  (Dkt. 442 at 5.)  Vitetta was retained to supervise architects and create architectural designs related to the Project.  (Id.)

The Project Contracts required D&D to post performance and payment bonds.  (Id. at 4.)  D&D obtained these bonds from American Motorists Insurance Company ("the Surety"), which was a subsidiary of Kemper Insurance Companies.  (Id.)  D&D and the Surety executed a General Indemnity Agreement ("GIA") in connection with those required bonds.  (Id.)  The GIA provided, inter alia, that in the event of a default, all of D&D's rights under the Project Contracts were to be assigned to the Surety.  (Id. at 4–5.)  The GIA deemed "all claims and causes of action against any parties to the Bonded Contract(s) or against third parties relating to the Bonded Contract(s)" as assignable rights.  (Id. at 5.)

### 2.    Default and Termination

Several conflicts arose between D&D and Epstein, due to actions that he took in his role as counsel for the Board, during the early stages of the Project in 2001 through 2002.  (Id. at 6–12.)  The root of these conflicts concerned delays in the completion of the Project.  (Id.)  D&D and Epstein contested, inter alia: (1) D&D's obligation to provide required construction schedules under the Project Contracts; and (2) the cause of delays related to the Project.  (Id. at 6–14.)  D&D also contended that delays in the Project were due to the Board's failure to provide the Project's contractors with sealed drawings in a timely fashion.  (Id. at 7.)  According to D&D, the sealed drawings were required in order for the necessary construction permits to issue and keep the Project on schedule.  (Id.)

The Board, through Epstein, and Vitetta issued several default letters to D&D in 2001 and 2002.  (Id. at 6–14.)  During this period, the parties resolved the conflicts to a sufficient degree such that neither party declared the contracts terminated.  (See id.)  Epstein, on behalf of the Board, issued an initial termination letter to D&D in a letter dated February 11, 2003.  (Id. at 14.)  The parties were unable to resolve their disputes, however, and on March 4, 2003: (1) D&D sent a letter to Vitetta stating that it was abandoning one of the Project's construction sites; (2) the Board terminated D&D as general contractor on a site related to the Project; and (3) the Board barred D&D from a site related to the Project.  (Id. at 15–16.)  Thereafter, Epstein, on behalf of the Board, terminated the remaining Project Contracts on July 23, 2003.  (Id. at 17.)

The Board, in the course of terminating the Project Contracts through Epstein, took possession of one construction site, thereby withholding D&D's materials and equipment related to the Project.  (Id. at 14; see also dkt. 264 at 13.)  Epstein later informed D&D that it was barred from all Project sites.  (Dkt. 442 at 17.)  The Board also announced the termination in three "Construction Updates" on its webpage.  (Id. at 17–18.)  The "Construction Updates" stated that D&D was terminated from the Project due to concerns with its performance.  (Id. at 18.)[6]  Thereafter, the Surety executed takeover

---

[6] Specifically, a "Construction Update" dated March 10, 2003 read as follows:

> The general contractor has been terminated from the Somerset School project due to a lack of performance and abandonment of the jobsite.  The Board … has issued the notice of termination to the general contractor's surety and demanded that the surety assume responsibility for the remaining work.

(Dkt. 347-4 at 7.)

agreements with the Board to govern the completion of the Project.  (Id. at 18–19.)

These agreements were executed on May 15, 2003 and May 19, 2004.  (Id.)

### 3.    Post-Termination Developments as to D&D

#### a.    Bonding Capacity

The problems associated with the timely completion of the Project, coupled with

the issuance of default letters to D&D, impacted D&D's ability to obtain bonding for

other projects.  (Id. at 20–25.)  For example, the Surety declined to support D&D's bid on

a $7.2 million project in June of 2002.  (Id. at 23.)  When D&D requested bonding for a

project estimated at $12 million, an agent for the Surety responded, "No way; $5MM and

under only," indicating that the Surety imposed a bonding limit of $5 million.  (Id.)  The

Surety later increased the bonding limit to $7 million; however, D&D did not secure any

other project.  (Id. at 23–24.)  The Surety issued no further bonding credit to D&D

through December of 2002, and sold its bonding portfolio to Arch Insurance

approximately one year later.  (Id. at 26.)

#### b.    Prequalification Status and Bankruptcy

The termination of the Project Contracts also affected, at least in part, D&D's

prequalification status to perform construction work on school buildings.  (Id. at 26–32.)

The prequalification application process in the state of New Jersey was somewhat

complex at the time of this action.  (See id.)[7]  The Court, for that reason, provides the

following overview of the application procedure and summary of the relevant facts.

---

[7] This summary describes the application procedures at the time that this Court issued its
Memorandum Opinion dated March 30, 2012.  (See dkt. 442 at 26–32.)

At least two administrative bodies in the state of New Jersey govern the prequalification for construction contractors seeking to pursue construction projects at schools within the state.  A construction contractor first applies to the New Jersey Division of Property Management and Construction ("DPMC") to achieve classification as a general construction contractor.  (Id. at 26.)  The DPMC issues a "Notice of Classification" to memorialize the classification.  (Id. at 27.)  Pursuant to the New Jersey Educational Facilities Construction and Financing Act, however, a construction contractor next applies to the New Jersey Economic Development Authority ("NJEDA") to request classification to bid on construction projects at school facilities.  (Id. at 26–27.)  A contractor, upon receiving classification from the DPMC, may request that the NJEDA accept the DPMC classification on an interim basis by submitting a short form to the NJEDA, along with a copy of the current DPMC "Notice of Classification" form.  (Id.)

D&D, before and during its involvement with the Project, was classified as a general construction contractor by the DPMC.  (Id. at 26.)  D&D likewise achieved the classification to bid on construction projects at school facilities through June 30, 2002.  (See id. at 26–27.)  D&D submitted an application for prequalification to DPMC on June 30, 2003 ("the 6-30-03 Application"), after it: (1) received several default letters; and (2) was denied bonding by the Surety.  (Id. at 27–30.)  The 6-30-03 Application was deficient as lacking necessary signatures, notarization, and a completed Surety affidavit.  (Id. at 29.)

Discovery in this action revealed that the 6-30-03 Application was submitted by D&D's office manager, Sylvia Blackmore, and unbeknownst to D&D's President,

7

Michael Tattoli.  (Id. at 29–30.)  Blackmore testified that she realized the 6-30-03

Application was procedurally deficient when she submitted it to DPMC.  (Id.)

The DPMC, upon receiving the 6-30-03 Application, informed D&D via letter

dated August 19, 2003 that the request for classification was incomplete.  (Id. at 31.)

Neither Blackmore nor Tattoli responded to the DPMC, and the DPMC later deemed the

6-30-03 Application withdrawn.  (Id.)  D&D petitioned for Chapter 11 bankruptcy relief

on August 15, 2003, and the Bankruptcy Court approved D&D's reorganization plan on

January 19, 2005.  (Id. at 32.)

## II.    PROCEDURAL HISTORY

The detailed procedural background of this action is set forth in earlier opinions of

this Court.  (See, e.g., dkt. 442.)  Accordingly, the Court limits the procedural analysis

insofar as it relates to the arguments raised here regarding Count One, Count Two, Count

Three, and Count Four (collectively, the "Civil Rights Counts") against Epstein.[8]

D&D filed its initial complaint against Epstein, the Board,  Bovis, and Vitetta on

March 10, 2003.  (Dkt. 1; see also dkt. 58.)  D&D later amended the complaint to expand

its claims.  (Dkt. 58.)  The amended complaint contained 16 counts, 13 of which were

asserted against Epstein.  (Id. at 3–45.)  The first four counts asserted federal civil rights

causes of action against Epstein under, inter alia, Section 1983 and 42 U.S.C. § 1985

("Section 1985").  (Id. at 3–25.)

---

[8] Epstein moves for Defense Costs related to the "four claims against … Epstein under 42 U.S.C. § 1983" alleged in Count One, Count Two, Count Three, and Count Four.  (Dkt. 500-1 at 11.) The Court notes, however, that D&D asserted two additional civil rights claims against Epstein in Count Five and Count Six of its Amended Complaint.  (See dkt. 58 at 27–32.)

A.     **District Court Rulings**

The Court notes, as a preliminary matter, the significance of its prior rulings in relation to the arguments raised by the parties here.  The Court provides the following overview of the relevant rulings for convenience, and later describes the procedural history as to each count in greater detail.[9]

> **September 30, 2005 Ruling ("9-30-05 Ruling"):** The 9-30-05 Ruling decided separate motions filed by Bovis and Vitetta to dismiss the amended complaint.  The 9-30-05 Ruling granted the motion filed by Bovis to dismiss the amended complaint with respect to, <u>inter alia</u>, Count One, Count Two, Count Three, and Count Four.  The 9-30-05 Ruling granted the motion filed by Vitetta to dismiss the amended complaint with respect to, <u>inter alia</u>, Count One and Count Two.

(Dkt. 86; dkt. 87.)

> **December 21, 2007 Ruling ("12-21-07 Ruling"):** The 12-21-07 Ruling decided the motion for summary judgment filed by Epstein on all counts.  The Court granted judgment in favor of Epstein with respect to, <u>inter alia</u>, Count One, Count Three, and Count Four.

(Dkt. 264; dkt. 265.)

> **March 30, 2012 Ruling ("3-30-12 Ruling"):** The 3-30-12 Ruling granted judgment in favor of Epstein on Count Two.  The Court declined to exercise subject matter jurisdiction over the remaining pendent state claims against Epstein, Bovis, and Vitetta, and instructed the Clerk of the Court to designate the action as closed.[10]

(Dkt. 442; dkt. 443.)

---

[9] The Court will limit the analysis of the procedural history here to the Civil Rights Counts.  The Court also analyzes the procedural history as to Bovis and Vitetta, to the extent necessary to address the arguments of the parties raised here.  <u>See</u> <u>infra</u> Sec.III.

[10] The Court granted leave for D&D to commence the action on the pendent state claims in an appropriate state court within 30 days of the 3-30-12 Ruling.  (Dkt. 443.)

### B.      Proposed Consent Order

Epstein, during the pendency of this action, requested that D&D withdraw claims asserted against him after this Court issued the 9-30-05 Ruling.  (Dkt. 470.)[11]  Epstein forwarded the request to D&D on April 13, 2006 by way of Proposed Consent Order ("the 4-13-06 Proposed Consent Order"), which was styled as an "ORDER DISMISSING CERTAIN COUNTS OF THE AMENDED COMPLAINT AGAINST DEFENDANT ROBERT C. EPSTEIN, ESQ."  (Dkt. 470-1 at 2–5.)  The 4-13-06 Proposed Consent Order stated that "under the law of the case doctrine [this] Court's prior rulings require dismissal of certain counts of the Amended Complaint against Epstein …."  (Id. at 5.)  Thus, the 4-13-06 Proposed Consent Order requested that D&D withdraw Count One, Count Two, Count Six, and Count Seven against Epstein.  (Id. at 5.)  D&D refused to execute the 4-13-06 Proposed Consent Order.  (Id. at 2.)

### III.    PROCEDURAL HISTORY: COUNT-BY-COUNT ANALYSIS

Many of the arguments raised by the parties here concern the lengthy procedural history of this action.  The Court, for that reason, provides the following summary of the procedural history of the Civil Rights Counts.  This section provides cross references to the underlying facts related to D&D's claims, discussed supra Sec.I.B, for convenience.

---

[11] This request was made by counsel for Epstein, and received by counsel for D&D.  The Court, for simplicity hereinafter in this Memorandum Opinion, will simply refer to the requesting party as "Epstein," and the receiving party as "D&D".

**A.    Count One: "Civil Rights – Fourth Amendment, Fifth Amendment, Fourteenth Amendment Seizure of Property (All Defendants)"[12]**

Count One alleged, <u>inter</u> <u>alia</u>, that Defendants seized D&D's equipment, business records, and job files in violation of the Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and Section 1983.  (Dkt. 58 at 3–19.)  <u>See also</u> <u>supra</u> Sec.I.B.2 (describing the Board's takeover of construction sites related to the Project).[13]  D&D, in support of its constitutional claims, alleged that it procured the seized materials pursuant to the Project Contracts executed between D&D and the Board.  (<u>See</u> dkt. 264 at 18, 21–22.)  Thus, D&D alleged that Defendants "acted under color of state law to cause a deprivation of a right secured by the United States Constitution …" by seizing materials that were obtained pursuant to its contractual obligations with a state entity.  (<u>Id.</u> at 18.)

**1.    9-30-05 Ruling**

Bovis and Vitetta separately moved to dismiss Count One, insofar as it was asserted against them, in 2005.  (Dkt. 86 at 1.)  This Court, in the 9-30-05 Ruling, dismissed Count One insofar as it was asserted against Bovis and Vitetta.  (Dkt. 87.)  The Court held that the Project Contracts did not give rise to a constitutionally protected property interest under <u>Linan-Faye Construction Co. v. Housing Authority of City of Camden</u>, 49 F.3d 915, 931–33 (3d Cir. 1995) ("<u>Linan-Faye</u>").  (Dkt. 86 at 9–10.)  <u>Linan-</u>

---

[12] The Court's subheadings state each count as styled in D&D's amended complaint.  (<u>See</u> dkt. 58.)

[13] This Memorandum Opinion will cite to the Court's prior Memorandum Opinions, discussed <u>supra</u> Sec.II.A, to analyze the procedural history of each count.  When a document from the evidentiary record requires extensive analysis – particularly in relation to the arguments of the parties here – the Court will cite to the relevant document.

<u>Faye</u> recognizes that a contract with a state entity gives rise to a constitutionally protected property interest under the Fourteenth Amendment where it: (1) "confers a protected status, such as those characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both …"; or (2) "includes a provision that the state entity can terminate the contract only for cause." <u>Linan-Faye</u>, 49 F.3d at 932 (internal citation and quotation omitted).

The Court held that the Project Contracts did not fall into either of those two categories, because their underlying provisions: (1) governed a single group of public works projects that did not invoke a quality of extreme dependence or permanence; and (2) provided that the Board could terminate "for convenience and without cause." (Dkt. 86 at 10 (internal citation and quotation omitted).) Thus, the Court held that any alleged seizure of property did not invoke a constitutionally protected interest. (<u>Id.</u>)[14]

### 2. 12-21-07 Ruling

Epstein moved for judgment in his favor on Count One on May 12, 2006. (Dkt. 138.)[15] This Court granted judgment in favor of Epstein on Count One in the 12-21-07 Ruling. (Dkt. 265.) This Court, in so ruling, initially determined that D&D failed to state a viable Fourth Amendment or Fifth Amendment claim against Epstein. (Dkt. 264 at 17 n.4.) Rather, the Court determined that the allegations in support of Count One were

---

[14] Epstein, after the 9-30-05 Ruling, requested that D&D withdraw Count One against him in the 4-13-06 Proposed Consent Order. D&D did not withdraw Count One against Epstein. <u>See</u> <u>supra</u> Sec.II.B.

[15] Epstein moved for judgment in his favor with respect to all counts asserted against him. (Dkt. 138.)

"properly analyzed" as due process violations under the Fourteenth Amendment.  (Id.)

The basis for the due process violations were allegations related to Epstein's alleged: (1)

seizure of "D&D's business records and job files"; and (2) termination of the Project

Contracts.  (Id. at 18 (internal citation and quotation omitted).)

This Court, with respect to Count One insofar as it was asserted against Epstein,

found that D&D did not state a viable substantive or procedural due process claim.  (Id. at

19–22.)  D&D did not prevail on its substantive due process claim, insofar as it was

asserted against Epstein, because Count One failed to plead allegations sufficient to make

the requisite demonstration that Epstein's conduct was egregious so as to: (1) shock the

conscience of the Court; or (2) interfere with rights implicit to the concept of ordered

liberty.  (Id. at 20.)  Moreover, with respect to any alleged procedural due process

violation, the Court found that Count One failed to demonstrate a property interest

protected by due process under Linan-Faye.  (Id. at 20–21.)  See also supra Sec.III.A.1

(describing due process rights under Linan-Faye).

The Court's application of Linan-Faye in the 12-21-07 Ruling mirrored the 9-30-

05 Ruling, which dismissed Count One insofar as it was asserted against Bovis and

Vitetta.  (See id. at 20–22.)  See also supra Sec.III.A.1.  The Court, with respect to its

prior application of Linan-Faye in the 9-30-05 Ruling, stated the following:

> This Court … previously determined that D&D's contracts with the Board
> do not fall into either of the Linan-Faye categories because they neither
> "confer protection on D&D characterized by either extreme dependence or
> permanence, as they are for a single group of public works projects," nor
> provide that the Board can only terminate it for cause …. Thus, the Court
> held that "D&D's contracts with the Board do not give rise to a protected

> property interest either in the contracts or in the materials, trailer, and records held by D&D pursuant to the contracts."
>
> ….
>
> The [above] analysis … pertains equally to all of the defendants. Therefore, the Court finds that summary judgment in favor of Epstein … is appropriate on count 1 of the amended complaint.

(Id. at 21–22.)

### B.   Count Two: "Civil Rights – Liberty Interest, Destruction of Prequalification for Public Works Contracts Without Due Process (All Defendants)"

Count Two alleged, inter alia, that Defendants implicated a constitutionally protected liberty interest by terminating the Project Contracts with D&D. (Dkt. 58 at 20–24.) The alleged protected liberty or property interest concerned D&D's bonding capacity and prequalification status to bid to public works projects under the NJEDA. (Id.) See also supra Sec.I.B.3 (describing D&D's bonding capacity and the administrative bodies and laws that governed D&D's prequalification classification). Specifically, D&D alleged that Defendants issued misleading default letters to its bonding agent to hinder its ability to renew its prequalification classification. (Dkt. 58 at 21.) See also supra Sec.I.B.2 (describing the issuance of default letters and subsequent termination of the Project Contracts). D&D asserted the due process violations under the Fifth Amendment and Fourteenth Amendment, by alleging that the default letters implicated a protected liberty interest in its: (1) good reputation; (2) ability to secure prequalification status to bid on public works contracts; and (3) "right to bid on public works projects." (Id. at 23–24.)

14

### 1.    9-30-05 Ruling

Bovis and Vitetta separately moved to dismiss Count Two, insofar as it was asserted against them, in 2005.  (Dkt. 86 at 1.)  This Court dismissed Count Two, insofar as it was asserted against Bovis and Vitetta, in the 9-30-05 Ruling.  (Dkt. 87.)  This Court, in so ruling, held that the allegations in Count Two failed "to rise to the level of constitutional violations."  (Dkt. 86 at 11.)  Citing precedent of the United States Court of Appeals for the Third Circuit ("Third Circuit"), this Court held that the "interest in one's reputation is neither liberty nor property that is protected by the due process clause."  (Id. (internal citation and quotation omitted).)[16]  The Court further held that any alleged financial injury to D&D related to its bonding capacity did not support a due process claim.  (Id.)[17]  See infra Sec.III.B.2.

### 2.    12-21-07 Ruling

Epstein moved for judgment in his favor on Count Two on May 12, 2006.  (Dkt. 138.)  This Court, for the reasons discussed below, denied Epstein's motion for judgment in his favor with respect to Count Two in the 12-21-07 Ruling.  (Dkt. 265.)

A significant portion of the Court's analysis with respect to Count Two against Epstein examined the basis for the 9-30-05 Ruling, which dismissed Count Two insofar

---

[16] The Court did note, however, that state tort or contract law may provide relief for any "alleged injuries to [D&D's] reputation."  (Dkt. 86 at 11.)

[17] Epstein, after the 9-30-05 Ruling, requested that D&D withdraw Count Two against him in the 4-13-06 Proposed Consent Order.  D&D did not withdraw Count Two against Epstein.  See supra Sec.II.B.

as it was asserted against Bovis and Vitetta.  (Dkt. 264 at 23–24.)[18]  The Court

summarized the 9-30-05 Ruling with respect to Count Two as follows:

> This Court … concluded, with respect to count 2 that (1) "impairment of
> employment opportunities does not imbue a claim based on injury to one's
> reputation with a constitutional element", and (2) D&D's financial loss
> associated with the alleged injury to its bonding capacity is not
> constitutionally protected ….  Further, the Court noted that reputation alone
> is not a liberty or property interest protected by the Fourteenth
> Amendment….

(Id. at 24.)

The Court, after summarizing the 9-30-05 Ruling, analyzed the then-recent

decision of the Third Circuit in Hill v. Borough of Kutztown, 455 F.3d 225, 235 (3d Cir.

2006).  (Id. at 24–26.)  The Hill decision, which was decided after this Court's 9-30-05

Ruling, examined the applicability of the "stigma-plus" test to define the boundaries of a

viable due process claim related to reputational damage.  Hill, 455 F.3d at 235–39.

A viable due process claim under Hill meets the two-prong "stigma-plus" test by

alleging facts sufficient to demonstrate: (1) a stigma to a reputational interest (the "stigma

prong"); "plus" (2) a deprivation of some additional right or interest (the "plus prong").

Id. at 236.  The "stigma prong" is satisfied where the allegations demonstrate that the

relevant statements were false and made available to the public.  Id.  With respect to the

"plus prong," however, the Hill decision clarified that an allegation sufficient to

---

[18] The Court held that the Fifth Amendment did not apply to the allegations stated in Count Two,
and therefore analyzed D&D's due process claims in Count Two exclusively under the
Fourteenth Amendment.  (Dkt. 264 at 23 n.6.)

demonstrate an "extinguishment of a right or status previously recognized under by law" is sufficient.  Id. at 237 (internal quotation and citation omitted).[19]

The Court applied the "stigma-plus" test as defined under Hill to the facts alleged, and determined that D&D met the "stigma prong" sufficient to survive D&D's motion for summary judgment.  (Dkt. 264 at 24–26.)  D&D alleged that Epstein took stigmatizing actions by: (1) issuing default letters; and (2) publishing the "Construction Updates" on the Board's website.  (Id. at 24–25.)  See also supra Sec.I.B.2 (describing the default letters and "Construction Updates").

The Court also found that D&D met the "plus" requirement under Hill by alleging deprivations that accompanied the alleged reputational damage related to: (1) the termination of the Project Contracts; (2) its lost prequalification status; (3) its inability to obtain bonding capacity; and (4) its overall inability to bid on other public works contracts.  (Id. at 25.)  Viewing D&D's allegations and supporting evidence under the summary judgment standard, the Court held that D&D demonstrated "a protected liberty interest in its reputation under the Fourteenth Amendment, and that Epstein … interfered with this interest."  (Id.)  Accordingly, the Court denied Epstein's motion for summary judgment with respect to Count Two in the 12-21-07 Ruling.  (Dkt. 265.)[20]

---

[19] Significantly, Hill held that termination may implicate a constitutionally protected due process interest by satisfying the "plus prong," even when the employee does not have a protected property interest in the job.  455 F.3d at 237–38 ("We … have never clearly answered the question whether termination from a government job constitutes a sufficient 'plus' under the 'stigma-plus' test when … the plaintiff lacked a property interest in retaining the job….").

[20] The Court, in view of this ruling and analysis under Hill, granted D&D leave to move to reinstate Count Two insofar as asserted against Bovis and Vitetta, by stating the following:

### 3.    3-30-12 Ruling

Epstein moved for summary judgment in his favor on Count Two on October 30, 2009.  (Dkt. 347.)  The Court granted that motion, upon reevaluating the 12-21-07 Ruling as to Count Two, and in light of: (1) the record at the close of discovery; and (2) intervening changes in the law.  (Dkt. 443; see also dkt. 442 at 35–47.)  The Court, upon revisiting Count Two, credited D&D with the assumption that it satisfied the "stigma prong" under Hill, due to, inter alia, the alleged statements in the "Construction Updates."  (Dkt. 442 at 39.)  The Court held, however, that the Project Contracts "did not confer a constitutionally protected property interest that could suffice as the 'plus' to the alleged damage to D&D's reputation" with respect to the termination of the Project Contracts and lost bonding capacity.  (Id. at 44.)  The Court described its reasoning in the following passage:

> The Court notes, however, "the possibility of a future contract with a municipality is not a property interest that warrants procedural due process protection."  Mun. Revenue Servs., Inc. v. McBlain, 347 Fed.Appx. 817, 826 (3d Cir. 2009).  A property interest warranting due process protection has been recognized as existing with respect to two types of contract rights: where (1) the contract confers a protected status, such as in the case of receipt of welfare benefits or continued tenure in the public school employment context, or (2) the contract itself includes a provision that the state entity can terminate the contract only for cause.  Linan-Faye Constr.

---

The Court notes that Hill was decided following the issuance of the 9-30-05 Memorandum Opinion and corresponding Order.  Thus, in light of this decision and our analysis above, we intend to grant D&D leave to move to reinstate count 2 insofar as asserted against Bovis and Vitetta.  However, the Court notes that D&D must establish that Vitetta and Bovis acted under color of state law at all times relevant to count 2 in order to state a claim under Section 1983.  The Court acknowledges that we did not address this issue in the 9-30-05 Memorandum Opinion.

(Dkt. 264 at 26 n.8.)

> Co., Inc. v. Hous. Auth. of City of Camden, 49 F.3d 915, 932 (3d Cir. 1995) …

(Id. at 40.)

Thus, based upon the record at the close of discovery, the Court held that D&D failed to establish the deprivation of a property interest in the Project Contracts under Linan-Faye.  (Id. at 40–41 (finding no constitutionally protected interest in the Project Contracts in light of the provision that permitted "the Board's termination for convenience and without cause" (internal citation omitted)).)  See also supra Sec.III.A.1 (summarizing due process protection under Linan-Faye).  Moreover, the Court concluded that "based upon the undisputed record evidence," the Project Contracts did not confer a constitutionally protected property interest that could suffice as the "plus" to the alleged damage to D&D's reputation.  (Id. at 44.)

The Court likewise found that D&D did not satisfy the "plus" prong of the "stigma-plus" test with regard to its lost bonding capacity and prequalification status under the NJEDA.  (Id. at 44–46.)  The Court deemed any alleged causal connection between Epstein's stigmatizing statements and those injuries as too attenuated.  (Id. at 44–45.)  See also supra Sec.I.B.3 (describing other factors related to those injuries).  With respect to D&D's bonding capacity, the Court clarified that any "alleged injuries flow[ed] from the Surety's unwillingness to provide further bonding and D&D's subsequent determination that seeking prequalification status would be futile in light of its inability to obtain bonding …."  (Id. at 45–46 (emphasis in original).)  See also supra Sec.I.B.3.a.  Thus, upon finding that D&D failed to satisfy the "stigma prong" of the "stigma-plus"

test under <u>Hill</u>, the Court entered summary judgment in favor of Epstein on Count Two. (Dkt. 443.)

**C.    Count Three: "Civil Rights – Retaliatory Terminations for Exercise of First Amendment Rights (All Defendants)" and Count Four: "Civil Rights – First Amendment Retaliation For Seeking Redress in Federal Court (Board of Education, Vitetta, Epstein)"[21]**

Count Three alleged that Epstein issued default letters to D&D in violation of D&D's free speech rights under the First Amendment and Section 1983.  (Dkt. 58 at 24– 25.)  D&D, with respect to Count Three, alleged that Epstein retaliated against it because D&D: (1) refused to make false statements regarding the timely completion of the Project; (2) stated that the Board contributed to the Project delays; (3) requested extensions of time and compensation related to the Project; and (4) attempted "to meet with other prime contractors … to form a coordinated attempt to seek scheduling adjustments and other redresses."  (<u>Id.</u>)  Similarly, Count Four alleged that Epstein terminated the Project Contracts "in direct retaliation for D&D's commencement of the instant litigation, for filing opposition to defendants' motions to dismiss and for summary judgment in the instant matter, and for proposing to seek a court order for relief …."  (<u>Id.</u> at 26.)  According to D&D, the alleged retaliatory conduct violated the First Amendment, Section 1983, and Section 1985.  (<u>Id.</u>)

**1.    9-30-05 Ruling as to Bovis and Vitetta**

Bovis and Vitetta separately moved to dismiss Count Three and Count Four, insofar as those counts were asserted against them, in 2005.  (Dkt. 86 at 1.)  The Court

---

[21] The Court will analyze related counts in tandem.  Here, Count Three and Count Four alleged First Amendment retaliation claims.

examines the procedural history as to Count Three and Count Four – insofar as each relates to Bovis and Vitetta – below.

### a.    9-30-05 Ruling as to Bovis

This Court dismissed Count Three and Count Four, insofar as asserted against Bovis, in the 9-30-05 Ruling.  (Dkt. 87.)  The Court so held because D&D failed to allege the requisite elements of a First Amendment claim against Bovis.  (Dkt. 86 at 12–13.)  Notably, D&D failed to plead the requisite elements of a First Amendment retaliation claim with respect to Bovis to demonstrate that: (1) D&D engaged in a protected activity by speaking as a citizen regarding a matter of public concern; (2) Bovis retaliated against D&D; and (3) the alleged protected activity caused the retaliation.  (Id. at 12–13; see also dkt. 264 at 28–29.)  D&D did not meet this burden, insofar as it concerned Bovis, because Count Three and Count Four alleged only that Epstein, Vitetta, and the Board engaged in retaliatory conduct by issuing default letters to D&D.  (Dkt. 86 at 13.)  Moreover, Count Three and Count Four did not indicate that Bovis engaged in any other retaliatory conduct against D&D.  (Dkt. 58 at 24–27.)  Thus, the Court found that D&D failed to state a prima facie First Amendment retaliation claim against Bovis in Count Three and Count Four, and dismissed those counts as asserted against Bovis.  (Dkt. 86 at 13; see also dkt. 87.)

### b.    9-30-05 Ruling as to Vitetta

The 9-30-05 Ruling did not dismiss Count Three and Count Four against Vitetta because D&D's allegations were sufficient to withstand Vitetta's motion to dismiss.  (Dkt. 86 at 14–15; see also dkt. 87.)  Specifically, the Court noted that D&D alleged that

21

Vitetta: (1) issued default letters in retaliation for D&D's protected activity; and (2) delayed the Project as part of a "campaign to blame all of the Projects' problems on D&D's alleged failure to coordinate the work." (Dkt. 86 at 14–15 (internal citation and quotation omitted).) The Court also rejected Vitetta's argument that Count Three and Count Four failed because it was not a state actor, because D&D alleged that Vitetta acted in concert with the Board. (Id.) The Court reasoned that "D&D may be able to show there was a close nexus between Vitetta and the Board such that Vitetta's acts may be attributed to the Board" at a future procedural juncture. (Id. at 14–15.) Thus, in the 9-30-05 Ruling, this Court determined it "would be premature to dismiss D&D's retaliation claims against Vitetta before allowing D&D the opportunity to develop evidence in support thereof." (Id.)

### 2.       12-21-07 Ruling as to Vitetta

Vitetta moved for summary judgment in its favor with respect to Count Three and Count Four in 2006. (Dkt. 141.) This Court granted judgment in favor of Vitetta with respect to both counts on the ground that D&D failed to demonstrate that its alleged activities, discussed supra Sec.III.C, were protected under the First Amendment. (Dkt. 264 at 30–31; see also dkt. 265.) Initially, the Court held that D&D's allegations related to its refusal to falsely state that the Project was on schedule and its attempts to meet with other contractors to discuss Defendants' alleged misconduct did not involve constitutionally protected speech. (Dkt. 264 at 31.) Rather, the Court determined those allegations concerned the absence of speech, which warranted no First Amendment protection. (Id.)

The Court, in the 12-21-07 Ruling, analyzed the type of speech that is properly considered a matter of public concern.  (Id. at 30.)  The following passage described the relevant standard to determine whether speech pertains to a matter of public concern:

> Speech pertains to a matter of public concern if the speech "can be fairly considered as relating to any matter of political, social or other concern to the community."  Costello v. City of Brigantine, No. 99-4072, 2001 U.S. Dist. LEXIS 8687, at *63 (D.N.J. June 28, 2001) …. Moreover, there can be no cognizable First Amendment claim under Section 1983 in the absence of speech …. The Court determines as a matter of law if an activity constitutes protected speech.  However, whether the retaliatory action of the defendant "reached the threshold of actionability under § 1983" is a factual question for the trier of fact.  Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000).

(Id.)

The Court applied this standard to D&D's allegations with respect to Vitetta and determined that D&D failed to demonstrate that it engaged in a protected First Amendment activity.  (Id. at 31–32.)  The Court determined that D&D's requests for extensions and compensation did not address matters of public concern, because those statements "pertained solely to D&D's own employment situation and circumstances surrounding" the termination of the Project Contracts.  (Id. at 31.)  While acknowledging a potential community interest in the timely completion of public school construction projects, the Court observed that "D&D's requests for compensation or additional time to complete portions of the Project, and assertions that other parties [were] causing Project delays" were related "specifically to D&D's employment and its relationship with the

other contractors," and not the Project in general.  (Id. at 31–32.)[22]  Thus, the Court

concluded that no allegation in Count Three or Count Four against Vitetta deserved First

Amendment protection.  (Id. at 32.)

### 3.    12-21-07 Ruling as to Epstein

Epstein moved for summary judgment in his favor on Count Three and Count

Four on May 12, 2006.  (Dkt. 138.)  This Court granted judgment in favor of Epstein on

Count Three and Count Four in the 12-21-07 Ruling, for the same reasons the Court

granted judgment in favor of Vitetta on both counts.  (Dkt. 265; see also dkt. 264 at 26–

33.)  See also supra Sec.III.C.2.  Notably, the Court found that D&D did not demonstrate

that it engaged in a protected First Amendment activity with respect to its allegations

against Epstein, because the alleged activity did not invoke matters of public concern.

(Dkt. 264 at 30–33.)  See also supra Sec.III.C.2.

## IV.   PROCEDURAL HISTORY: MOTION FOR RECONSIDERATION AND APPEAL

### A.    Motion for Reconsideration

As described supra Sec.III.B.3, the Court granted summary judgment in favor of

Epstein on Count Two in its 3-30-12 Ruling.  D&D moved, in effect, for reconsideration

of the 3-30-12 Ruling on April 26, 2012.  (Dkt. 448.)  This Court denied that motion on

August 15, 2012 ("8-15-12 Ruling"), on the grounds that, inter alia, D&D did not: (1)

raise an intervening change in controlling law or new evidence; or (2) base the motion on

---

[22] The Court further observed that the statements and arguments of the parties in this action were unrelated "to any matter of political, social, or other concern to the community, but instead relate[d] to matters of personal interest to D&D and address[ed] the individual circumstances of its termination from the Project."  (Dkt. 264 at 32–33.)

facts or controlling legal precedent previously considered by this Court.  (Dkt. 464 at 4–6;

see also dkt. 465.)  The Court concluded, rather, that D&D's motion merely asserted

D&D's disagreement with the 3-30-12 Ruling.  (Dkt. 464 at 6.)

**B.      Appeal**

D&D appealed from the 12-21-07 Ruling, 3-30-12 Ruling, and 8-15-12 Ruling –

insofar as those rulings addressed, inter alia, the Civil Rights Counts – to the Third

Circuit.  (Dkt. 491; see also dkt. 493-2.)  On January 8, 2014, the Third Circuit affirmed

this Court's rulings on all counts.  (Dkt. 491.)  The Court summarizes the Third Circuit's

analysis as to the Civil Rights Counts below.

**1.      Count One: "Civil Rights – Fourth Amendment, Fifth
Amendment, Fourteenth Amendment Seizure of Property (All
Defendants)"**

The Third Circuit found that D&D's arguments related to Count One were

"entangled with contentions on other counts."  (Dkt. 493-2 at 5.)  Moreover, the Third

Circuit, in support of its decision, determined that D&D did not request that Count One

be reinstated in its opening appellate brief.  (Id.)  Based upon the insufficiency of D&D's

briefing as to Count One, the Third Circuit held that D&D did not preserve any issue

related to that count on appeal.  (Id.)

**2.      Count Two: "Civil Rights – Liberty Interest, Destruction of
Prequalification for Public Works Contracts Without Due
Process (All Defendants)"**

The Third Circuit affirmed the 3-30-12 Ruling as to Count Two.  (Dkt. 491; see

also dkt. 493-2 at 6–9.)  See also Sec.III.B.3 (describing the 3-30-12 Ruling as to Count

Two).  The Third Circuit, in support of its decision, determined that D&D had no liberty

interest in its prequalification classification, because "the connection between the alleged stigma and the loss of prequalification" classification was too remote to satisfy the "stigma prong" of the "stigma-plus" test.  (Dkt. 493-2 at 5–8.)  See also supra Sec.III.B.3. Any alleged damage to D&D's prequalification interest was too remote, in the Third Circuit's view, because the 6-30-03 Application lacked necessary signatures, notarizations, and affidavits, which resulted in the 6-30-03 Application being deemed withdrawn.  (Dkt. 493-2 at 7.)  See also supra Sec.I.B.3.b (describing the procedural deficiencies related to the 6-30-03 Application).  Thus, the Third Circuit viewed the 6-30-03 Application as an intervening act by D&D that also contributed to its lost prequalification interest.  (Dkt. 493-2 at 7–8.)[23]

### 3. Count Three: "Civil Rights – Retaliatory Terminations for Exercise of First Amendment Rights (All Defendants)" and Count Four: "Civil Rights – First Amendment Retaliation For Seeking Redress in Federal Court (Board of Education, Vitetta, Epstein)"

The Third Circuit affirmed the 3-30-12 Ruling as to Count Three and Count Four as to the Board.  (Dkt. 491.)[24]  With respect to Count Three, the Third Circuit agreed that

---

[23] The Third Circuit, with respect to D&D's bonding capacity, observed that the Surety had "concerns about D&D's ability to handle existing projects."  (Dkt. 493-2 at 7.)  See also supra Sec.I.B.3.a (describing post default developments as to D&D's bonding capacity).

[24] The 3-30-12 Ruling on Count Three and Count Four granted summary judgment in favor of the Board on both counts.  (Dkt. 442 at 47–59; dkt. 443.)  The 3-30-12 Ruling on Count Three and Count Four against the Board, however, applied the same First Amendment doctrine discussed in the 12-21-07 Ruling, which granted summary judgment in favor of Epstein on both counts.  See supra Sec.III.C.2.  The Court, in the 12-21-07 Ruling, held that the speech referenced by D&D did not address a matter of public concern.  See id.  The Court later found, in the 3-30-12 Ruling, that newly-raised evidence cited by D&D in support of Count Three and Count Four against the Board did "not support a finding that D&D was engaging in constitutionally-protected speech as a citizen," and therefore its speech was not constitutionally protected.  (Dkt. 442 at 47–59.)  Indeed, in the 3-30-12 Ruling, the Court reiterated that D&D could not "show that it engaged in protected First Amendment activity …."  (Id. at 48.)

the relevant speech was made in D&D's capacity as a contractor – and not as a citizen – and thereby warranted no constitutional protection.  (Dkt. 493-2 at 9.)  The Third Circuit also held that D&D did not preserve its appeal from this Court's ruling as to Count Four.  (Id. at 9–10.)  Notably, D&D "requested in its conclusion that this count be reinstated against the Board but made no arguments regarding retaliation for initiating litigation anywhere in [its] brief."  (Id. at 10.)

### C.   Motion for Sanctions

Epstein moved for sanctions on September 14, 2012.  (Dkt. 470.)  This Court denied the motion without prejudice, pending the outcome of D&D's appeal to the Third Circuit.  (Dkt. 486.)  The motion was later deferred on March 12, 2014, pending the Supreme Court rulings in Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S.Ct. 1749 (2014) and Highmark Inc. v. Allcare Health Management System, 134 S.Ct. 1744 (2014).  (Dkt. 495.)

## V.   LEGAL STANDARD: SECTION 1988

Our legal system, as a general rule, "requires each party to bear his own litigation expenses … regardless whether he wins or loses."  Fox v. Vice, 131 S.Ct. 2205, 2213 (2011).  Section 1988, however, is an exception to that general rule.  Id.  A court, under Section 1988, may award reasonable attorneys' fees to the prevailing party in a civil rights action, including those brought under Section 1983 and Section 1985.  42 U.S.C. § 1988(b).  Any statutory award is limited to the non-prevailing party, and thus, Section 1988 does not authorize an award of fees against counsel.  Id.  Any remedy must be related to "costs that the defendant would not have incurred but for the frivolous claims."

27

Vice, 131 S.Ct. at 2211.   A court must therefore determine "whether the costs would have been incurred in the absence of the frivolous allegation."  Id. at 2216.

Section 1988 entitles prevailing defendants in civil rights actions to attorneys' fees upon a finding that the underlying "action was frivolous, unreasonable, or without foundation."  Id. at 2213 (internal citation and quotation omitted).   An award of fees to a prevailing defendant under Section 1988, however, does not require a finding that the plaintiff pursued the frivolous claims in subjective bad faith.  Barnes Found. v. Twp. of Lower Merion, 242 F.3d 151, 158 (3d Cir. 2001).  Rather, the standard is objective and applies on a case-by-case basis.  Id.

A court, when determining whether an action was frivolous, unreasonable, or without foundation, considers: (1) whether the underlying claim had an arguable legal basis; and (2) the evidence that supported each claim.  Id. at 158–66.  A court under Barnes may also consider the following nonexclusive list of factors (collectively, "the Barnes Factors") and analyze whether:

(1) the plaintiff established a prima facie case;

(2) the defendant offered to settle;

(3) the trial court dismissed the case before trial;

(4) the case proceeded to trial on the merits;

(5) "the question in issue was one of first impression requiring judicial resolution"; and

(6) the controversy presented a "real threat of injury to the plaintiff …"

Id. at 158.

28

The statutory purpose of Section 1988 is to "relieve defendants of the burdens associated with fending off frivolous litigation." Vice, 131 S.Ct. at 2209. But a court must not award attorneys' fees under Section 1988 simply because a plaintiff did not prevail. Hughes v. Rowe, 449 U.S. 5, 14 (1980); see also Vice, 131 S.Ct. at 2209. Thus, "fee-shifting in favor of prevailing defendants … is not routine and is only to be sparingly exercised." Veneziano v. Long Island Pipe Fabrication & Supply Corp., 238 F.Supp.2d 683, 688 (D.N.J. 2002), aff'd, 79 Fed.Appx. 506 (3d Cir. 2003). The Barnes Factors, therefore, must be weighed against: (1) the risk of chilling the exercise of constitutional rights; and (2) the possibility that a plaintiff had a good faith belief in the merits of the claims. Baby Doe v. Methacton Sch. Dist., 920 F.Supp. 78, 79 (E.D. Pa. 1996).

## VI.    LEGAL STANDARD APPLIED HERE: SECTION 1988

Epstein moves for Defense Costs under Section 1988 against D&D, with respect to the Civil Rights Counts, insofar as D&D asserted those counts against him. (Dkt. 500-1.) See also supra Sec.V (describing the scope of Section 1988 liability). The Court notes, as a preliminary matter, that the parties frame their arguments regarding the applicability of Section 1988 liability with reference to: (1) the Civil Rights Counts collectively; and (2) each count individually. See infra Sec.VI.A–B. The Court, for that reason, will first discuss the parties' arguments regarding the Civil Rights Counts collectively, infra Sec.VI.A.1–2. The Court later discusses the parties' arguments regarding each civil rights claim, infra Sec.VI.B, and also provides the Court's analysis as to each count.

29

A.    **Argument: Civil Rights Counts**

1.    **Epstein's Arguments: The <u>Barnes</u> Factors**

Epstein contends that he is a prevailing party under Section 1988 because this Court granted judgment in his favor on the Civil Rights Counts, and the Third Circuit affirmed.  (Dkt. 519 at 5–8.)  <u>See also</u> <u>supra</u> Sec.IV.B (describing the Third Circuit decision on appeal).  Epstein also applies the <u>Barnes</u> Factors to support the argument that Section 1988 fees are warranted here, because each of the Civil Rights Counts were frivolous, unreasonable, or without foundation.  (Dkt. 500-1 at 16–21.)  <u>See also</u> <u>supra</u> Sec.V (listing the <u>Barnes</u> Factors).[25]  With respect to the <u>Barnes</u> Factor concerning settlement, for example, Epstein contends that he, through his counsel, made an offer to settle this case in December of 2008.   (Dkt. 500-1 at 18–19.)  Epstein further explains that D&D did not respond to the offer, and "proceeded to litigate the baseless civil rights claims that would eventually be dismissed."  (<u>Id.</u> at 19)

Epstein also argues that D&D did not make a prima facie demonstration on any of the Civil Rights Counts because "D&D could not establish a *prima facie* case on any of its four § 1983 claims."  (<u>Id.</u> at 18.)  <u>See also</u> <u>supra</u> Sec.V (listing the <u>Barnes</u> Factors). According to Epstein, D&D did not establish a single prima facie civil rights claim against him, because this Court entered judgment in his favor on each.  (Dkt. 500-1 at 18.)  Epstein also suggests that the D&D forced its "alleged contractual and tortious

---

[25] Epstein cites to <u>EEOC v. L.B. Foster Co.</u>, 123 F.3d 746 (3d Cir. 1997) ("<u>L.B. Foster</u>") to support his arguments regarding the <u>Barnes</u> Factors.  The more recent <u>Barnes</u> decision relied heavily upon <u>L.B. Foster</u>.  <u>Barnes Found.</u>, 242 F.3d at 158.

grievances into the framework of the § 1983 claims" without requisite evidentiary support.  (Id. at 19–20.)

### 2.    D&D's Arguments

The Court notes that D&D does not provide the asserted factual or legal basis for each claim against Epstein in its opposition papers to this motion.  (See dkt. 515.)[26] Rather, the majority of D&D's argument is structured under general subheadings addressing the: (1) Barnes Factors; (2) procedural history of this action; (3) Epstein's conduct and evidentiary support; and (4) state claims against Epstein.  (See generally id.) The Court analyzes these arguments below.

### a.    The Barnes Factors

D&D argues that Epstein is not a prevailing party in this lawsuit, because D&D "achieved several key objectives in its litigation."  (Dkt. 515 at 6.)  D&D describes, inter alia, the following examples of purported "achievements" in this action: (1) the remaining pending state law claims against Epstein in New Jersey Superior Court; (2) Defendants' inability to compel arbitration in this action; and (3) Epstein's failure to achieve absolute immunity in this lawsuit.  (Id. at 6–10, 12.)   Those "achievements," in D&D's view, sufficiently altered its legal relationship with Epstein so as to bar a finding that Epstein prevailed on the Civil Rights Counts.  (Id. at 15.)

D&D contends that the Barnes Factors weigh in its favor.  (Id. at 29–32.)  D&D, in support of this contention, argues that: (1) D&D established "triable claims against all

---

[26] D&D did address the factual and legal basis for each count, to some degree, during oral argument on March 25, 2015.  (Dkt. 524 at 35–99.)  The Court summarizes D&D's argument as to each count infra Sec.VI.B.

defendants including claims on multiple counts under the Civil Rights Acts through two rounds of summary judgment and motions to dismiss, up to the pretrial conference stage…" thereby establishing prima facie claims; and (2) "Epstein refused to settle except for a complete unconditional and uncompensated dismissal of the claims against him, a position which was unrealistic since the claims against him proved to be the strongest in the case." (Id. at 25, 29–30.)[27]  D&D also contends that the Board made no settlement offer in the case, and therefore concludes "it has been the Board and Epstein who have refused to minimize fees through settlement or partial settlements."  (Id. at 30.)

D&D also argues that it participated in Court-ordered mediation in this action in good faith by arranging the attendance of out-of-state representatives and counsel at "great effort and expense."  (Id. at 25–26.)  According to D&D, however, the Board "violated the explicit direction of the Court to have a representative of the Board (and not merely counsel) personally participate in the mediation."  (Id. at 26.)  With respect to the threat of injury against it, D&D argues that defendants "expressly threatened to make it impossible for D&D to work on any project other than their own school project – to make it impossible to obtain bonds necessary for public projects."  (Id. at 32.)  D&D construes those alleged threats as having created "real damages to the plaintiff's interests and reputation sufficient to support claims under both federal and state law."  (Id.)[28]

---

[27] D&D provides no basis for its assertion that the claims against Epstein were "the strongest in the case."  (Dkt. 515 at 30.)

[28] D&D contends that this Court, "in its December 2007 ruling, found [those] threats to have created real damages to the plaintiff's interests and reputation sufficient to support claims under both federal and state law."  (Dkt. 515 at 32 (citing to dkt. 264 at 25–26).)  D&D

D&D also argues to distinguish this action from cases where courts awarded attorneys' fees under Section 1988.  (Id. at 27.)  According to D&D, the majority of these cases concerned: (1) repeated litigation arising from the same dispute; and (2) vindictive motives on part of the plaintiff.  (Id. at 27–29 (internal citation omitted).)  This action is distinguishable, D&D argues, because Epstein contributed to the tortured procedural record.  (Id. at 28 ("In this case, it has been the defendants, and not the plaintiff, who have been the repeat litigators.  Epstein has asserted his absolute privilege on several occasions, and has been denied summary judgment on that basis each time.") (internal footnote omitted).)[29]

### b.    Procedural History

D&D also argues that the Civil Rights Counts were not frivolous, unreasonable, or groundless, because this Court "reconsidered and reversed its previous prohibition on further summary judgment motions."  (Dkt. 515 at 9–10.)  For example, D&D references the 3-30-12 Ruling, which it describes as follows:

---

mischaracterizes the cited portion of the 12-21-07 Ruling, which was limited to Count Two, and held as follows:

> Viewing the evidence in the light most favorable to D&D, we find that D&D has sufficiently alleged that it has a protected liberty interest in its reputation under the Fourteenth Amendment, and that Epstein and the Board interfered with this interest.  Thus, if D&D can prove its allegations, it is entitled to a name-clearing hearing under Hill …. Accordingly, the Court will deny Epstein and the Board's separate motions for summary judgment with respect to count 2.

(Dkt. 264 at 25–26 (internal footnote omitted).)

[29] D&D's arguments, however, reference proceedings before the United States Bankruptcy Court and the New Jersey Superior Court, which the Court finds irrelevant to this fee application.  (Dkt. 515 at 28; see also dkt. 524 at 40–41.)

33

With respect to the civil rights claims, it must be noted that, in its March 31, 2012 Opinion dismissing those claims, the Court acknowledged, on more than one occasion, that it was "revisiting" its prior rulings on summary judgment[.]

(Id. at 9.)

D&D argues that the lengthy procedural history in this action does not support an award against it under Section 1988.  (See, e.g., id. at 18–22.)  D&D also contends that this Court cited to "a number of precedents from the Second Circuit to adopt a time test for due process violations which neither the Supreme Court, nor the Third Circuit had previously applied."  (Dkt. 515 at 21.)[30]

### c.   Epstein's Conduct and Evidentiary Support

D&D argues that Epstein played a role in the default and termination against D&D, and therefore was properly named as a defendant in this lawsuit.  (Dkt. 515 at 10.)  D&D describes Epstein as "a principal instigator in the Board's ultimate defaulting of

---

[30] D&D is wrong on that point, and the Court finds it necessary to provide clarification.  This Court's analysis in the 12-21-07 Ruling, which granted judgment in favor of Epstein on the due process claim asserted in Count One, did not cite a single Second Circuit case.  (Dkt. 264; see also dkt. 265.)  The Court's analysis in the 3-30-12 Ruling, which granted judgment in favor of Epstein on the due process claim asserted in Count Two, cited to Bieluch v. Sullivan, 999 F.2d 666, 671 (2d Cir. 1993).  (Dkt. 442 at 53.)  The Court's citation to Bieluch, however, was limited to its analysis of Count Three, which asserted First Amendment retaliation claims – rather than due process claims – against Epstein.  (Id. at 50–53; see also dkt. 443.)

The Court therefore rejects D&D's suggestion that there was "no directly binding Third Circuit or Supreme Court appellate precedent to which the Court could point and declare that D&D's claims, on their face, were patently frivolous or without foundation."  (Dkt. 515 at 21–22.)  Nor does the Court understand the basis for D&D's assertion that this Court adopted "a time test for due process violations …."  (Id. at 21.)  The Court criticizes D&D for its failure to: (1) address each due process claim individually; (2) accurately summarize the record; and (3) provide citations to the record.

D&D" primarily due to "his efforts to thwart D&D's ability to complete the project and obtain even partial payment …." (Id. at 12.)[31]

D&D also defends the merits of its claims against Epstein by describing its factual investigation in this action. (Id. at 17.) D&D contends, for example, that it cited to correspondence authored by Epstein as evidentiary support for its First Amendment claims. (Id.) D&D later states – with no citation to the record – that it proffered "detailed governmental records (the authenticity of which was never contested) in support of" its claims. (Id. at 29.)

### d.    State Law Claims against Epstein

D&D argues that Epstein is not entitled to an award under Section 1988, because D&D "established a triable tortious interference claim against Epstein under state law." (Id. at 19.)[32] According to D&D, that claim is pending in New Jersey Superior Court and "could result in D&D obtaining an award of damages and possibly attorney's fees against

---

[31] D&D mistakenly implies that this Court and the Third Circuit share its view on this point. (Dkt. 515 at 12 ("Clearly, both Courts remain troubled by Epstein's role as a principal instigator …."))  This Court rejects the mischaracterization as unsupported by the lengthy procedural history in this action.

[32] D&D mischaracterizes the Court's 3-30-12 Ruling on Count Ten, wherein this Court declined to exercise supplemental jurisdiction over D&D's tortious interference claim against Epstein. (Dkt. 442 at 72–80; dkt. 443.)  Contrary to D&D's belief, this Court did not find "that the plaintiff ha[d] established a triable tortious interference claim against Epstein under state law." (Dkt. 515 at 19.)  The Court reiterates its clarification on this point during oral argument on this motion below:

> I didn't find anything is triable in State Court .… I dismissed it by declining to continue to exercise jurisdiction.  State Court is going to have to decide whether any of those claims are triable .… When we get done with federal claims, and we decline to exercise ... jurisdiction over state law claims, we make no rulings whatsoever into the future of those claims.

(Dkt. 524 at 95–96.)

Epstein at the end of the state court case." (Id.)  D&D also argues that this Court cannot award Section 1988 attorneys' fees, because the remaining state law claim "rests upon the same course of conduct and overlap [sic] in damages with the dismissed Civil Rights claims." (Id.)

### B.   Count-by-Count Analysis

#### 1.   Count One: "Civil Rights – Fourth Amendment, Fifth Amendment, Fourteenth Amendment Seizure of Property (All Defendants)"

##### a.   Epstein's Arguments

Epstein, with respect to Count One, moves for Defense Costs under Section 1988. (Dkt. 500-1 at 11.)  Epstein argues that Count One was frivolous, unreasonable, or without foundation under Section 1988 because, inter alia, D&D continued to prosecute that count after: (1) this Court issued the 9-30-05 Ruling; and (2) Epstein issued the 4-13-06 Proposed Consent Order.  (Id. at 12–13.)  See also supra Secs.II.B–III.A.

##### b.   D&D's Arguments

D&D argues that Count One was supported by fact and law.  (Dkt. 515 at 18–19.) D&D from a factual standpoint, contends that it "argued facts to show that its claims fell within the standards of unlawful seizures."  (Id. at 18.)  According to D&D, those facts concerned "new evidence that the defendants, including Epstein, actively acted to seize D&D's property …."  (Id.)  D&D also suggests that it submitted unspecified correspondence in support of Count One.  (Id.)[33]

---

[33] D&D does not provide a single citation to the record in support of these arguments.  (See dkt. 515.)  D&D later states, in passing, that it examined project records, documents, and Grant Agreements related to Count One.  (Id. at 31.)

D&D, with respect to its evidence in support of Count One and Count Two, argues that "defendants did not challenge the credibility of plaintiff's presentation of evidence (an affidavit containing a supporting statement of the police officer regarding the request to enforce the lockout of D&D and the email in which defendants discussed suppressing the newspaper story)."  (Id. at 32 (internal footnote omitted).)  D&D explains that it submitted an affidavit of "a police officer" to demonstrate "the involvement of the police in the lockout …."  (Id. at 32 n.4)  See also supra Sec.I.B.II (describing the events surrounding the lockout).  D&D fails to explain, however, how that evidence supported its due process claims either by: (1) explaining the relevancy of the evidence; or (2) citing to the evidence in the procedural record.  (See id. at 32.)

D&D, from a legal standpoint, argues that it cited to case law that was decided after the 9-30-05 Ruling on Count One, which dismissed Count One against Bovis and Vitetta.  (Id. at 18.)  See also supra Sec.III.A.1.  D&D describes those cases as follows:

> D&D then argued that the mere existence of an asserted lien did not defeat a claim for property deprivation under newer precedents decided after the 2005 summary judgments to Bovis and Vitteta [sic].[34]  Specifically, these were *Jones v. Flowers*, 547 U.S. 220 … (2006) (state's claimed lien on property does not allow property to be seized by surprise); *Jordon v. Horn*, 165 Fed. Appx. 979 (3d Cir. 2006); and *Christophe v. Morris*, 2006 WL 2329363 (11th Cir. August 11, 2006) (plaintiff stated a valid claim that defendant violated her Fourth Amendment rights by entering her home and removing items without a Writ of Possession authorizing the enforcement of eviction).

(Id. at 18 (internal footnote omitted).)[35]

---

[34] The Court clarifies that Bovis and Vitetta separately moved to dismiss Count One, and therefore the 9-30-05 Ruling did not concern motions for summary judgment.  See supra Sec.III.A.2.

[35] D&D also contends that it "relied extensively upon the authorizing statute and regulations" governing the Schools Construction Corporation in its prosecution of Count One.  (Dkt. 515 at 31.)

### c.      Analysis

The Court finds that D&D's prosecution of Count One against Epstein was frivolous, unreasonable, and without foundation, and therefore will award Defense Costs on that count against D&D under Section 1988, beginning from the date of April 13, 2006.  The procedural record here supports that award.  The 9-30-05 Ruling dismissed Count One against Bovis and Vitetta, on the ground that the Project Contracts did not give rise to a constitutionally protected property interest under Linan-Faye.  See supra Sec.III.A.1.  D&D, after the issuance of the 9-30-05 Ruling and its receipt of the 4-13-06 Proposed Consent Order, refused to withdraw Count One against Epstein.  See supra Sec.II.B.  The Court subsequently granted judgment in favor of Epstein on Count One, under the same rationale applied in the 9-30-05 Ruling as to Bovis and Vitetta.  See supra Sec.III.A.2.

The Court finds that the 4-13-06 Proposed Consent Order provided D&D with sufficient notice of the legal deficiencies of Count One against Epstein.  See id.  Yet D&D continued to prosecute Count One after April 13, 2006, in the absence of legal or factual support.  Barnes, 242 F.3d at 158–66.[36]   The Court also finds that the Barnes Factors weigh in favor of Epstein on Count One, because here: (1) D&D failed to establish a prima facie due process claim on Count One; (2) this Court granted judgment in favor of Epstein on Count One in 2007, well before pre-trial preparation; (3) this case

---

[36] D&D fails to persuade this Court that its asserted support of Count One reasonably advanced its argument that D&D stated a viable due process claim against Epstein.  Indeed, on this motion, D&D provides little explanation as to the relevancy of its arguments in support of the due process claims.  See supra Sec.VI.B.1.b.

did not proceed to trial on the merits before this Court; and (4) the claim did not present an issue of first impression.  See supra Sec.V (describing the Barnes Factors). Accordingly, the Court will award Section 1988 Defense Costs on this count, for fees accrued after April 13, 2006.

### 2. Count Two: "Civil Rights – Liberty Interest, Destruction of Prequalification for Public Works Contracts Without Due Process (All Defendants)"

#### a. Epstein's Arguments

Epstein moves for Defense Costs against D&D under Section 1988 on Count Two. (Dkt. 500-1 at 11.)  Epstein, in so moving, argues, inter alia, that D&D did not prevail on Count Two before this Court or on D&D's appeal to the Third Circuit.  (Id. at 13–14.) Epstein also contends that D&D refused to execute the 4-13-06 Proposed Consent Order, after this Court issued the 9-30-05 Ruling, dismissing Count Two against Bovis and Vitetta.  (Id. at 12.)  See also supra Sec.III.B.1.

#### b. D&D's Arguments

D&D, with respect to Count Two, proceeds on the same arguments discussed supra Sec.VI.B.1.b.  (See, e.g., dkt. 515 at 21–22.)

#### c. Analysis

The Court will not award Defense Costs on Count Two under Section 1988.  The Court finds that this claim was not frivolous, unreasonable, or without foundation because the scope of the stigma-plus test was in flux during the course of this action. Compare supra Sec.III.B.2, with Sec.III.B.3.  See also Adams v. Teamsters Local 115, 678 F.Supp.2d 314, 322 (E.D. Pa. 2007) ("Because there was no definitive, binding

source of law at that time, I do not find that plaintiffs' claims were legally frivolous."). Significantly, the 3-30-12 Ruling as to Count Two also hinged upon: (1) the evidence submitted by the parties at the close of discovery; and (2) intervening changes in the law, discussed <u>supra</u> Sec.III.B.3.  Accordingly, the Court will not award fees under Section 1988 on Count Two.  <u>Lindquist v. Buckingham Twp.</u>, 106 Fed.Appx. 768, 778 (3d Cir. 2004) ("In light of the fact that the [Plaintiffs] might have been able to succeed under the standard in effect at the time they brought their claim, we cannot say that the action was frivolous, unreasonable or without foundation."); <u>Musila v. Lock Haven Univ.</u>, 970 F.Supp.2d 384, 395 (M.D. Pa. 2013) (denying fees under Section 1988 where the Court spent considerable time and effort researching the nuances of the claims).

### 3. Count Three: "Civil Rights – Retaliatory Terminations for Exercise of First Amendment Rights (All Defendants)" and Count Four: "Civil Rights – First Amendment Retaliation For Seeking Redress in Federal Court (Board of Education, Vitetta, Epstein)"

#### a. Epstein's Arguments

Epstein moves for Defense Costs under Section 1988 with respect to Count Three and Count Four.  (Dkt. 500-1 at 11.)  Epstein, in support thereof, argues that D&D "completely failed to show that Epstein engaged in any conduct protected by the First Amendment."  (<u>Id.</u> at 13–14.)

#### b. D&D's Arguments

The bulk of D&D's argument with respect to Count Three and Count Four concerns this Court's prior rulings on both counts.  (Dkt. 524 at 74–77.)  D&D, for example, argues that the counts cannot be deemed frivolous, because the Court's final

decision as to both counts hinged upon an intervening change in the law.  (Dkt. 515 at 17

("These First Amendment Claims ultimately failed, not because of lack of factual

support[,] but because the Supreme Court abrogated the then-existing Third Circuit

precedents, which allowed individuals to bring civil rights claims for retaliation for

speaking on … issues of public importance where the plaintiff could also show it was

speaking as a citizen as well as in the course of work." (internal quotation omitted)).)[37]

D&D also argues that, from an evidentiary standpoint, it provided the Court with various

correspondence authored by Epstein to demonstrate that he retaliated against D&D "for

asserting problems on the job regarding the scheduling and permit problems."  (Id.)

### c.  Analysis

The Court finds that D&D's prosecution of Count Three and Count Four against

Epstein was frivolous, unreasonable, and without foundation, and therefore will award

Defense Costs against D&D on those Counts.  The procedural record demonstrates that

D&D "knew or should have known" about the evidentiary deficiencies related to its

claims.  Brown v. Borough of Chambersburg, 903 F.2d 274, 277 (3d Cir. 1990).

---

[37] D&D misapplies the procedural record on this point.  This Court granted judgment in favor of
Epstein on Count Three and Count Four in the 12-21-07 Ruling, which expressly held as follows:

> Therefore, because D&D has not pointed to any speech protected by the First
> Amendment, summary judgment is appropriate on its First Amendment
> retaliation claims insofar as such claims are asserted against Epstein ….

(Dkt. 264 at 33.)

D&D's reference to the 3-30-12 Ruling as to Count Three and Count Four against the Board,
therefore, is irrelevant to Epstein's fee application.

Specifically, D&D fails to persuade this Court that it proffered evidence to support a viable First Amendment retaliation claim against Epstein.[38]

The Court also finds the Barnes Factors weigh in favor of Epstein with respect to D&D's prosecution of Count Three and Count Four against him, because here: (1) D&D failed to establish a prima facie retaliation claim; (2) this Court dismissed the counts in 2007, well before pre-trial preparation; (3) this case did not proceed to trial; and (4) the issue was not a matter of first impression before this Court.  See supra Sec.V (describing the Barnes Factors).  Accordingly, the Court will award Defense Costs under Section 1988 with respect to Count Three and Count Four, and quantify the relief in later proceedings.

## CONCLUSION

The Court, for the above-stated reasons, will:

(1)    award Defense Costs on Count One accrued after April 13, 2006 under Section 1988;

(2)    deny Defense Costs on Count Two under Section 1988; and

(3)    award Defense Costs on Count Three and Count Four under Section 1988.

The Court will issue an appropriate order.

    s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

**Dated:**  December 9, 2015

---

[38] D&D's legal analysis of the procedural record, discussed supra nn.28, 30–32, and 37, indicates that D&D misconstrues this Court's prior rulings, and therefore is of little value.