UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| D&D ASSOCIATES, INC., | : | CIVIL ACTION NO. 03-1026 (MLC) |
|  | : |  |
| Plaintiff, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| BOARD OF EDUCATION OF | : |  |
| NORTH PLAINFIELD, et al., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

**COOPER, District Judge**

**OUTLINE**

INTRODUCTION

DISCUSSION

I.      FACTUAL HISTORY

        A.      The Parties
        B.      Factual Background

II.     PROCEDURAL HISTORY

        A.      District Court Rulings
        B.      Proposed Consent Orders and Draft Motion for Sanctions

III.    PROCEDURAL HISTORY: COUNT-BY-COUNT ANALYSIS

        A.      Count One: "Civil Rights – Fourth Amendment, Fifth Amendment,
                Fourteenth Amendment Seizure of Property (All Defendants)"
        B.      Count Two: "Civil Rights – Liberty Interest, Destruction of Prequalification
                for Public Works Contracts Without Due Process (All Defendants)"
        C.      Count Three: "Civil Rights – Retaliatory Terminations for Exercise of First
                Amendment Rights (All Defendants)" and Count Four: "Civil Rights – First
                Amendment Retaliation For Seeking Redress in Federal Court (Board of
                Education, Vitetta, Epstein)"
        D.      Count Five: "Civil Rights – Intimidation of Witnesses (Epstein, Board of
                Education)" – 12-21-07 Ruling
        E.      Count Six: "Civil Rights – Illegal Garnishment Without Due Process of
                Law (All Defendants)"

F.      Count Seven: "Quia Timet – New Jersey Law (All Defendants)"
G.      Count Eight: "Breach of Contract (Board of Education)"
H.      Count Ten: "Tortious Interference (All Defendants)"
I.      Count Eleven: "Libel and Slander (All Defendants)" – 3-30-12 Ruling
J.      Count Twelve: "Conversion (Board of Education, Bovis)" – 3-30-12 Ruling
K.      Count Thirteen: "Fraudulent Inducement (Board of Education, Epstein, Vitetta)" and Count Fourteen: "Fraudulent Inducement, Rescission of Performance Bonds (Board of Education, Epstein, Vitetta)" – 3-30-12 Ruling
L.      Count Fifteen: "Civil Conspiracy (Board of Education, Epstein, Vitetta, Bovis)" – 12-21-07 Ruling
M.      Count Sixteen: "Malicious Abuse of Process (Board of Education, Epstein)" – 12-21-07 Ruling

IV.     PROCEDURAL HISTORY: MOTION FOR RECONSIDERATION AND APPEAL

A.      Motion for Reconsideration
B.      Appeal
C.      Motion for Sanctions

V.      LEGAL STANDARDS

A.      Section 1988
B.      Rule 11
C.      Section 1927 and the Court's Inherent Powers

VI.     LEGAL STANDARD APPLIED HERE: SECTION 1988

A.      Argument: Civil Rights Counts
B.      Count-by-Count Analysis under Section 1988

VII.    LEGAL STANDARD APPLIED HERE: RULE 11

A.      Argument: Civil Rights Counts – D&D's Arguments
B.      Count-by-Count Analysis: Civil Rights Counts
C.      Count-by-Count Analysis: Remaining Counts under Rule 11

VIII.   LEGAL STANDARD APPLIED HERE: SECTION 1927 AND THE COURT'S INHERENT POWERS

A.      The Board's Arguments
B.      D&D's Arguments
C.      Analysis

CONCLUSION

2

## INTRODUCTION

Defendant Board of Education of North Plainfield ("the Board") seeks attorneys' fees, costs, and sanctions (collectively, "Defense Costs") against Plaintiff, D&D Associates, Inc. ("D&D"), and D&D's counsel.  (Dkt. 499-1 at 12; dkt. 524 at 28–29.)[1] The Board moves for relief under 42 U.S.C. § 1988 ("Section 1988"), Federal Rule of Civil Procedure ("Rule") 11, 28 U.S.C. § 1927 ("Section 1927"), and the Court's inherent powers.  (Dkt. 499-1 at 12–13.)[2]  The Board requests a determination as to liability on this motion, and would seek to quantify the relief in subsequent proceedings.  (Id. at 13.)

The parties fully briefed this motion, and presented oral argument on March 25, 2015 and May 22, 2015.  (Dkt. 524; dkt. 527.)  The motion will be granted in part and denied in part, for the reasons stated herein.

## DISCUSSION

I. **FACTUAL HISTORY**

    A. **The Parties**

        1. **Parties to this Motion**

D&D is a New Jersey general construction contracting company with its principal place of business in Jackson, New Jersey.  (Dkt. 58 at 1; dkt. 264 at 5.)  The Board is a public body with its principal offices in North Plainfield, New Jersey.  (Dkt. 58 at 2.)

---

[1] The Court will cite to the documents filed on the Electronic Case Filing System ("ECF") by referring to docket entry numbers by the designation of "dkt."  Pincites reference ECF pagination.

[2] The Board moves for fees against D&D and counsel for D&D, represented by the firm Sheak & Korzun, P.C., insofar as permitted under the standards governing Section 1988, Rule 11, Section 1927, and the Court's inherent powers.  See infra Sec.V.  The Board also moves for costs incurred defending this action under Rule 54(d)(1), which authorizes a court to award costs other than attorneys' fees to a prevailing party.  (Dkt. 499-1 at 80–81.)  See also Fed.R.Civ.P. 54(d)(1).

The Board oversees school construction projects in the North Plainfield school district. (See dkt. 264 at 5; dkt. 58 at 3.)

### 2.     Other Parties to this Action

The three other Defendants in this action, Robert C. Epstein ("Epstein"), Bovis Lend Lease, Inc. ("Bovis"), and Vitetta Group, Inc. ("Vitetta"), are relevant, in part, to the Court's analysis here.  (See dkt. 264 at 1.)[3]  The Court, for that reason, will discuss those Defendants only to the extent necessary to address the arguments raised by the parties to this motion.  Epstein is an attorney who practices construction law in New Jersey.  (Dkt. 58 at 2–3.)  He served as counsel for the Board during the pendency of this action, and also separately moves for attorneys' fees.  (Dkt. 500-1 at 5; dkt. 58 at 3.)[4]

Bovis and Vitetta negotiated settlements in this action, and are not parties to this motion.  (See dkt. 489; dkt. 490.)  The factual and procedural background regarding D&D's claims against Bovis and Vitetta, however, are relevant in part to the arguments of the parties here.[5]  Bovis is a North Carolina corporation that performs management functions related to public and private construction projects in New Jersey.  (Dkt. 58 at 2.)  Vitetta is a Pennsylvania corporation that performs architectural and design work in connection with public and private construction projects in New Jersey.  (Id. at 1–2.)

_____

[3] The Court will refer to the Board, Epstein, Bovis, and Vitetta collectively as Defendants.

[4] The Court has decided this motion in a separately issued Memorandum Opinion.  (Dkt. 528.)

[5] The Court will discuss the relevancy of the procedural history as to D&D's claims against Bovis and Vitetta infra Secs.II–III.

### B.    Factual Background

### 1.    The Project

The Court assumes the parties' familiarity with the pertinent facts, and therefore provides a brief summary here.[6]  The Board requested bids for a $30 million construction project ("the Project") to renovate and expand five schools in North Plainfield in 2001. (Dkt. 264 at 5.)  D&D won the bid, and executed three contracts (collectively, "the Project Contracts") to govern the construction plans for the Project.  (Id.)

The Board also executed contracts related to the Project with Bovis and Vitetta. (Dkt. 499-3 at 3–4.)  The Board hired Bovis to perform construction management services in connection with the Project.  (Dkt. 442 at 5.)  Vitetta was retained to supervise architects and create architectural designs related to the Project.  (Id.)

The Project Contracts required D&D to post performance and payment bonds.  (Id. at 4.)  D&D obtained these bonds from American Motorists Insurance Company ("the Surety"), which was a subsidiary of Kemper Insurance Companies.  (Id.)  D&D and the Surety executed a General Indemnity Agreement ("GIA") in connection with those required bonds.  (Id.)  The GIA provided, inter alia, that in the event of a default, all of D&D's rights under the Project Contracts were to be assigned to the Surety.  (Id. at 4–5.) The GIA deemed "all claims and causes of action against any parties to the Bonded Contract(s) or against third parties relating to the Bonded Contract(s)" as assignable rights.  (Id. at 5.)

---

[6] This Court's Memorandum Opinion, dated March 30, 2012, provides a detailed overview of the complex factual background in this action.  (See dkt. 442 at 3–32.)

## 2.    Default and Termination

Several conflicts arose between D&D and the Board during the early stages of the Project in 2001 through 2002.  (Id. at 6–11.)  The root of these conflicts concerned delays in the completion of the Project.  (Id.)  D&D and the Board contested, inter alia: (1) D&D's obligation to provide required construction schedules under the Project Contracts; and (2) the cause of delays related to the Project.  (Id. at 6–14.)  D&D also contended that delays in the Project were due to the Board's failure to provide the Project's contractors with sealed drawings in a timely fashion.  (Id. at 7.)  According to D&D, the sealed drawings were required in order for the necessary construction permits to issue and keep the Project on schedule.  (Id.)

The Board and Vitetta issued several default letters to D&D in 2001 and 2002. (Id. at 6–14.)  During this period, the parties resolved the conflicts to a sufficient degree such that neither party declared the contracts terminated.  (See id.)  The Board issued its initial termination letter to D&D in a letter dated February 11, 2003.  (Id. at 14.)  The parties were unable to resolve their disputes, however, and on March 4, 2003: (1) D&D sent a letter to Vitetta stating that it was abandoning one of the Project's construction sites; (2) the Board, through Epstein, terminated D&D as general contractor on a site related to the Project; and (3) the Board barred D&D from a site related to the Project. (Id. at 15–16.)  Thereafter, the Board terminated the remaining Project Contracts on July 23, 2003.  (Id. at 17.)

The Board, in the course of terminating the Project Contracts, took possession of one construction site, thereby withholding D&D's materials and equipment related to the

6

Project.  (Id. at 14; see also dkt. 264 at 13.)  The Board later barred D&D from all Project

sites.  (Dkt. 442 at 17.)  The Board also announced the termination in three "Construction

Updates" on its webpage.  (Id. at 17–18.)  The "Construction Updates" stated that D&D

was terminated from the Project due to concerns with its performance.  (Id. at 18.)[7]

Thereafter, the Surety executed takeover agreements with the Board to govern the

completion of the Project.  (Id. at 18–19.)  These agreements were executed on May 15,

2003 and May 19, 2004.  (Id.)

### 3.   Post-Termination Developments as to D&D

#### a.   Bonding Capacity

The problems associated with the timely completion of the Project, coupled with

the issuance of default letters to D&D, impacted D&D's ability to obtain bonding for

other projects.  (Id. at 20–25.)  For example, the Surety declined to support D&D's bid on

a $7.2 million project in June of 2002.  (Id. at 23.)  When D&D requested bonding for a

project estimated at $12 million, an agent for the Surety responded, "No way; $5MM and

under only," indicating that the Surety imposed a bonding limit of $5 million.  (Id.)  The

Surety later increased the bonding limit to $7 million; however, D&D did not secure any

other project.  (Id. at 23–24.)  The Surety issued no further bonding credit to D&D

---

[7] Specifically, a "Construction Update" dated March 10, 2003 read as follows:

> The general contractor has been terminated from the Somerset School project due
> to a lack of performance and abandonment of the jobsite.  The Board … has
> issued the notice of termination to the general contractor's surety and demanded
> that the surety assume responsibility for the remaining work.

(Dkt. 347-4 at 7.)

through December of 2002, and sold its bonding portfolio to Arch Insurance

approximately one year later.  (Id. at 26.)

### b.    Prequalification Status and Bankruptcy

The termination of the Project Contracts also affected, at least in part, D&D's

prequalification status to perform construction work on school buildings.  (Id. at 26–32.)

The prequalification application process in the state of New Jersey was somewhat

complex at the time of this action.  (See id.)[8]  The Court, for that reason, provides the

following overview of the application procedure and summary of the relevant facts.

At least two administrative bodies in the state of New Jersey govern the

prequalification for construction contractors seeking to pursue construction projects at

schools within the state.  A construction contractor first applies to the New Jersey

Division of Property Management and Construction ("DPMC") to achieve classification

as a general construction contractor.  (Id. at 26.)  The DPMC issues a "Notice of

Classification" to memorialize the classification.  (Id. at 27.)  Pursuant to the New Jersey

Educational Facilities Construction and Financing Act, however, a construction

contractor next applies to the New Jersey Economic Development Authority ("NJEDA")

to request classification to bid on construction projects at school facilities.  (Id. at 26–27.)

A contractor, upon receiving classification from the DPMC, may request that the NJEDA

accept the DPMC classification on an interim basis by submitting a short form to the

NJEDA, along with a copy of the current DPMC "Notice of Classification" form.  (Id.)

---

[8] This summary describes the application procedures at the time that this Court issued its
Memorandum Opinion dated March 30, 2012.  (See dkt. 442 at 26–32.)

D&D, before and during its involvement with the Project, was classified as a general construction contractor by the DPMC.  (Id. at 26.)  D&D likewise achieved the classification to bid on construction projects at school facilities through June 30, 2002.  (See id. at 26–27.)  D&D submitted an application for prequalification to DPMC on June 30, 2003 ("the 6-30-03 Application"), after it: (1) received several default letters; and (2) was denied bonding by the Surety.  (Id. at 27–30.)  The 6-30-03 Application was deficient as lacking necessary signatures, notarization, and a completed Surety affidavit.  (Id. at 29.)

Discovery in this action revealed that the 6-30-03 Application was submitted by D&D's office manager, Sylvia Blackmore, and unbeknownst to D&D's President, Michael Tattoli.  (Id. at 29–30.)  Blackmore testified that she realized the 6-30-03 Application was procedurally deficient when she submitted it to DPMC.  (Id.)

Tattoli's testimony regarding the 6-30-03 Application is less enlightening because he did not recall the 6-30-03 Application.  (Id. at 30.)  According to Tattoli, however, "there was no sense in submitting" a prequalification application to the DPMC at that time because D&D was no longer able to obtain bonding.  (Id. at 29.)  With respect to the incomplete 6-30-03 Application, Tattoli testified that Blackmore likely "gave it another try" nonetheless.  (Id. at 30.)

The DPMC, upon receiving the 6-30-03 Application, informed D&D via letter dated August 19, 2003 that the request for classification was incomplete.  (Id. at 31.)  Neither Blackmore nor Tattoli responded to the DPMC, and the DPMC later deemed the 6-30-03 Application withdrawn.  (Id.)  D&D petitioned for Chapter 11 bankruptcy relief

on August 15, 2003, and the Bankruptcy Court approved D&D's reorganization plan on January 19, 2005 (the "1-19-05 Reorganization Plan").  (Id. at 32.)

## II.   PROCEDURAL HISTORY

The detailed procedural background of this action is set forth in earlier opinions of this Court.  (See, e.g., dkt. 442.)  Accordingly, the Court limits the procedural analysis to the history insofar as it relates to the arguments raised here.  D&D filed its initial complaint against the Board, Epstein, Bovis, and Vitetta on March 10, 2003.  (Dkt. 1; see also dkt. 58.)[9]   D&D later amended the complaint to expand its claims.  (Dkt. 58.)

The amended complaint contained 16 counts, 15 of which were asserted against the Board.  (Id. at 3–47.)  The first six counts asserted federal civil rights causes of action against the Board under, inter alia, 42 U.S.C. § 1983 ("Section 1983") and 42 U.S.C. § 1985 ("Section 1985").  (Id. at 3–32.)  The remaining counts, with the exception of Count Nine, asserted state claims against the Board.  (Id. at 32–47.)  Count Nine asserted a claim against Bovis, Vitetta, and Epstein, and is not in issue on this motion.  (Id. at 37–39.)

### A.    District Court Rulings

The Court notes, as a preliminary matter, the significance of its prior rulings in relation to the arguments raised by the parties here.  The Court provides the following

---

[9] The Court addressed the procedural history pertaining to D&D's claims against Epstein in the Memorandum Opinion that decided Epstein's separate motion for attorneys' fees.  (See dkt. 528.)  See also supra n.4 and accompanying text.

overview of the relevant rulings for convenience, and later describes the procedural

history as to each count in greater detail.[10]

> **September 30, 2005 Ruling ("9-30-05 Ruling"):** The 9-30-05 Ruling decided separate motions filed by Bovis and Vitetta to dismiss the amended complaint.  The 9-30-05 Ruling granted the motion filed by Bovis to dismiss the amended complaint with respect to Count One, Count Two, Count Three, Count Four, Count Six, Count Seven, and Count Twelve.  The 9-30-05 Ruling granted the motion filed by Vitetta to dismiss the amended complaint with respect to Count One, Count Two, Count Six, and Count Seven.

(Dkt. 86; dkt. 87.)

> **December 21, 2007 Ruling ("12-21-07 Ruling"):** The 12-21-07 Ruling decided, inter alia, the motion for summary judgment filed by the Board as to Count One, Count Two, Count Five, Count Six, Count Seven, Count Eight, Count Ten, Count Eleven, Count Fifteen, and Count Sixteen of the amended complaint, insofar as those counts were asserted against the Board.  The Court granted the motion, insofar as it sought summary judgment in the Board's favor, with respect to Count One, Count Five, Count Six, Count Seven, Count Eleven, Count Fifteen, and Count Sixteen.

(Dkt. 264; dkt. 265.)

> **March 30, 2012 Ruling ("3-30-12 Ruling"):** The 3-30-12 Ruling decided the Board's motion for summary judgment as to all remaining claims against it.[11]  This Court granted judgment in the Board's favor with respect to Count Two, Count Three, Count Four, Count Eight, Count Ten, Count Twelve, Count Thirteen, and Count Fourteen.  The Court declined to exercise subject matter jurisdiction over the remaining pendent state claims against Epstein, Bovis, and Vitetta, and instructed the Clerk of the Court to designate the action as closed.[12]

(Dkt. 442; dkt. 443.)

---

[10] The Court will limit the analysis of the procedural history pertaining to Bovis and Vitetta, however, to the extent necessary to address the arguments of the parties raised here.  See infra Sec.III.

[11] Those claims were asserted in Count Two, Count Three, Count Four, Count Eight, Count Ten, Count Twelve, Count Thirteen, and Count Fourteen of the amended complaint.  (Dkt. 443 at 2.)

[12] Accordingly, the Court dismissed Count Ten insofar as it was asserted against Epstein, Bovis, and Vitetta, and Count Eleven insofar as it was asserted against Bovis and Epstein, without prejudice.  The Court granted leave for D&D to commence the action in an appropriate state court within 30 days of the 3-30-12 Ruling.  (Dkt. 442 at 2.)

### B.    Proposed Consent Orders and Draft Motion for Sanctions

The Board, during the pendency of this action, requested that D&D withdraw claims asserted against it on three occasions.  See infra Sec.II.B.1–3.[13]  The Court provides the following background as to those requests, insofar as it pertains to the arguments raised by the parties to this motion.

### 1.    First Request

The Board initially requested that D&D withdraw claims asserted against it after this Court issued the 9-30-05 Ruling.  (Dkt. 499-2 at 12.)  The Board submitted this request via e-mail on or about April 14, 2006.  (Id. at 13.)  The e-mail appended a Proposed Consent Order ("the 4-14-06 Proposed Consent Order"), which was styled as an "ORDER DISMISSING CERTAIN COUNTS OF THE AMENDED COMPLAINT AGAINST DEFENDANT NORTH PLAINFIELD BOARD OF EDUCATION."  (Id.)  The 4-14-06 Proposed Consent Order stated that "under the law of the case doctrine [this] Court's prior rulings require dismissal of certain counts of the Amended Complaint against the Board."  (Id.)  Thus, the 4-14-06 Proposed Consent Order requested that D&D withdraw Count One, Count Two, Count Six, and Count Seven against it.  (Id. at 14.)

D&D refused to withdraw any claims it asserted against the Board in an e-mail correspondence dated April 14, 2006.  (Id. at 12.)  The e-mail read, in relevant part:

> The proposed orders are a demand for an agreement, which is not the same thing as an agreement.  We have never agreed to such a stipulation to dismiss these claims with prejudice or otherwise.  Plaintiff did not consent to do this and does not do so now ….  [The 9-30-05 Ruling] is

---

[13] Each of these requests was made by counsel for the Board and received by counsel for D&D. See infra Sec.II.B.1–3.  The Court, for simplicity hereinafter in this Memorandum Opinion, will simply refer to the requesting party as "the Board," and the receiving party as "D&D."

interlocutory, and plaintiff reserves the right to appeal this ruling at the end
of the case as well as pursue other litigation strategies.  Plaintiff is willing
to discuss mediation, so long as all parties are willing to participate.

(Id.)

### 2.    Second Request

The Board requested that D&D withdraw certain counts against it in an e-mail

correspondence dated March 26, 2007.  (Dkt. 499-2 at 16–17.)  The Board attached a

letter and draft motion for sanctions under Rule 11 and Section 1927, which was dated

March 26, 2007 ("3-26-07 Draft Motion").  (Id. at 16–32.)  The 3-26-07 Draft Motion

proposed that the Board would move for sanctions with respect to Count One, Count

Two, Count Five, Count Six, Count Seven, Count Eight, Count Ten, Count Eleven, Count

Fifteen, and Count Sixteen of the amended complaint.  (Id. at 17–32.)  D&D did not

withdraw those counts against the Board.  (See dkt. 442.)

### 3.    Third Request

The Board again sent a draft motion for sanctions to D&D via e-mail and regular

mail on January 13, 2010 ("1-13-10 Draft Motion").  (Dkt. 499-2 at 36–77.)  The Board

notified D&D of its intent to move for sanctions under Rule 11 and Section 1927, and the

Court's inherent powers with respect to all claims that D&D brought against it.  (Id.)

D&D did not withdraw the claims, and the Board moved for sanctions on February 8,

2010.  (Dkt. 397.)

## III.   PROCEDURAL HISTORY: COUNT-BY-COUNT ANALYSIS

Many of the arguments raised by the parties here concern the lengthy procedural

history of this action.  The Court, for that reason, provides the following summary of the

procedural history of each count asserted against the Board in the amended complaint.
This section provides cross references to the underlying facts related to D&D's claims,
discussed <u>supra</u> Sec.I.B.1–3, for convenience.

### A.   Count One: "Civil Rights – Fourth Amendment, Fifth Amendment, Fourteenth Amendment Seizure of Property (All Defendants)"[14]

Count One alleged, <u>inter alia</u>, that Defendants seized D&D's equipment, business
records, and job files in violation of the Fourth Amendment, Fifth Amendment,
Fourteenth Amendment, and Section 1983.  (Dkt. 58 at 3–19.)  <u>See also</u> <u>supra</u> Sec.I.B.2
(describing the Board's takeover of construction sites related to the Project).[15]  D&D, in
support of its constitutional claims, alleged that it procured the seized materials pursuant
to the Project Contracts executed between D&D and the Board.  (<u>See</u> dkt. 264 at 18, 21–
22.)  Thus, D&D alleged that Defendants "acted under color of state law to cause a
deprivation of a right secured by the United States Constitution" by seizing materials that
were obtained pursuant to its contractual obligations with a state entity.  (<u>Id.</u> at 18.)

### 1.   9-30-05 Ruling

Bovis and Vitetta separately moved in 2005 to dismiss Count One, insofar as it
was asserted against them.  (Dkt. 86 at 1.)  This Court, in the 9-30-05 Ruling, dismissed
Count One insofar as it was asserted against Bovis and Vitetta.  (Dkt. 87.)  The Court
held that the Project Contracts did not give rise to a constitutionally protected property

---

[14] The Court's subheadings state each count as styled in D&D's amended complaint.  (<u>See</u> dkt. 58.)

[15] This Memorandum Opinion will cite to the Court's prior Memorandum Opinions, discussed <u>supra</u> Sec.II.A, to analyze the procedural history of each count.  When a document from the evidentiary record requires extensive analysis – particularly in relation to the arguments of the parties here – the Court will cite to the relevant document.

interest under <u>Linan-Faye Construction Co. v. Housing Authority of City of Camden</u>, 49 F.3d 915, 931–33 (3d Cir. 1995) ("<u>Linan-Faye</u>").  (Dkt. 86 at 9–10.)  <u>Linan-Faye</u> recognizes that a contract with a state entity gives rise to a constitutionally protected property interest under the Fourteenth Amendment where it: (1) "confers a protected status, such as those characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both …."; or (2) "includes a provision that the state entity can terminate the contract only for cause." <u>Linan-Faye</u>, 49 F.3d at 932 (internal citation and quotation omitted).

The Court held that the Project Contracts did not fall into either of those two categories, because their underlying provisions: (1) governed a single group of public works projects that did not invoke a quality of extreme dependence or permanence; and (2) provided that the Board could terminate "for convenience and without cause."  (Dkt. 86 at 10 (internal citation and quotation omitted).)  Thus, the Court held that any alleged seizure of property did not invoke a constitutionally protected interest.  (<u>Id.</u>)[16]

### 2.    12-21-07 Ruling[17]

The Board moved for summary judgment in its favor as to Count One on May 13, 2006.  (Dkt. 143.)[18]  This Court granted judgment in favor of the Board on Count One.

---

[16] The Board, after the 9-30-05 Ruling, requested that D&D withdraw Count One against it in the 4-14-06 Proposed Consent Order and accompanying e-mail.  D&D did not withdraw Count One against the Board.  <u>See</u> <u>supra</u> Sec.II.B.1.

[17] The Board notified D&D of its intention to move for sanctions with respect to Count One via the 3-26-07 Draft Motion and accompanying e-mail.  D&D did not withdraw Count One against the Board.  <u>See</u> <u>supra</u> Sec.II.B.2.

[18] The Board also moved for judgment in its favor with respect to Count Two, Count Five, Count Six, Count Seven, Count Eight, Count Ten, Count Fifteen, and Count Sixteen.  (Dkt. 143 at 1.)

(Dkt. 264 at 17–22.)  This Court, in so ruling, initially determined that D&D failed to state a viable Fourth Amendment or Fifth Amendment claim against the Board.  (Id. at 17 n.4.)  Rather, the Court determined that the allegations in support of Count One were "properly analyzed" as due process violations under the Fourteenth Amendment.  (Id.)  The basis for the due process violations were allegations related to the Board's alleged seizure of equipment and records belonging to D&D "without notice and an opportunity to be heard and … without due process of law."  (Id. at 18 (internal citation and quotation omitted).)

This Court, with respect to Count One insofar as it was asserted against the Board, found that D&D did not state a viable substantive or procedural due process claim.  (Id. at 19–22.)  D&D did not prevail on its substantive due process claim, insofar as it was asserted against the Board, because Count One failed to plead allegations sufficient to make the requisite demonstration that the Board's conduct was egregious so as to: (1) shock the conscience of the Court; or (2) interfere with rights implicit to the concept of ordered liberty.  (Id. at 20.)  Moreover, with respect to any alleged procedural due process violation, the Court found that Count One failed to demonstrate a property interest protected by due process under Linan-Faye.  (Id. at 20–21.)  See also supra Sec.III.A.1 (describing due process rights under Linan-Faye).

The Court's application of Linan-Faye in the 12-21-07 Ruling mirrored the 9-30-05 Ruling, which dismissed Count One insofar as it was asserted against Bovis and Vitetta.  (See id. at 20–22.)  See also supra Sec.III.A.1.  The Court, with respect its prior application of Linan-Faye in the 9-30-05 Ruling, stated the following:

> This Court … previously determined that D&D's contracts with the Board do not fall into either of the Linan-Faye categories because they neither

"confer protection on D&D characterized by either extreme dependence or permanence, as they are for a single group of public works projects," nor provide that the Board can only terminate it for cause …. Thus, the Court held that "D&D's contracts with the Board do not give rise to a protected property interest either in the contracts or in the materials, trailer, and records held by D&D pursuant to the contracts."

...

The [above] analysis … pertains equally to all of the defendants. Therefore, the Court finds that summary judgment in favor of … the Board is appropriate on count 1 of the amended complaint.

(Id. at 21–22.)[19]

### B.   Count Two: "Civil Rights – Liberty Interest, Destruction of Prequalification for Public Works Contracts Without Due Process (All Defendants)"

Count Two alleged, inter alia, that Defendants implicated a constitutionally protected liberty or property interest by terminating the Project Contracts with D&D. (Dkt. 58 at 20–24.)  The alleged interest concerned D&D's bonding capacity and prequalification status to bid to public works projects under the NJEDA.  (Id.)  See also supra Sec.I.B.3 (describing D&D's bonding capacity and the administrative bodies and laws that governed D&D's prequalification classification).  Specifically, D&D alleged that Defendants issued misleading default letters to its bonding agent to hinder its ability to renew its prequalification classification.  (Dkt. 58 at 21.)  See also supra Sec.I.B.2 (describing the issuance of default letters and subsequent termination of the Project Contracts).  D&D asserted the due process violations under the Fifth Amendment and Fourteenth Amendment, by alleging that the default letters implicated a protected liberty

---

[19] The Board notified D&D of its intention to move for sanctions with respect to Count One via the 1-13-10 Draft Motion and accompanying e-mail.  See supra Sec.II.B.3.

interest in its: (1) good reputation; (2) ability to secure prequalification status to bid on public works contracts; and (3) "right to bid on public works projects." (Id. at 23–24.)

### 1. 9-30-05 Ruling

Bovis and Vitetta separately moved in 2005 to dismiss Count Two, insofar as it was asserted against them. (Dkt. 86 at 1.) This Court dismissed Count Two, insofar as it was asserted against Bovis and Vitetta, in the 9-30-05 Ruling. (Id. at 10–11.) This Court, in so ruling, held that the allegations in Count Two failed "to rise to the level of constitutional violations." (Id. at 11.) Citing precedent of the United States Court of Appeals for the Third Circuit ("Third Circuit"), this Court held that the "interest in one's reputation is neither liberty nor property that is protected by the due process clause." (Id. (internal citation and quotation omitted).)[20] The Court further held that any alleged financial injury to D&D related to its bonding capacity did not support a due process claim. (Id.) See infra Sec.III.B.2.[21]

### 2. 12-21-07 Ruling

The Board moved for summary judgment as to Count Two, insofar as it was asserted against it, on May 13, 2006. (Dkt. 143.)[22] This Court, for the reasons discussed below, denied

---

[20] The Court did note, however, that state tort or contract law may provide relief for any "alleged injuries to [D&D's] reputation." (Dkt. 86 at 11.)

[21] The Board, after the 9-30-05 Ruling, requested that D&D withdraw Count Two against it in the 4-14-06 Proposed Consent Order and accompanying e-mail. D&D did not withdraw Count Two against the Board. See supra Sec.II.B.1.

[22] The Board notified D&D of its intention to move for sanctions with respect to Count Two via the 3-26-07 Draft Motion and accompanying e-mail. D&D did not withdraw Count Two against the Board. See supra Sec.II.B.2.

the Board's motion for summary judgment in its favor with respect to Count Two in the 12-21-07 Ruling.  (Dkt. 265.)

A significant portion of the Court's analysis with respect to Count Two against the Board examined the basis for the 9-30-05 Ruling, which dismissed Count Two insofar as it was asserted against Bovis and Vitetta.  (Dkt. 264 at 23–24.)[23]  The Court summarized the 9-30-05 Ruling with respect to Count Two as follows:

> This Court … concluded, with respect to count 2 that (1) "impairment of employment opportunities does not imbue a claim based on injury to one's reputation with a constitutional element", and (2) D&D's financial loss associated with the alleged injury to its bonding capacity is not constitutionally protected …. Further, the Court noted that reputation alone is not a liberty or property interest protected by the Fourteenth Amendment….

(Id. at 24.)

The Court, after summarizing the 9-30-05 Ruling, analyzed the then-recent decision of the Third Circuit in Hill v. Borough of Kutztown, 455 F.3d 225, 235 (3d Cir. 2006).  (Id. at 24–26.)  The Hill decision, which was decided after this Court's 9-30-05 Ruling, examined the applicability of the "stigma-plus" test to define the boundaries of a viable due process claim related to reputational damage.  455 F.3d at 235–39.

A viable due process claim under Hill meets the two-prong "stigma-plus" test by alleging facts sufficient to demonstrate: (1) a stigma to a reputational interest (the "stigma prong"); "plus" (2) a deprivation of some additional right or interest (the "plus prong").  Id. at 236.  The "stigma prong" is satisfied where the allegations demonstrate that the

---

[23] The Court held that the Fifth Amendment did not apply to the allegations stated in Count Two, and therefore analyzed D&D's due process claims in Count Two exclusively under the Fourteenth Amendment.  (Dkt. 264 at 23 n.6.)

relevant statements were false and made available to the public.  Id.  With respect to the

"plus prong," however, the Hill decision clarified that an allegation sufficient to

demonstrate an "extinguishment of a right or status previously recognized by state law" is

sufficient.  Id. at 237 (internal citation and quotations omitted).[24]

The Court applied the "stigma-plus" test as defined under Hill to the facts alleged,

and determined that D&D met the "stigma prong" sufficient to survive D&D's motion for

summary judgment.  (Dkt. 264 at 24–26.)  D&D alleged that the Board took stigmatizing

actions when it: (1) issued default letters; and (2) published the "Construction Updates"

on its website.  (Id. at 24–25.)  See also supra Sec.I.B.2 (describing the default letters and

"Construction Updates").  D&D also alleged that the Board's statements in the default

letters and "Construction Updates" were false and damaged its good reputation as a

general contractor sufficient to satisfy the "stigma prong."  (Id. at 25.)

The Court also found that D&D met the "plus" requirement under Hill by alleging

deprivations that accompanied the alleged reputational damage related to: (1) the

termination of the Project Contracts; (2) its lost prequalification status; (3) its inability to

obtain bonding capacity; and (4) its overall inability to bid on other public works

contracts.  (Id.)  Viewing D&D's allegations and supporting evidence under the summary

judgment standard, the Court held that D&D demonstrated "a protected liberty interest in

its reputation under the Fourteenth Amendment, and that … the Board interfered with this

---

[24] Significantly, Hill held that termination may implicate a constitutionally protected due process
interest by satisfying the "plus prong," even when the employee does not have a protected
property interest in the job.  455 F.3d at 237–38 ("We … have never clearly answered the
question whether termination from a government job constitutes a sufficient 'plus' under the
'stigma-plus' test when … the plaintiff lacked a property interest in retaining the job ….").

interest." (Id.)  Accordingly, the Court denied the Board's motion for summary judgment with respect to Count Two in the 12-21-07 Ruling.  (Id. at 26.)[25]

### 3.      3-30-12 Ruling[26]

The Board again moved for summary judgment in its favor on Count Two, insofar as it was asserted against it, on October 30, 2009.  (Dkt. 348-8 at 13.)  The Court granted the motion, upon reevaluating the 12-21-07 Ruling as to Count Two, and in light of: (1) the record at the close of discovery; and (2) intervening changes in the law.  (Dkt. 442 at 35–47.)[27]  The Court, upon revisiting Count Two, credited D&D with the assumption that it satisfied the "stigma prong" under Hill, due to, inter alia, the Board's alleged statements in the "Construction Updates."  (Id. at 39.)  The Court held, however, that the Project Contracts "did not confer a constitutionally protected property interest that could suffice as the 'plus' to the alleged damage to D&D's reputation" with respect to the

---

[25] The Court, in view of this ruling and analysis under Hill, granted D&D leave to move to reinstate Count Two, insofar as asserted against Bovis and Vitetta, by stating the following:

> The Court notes that Hill was decided following the issuance of the 9-30-05 Memorandum Opinion and corresponding Order.  Thus, in light of this decision and our analysis above, we intend to grant D&D leave to move to reinstate count 2 insofar as asserted against Bovis and Vitetta.  However, the Court notes that D&D must establish that Vitetta and Bovis acted under color of state law at all times relevant to count 2 in order to state a claim under Section 1983.  The Court acknowledges that we did not address this issue in the 9-30-05 Memorandum Opinion.

(Dkt. 264 at 26 n.8.)

[26] The Board notified D&D of its intention to move for sanctions with respect to Count Two via the 1-13-10 Draft Motion and accompanying e-mail.  See supra Sec.II.B.3.

[27] This Court acknowledged that it had received the "whole universe of discovery," which it considered as closed, during oral argument on August 10, 2010.  (Dkt. 416 at 8, 15.)

termination of the Project Contracts and lost bonding capacity.  (Id. at 44.)  The Court

described its reasoning in the following passage:

> The Court notes, however, "the possibility of a future contract with a
> municipality is not a property interest that warrants procedural due process
> protection."  Mun. Revenue Servs., Inc. v. McBlain, 347 Fed.Appx. 817, 826
> (3d Cir. 2009).  A property interest warranting due process protection has
> been recognized as existing with respect to two types of contract rights:
> where (1) the contract confers a protected status, such as in the case of receipt
> of welfare benefits or continued tenure in the public school employment
> context, or (2) the contract itself includes a provision that the state entity can
> terminate the contract only for cause.  Linan-Faye Constr. Co., Inc. v. Hous.
> Auth. of City of Camden, 49 F.3d 915, 932 (3d Cir. 1995) ….

(Id. at 40.)

Thus, based upon the record at the close of discovery, the Court held that D&D

failed to establish the deprivation of a property interest in the Project Contracts under

Linan-Faye.  (Id. at 40–41 (finding no constitutionally protected interest in the Project

Contracts in light of the provision that permitted "the Board's termination for

convenience and without cause." (internal citation omitted)).)  See also supra Sec.III.A.1

(summarizing due process protection under Linan-Faye).  Moreover, the Court concluded

that "based upon the undisputed record evidence," the Project Contracts did not confer a

constitutionally protected property interest that could suffice as the "plus prong" to the

alleged damage to D&D's reputation.  (Id. at 44.)

The Court likewise found that D&D did not satisfy the "plus prong" of the

"stigma-plus" test with regard to its lost bonding capacity and prequalification status

under the NJEDA.  (Id. at 44–46.)  The Court deemed any alleged causal connection

between the Board's stigmatizing statements and those injuries too attenuated,

particularly because the Board was "not responsible for or even capable of either granting

prequalification status or bonding D&D." (Id. at 44–45.)  See also supra Sec.I.B.3

(describing other factors related to those injuries).  With respect to D&D's bonding

capacity, the Court clarified that any "alleged injuries flow[ed] from the Surety's

unwillingness to provide further bonding and D&D's subsequent determination that

seeking prequalification status would be futile in light of its inability to obtain bonding,

[and] not directly from the actions of the Board."  (Id. at 45–46 (emphasis in original).)

See also supra Sec.I.B.3.a.[28]  Thus, upon finding that D&D failed to satisfy the "stigma

prong" of the "stigma-plus" test under Hill, the Court entered summary judgment in favor

of the Board on Count Two. (Dkt. 442 at 46.)[29]

### C.   Count Three: "Civil Rights – Retaliatory Terminations for Exercise of First Amendment Rights (All Defendants)" and Count Four: "Civil Rights – First Amendment Retaliation For Seeking Redress in Federal Court (Board of Education, Vitetta, Epstein)"[30]

Count Three alleged that the Board issued default letters to D&D in violation of

D&D's free speech rights under the First Amendment and Section 1983.  (Dkt. 58 at 24–

25.)  D&D, with respect to Count Three, alleged that the Board retaliated against it

---

[28] The 3-30-12 Ruling as to Count Two rested upon the "stigma-plus" test under Hill.  Accordingly, as described in the passage below, the Court did not reach the issue of whether the Board was immune from liability under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) ("Monell"):

> Because the Court finds no constitutional violation as to count 2, we need not address whether (1) the Board could be held liable pursuant to Monell … or (2) whether Epstein, Bovis, and Vitetta could be considered to have acted "under color of state law," with respect to count 2.

(Dkt. 442 at 46 n.9.)

[29] D&D, pursuant to this Court's 12-21-07 Ruling, moved to reinstate Count Two against Bovis and Vitetta.  (Dkt. 442 at 35.)  This Court denied the motion for the reasons discussed above. (Id. at 46.)  See also supra n.25 and accompanying text.

[30] The Court will analyze related counts in tandem.  Here, Count Three and Count Four alleged First Amendment retaliation claims.  (Dkt. 86 at 12.)  See also infra Sec.III.K.

because D&D: (1) refused to make false statements regarding the timely completion of the Project; (2) stated that the Board contributed to the Project delays; (3) requested extensions of time and compensation related to the Project; and (4) attempted "to meet with other prime contractors … to form a coordinated attempt to seek scheduling adjustments and other redresses."  (Id.)  Similarly, Count Four alleged that the Board terminated the Project Contracts "in direct retaliation for D&D's commencement of the instant litigation, for filing opposition to defendants' motions to dismiss and for summary judgment in the instant matter, and for proposing to seek a court order for relief …"  (Id. at 26.)  According to D&D, the alleged retaliatory conduct violated the First Amendment, Section 1983, and Section 1985.  (Id.)

### 1.  9-30-05 Ruling as to Bovis and Vitetta

Bovis and Vitetta separately moved in 2005 to dismiss Count Three and Count Four, insofar as those counts were asserted against them.  (Dkt. 86 at 1.)  The Court examines the procedural history as to Count Three and Count Four – insofar as each relates to Bovis and Vitetta – below.

### a.  9-30-05 Ruling as to Bovis

This Court dismissed Count Three and Count Four, insofar as asserted against Bovis, in the 9-30-05 Ruling.  (Dkt. 87.)  The Court so held because D&D failed to allege the requisite elements of a First Amendment claim against Bovis.  (Dkt. 86 at 12–13.)  Notably, D&D failed to plead the requisite elements of a First Amendment retaliation claim with respect to Bovis to demonstrate that: (1) D&D engaged in a protected activity by speaking as a citizen regarding a matter of public concern; (2) Bovis retaliated against

24

D&D; and (3) the alleged protected activity caused the retaliation.  (Id. at 13; see dkt. 264 at 28–29.)  D&D did not meet this burden, insofar as it concerned Bovis, because Count Three and Count Four alleged only that Epstein, Vitetta, and the Board engaged in retaliatory conduct by issuing default letters to D&D.  (Dkt. 86 at 13.)  Moreover, Count Three and Count Four did not indicate that Bovis engaged in any other retaliatory conduct against D&D.  (Dkt. 58 at 24–27.)  Thus, the Court found that D&D failed to state a prima facie First Amendment retaliation claim against Bovis in Count Three and Count Four, and dismissed those counts as asserted against Bovis.  (Dkt. 86 at 13.)

### b.  9-30-05 Ruling as to Vitetta

The 9-30-05 Ruling did not dismiss Count Three and Count Four against Vitetta because D&D's allegations were sufficient to withstand Vitetta's motion to dismiss.  (Id. at 14–15; see dkt. 87.)  Specifically, the Court noted that D&D alleged that Vitetta: (1) issued default letters in retaliation for D&D's protected activity; and (2) delayed the Project as part of a "campaign to blame all of the Projects' problems on D&D's alleged failure to coordinate the work."  (Dkt. 86 at 15 (internal citation and quotation omitted).)  The Court also rejected Vitetta's argument that Count Three and Count Four failed because it was not a state actor, because D&D alleged that Vitetta acted in concert with the Board.  (Id. at 14–15.)  The Court reasoned that "D&D may be able to show there was a close nexus between Vitetta and the Board such that Vitetta's acts may be attributed to the Board" at a future procedural juncture.  (Id.)  Thus, in the 9-30-05 Ruling, this Court determined it "would be premature to dismiss D&D's retaliation claims against Vitetta before allowing D&D the opportunity to develop evidence in support thereof."  (Id. at 15.)

### 2.    12-21-07 Ruling as to Vitetta

Vitetta again moved for judgment in its favor with respect to Count Three and Count Four in 2006.  (Dkt. 141.)  This Court granted judgment in favor of Vitetta with respect to both counts on the ground that D&D failed to demonstrate that its alleged activities, discussed <u>supra</u> Sec.III.C, were protected under the First Amendment.  (Dkt. 264 at 30–31; <u>see also</u> dkt. 265.)  Initially, the Court held that D&D's allegations related to its refusal to falsely state that the Project was on schedule and its attempts to meet with other contractors to discuss Defendants' alleged misconduct did not involve constitutionally protected speech.  (Dkt. 264 at 31.)  Rather, the Court determined those allegations concerned the absence of speech, which warranted no First Amendment protection.  (<u>Id.</u>)

The Court, in the 12-21-07 Ruling, analyzed the type of speech that is properly considered a matter of public concern.  (<u>Id.</u> at 30.)  The following passage described the relevant standard to determine whether speech pertains to a matter of public concern:

> Speech pertains to a matter of public concern if the speech "can be fairly considered as relating to any matter of political, social or other concern to the community."  <u>Costello v. City of Brigantine</u>, No. 99-4072, 2001 U.S. Dist. LEXIS 8687, at *63 (D.N.J. June 28, 2001) …. Moreover, there can be no cognizable First Amendment claim under Section 1983 in the absence of speech .... The Court determines as a matter of law if an activity constitutes protected speech.  However, whether the retaliatory action of the defendant "reached the threshold of actionability under § 1983" is a factual question for the trier of fact.  <u>Suppan v. Dadonna</u>, 203 F.3d 228, 233 (3d Cir. 2000).

(<u>Id.</u>)

The Court applied this standard to D&D's allegations with respect to Vitetta, and determined that D&D failed to demonstrate that it engaged in a protected First

Amendment activity.  (Id. at 31–32.)  The Court determined that D&D's requests for extensions and compensation did not address matters of public concern, because those statements "pertained solely to D&D's own employment situation and circumstances surrounding" the termination of the Project Contracts.  (Id. at 31.)  While acknowledging a potential community interest in the timely completion of public school construction projects, the Court observed that "D&D's requests for compensation or additional time to complete portions of the Project, and assertions that other parties [were] causing Project delays" were related "specifically to D&D's employment and its relationship with the other contractors," and not the Project in general.  (Id. at 31–32.)[31]  Thus, the Court concluded that no allegation in Count Three or Count Four against Vitetta deserved First Amendment protection.  (Id. at 32.)

### 3.  3-30-12 Ruling as to the Board[32]

The Board did not move for summary judgment with respect to Count Three and Count Four, insofar as those counts were asserted against it, in its initial motion for summary judgment.  (See dkt. 264 at 2.)  Rather, the Board moved for summary judgment as to those counts on July 22, 2011.  (Dkt. 430; see also dkt. 358-8 at 46–47.)  The Court granted judgment in favor of the Board on Count Three and Count Four in the 3-30-12 Ruling.  (Dkt. 442 at 47–59.)

---

[31] The Court further observed that the statements and arguments of the parties in this action were unrelated "to any matter of political, social, or other concern to the community, but instead relate[d] to matters of personal interest to D&D and address[ed] the individual circumstances of its termination from the Project."  (Dkt. 264 at 32–33.)

[32] The Board notified D&D of its intention to move for sanctions with respect to Count Three and Count Four via the 1-13-10 Draft Motion and accompanying e-mail.  See supra Sec.II.B.3.

The Court relied upon much of the analysis in the 12-21-07 Ruling regarding Count Three and Count Four, insofar as those counts were asserted against Vitetta, in the 3-30-12 Ruling.  The Court, as described in the excerpt below, however, declined to enter judgment in favor of the Board on those two counts simply based upon the 12-21-07 Ruling as to Vitetta:

> The Court finds it appropriate to revisit its previous ruling that the bringing of this action and D&D's affirmative statements regarding Project scheduling, delays, requests for extensions of time, and attempts to meet with other contractors, did not constitute speech pertaining to matters of public concern …. The Court therefore declines to simply enter judgment in favor of the Board on these two counts on the basis of law of the case, as urged by the Board …. However, for the reasons discussed below, the Court ultimately reaches the same conclusion: D&D cannot show that it engaged in protected First Amendment activity.

(Id.)

The Court's ruling as to Count Three and Count Four against the Board required extensive analysis.  (See id. at 48–59 (analyzing Count Three and Count Four against the Board).)  Such analysis was required, in the Court's view, because D&D raised new arguments stemming from both fact and law in its opposition papers.  (See id. at 51–52 (discussing D&D's arguments).)  The Court discusses these arguments below, insofar as they relate to the arguments of the parties to this motion.

### a.      Count Three

### i.      Legal Argument

D&D opposed the Board's motion for summary judgment, and defended Count Three insofar as it was asserted against the Board, on two grounds.  (Id. at 50–57.)  First, D&D argued that the Board's demands for alleged unrealistic schedules for the Project violated its First Amendment right to be free from compelled speech.  (Id. at 50.)

Second, D&D contended that the scheduling of the Project invoked a matter of public concern.  (Id. at 51.)

### ii.       Supporting Evidence

D&D cited to several documents in support of its argument that the construction schedules invoked a matter of public concern.  (Id. at 50–53.)  The first were the "Construction Updates" on the Board's website.  (Id. at 51.)  See also supra Sec.I.B.2. D&D, in support of its position, interpreted the publicly-available "Construction Updates" as demonstrating that "the Board felt that the scheduling was a critical issue of public interest to the community."  (Id.)

D&D also submitted two interrelated documents, which it viewed as pertinent to the determination of whether speech by D&D invoked matters of public concern.  (Id. at 51–57.)  Both documents concerned the scheduling of the Project.  (Id.)  The first was a letter authored by D&D's project manager, Ken Pereira, and dated September 25, 2001 ("9-25-01 Pereira Letter").  (Id. at 52.)  The 9-25-01 Pereira Letter, which was addressed to the Superintendent of the Board, stated, in pertinent part:

> AS PER OUR CONTRACT WE ARE REQUIRED TO SUBMIT A 90
> DAY SCHEDULE.  WE ARE IN THE PROCESS OF WORKING ON
> THE SCHEDULE BUT PLEASE BE AWARE THAT THIS DOCUMENT
> IS GOING TO SHOW SUBSTANTIAL DELAYS CAUSED BY THE
> ARCHITECTS, WITH DELAYS IN DRAWINGS.
>
> ...
>
> THIS 90 DAY PRELIMINARY SCHEDULE … THAT YOU WANT TO
> POST … ON A WEBSITE WILL HAVE A SEVERELY NEGATIVE
> IMPACT ON THE SCHOOL BOARD.

(Dkt. 355-1.)

The second document submitted by D&D, similar to the 9-25-01 Pereira Letter, concerned the progress of the Project.  (Dkt. 442 at 52–53.)  This document contained the minutes of a meeting held by the Board on October 3, 2001 ("10-3-01 Board Meeting Minutes").  (Dkt. 355-2.)  The 10-3-01 Board Meeting Minutes indicated that members of the public: (1) attended the meeting of the Board held on October 3, 2001; (2) requested updates regarding the progress of the Project; and (3) vocalized concerns regarding the progress of the Project.  (Id. at 1.)

### iii.      Analysis

The Court, in the 3-30-12 Ruling, determined that the 9-25-01 Pereira Letter, coupled with the 10-3-01 Board Meeting Minutes, invoked a matter of public concern related to the timing and progress of the Project.  (Dkt. 442 at 52 ("That the issues identified by D&D in the 9-25-01 Pereira Letter are of public concern is shown by minutes from a meeting of the Board on October 3, 2001." (internal quotation omitted)).)  The Court likewise found that the 10-3-01 Board Meeting Minutes "strongly indicate[d] the public concern in the timing and progress of the Project ...."  (Id.)

The Court, upon applying the legal standard governing whether speech invokes a matter of public concern to the evidence before it, however, determined that both documents were insufficient to state a viable First Amendment retaliation claim against the Board on Count Three.  (Id. at 53–57.)  Although the Court found that the documents cited by D&D invoked a matter of public concern, the Court determined that D&D failed to make the requisite showing that it spoke as a citizen.  (Id. at 49–53.)  See also Sec.III.C.1.A (describing the elements of a prima facie First Amendment retaliation

claim).  The Court, in this regard, determined that D&D's speech was related to its
contractual duties because the "context and form" of the speech failed to "show that
D&D was acting as a citizen."  (Id. at 53–55.)  The Court noted, for example, that D&D
was required to submit the construction schedules related to the First Amendment
retaliation claims: (1) pursuant to the Project Contracts; and (2) in its capacity as a
general contractor.  (Id. at 56.)  Thus, because the Board sought information from D&D
in its capacity as a general contractor – and not as a citizen – the Court held that the
"evidence relied upon by D&D in support of its First Amendment retaliation claims [did]
not support a finding that D&D was engaging in constitutionally protected speech as a
citizen."  (Id. at 55.)

### b.      Count Four

D&D, with respect to Count Four, alleged that a causal connection existed
between its opposition to the Board's motion for summary judgment and the termination
of the Project Contracts and issuance of default letters.  (Id. at 57.)  Stated differently,
D&D alleged that its oppositional papers prompted the Board to terminate all of the
Project Contracts and declare default.  (Id.)

The Court granted judgment in favor of the Board on Count Four, based upon its
determination that D&D did not demonstrate that it engaged in a protected activity in its
role as a citizen.  (Id. at 57–59.)  See also supra Sec.III.C.3.a.iii.  Rather, as explained in
the following passage of the 3-30-12 Ruling, the Court determined that D&D's speech
concerned D&D's role as a general contractor:

> We find that D&D's claims in this action are brought in its capacity as an
> employee/independent contractor involving matters particular to it, though

the relationship between D&D and the Board concerned a subject of inherently public concern, school construction.

(Id. at 58–59 (internal citation and quotation omitted).)

### D.      Count Five: "Civil Rights – Intimidation of Witnesses (Epstein, Board of Education)" – 12-21-07 Ruling

Count Five alleged that the Board conspired with Epstein to intimidate a witness from testifying truthfully in violation of Section 1985.  (Dkt. 58 at 27–28.)  D&D identified this witness as Bovis employee, Earl Hawley.  (Id. at 27.)  The alleged intimidation concerned a report authored by another Bovis employee, James Hanick ("Hanick Report").  According to D&D, the Hanick Report stated that D&D: (1) substantially performed its work related to the Project; and (2) did not cause the Project delays.  (Id.)

D&D, as to Count Five, alleged that Epstein and the Board Superintendent confronted Hawley, and inquired as to how D&D learned about the Hanick Report.  (Id.) D&D also alleged that Epstein and the Board Superintendent sought information from Hawley regarding: (1) e-mail correspondence that Hawley sent to the Board; and (2) other documents supporting D&D's contentions.  (Id.)  D&D characterized those alleged interactions as means by Epstein and the Board Superintendent "to prevent and deter, by force, and intimidation, or threat, Hawley from testifying fully and truthfully in this case" in violation of Section 1985.  (Dkt. 58 at 27–28.)  The Board moved for summary judgment in its favor on Count Five on May 13, 2006.  (Dkt. 143.)[33]

---

[33] The Board notified D&D of its intention to move for sanctions with respect to Count Five via the 3-26-07 Draft Motion and accompanying e-mail.  D&D did not withdraw Count Five against the Board.  See supra Sec.II.B.2.

This Court granted judgment in favor of the Board on Count Five in the 12-21-07 Ruling. (Dkt. 264 at 33–36.) The Court initially noted D&D failed to identify the subsection of Section 1985 that gave rise to Count Five. (Id. at 34.) Thus, the Court provided this legal analysis to discern the basis for D&D's claim under Section 1985:

> Section 1985(1), Section 1985(3), and the second clause of Section 1985(2) have no relevance to the factual allegations set forth in count 5 of the amended complaint. Specifically, D&D has not alleged that Epstein and the Board conspired to (1) prevent an officer of the United States from performing duties, (2) deprive a person of a right or privilege due to racial animus, or (3) impede or hinder justice in any state with a discriminatory or other class-based animus.

(Id. at 33–34 (internal citation omitted).)

The Court, after rejecting the applicability of all other claims under Sections 1985, determined that D&D's allegations in Count Five exclusively fell under the first clause of Section 1985(2), which provides legal recourse where:

> [T]wo or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully ….

42 U.S.C. § 1985(2).

The Court determined, however, that D&D failed to state a prima facie claim under Section 1985(2) by demonstrating a conspiracy between two or more persons. (Dkt. 264 at 35–36.) Specifically, the Court found that any alleged "conspiracy" was limited to the alleged conduct of Epstein and the Board Superintendent in relation to Hawley. (Id. at 35.) That alleged conduct on the part of Epstein and the Board Superintendent, however, fell squarely within the attorney-client exception to Section 1985(2), which exempts "attorneys acting within the scope of the attorney-client

relationship" from Section 1985 liability.  (Id. at 36–37.)[34]  Accordingly, the Court

entered judgment in favor of the Board on Count Five.  (Id. at 33–36.)[35]

### E.   Count Six: "Civil Rights – Illegal Garnishment Without Due Process of Law (All Defendants)"

Count Six alleged that Defendants violated D&D's due process rights by refusing

to pay for work performed in violation of the New Jersey Trust Fund Law ("NJTFL"),

thereby depriving D&D of a constitutionally protected property interest under the Project

Contracts.  (Dkt. 58 at 28–32.)  Count Six also referenced property interests in "materials,

equipment and leased items" and "seized funds."  (Id. at 28–32.)

### 1.   9-30-05 Ruling

Bovis and Vitetta separately moved in 2005 to dismiss Count Six insofar as it was

asserted against them.  (Dkt. 86 at 1.)  This Court dismissed Count Six against both of

those Defendants in the 9-30-05 Ruling.  (Id. at 15–17.)  This Court applied the same

analysis as it did for Count One and Count Two – insofar as those counts were asserted

against Bovis and Vitetta – and determined that D&D did not have "a protected property

interest in either materials or receiving payment under the contract" to support a due

process claim under Linan-Faye.  (Id. at 16.)  See supra Sec.II.A.1 (describing the Court's

application of Linan-Faye in the 9-30-05 Ruling as to Count One and Count Two).[36]

---

[34] The Court determined that the attorney-client exception applied to the allegations because Epstein acted within the scope of his representation when he contacted Hawley.  (Dkt. 264 at 36.)

[35] The Board notified D&D of its intention to move for sanctions with respect to Count Five via the 1-13-10 Draft Motion and accompanying e-mail.  See supra Sec.II.B.3.

[36] The Board, after the 9-30-05 Ruling, requested that D&D withdraw Count Six against it in the 4-14-06 Proposed Consent Order and accompanying e-mail.  D&D did not withdraw Count Six against the Board.  See supra Sec.II.B.1.

### 2.    12-21-07 Ruling[37]

This Court's 12-21-07 Ruling granted judgment in favor of the Board on Count

Six.  (Dkt. 264 at 36–37.)  The 12-21-07 Ruling as to the Board was entirely predicated

on the 9-30-05 Ruling, discussed <u>supra</u> Sec.III.E.1, which determined that D&D had no

constitutionally protected property interest in: (1) receiving payments pursuant to the

Project Contracts; or (2) the materials purchased in connection with the Project.  (<u>Id.</u> at

37.)  Thus, the Court provided the following analysis in the 12-21-07 Ruling:

> The Court … has already determined that D&D does not have a
> constitutionally protected property interest in either the materials purchased
> in connection with the Project or receiving payments pursuant to the Project
> contracts …. Thus, Epstein and the Board are entitled to summary judgment
> in their favor on count 6 to the extent it asserts due process claims.

(<u>Id.</u> at 37–38.)[38]

### F.    Count Seven: "Quia Timet – New Jersey Law (All Defendants)"

Count Seven alleged that Defendants violated the NJTFL by withholding payment

from D&D.  (Dkt. 58 at 32–36.)  D&D alleged, in support of Count Seven that: (1) it

hired laborers and entered into agreements with subcontractors and suppliers in

connection with the Project; (2) Defendants "refused to release funds to satisfy the lawful

claims of these laborers, subcontractors, and suppliers"; and (3) it feared "that it ha[d]

suffered and will continue to suffer actual injury in that trust monies and funds associated

with the [Project] [were] not available."  (<u>Id.</u> at 32–34.)

---

[37] The Board notified D&D of its intention to move for sanctions with respect to Count Six via
the 3-26-07 Draft Motion and accompanying e-mail.  D&D did not withdraw Count Six against
the Board.  <u>See</u> <u>supra</u> Sec.II.B.2.

[38] The Board notified D&D of its intention to move for sanctions with respect to Count Six via
the 1-13-10 Draft Motion and accompanying e-mail.  <u>See</u> <u>supra</u> Sec.II.B.3.

### 1.    9-30-05 Ruling

Bovis and Vitetta separately moved to dismiss Count Seven, insofar as it was asserted against them, in 2005.  (Dkt. 86 at 1.)  This Court dismissed Count Seven insofar as it was asserted against both of those Defendants in the 9-30-05 Ruling.  (Dkt. 86 at 17–18.)  The basis for the 9-30-05 Ruling was this Court's plain reading of the NJTFL, which provides as follows:

> All money <u>paid</u> by the state of New Jersey or by any agency, commission or department thereof, or by any county, municipality or school district in the state, to any person pursuant to the provisions of any contract for any public improvement made between any such person and the state or any agency, commission or department thereof, or any county, municipality or school district in the state, shall constitute a trust fund in the hands of such person as such contractor, until all claims for labor, materials and other charges incurred in connection with the performance of such contract shall have been fully <u>paid</u>.

N.J.S.A. 2A:44-148 (emphasis added).

Whereas the NJTFL applies to money <u>paid</u> by a state entity for a public improvement project, the Court found that Count Seven exclusively referenced funds that were <u>withheld</u> by Defendants from D&D as general contractor.  (Dkt. 86 at 17.)  The Court, for that reason, determined that D&D failed to state a claim under the NJTFL from D&D as general contractor.  (<u>Id.</u> at 18.)[39]

### 2.    12-21-07 Ruling

The Board moved for summary judgment in its favor with respect to Count Seven, insofar as it was asserted against it, on May 13, 2006.  (Dkt. 143.)  The Court granted that

---

[39] The Board, after the 9-30-05 Ruling, requested that D&D withdraw Count Seven against it in the 4-14-06 Proposed Consent Order and accompanying e-mail.  D&D did not withdraw Count Seven against the Board.  <u>See</u> <u>supra</u> Sec.II.B.1.

motion in the 12-21-07 Ruling.  (Dkt. 264 at 37.) [40]  The 12-21-07 Ruling as to the Board was entirely predicated on the 9-30-05 Ruling as to Bovis and Vitetta, discussed supra Sec.III.F.1.  The Court, in both rulings, held that the NJTFL "does not provide any protection for [a] general contractor with respect to money [a] contractor is owed from [a] government entity."  (Id. at 40.)  Thus, the Court reiterated that D&D could not "assert any NJTFL claim against the Board or any other defendant."  (Id.)[41]

## G.   Count Eight: "Breach of Contract (Board of Education)"

Count Eight asserted a breach of contract claim against the Board.  (Dkt. 58 at 36–37.)  D&D alleged, in support of Count Eight, that the Board breached the Project Contracts "by refusing to make payments to D&D, improperly interfering with the performance of D&D's work, improperly demanding extra work through unpriced 'field directives' to avoid the formal change order process, improperly threatening defaults and terminations, and improperly terminating D&D's work on [the Project] Contracts …."  (Id. at 37.)  The parties engaged in extensive discovery as to Count Eight, because D&D initially disputed whether the breach of contract claims were assigned to the Surety.  (Dkt. 524 at 20.)  See also supra Sec.I.B.1 (describing the bonding requirement under the Project Contracts).

---

[40] The Board notified D&D of its intent to move for sanctions with respect to Count Seven via the 3-26-07 Draft Motion and accompanying e-mail.  D&D did not withdraw Count Seven against the Board.  See supra Sec.II.B.2.

[41] The Board notified D&D of its intent to move for sanctions with respect to Count Seven via the 1-13-10 Draft Motion and accompanying e-mail.  See supra Sec.II.B.3.

1.      **12-21-07 Ruling**[42]

The Board moved for judgment in its favor on Count Eight on May 13, 2006. (Dkt. 143.)  The Court denied the motion in the 12-21-07 Ruling, however, upon considering the arguments of the parties, the provisions of the Project Contracts, and New Jersey contract law.  (Dkt. 264 at 40–46.)  The Court provides a brief summary of those considerations below.

The Board, in support of its motion for summary judgment with respect to Count Eight, argued, <u>inter alia</u>, that D&D assigned all its rights under the Project Contracts to the Surety, pursuant to the GIA executed by D&D and the Surety.  (<u>Id.</u> at 41.)  <u>See also</u> <u>supra</u> Sec.I.B.1.  Thus, the Board contended that only the Surety – as the assignee of all rights vested under the Project Contracts – could recover any sums due.  (<u>Id.</u>)  <u>See also</u> <u>supra</u> Sec.I.B.1.

D&D, however, contended that the Surety declined to exercise its rights under the GIA, thereby denying the assignment of its rights under the Project Contracts.  (<u>Id.</u> at 41–42.)  The Court, upon considering these arguments, analyzed and applied principles of contract construction.  (<u>Id.</u> at 42–46.)  Applying these principles, the Court found ambiguities in the relevant contractual language of the GIA between D&D and the Surety.  (<u>Id.</u> at 43–46.)  Specifically, the Court determined that the provision assigning "all claims and causes of action against any parties" in the event of default did not

---

[42] The Board notified D&D of its intent to move for sanctions with respect to Count Eight via the 3-26-07 Draft Motion and accompanying e-mail.  D&D did not withdraw Count Eight against the Board.  <u>See</u> <u>supra</u> Sec.II.B.2.

provide adequate guidance as how to discern whether a default occurred.  (Id. at 44–

45.)[43]  The Court explained this ambiguity as follows:

> Specifically, it is unclear whether the provision has any temporal limitation
> (e.g., whether it applies to claims arising before the default occurs).  Further,
> the phrase "in the event of Default" could encompass (1) the Board's
> declaration that D&D is in default, whether or not the Board followed the
> procedures set forth in the applicable contract or the Project Terms &
> Conditions before declaring such default, (2) a letter from either Vitetta or
> Bovis stating that D&D is in default, (3) a judicial determination that a default
> has occurred, or (4) commencement of an action alleging a default or facts that
> would lead a reasonably prudent person to deduce that a default has occurred.

(Id. at 44.)

The ambiguous phrase was particularly troublesome, because the parties did not

agree as to: (1) whether the Board properly declared D&D in default of the Project

Contracts; and (2) when the default – if any – occurred.  (Id.)  Thus, the Court, in light of

those material factual issues and the ambiguities in the GIA, denied the Board's motion

for summary judgment with respect to D&D's breach of contract claim.[44]

## 2. 3-30-12 Ruling

The Board again moved for summary judgment with respect to Count Eight on

October 30, 2009.  (Dkt. 348.)  D&D also moved for judgment in its favor on the same

---

[43] The assignment provision provided, in relevant part:

> In the event of a Default, Principal and Indemnitors do hereby assign, transfer,
> and set over to Surety, all of their rights under all Bonded Contract(s) including
> …. all claims and causes of action against any parties to the Bonded Contract(s)
> or against third parties relating to the Bonded Contract(s), … [and] any and all
> sums due, or to become due under the Bonded Contract(s) at or after the time of
> such Default.

(Dkt. 144-6 at 3.)

[44] The Board notified D&D of its intent to move for sanctions with respect to Count Eight via the
1-13-10 Draft Motion and accompanying e-mail.  See supra Sec.II.B.3.

count.  (Dkt. 351.)  The Court, in the 3-30-12 Ruling, decided the contractual dispute in favor of the Board, and granted judgment in its favor on Count Eight.  (Dkt. 442 at 72.) The arguments of both parties warranted considerable analysis, which the Court summarizes below.  (See id. at 59–72.)

The Board asked the Court to construe the GIA based upon the extrinsic evidence submitted by the parties.  (Id. at 60.)  The Board also argued that D&D failed to meet its burden of proof regarding the breach of contract claim, because it did not retain an expert to testify as to contract liability.  (Id.)

D&D replied that the Board breached the Project Contracts by failing to obtain approved plans, sealed construction drawings, and construction permits.  (Id. at 60.)  See also supra Sec.I.B.2.  D&D also contended that no default occurred because: (1) the Board wrongfully withheld payment from D&D; and (2) D&D denied having assigned its rights under the Project Contracts to the Surety.  (Id.)

The Court reconsidered the ambiguity of the GIA term "in the event of default," in light of: (1) the definitions under the GIA; (2) D&D's course of dealing with the Surety; and (3) the extrinsic evidence submitted by the parties.  (Id. at 61–65.)  The Court, in analyzing the definitions under the GIA, noted that "Default" was defined as "[a]n instance or condition in which Indemnitors, or any of them ... forfeit, breach, abandon, default or be declared in default on any Bonded Contract."  (Id. at 62.)  Moreover, the GIA defined "Bonded Contract" as a "contract for which Surety issues or has issued a Bond."  (Id. at 62–63.)  The Court determined that the Project Contracts fell within this definition of a "Bonded Contract."  (Id.)

The Court also analyzed the assignment provision of the GIA, which states:

> 7.  ASSIGNMENTS: In the event of a Default, Principal and Indemnitors do hereby assign, transfer and set over to [the] Surety, all of their rights under all Bonded Contract(s) including . . . (c.) <u>all claims and causes of action against any parties to the Bonded Contract(s) or against third parties relating to the Bonded Contract(s)</u>, (d.) <u>any and all sums due, or to become due under the Bonded Contract(s) at or after the time of such Default</u> .... In the event of a Default, each of Principal and Indemnitors hereby appoint and designate Surety or it's [sic] authorized representative as their respective Attorneys-in-Fact to endorse and sign in the name of Principal or Indemnitor, as payee or otherwise, all documents and all checks, drafts, warrants or other instruments made or issued in connection with the Bonded Contract(s).  Surety shall have the right to receive, collect and disburse the proceeds of all such checks, drafts or warrants.

(<u>Id.</u> at 63 (emphasis in original).)

The Court, based upon the GIA definitions and the assignment provision, concluded that the GIA governed the Project.  (<u>Id.</u>)  The Court next analyzed the extrinsic conduct of the parties related to the Project default.  (<u>Id.</u> at 64–65.)  This analysis concerned the default letters issued by the Board to D&D and the Surety.  (<u>Id.</u>)  <u>See also</u> <u>supra</u> Sec.I.B.2.  The Court observed that the default letters stated that D&D was in material default of the Project Contracts, and found as follows with respect to the GIA:

> The Court finds that when read together with the General Conditions governing the [Project] Contracts and considered in light of the parties' course of dealing, the term "to be declared in default of any Bonded Contract" unambiguously refers to the termination of D&D from the Project by reason of default, following the notice procedure outlined in the General Conditions [of the Project Contract].
>
> ….
>
> Whereas the Court previously found that there was a genuine issue of material fact "regarding whether the Board properly declared D&D in default and when such default occurred," we now note that the GIA requires only the declaration of default, not a procedurally proper and justified default, to trigger the assignment of "any and all sums due, or to

41

become due under the Bonded Contract(s) at or after the time of such
Default" under … the GIA ….

(Dkt. 442 at 64–65.)

Based upon the above analysis, the Court determined that the GIA assigned all of
D&D's rights under the Project Contracts to the Surety.  (Id. at 72.)  Accordingly, the
Court granted judgment in favor of the Board on Count Eight, and denied D&D's cross
motion for summary judgment on Count Eight.  (Id. at 72.)[45]

### H.    Count Ten: "Tortious Interference (All Defendants)"[46]

Count Ten asserted that all Defendants tortiously interfered with D&D's bonding
relationship with the Surety, thereby limiting its ability to bid on public work.  (Dkt. 58 at
39–41.)  This claim was based on the "Construction Updates" published on the Board's
website, which suggested that D&D performed defective construction work and
abandoned the project.  (Id. at 40.)  See also supra Sec.I.B.2.  D&D contended that the
"Construction Updates" caused it to lose its bonding capacity, thereby limiting its ability
to bid on other public works contracts.  (Dkt. 264 at 52.)  See also supra Sec.I.B.3.  Thus,
D&D argued that Defendants "intentionally and deliberately interfered with [its]
prospective economic advantage."  (Dkt. 58 at 41.)

#### 1.    12-21-07 Ruling[47]

The Board moved for summary judgment in its favor as to Count Ten on May 13,
2006.  (Dkt. 143.)  The Court denied the Board's motion, because D&D properly pleaded

---

[45] The Court rejected each argument advanced by D&D as meritless.  (Dkt. 442 at 69–72.)

[46] D&D did not assert Count Nine against the Board.  (Dkt. 58 at 37–39.)

[47] The Board notified D&D of its intent to move for sanctions with respect to Count Ten via the
3-26-07 Draft Motion and accompanying e-mail.  See supra Sec.II.B.2.  D&D did not withdraw
Count Ten against the Board.

the following the elements of a tortious interference with prospective economic advantage claim: (1) its reasonable expectation of economic advantage; (2) that Defendants intentionally and <u>maliciously</u> interfered with that expectation; (3) a causal connection between Defendants' interference and its loss of prospective gain; and (4) damages.  (Dkt. 264 at 52–55 (emphasis added).)[48]

The Court recognized a potential tortious interference with prospective economic advantage claim based upon D&D's lost bonding capacity.  (<u>Id.</u> at 56.)  The Court, with respect to the arguments raised by the parties, identified the following issues of fact that remained at the time that the 12-21-07 Ruling issued: (1) whether the Surety was capable of issuing bonds to D&D at the time of Defendants' alleged interfering conduct; (2) each Defendant's motive in drafting and posting the "Construction Updates"; and (3) whether each Defendant acted with malice.  (<u>Id.</u> at 56–58.)  Thus, the Court denied the Board's initial motion for summary judgment with respect to Count Ten.  (<u>Id.</u> at 57–58.)[49]

### 2.      3-30-12 Ruling

The Board again moved for summary judgment on October 30, 2009.  (Dkt. 348.) The Board, in support of its motion on Count Ten, argued that it was entitled to unqualified immunity under the New Jersey Tort Claims Act ("NJTCA"), which provides that a "public entity is not liable for the acts or omission of a public employee constituting a crime, actual fraud, actual <u>malice</u>, or willful misconduct."  (Dkt. 442 at 74.)

---

[48] The Court determined that D&D did not state a tortious interference claim related to the Project Contracts.  (Dkt. 264 at 55 n.14.)

[49] The Board notified D&D of its intention to move for sanctions with respect to Count Ten via the 1-13-10 Draft Motion and accompanying e-mail.  <u>See</u> <u>supra</u> Sec.II.B.3.

See also N.J.S.A. 59:2-10 (emphasis added).)  The Court agreed, on the ground that

"malice is an element of tortious interference, and as a matter of law cannot be

entertained by the Board as a public entity …"  (Id. at 74–75.)  See also supra Sec.III.H.1.

Accordingly, the Court granted judgment in favor of the Board on Count Ten.  (Id. at 75.)

### I.    Count Eleven: "Libel and Slander (All Defendants)" – 3-30-12 Ruling

Count Eleven was styled as "Libel and Slander," although the count also described

intentional acts sounding in defamation.  (Dkt. 58 at 42 (stating "defendants intentionally

and deliberately slandered and defamed [it]").)  The allegations in support of Count

Eleven were related to statements contained in the "Construction Updates" and default

letters.  (Dkt. 264 at 58.)  See also supra Sec.I.B.2–3.   D&D, with respect to those

statements, claimed damages for alleged injuries to its integrity, morality, and

commercial reputation.  (Dkt. 58 at 42.)

The Board moved for summary judgment with respect to Count Eleven, insofar as

it was asserted against it, on October 30, 2009.  (Dkt. 348.)[50]  The Court, in the 3-30-12

Ruling, observed that "actual malice" – as demonstrated by clear and convincing

evidence that the defendant knew a statement was false or acted with reckless disregard

to its falsity – is a requisite element of a defamation claim against a public figure.  (Dkt.

264 at 61.)  D&D, however, argued that it was a private figure at all times related to the

amended complaint, and therefore asked the Court to review Count Eleven under a

---

[50] The Board notified D&D of its intention to move for sanctions with respect to Count Eleven
via the 3-26-07 Draft Motion and accompanying e-mail.  See supra Sec.II.B.2.  D&D did not
withdraw Count Eleven against the Board.  The Board again notified D&D of its intention to
move for sanctions with respect to Count Eleven via the 1-13-10 Draft Motion and
accompanying e-mail.  See supra Sec.II.B.3.

negligence standard rather than the standard applicable to public figures.  (Id. at 59.)  The

Court, for the reasons discussed below, rejected this argument:

> D&D bid and performed general construction work on the Project, which
> undoubtedly received significant attention from the North Plainfield
> community.  Also, D&D likely received public attention in the past because
> it performed work on other public construction projects, including other
> school renovation projects …. Therefore, we conclude that D&D was
> transformed into a public figure for the limited purpose of performing its
> work under the Project contracts, and thus, it must show that the
> defendants' statements about it were made with actual malice.

(Id. at 62.)

Although the Court found that D&D "presented evidence from which a reasonable

jury could conclude that … the Board … knew that D&D did not cause the Project delays

or perform incomplete and defective work on the dates they issued the default notices,

default and termination letters, and published the statements about D&D's performance

on the Board's website, and thus, their statements were knowingly false," the Court

likewise determined that the Board was entitled to unqualified immunity with respect to

D&D's defamation claim under the NJTCA.  (Id. at 64–65.)  See also supra Sec.III.H.2.

Accordingly, the Court granted summary judgment in favor of the Board on D&D's

defamation claim.  (Id. at 66.)

## J.    Count Twelve: "Conversion (Board of Education, Bovis)" – 3-30-12 Ruling

D&D asserted a conversion claim against the Board and Bovis in Count Twelve.

(Dkt. 58 at 43.)[51]  The allegations in support of Count Twelve were related to the Board

---

[51] The Board notified D&D of its intention to move for sanctions with respect to Count Twelve
via the 1-13-10 Draft Motion and accompanying e-mail.  See supra Sec.II.B.3.

and Bovis's alleged withholding of: (1) equipment and materials related to the Project; and (2) funds due pursuant to the Project Contracts.  (Id.)  See also supra Sec.I.B.2.

The Board moved for judgment in its favor with respect to Count Twelve in the first instance on October 30, 2009.  (Dkt. 348.)  The Board, in support of this motion, argued that the conversion claim was barred by the economic loss doctrine, which "prevents a plaintiff from recovering in tort for economic losses flowing from a contract." (Dkt. 442 at 89.)  The Court agreed with the Board on this point, and for the reasons that follow, found that the allegations in Count Twelve were intrinsic to the Project Contracts:

> The actions complained of in count 12 are expressly provided by the terms of the [Project Contracts], specifically, Article 14.2 of the General Conditions, and therefore are not extrinsic to the contract between D&D and the Board.  (See General Conditions at Art. 14.2.2 (stating that if conditions for terminating the Contract exist, the Owner may "take possession of the site and all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor"); id. at 14.2.3 ("When the Owner terminates the Contract ... the Contractor shall not be entitled to receive further payment until the Work is finished.").)

(Id. at 90.)

The Court further noted that D&D's allegations concerning withheld funds did not support the conversion claim, because "[a]n action for conversion will not lie in the context of a mere debt."  (Id. (internal citation omitted).)  Thus, the Court granted judgment in favor of the Board on Count Twelve.  (Id. at 91.)

### K.   Count Thirteen: "Fraudulent Inducement (Board of Education, Epstein, Vitetta)" and Count Fourteen: "Fraudulent Inducement, Rescission of Performance Bonds (Board of Education, Epstein, Vitetta)" – 3-30-12 Ruling

Count Thirteen and Count Fourteen asserted claims against the Board for fraudulent inducement and misrepresentation under New Jersey law.  (Dkt. 58 at 44–45.)

The basis for Count Thirteen, according to D&D, was that: (1) the Board failed to disclose "problems and delays in obtaining bond funding, grant funding, and submitting sealed final drawings sufficient to permit building permits to issue"; (2) these facts were material to D&D's decision to bid on the Project and enter into the Project Contracts; (3) D&D would not have bid on the Project had it known about these concealed facts; (4) "[t]he concealment of the true facts by defendants was done with the specific intent that plaintiff and others would rely on the information supplied by defendants in preparing their bids and evaluating the projects"; and (5) D&D and the Surety relied on the Board's material misrepresentations and omissions to their detriment. (Id. at 44.)  Count Fourteen demanded restitution and damages stemming from the conduct described in Count Thirteen.  (Id. at 45.)

The Board moved for summary judgment with respect to Count Thirteen and Count Fourteen on October 30, 2009.  (Dkt. 348.)[52]  The Board argued, inter alia, that it was immune from liability under the NJTCA, which bars the imposition of fraudulent scienter liability on a public entity.  (Dkt. 442 at 92–93.)  See also supra Sec.III.H.2. D&D, in reply, argued that a different New Jersey statute, N.J.S.A. 2A:58B-3, superseded the NJTCA, because it stated "that there should be no limits on a contractors' [sic] remedy for delays to its performance created by public entities," and therefore its fraud claims should not be dismissed.  (Id. at 92.)

---

[52] The Board notified D&D of its intention to move for sanctions with respect to Count Thirteen and Count Fourteen via the 1-13-10 Draft Motion and accompanying e-mail.  See supra Sec.II.B.3.

The Court resolved the dispute in favor of the Board, because "under New Jersey law, the scienter necessary to a fraud claim cannot be imputed to a public entity ..." (Id. at 93–94 (citing the NJTCA, as interpreted and applied in the Federal District Court for the District of New Jersey).)  Moreover, the Court found no conflict between the NJTCA and any New Jersey statute cited by D&D.  (Id. at 94.)  Accordingly, because the NJTCA barred liability against the Board on Count Thirteen or Count Fourteen, the Court entered judgment in favor of the Board on both counts.  (Id.)

### L.   Count Fifteen: "Civil Conspiracy (Board of Education, Epstein, Vitetta, Bovis)" – 12-21-07 Ruling

Count Fifteen alleged that Defendants conspired with one another to cause financial injury to D&D.  (Dkt. 58 at 45–46.)  D&D alleged, in support of Count Fifteen, that Defendants entered into "a combination with a real agreement, common design and unlawful purpose to be achieved by unlawful means to deprive plaintiff of its property and destroy its business."  (Id. at 46.)  D&D sought special damages related to that allegation.  (Id.)

The Board moved for judgment in its favor on Count Fifteen on May 13, 2006.  (Dkt. 143.)[53]  The Court granted judgment in favor of the Board as to Count Fifteen in the 12-21-07 Ruling, on the ground that D&D failed to articulate a prima facie civil conspiracy claim.  (Dkt. 264 at 73–75.)  The Court described the requisite elements of a civil conspiracy claim as follows:

---

[53] The Board again notified D&D of its intention to move for sanctions with respect to Count Fifteen via the 3-26-07 Draft Motion and accompanying e-mail.  D&D did not withdraw Count Fifteen against the Board.  See supra Sec.II.B.2.

> To state a civil conspiracy claim, a plaintiff must establish: "(1) a
> combination of two or more persons; (2) a real agreement of confederation
> with a common design; (3) the existence of an unlawful purpose; and (4)
> proof of special damages." Morganroth & Morganroth v. Norris,
> McLaughlin, & Marcus, P.C., 331 F.3d 406, 414 (3d Cir. 2003) (citation
> omitted). An agreement to commit a wrongful act does not, by itself,
> support a civil conspiracy claim. Id. Instead, at least one of the co-
> conspirators must commit a tortious act in furtherance of the conspiracy.
> Id. Accordingly, the "gist of the claim, is not the unlawful agreement but
> the underlying wrong which absent the conspiracy, would give a right of
> action." Engineered Framing Sys., Inc. v. Vescom Structures, Inc., No. 05-
> 1461, 2005 U.S. Dist. LEXIS 26295, at *15 (D.N.J. Nov. 1, 2005) (citation
> and internal quotations omitted).

(Id. at 73.)

The Court determined that D&D's conspiracy claim failed as a matter of law

because, inter alia, D&D failed to plead facts sufficient to demonstrate that Defendants:

(1) entered into an agreement to commit an unlawful act or engaged in any discussions

that could be construed as an agreement; and (2) committed acts in furtherance of the

alleged conspiracy. (Id. at 74.) Thus, the Court granted judgment in favor of the Board

with respect to Count Fifteen. (Id. at 73–75.)[54]

## M.   Count Sixteen: "Malicious Abuse of Process (Board of Education, Epstein)" – 12-21-07 Ruling

D&D alleged in Count 16 that the Board and Epstein: (1) "engaged in malicious

abuse of process in proceedings which have adversely affected [D&D's] legally protected

interests"; (2) acted with malice; and (3) caused D&D to suffer "a special grievance, to

wit, wrongful interference with the destruction of its liberty and property interests." (Dkt.

58 at 46.) D&D later explained that the allegations related to malicious abuse of process

---

[54] The Board notified D&D of its intention to move for sanctions with respect to Count Fifteen
via the 1-13-10 Draft Motion and accompanying e-mail. See supra Sec.II.B.3.

were largely related to the Board's attempts to compel arbitration of this action.  (Dkt. 264 at 75–76.)  D&D argued that the Board sought to compel arbitration by filing a Third Party Complaint in a state court matter, <u>P.J. Smith Elec. Contractors, Inc. v. N. Plainfield Bd. of Educ.</u>, No. SOM-L-23-05 ("<u>Smith</u> Action").  (Dkt. 264 at 75–76.)  While acknowledging that the Board did not move for leave to proceed with arbitration in this action, D&D asserted that the Board and Epstein abused the arbitration proceedings "to try to entice other co-primes into joining the conspiracy to shift the blame for the delays in the [P]roject from the defendants, themselves, to D&D."  (<u>Id.</u> at 76.)

The Board moved for summary judgment in its favor as to Count Sixteen on May 13, 2006.  (Dkt. 143.)[55]  The Court ruled that Count Sixteen failed as a matter of law, in part because D&D failed to establish the requisite elements of a malicious prosecution claim by demonstrating that the Board and Epstein instituted proceedings: (1) without probable cause; and (2) with malice.  (Dkt. 264 at 76–78.)  Nor did D&D make the requisite demonstration that the proceedings terminated in its favor.  (<u>Id.</u>)  The Court explained that D&D failed to establish the first element, because the complaint in the <u>Smith</u> Action was never served on D&D, and was subsequently dismissed.  (<u>Id.</u> at 77.)  The Court therefore found that neither the Board, nor Epstein, "instituted proceedings" against D&D in the <u>Smith</u> Action.  (<u>Id.</u>)  D&D also failed to establish that the proceedings terminated in its favor, because "all claims involving D&D that were subject

---

[55] The Board again notified D&D of its intention to move for sanctions with respect to Count Sixteen via the 3-26-07 Draft Motion and accompanying e-mail.  D&D did not withdraw Count Sixteen against the Board.  <u>See</u> <u>supra</u> Sec.II.B.2.

to arbitration were stayed shortly … because D&D filed a bankruptcy petition."  (Id. at

77.)  See also supra Sec.I.B.3.b.

D&D's malicious abuse of process claim likewise failed, the Court ruled, because

D&D failed to demonstrate: (1) "improper, unwarranted and perverted use of process

after it was issued"; and (2) that Epstein and the Board committed further acts, which

revealed a motive to coerce or oppress D&D.  (Id. at 78 (internal citation and quotation

omitted).)[56]  The Court found that D&D failed to allege any "further acts" on the part of

Epstein or the Board concerning the Smith Action.  (Id. at 79.)  Moreover, the Court

noted that, from a procedural standpoint, the Smith Action was never properly served on

D&D, and was stayed shortly thereafter, thereby truncating any ability of the Board to

abuse the process.  (Id.)  Accordingly, the Court granted judgment in favor of the Board

with respect to D&D's malicious prosecution and malicious abuse of process claims.  (Id.

at 80.)

## IV.  PROCEDURAL HISTORY: MOTION FOR RECONSIDERATION AND APPEAL

### A.     Motion for Reconsideration

D&D moved, in effect, for reconsideration of the 3-30-12 Ruling on April 26,

2012.  (Dkt. 448.)  This Court denied that motion on August 15, 2012 ("8-15-12

Ruling"), on the ground that, inter alia, D&D did not: (1) raise an intervening change in

controlling law or new evidence; or (2) base the motion on facts or controlling legal

precedent previously considered by this Court.  (Dkt. 464 at 4–6.)  The Court concluded,

---

[56] The Board again notified D&D of its intention to move for sanctions with respect to Count
Sixteen via the 1-13-10 Draft Motion and accompanying e-mail.  See supra Sec.II.B.3.

rather, that D&D's motion merely asserted D&D's disagreement with the 3-30-12 Ruling.  (Id. at 6.)

**B.     Appeal**

D&D appealed from the 12-21-07 Ruling, 3-30-12 Ruling, and 8-15-12 Ruling – insofar as those rulings addressed Count One, Count Two, Count Three, Count Four, and Count Eight – to the Third Circuit.  (Dkt. 491; see also dkt. 493-2.)  On January 8, 2014, the Third Circuit affirmed this Court's rulings on all counts.  (Dkt. 493-2.)  The Court summarizes the Third Circuit's analysis as to each count below.

**1.     Count One: "Civil Rights – Fourth Amendment, Fifth Amendment, Fourteenth Amendment Seizure of Property (All Defendants)"**

The Third Circuit found that D&D's arguments related to Count One were "entangled with contentions on other counts."  (Id. at 5.)  Moreover, the Third Circuit determined that D&D did not request that Count One be reinstated in its opening appellate brief.  (Id.)  Based upon the insufficiency of D&D's briefing as to Count One, the Third Circuit held that D&D did not preserve any issue related to that count on appeal.  (Id.)

**2.     Count Two: "Civil Rights – Liberty Interest, Destruction of Prequalification for Public Works Contracts Without Due Process (All Defendants)"**

The Third Circuit affirmed the 3-30-12 Ruling as to Count Two.  (Id. at 6–9.)  See also Sec.III.B.3 (describing the 3-30-12 Ruling as to Count Two).  The Third Circuit, in support of the decision, determined that D&D had no liberty interest in its prequalification classification, because "the connection between the alleged stigma and the loss of prequalification" classification was too remote to satisfy the "stigma prong" of

the "stigma-plus" test.  (Dkt. 493-2 at 5–8.)  See also supra Sec.III.B.3.  Any alleged

damage to D&D's prequalification interest was too remote, in the Third Circuit's view,

because the 6-30-03 Application lacked necessary signatures, notarizations, and

affidavits, which resulted in the 6-30-03 Application being deemed withdrawn.  (Dkt.

493-2 at 7.)  See also supra Sec.I.B.3.b (describing the procedural deficiencies related to

the 6-30-03 Application).  Thus, the Third Circuit viewed the 6-30-03 Application as an

intervening act by D&D that also contributed to its lost prequalification interest.  (Dkt.

493-2 at 7–8.)[57]

> **3.  Count Three: "Civil Rights – Retaliatory Terminations for
> Exercise of First Amendment Rights (All Defendants)" and Count
> Four: "Civil Rights – First Amendment Retaliation For Seeking
> Redress in Federal Court (Board of Education, Vitetta, Epstein)"**

The Third Circuit affirmed the 3-30-12 Ruling as to Count Three and Count Four.

(Id. at 8–10.)  See also Sec.III.C.3.a.iii (describing this Court's 3-30-12 Ruling as to

Count Three).  With respect to Count Three, the Third Circuit agreed that the relevant

speech was made in D&D's capacity as a contractor – and not as a citizen – and thereby

warranted no constitutional protection.  (Id. at 9.)  The Third Circuit also held that D&D

did not preserve its appeal from this Court's ruling as to Count Four.  (Dkt. 493-2 at 9–

10.)  Notably, D&D "requested in its conclusion that this count be reinstated against the

Board but made no arguments regarding retaliation for initiating litigation anywhere in

[its] brief."  (Id. at 10.)

---

[57] The Third Circuit, with respect to D&D's bonding capacity, observed that the Surety had
"concerns about D&D's ability to handle existing projects."  (Dkt. 493-2 at 7.)  See also supra
Sec.I.B.3.a (describing post default developments as to D&D's bonding capacity).

### 4.    Count Eight: "Breach of Contract (Board of Education)"

The Third Circuit affirmed the 3-30-12 Ruling as to Count Eight.  (Id. at 11–13.)

See Sec.III.G.2 (describing 3-30-12 Ruling as to Count Eight).  This decision was largely

based on D&D's procedural errors on appeal.  (Dkt. 493-2 at 10–12.)  The Third Circuit

found, for example, that two of D&D's arguments were: (1) barred by res judicata; and

(2) not raised before this Court, and therefore barred on appeal.  (Id. at 10–11.)

With respect to Count Eight, D&D raised two arguments on appeal that were

procedurally viable.  (Id. at 11–12.)  First, D&D argued that its interpretation of United

States v. Aetna Cas. & Sur. Co., 338 U.S. 366 (1949) controlled and supported "the

conclusion that D&D was entitled to pursue the breach of contract claim in its own

name."  (Id. at 11.)  The Third Circuit deemed Aetna Cas. & Sur. Co. factually-dissimilar

to this action – notably because "D&D's rights [under the Project Contracts] were

wholly, not partially, assigned to the Surety" – and therefore found "no reason to

question" the 3-30-12 Ruling as to Count Eight.   (Id.)  See also supra Sec.III.G.2.[58]

D&D's final argument with respect to Count Eight was addressed by this Court in

the 8-15-12 Ruling.  (Dkt. 493-2 at 11–12.)  See also supra Sec.IV.A (describing the

motion for reconsideration and 8-15-12 Ruling).  D&D argued, for the first time in

---

[58] The Third Circuit described the factual distinction as follows:

> Aetna is inapplicable because it concerns an entirely dissimilar fact pattern.  In
> that case, the Supreme Court held that where an insurer has only partially paid a
> claim and is therefore a partial subrogee to the insured, both the insured and the
> insurer may bring actions in their own names for the portions of the claim they
> respectively hold ….  Here the District Court concluded that D&D's rights were
> wholly, not partially, assigned to the Surety.

(Dkt. 493-2 at 11.)

support of its motion for reconsideration, that the 1-19-05 Reorganization Plan foreclosed a finding that the Surety was the party of interest.  (Dkt. 493-2 at 11–12.)  This Court rejected that argument due to its failure to present a change in law or new evidence warranting reconsideration.  (Id. at 12.)  Nor did this Court find that the argument suggested a "clear error of law or fact" or present "manifest injustice."  (Id.)  The Third Circuit, for those reasons, affirmed the 3-30-12 Ruling and 8-15-12 Ruling as to Count Eight.  (Id. ("D&D cannot use a motion for reconsideration to avoid the consequences of failing, without providing any explanation, to raise this argument in the six years this issue has been under litigation.").)

### C.    Motion for Sanctions

The Board moved for sanctions on September 14, 2012.  (Dkt. 471.)  This Court denied the motion without prejudice, pending the outcome of D&D's appeal to the Third Circuit.  (Dkt. 486.)  The motion was later deferred on March 12, 2014, pending the Supreme Court rulings in Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S.Ct. 1749 (2014) and Highmark Inc. v. Allcare Health Management System, 134 S.Ct. 1744 (2014).  (Dkt. 495.)

## V.    LEGAL STANDARDS

Our legal system, as a general rule, "requires each party to bear his own litigation expenses … regardless whether he wins or loses."  Fox v. Vice, 131 S.Ct. 2205, 2213 (2011).   Exceptions to that rule exist, however, under Section 1988, Rule 11, and Section 1927.  See infra Secs.V.A–C.  The Court provides a summary of the legal standards that govern each exception below.

### A.    Section 1988

A court, under Section 1988, may award reasonable attorneys' fees to the prevailing party in a civil rights action, including those brought under Section 1983 and Section 1985.  42 U.S.C. § 1988(b).  Any statutory award is limited to the non-prevailing party, and thus, Section 1988 does not authorize an award of fees against counsel.  Id. Any remedy must be related to "costs that the defendant would not have incurred but for the frivolous claims."  Vice, 131 S.Ct. at 2211.   A court must therefore determine "whether the costs would have been incurred in the absence of the frivolous allegation." Id. at 2216.

Section 1988 entitles prevailing defendants in civil rights actions to attorneys' fees upon a finding that the underlying "action was frivolous, unreasonable, or without foundation."  Id. at 2213 (internal citation and quotation omitted).   An award of fees to a prevailing defendant under Section 1988, however, does not require a finding that the plaintiff pursued the frivolous claims in subjective bad faith.  Barnes Found. v. Twp. of Lower Merion, 242 F.3d 151, 158 (3d Cir. 2001).  Rather, the standard is objective and applies on a case-by-case basis.  Id.

A court, when determining whether an action was frivolous, unreasonable, or without foundation, considers: (1) whether the underlying claim had an arguable legal basis; and (2) the evidence that supported each claim.  Id. at 158–66.  A court under Barnes may also consider the following nonexclusive list of factors (collectively, "the Barnes Factors") and analyze whether:

(1) the plaintiff established a prima facie case;

56

(2) the defendant offered to settle;

(3) the trial court dismissed the case before trial;

(4) the case proceeded to trial on the merits;

(5) "the question in issue was one of first impression requiring judicial resolution"; and

(6) the controversy presented a "real threat of injury to the plaintiff …"

Id. at 158.

The statutory purpose of Section 1988 is to "relieve defendants of the burdens associated with fending off frivolous litigation." Vice, 131 S.Ct. at 2209.  But a court must not award attorneys' fees under Section 1988 simply because a plaintiff did not prevail.  Hughes v. Rowe, 449 U.S. 5, 14 (1980) (internal citation and quotation omitted); see also Vice, 131 S.Ct. at 2209.  Thus, "fee-shifting in favor of prevailing defendants … is not routine and is only to be sparingly exercised." Veneziano v. Long Island Pipe Fabrication & Supply Corp., 238 F.Supp.2d 683, 688 (D.N.J. 2002), aff'd, 79 Fed.Appx. 506 (3d Cir. 2003).  The Barnes Factors, therefore, must be weighed against: (1) the risk of chilling the exercise of constitutional rights; and (2) the possibility that a plaintiff had a good faith belief in the merits of the claims.  Baby Doe v. Methacton Sch. Dist., 920 F.Supp. 78, 79 (E.D. Pa. 1996).

### B.     Rule 11

Rule 11 provides, in pertinent part:

(b) By presenting to the court a pleading, written motion, or other paper … an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed.R.Civ.P. 11(b)(1)–(4).

Subsection (c)(1) of Rule 11 states, in pertinent part:

If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.

Fed.R.Civ.P. 11(c)(1).

The following subsection of Rule 11 describes the scope of a court's sanctioning

powers under that rule:

A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed.R.Civ.P. 11(c)(4).

Rule 11 sanctions may be imposed on counsel and the party represented by

counsel. Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 94–95 (3d Cir. 1988). The

purpose of Rule 11 is to hold attorneys and clients accountable for actions made during

the course of litigation. Id. at 94. Specifically, the Rule aims to discourage litigants from

pursuing claims that are frivolous, legally unreasonable, or without factual foundation. Lieb v. Topstone Indus., 788 F.2d 151, 157 (3d Cir. 1986). Rule 11, to discourage the prosecution of such claims, imposes an obligation on counsel and the party represented to "Stop, Think, Investigate and Research before filing papers either to initiate a suit or to conduct the litigation." Gaiardo v. Ethyl Corp., 835 F.2d 479, 482 (3d Cir. 1987) (internal quotation omitted). That obligation encourages responsible lawyering, while also promoting "the court's duty to serve the public efficiently." Id.

Rule 11 sanctions are triggered upon a finding of abusive litigation or misuse of a court's process. Id. The standard governing Rule 11 requires a court to consider whether, after a reasonable inquiry, the pleading, motion, or other paper at issue was: (1) well-grounded in fact; and (2) warranted by existing law or a good faith argument for the extension, modification, or reversal of the law. Id. (internal citation and quotation omitted). The standard is objective and based upon the reasonableness of counsel and the party under the circumstances. Id. "Mistaken judgment, ignorance of the law, or personal belief with regard to what the law should be do not provide the attorney with an excuse or defense if the lawyer who signed the pleading failed to make a reasonable inquiry into the facts and law supporting the pleading before it is filed." Kuhns v. CoreStates Fin. Corp., 998 F.Supp. 573, 577 (E.D. Pa. 1998).

Rule 11 sanctions are appropriate where "a pleading, motion, or other paper is signed" in contravention to the Rule. Gaiardo, 835 F.2d at 484 (internal quotation omitted). Rule 11, however, does not authorize a sanction due to counsel's failure to "amend or correct a document if information obtained or legal research performed after

filing reveals an error." Id.  A court's analysis, therefore, "properly concentrates on circumstances existing at the time the paper was filed." Id.  Rule 11 does recognize, however, that "parties will not be entitled to continuing immunity if they acquire or should acquire knowledge under the Rule's standard before a later filing." Id.  This principle applies as follows:

> For example, a defendant's answer may be in the spirit of the Rule at the time of filing, but a motion for summary judgment founded on the same theory may violate the Rule if investigation or research shows that the initial information was incorrect.  Liability would be based on circumstances present when the motion is filed, not when the answer was filed.

Id.

Rule 11 is not breached, however, if after reasonable legal research and adequate factual investigation, a party and counsel challenge existing law in good faith. Id. at 483–84 (describing the concern of the Advisory Committee on the Federal Rules of Civil Procedure that Rule 11 "might be interpreted to inhibit imaginative legal or factual approaches to applicable law or to unduly harness good faith calls for reconsideration of settled doctrine").  Thus, an advocate of new or novel legal theories shall not be sanctioned. Id. at 483.

Rule 11 sanctions, therefore, are "not to be used routinely when the parties disagree about the correct resolution of a matter in litigation" and are "instead reserved for only exceptional circumstances." Morristown Daily Record, Inc. v. Graphic Commc'ns Union, Local 8N, 832 F.2d 31, 32 n.1 (3d Cir. 1987).  Indeed, Rule 11, as amended in 1993, is "viewed to discourage [the] imposition of monetary and other sanctions … where conduct does not reach the point of clear abuse." Kuhns, 998 F.Supp.

at 577.  Accordingly, litigants "misuse the Rule when sanctions are sought against a party

or counsel whose only sin was being on the unsuccessful side of a ruling or judgment."

Gaiardo, 835 F.2d at 483.  Rather, a demonstration of "substantially more" is required.  Id.

### C.   Section 1927 and the Court's Inherent Powers

Section 1927 provides, in relevant part:

> Any attorney or other person admitted to conduct cases in any court of the
> United States … who so multiplies the proceedings in any case
> unreasonably and vexatiously may be required by the court to satisfy
> personally the excess costs, expenses, and attorneys' fees reasonably
> incurred because of such conduct.

28 U.S.C. § 1927.

The statute, by its own terms, is directed at counsel rather than a party to litigation.

Id.  Section 1927 liability is limited to "instances of a serious and studied disregard for

the orderly process of justice."  Williams v. Giant Eagle Mkts., Inc., 883 F.2d 1184, 1191

(3d Cir. 1989) (internal citation and quotation omitted).  Thus, Section 1927 "limits

attorney sanctions imposed thereunder to those situations where an attorney has: (1)

multiplied proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost

of the proceedings; (4) with bad faith or with intentional misconduct."  LaSalle Nat'l

Bank v. First Conn. Holding Grp., LLC, 287 F.3d 279, 288 (3d Cir. 2002).

A finding of bad faith is a precondition to Section 1927 liability.  Baker Indus.,

Inc. v. Cerberus Ltd., 764 F.2d 204, 208–09 (3d Cir. 1985).  The bad faith requirement is

intended "to avoid chilling an attorney's legitimate ethical obligation to represent his

client zealously .…"  Id. at 208.  Notably, a court must find evidence of "willful bad faith

on the part of the offending attorney" by identifying "conduct … of an egregious nature,

stamped by bad faith that is violative of recognized standards in the conduct of litigation." Id. at 208–09 (internal citation omitted).  A finding that "counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal" will not suffice.  LaSalle Nat'l Bank, 287 F.3d at 289.

A court may impose sanctions under its inherent powers where counsel has willfully abused the judicial process or otherwise conducted litigation in bad faith. Roadway Express, Inc. v. Piper, 447 U.S. 752, 765–66 (1980).  The inherent power of the court permits sanctions on both attorneys and litigants.  Quiroga v. Hasbro, Inc., 934 F.2d 497, 505 (3d Cir. 1991).

## VI.    LEGAL STANDARD APPLIED HERE: SECTION 1988

The Board moves for attorneys' fees under Section 1988 against D&D, with respect to Count One, Count Two, Count Three, Count Four, Count Five, and Count Six (collectively, the "Civil Rights Counts"), insofar as D&D asserted those counts against it. (Dkt. 499-1 at 16 n.2.)  See also supra Sec.V.A (describing the scope of Section 1988 liability).[59]  The Court notes, as a preliminary matter, that the parties frame their arguments regarding the applicability of Section 1988 liability with reference to: (1) the Civil Rights Counts collectively; and (2) each count individually.  See infra Sec.VI.A–B. The Court, for that reason, will first discuss the parties' arguments regarding the Civil

---

[59] The Court notes that the Board also moves for attorneys' fees under Section 1988 with respect to Count Seven, Count Eight, Count Ten, Count Fifteen, and Count Sixteen.  (Dkt. 499-1 at 48–63.)  The Court does not find that awarding fees with respect to state law counts will further the congressional policy of sparing defendants the costs of frivolous litigation for Section 1983 and Section 1985 claims.  Vice, 131 S.Ct. at 2217; see also 42 U.S.C. § 1988(b).  Accordingly, the Court will consider the Board's motion with respect to D&D's state law counts exclusively under Rule 11, infra Sec.VII.

Rights Counts collectively, infra Sec.VI.A.1–2.  The Court later discusses the parties'

arguments regarding each civil rights count, infra Sec.VI.B, and also provides the Court's

analysis as to each count.

### A.    Argument: Civil Rights Counts

#### 1.    The Board's Arguments – the Barnes Factors

The Board contends that it is the prevailing party under Section 1988 because this

Court granted judgment in favor of the Board on the Civil Rights Counts, and the Third

Circuit affirmed.  (Dkt. 499-1 at 20 ("Now that the Third Circuit has affirmed the

dismissal of all of D&D's claims against the Board, there is no doubt that the Board is the

'prevailing party ...'").)  See also supra Sec.IV.B (describing the Third Circuit decision

on appeal).  Further, the Board argues that D&D bears the burden of demonstrating that

its claims had colorable merit, and that its factual allegations were supported by

competent evidence.  (Dkt. 499-1 at 19.)

The Board applies the Barnes Factors to support the argument that Section 1988

sanctions are warranted here, because each of the Civil Rights Counts were "frivolous,

unreasonable, or without foundation."  (Id. at 25, 46–47.)  See also supra Sec.V.A (listing

the Barnes Factors).  With respect to the Barnes Factor concerning settlement, for

example, the Board contends that D&D made only one settlement demand in this case of

$6 million to settle its $8 million claim against the Board.  (Dkt. 499-1 at 46.)  The Board

further explains that it did not respond to that "outrageous" settlement demand.  (Id.)

Based upon its failure to respond, and the unsuccessful settlement negotiations between

the parties, the Board argues that it is entitled to attorneys' fees under Section 1988.  (Id.)

The Board also argues that two other <u>Barnes</u> Factors weigh in its favor because this action did not proceed to trial.  (<u>Id.</u>)  <u>See also</u> <u>supra</u> Sec.V.A (listing the <u>Barnes</u> Factors).  According to the Board, D&D did not establish a single prima facie claim against it, because this Court entered judgment in favor of the Board as to all counts in the amended complaint.  (Dkt. 499-1 at 46.)  With respect to the remaining <u>Barnes</u> Factors, the Board contends that the factual and legal underpinnings of this action did not: (1) raise issues of first impression; and (2) demonstrate a threat of a real constitutional injury to D&D.  (<u>Id.</u> at 46–47.)

## 2.   D&D's Arguments

The Court notes that D&D does not provide the factual or legal basis for each claim it asserted against the Board in its opposition papers.  (<u>See</u> dkt. 510.)[60]  Rather, the majority of D&D's argument is structured under general subheadings addressing the: (1) <u>Barnes</u> Factors; (2) procedural history of this action; (3) discovery exchanged between the parties; and (4) factual investigation by D&D.  (<u>See</u> <u>generally</u> <u>id.</u>)[61]

---

[60] D&D did address the factual and legal basis for each count, to some degree, during oral argument on March 25, 2015.  (Dkt. 524 at 35–99.)  The Court summarizes D&D's argument as to each count <u>infra</u> Sec.VI.B.

[61] The Court is inclined to agree with the Board that this structure required the Court to "sift through the voluminous record to specifically identify facts or evidence which might support D&D's claims." (Dkt. 518 at 13.)  The Court likewise agrees with the Board that the papers submitted by D&D had "minimal citations to the record and then cites only generally to the several hundred page appendix submitted with the opposition." (<u>Id.</u> at 14.)  The Court, however, rejects the Board's suggestion that D&D was required to provide a count-by-count analysis addressing the merits of each claim.  (<u>Id.</u> at 12.)  The Court's review of the procedural history as to each count here is predicated upon the voluminous procedural record in this action and the Court's prior rulings, discussed <u>supra</u> Sec.II.A.  When necessary, the Court has endeavored to identify the citations that D&D failed to provide.

The Court analyzes these arguments below.[62]

### a.   The <u>Barnes</u> Factors

D&D contends that the <u>Barnes</u> Factors weigh in its favor.  (<u>Id.</u> at 50–57.)  D&D, in support of this contention, argues that: (1) D&D established prima facie claims against the Board; (2) the Board "refused to minimize fees through settlement or partial settlements because it refused … to even begin negotiations [with D&D] unless D&D unconditionally released all claims against Epstein"; (3) D&D raised issues of first impression before this Court; and (4) D&D pleaded "a sufficiently real threat of injury" in this action by alleging that "defendants expressly threatened to make it impossible for D&D to work on any project other than their own school project ..."  (<u>Id.</u> at 53–57, 73.) <u>See also</u> <u>supra</u> Sec.V.A (listing the <u>Barnes</u> Factors).

D&D also argues to distinguish this action from cases where courts awarded attorneys' fees under Section 1988.  (Dkt. 510 at 51–52, 65.)  According to D&D, the majority of these cases involved, <u>inter alia</u>: (1) repeated litigation arising from the same dispute; and (2) vindictive motives.  (<u>Id.</u> at 51–52 (internal citation omitted).)  This action is distinguishable, D&D argues, because the Board contributed to the tortured procedural record.  (<u>Id.</u> at 52 ("In this case … it has been the defendants, and not the plaintiff, who have been the repeat litigators ..." (internal footnote omitted)).)

---

[62] D&D does not indicate whether many of the general arguments support its opposition to a fee award under Section 1988, Rule 11, or both.  The Court, for organizational purposes, will discuss the general arguments in tandem here.

### b.  Procedural History

D&D argues that the lengthy procedural history in this action does not support relief against it under Section 1988.  (See, e.g., id. at 18–22.)  D&D construes the rulings of "this District Court and other courts in related proceedings" to have "repeatedly found that D&D's claims had merit and should proceed."  (Id. at 18.)[63]  D&D also submits, without providing a citation to the record, that this Court "rejected eight motions to dismiss, in whole or in part, filed by Epstein, Bovis and Vitetta within the first two years of the litigation."  (Id.)  D&D construes those rulings to support the sufficiency of its claims.  (Id. at 18–19.)

D&D also criticizes the Board for having waited until 2006 to file its initial motion for summary judgment.  (Id. at 70 ("Significantly, when Bovis and Vitetta filed their summary judgment motions to dismiss Counts 1 and 2 in January 2005 … the Board did not join in it or cross-move on its own to dismiss these counts.  The Board waited over a year to do so, in May 2006, instead of moving at once to join Bovis and Vitetta to dismiss what it contended was a baseless claim.").)[64]  D&D also suggests that the Board delayed filing the dispositive motions for summary judgment in bad faith.  (See id. at 36.)[65]

---

[63] D&D does not persuade the Court that proceedings before the United States Bankruptcy Court and the New Jersey Superior Court support the validity of its claims adjudicated by this Court. (Dkt. 510 at 20–25, 32–34; see also dkt. 524 at 40–41.)

[64] D&D also contends that the Board did not move for summary judgment in its favor as to all counts until the parties were preparing for trial in 2009.  (Dkt. 510 at 19.)

[65] D&D, to support this argument, offers three explanations as to why the Board delayed moving for judgment in its favor.  (Dkt. 510 at 37–39.)  First, D&D postulates that the Board "did not believe at the earlier stages that a motion would have been likely to succeed."  (Id. at 37.)  Second, D&D suggests that the Board may have delayed moving for sanctions to remain before this Court.  (Id. at 37–38.)  Third, D&D submits that the Board "delayed moving to dismiss the

D&D opposes a fee award on the ground that the Board moved for judgment in its

favor in a piecemeal fashion, by initially filing, in effect, "a motion for partial summary

judgment …" (Id. at 18–19.)  See also supra Sec.II.A (describing this Court's disposition

of each Count against the Board).  Even though this Court granted judgment in favor of

the Board on all counts, D&D contends that the absence of critical language in this

Court's Memorandum Opinions – deeming its claims "utterly baseless or without any

colorable basis in law" – supports the merits of its claims against the Board.  (Dkt. 510 at

20.)[66]  With respect to its appeal, D&D argues that "a party is entitled to preserve an

appeal of a dismissed claim, even if the appeal is in part based upon the anticipation of a

future favorable precedent."  (Id. at 60–61.)

### c.    Discovery and Factual Investigation

D&D also argues that its claims warranted lengthy discovery between the parties.

(Id. at 75.)  Specifically, D&D contends that it obtained "necessary discovery"

concerning "documents which the Board had officially produced" to support its claims.

(Id.)  D&D also describes that it proffered "several favorable expert reports" and "witness

statements" during the course of discovery.  (Id.)

D&D also defends the merits of its claims by describing its factual investigation

here.  (Id. at 16–17.)  For example, D&D contends that it requested and reviewed "several

---

claims in order to maximize the fees its attorneys might ultimately collect …. "  (Id. at 38.)  The
Court rejects each suggestion as speculative and unsupported by the procedural record.

[66] Essentially, D&D construes the absence of critical language as supporting the validity of its
claims.  (Dkt. 510 at 30.)  D&D characterizes the Third Circuit's decision in the same manner,
stating "[n]owhere in its opinion did the Court of Appeals find D&D's appeal was frivolous or
suggest that D&D's underlying claims were without basis or pursued in bad faith."  (Id. at 20.)
See also supra Sec.IV.B (summarizing the Third Circuit's decision).

volumes of records" of the New Jersey Department of Education, which included

"agendas and billing records of several of the defendants on a daily basis." (Id. at 16.)[67]

D&D construes those records as indicating, inter alia, that the Board: (1) was aware of

delays related to the Project; and (2) did not have sufficient funding to complete the

Project. (Id.)

### B.     Count-by-Count Analysis under Section 1988

#### 1.     Count One: "Civil Rights – Fourth Amendment, Fifth Amendment, Fourteenth Amendment Seizure of Property (All Defendants)"

##### a.     The Board's Arguments

The Board, with respect to Count One, moves for attorneys' fees under Section

1988. (Dkt. 499-1 at 25.) The Board argues that Count One was frivolous, unreasonable,

or without foundation under Section 1988 because, inter alia: (1) D&D did not allege a

prima facie substantive due process deprivation claim; (2) the Project Contracts did not

create a constitutionally protected property interest under Linan-Faye, because the Project

Contracts contained a "termination for convenience" provision; and (3) D&D continued

to prosecute Count One after this Court issued the 9-30-05 Ruling. (Id. at 25–31.)[68]

---

[67] D&D states, in passing, that it "presented substantial factual evidence and detailed governmental records" in support of its claims. (Dkt. 510 at 53.) D&D later describes that "it secured and analyzed records from hundreds of pages of documents from the state, detailing the financial obligations of the defendants, and records of their daily management of the project." (Id. at 75.)

[68] The Board also argues that all Civil Rights Counts against it were frivolous under Section 1988, because D&D "had no good faith basis to challenge the Board's Monell immunity from civil rights liability." (Dkt. 499-1 at 29; see also id. at 30–31, 36, 41, 44–46.) This Court expressly declined to rule as to the applicability of Monell immunity in the 3-30-12 Ruling. See supra n.28. This Court, at the urging of the Board, accepted supplemental briefing as to the applicability of Monell immunity on this fee application. (Dkt. 524 at 6–9.) This Court has carefully reviewed: (1) the supplemental briefing; and (2) the arguments of the parties regarding the applicability of Monell immunity during the pendency of this action. (See dkt. 525; dkt. 526.) The Court, as a preliminary matter, observes that the Board's arguments regarding the applicability of Monell

### b.      D&D's Arguments

D&D argues that Count One was supported by fact and law.  (Dkt. 510 at 55–57.)

D&D, from a factual standpoint, contends that it examined "project records and

documents" and "Grant Agreements, regulations, and statutes governing school projects

…"  (Id. at 55 (internal citation omitted).)  D&D also defends its prosecution of Count

One from an evidentiary standpoint, on the ground that it submitted the following

documents before this Court: (1) "an affidavit containing a supporting statement of [a]

police officer regarding the request to enforce the lockout of D&D"; and (2) an e-mail

that described an alleged suppressed newspaper story regarding to the lockout.  (Id. at

56.)  See also supra Sec.I.B.2 (discussing the circumstances surrounding the lockout).

D&D provides no citation to the affidavit, but describes it as follows:

> We acknowledged the Court's prior ruling, and we said we have new case
> law regarding the notion that trailers can be property rights and that the fact
> that this was not simply a garnishment but that a police officer came in at
> night without notice to D&D and that there were attempts to lie about this
> to change the locks and we had the affidavit of the police officer ….

(Dkt. 524 at 81.)

D&D also contends that the "issue of a government's refusal to pay dedicated

funds" is not a matter of settled law.  (Dkt. 510 at 56.)  D&D, in support of this argument,

---

immunity in support of its 2009 motion for summary judgment were limited to Count Two – and
in no way addressed all of the Civil Rights Counts.  (See dkt. 348-8 at 44–46; dkt. 389 at 31–33;
dkt. 525; dkt. 526.)  The Court therefore finds that the issue of Monell immunity irrelevant to the
disposition of the Civil Rights Counts in this action.  Accordingly, the Court finds no reason to
revisit the applicability of Monell immunity – with respect to any of the Civil Rights Counts – on
this fee application.  Vice, 131 S.Ct. at 2210 ("The determination of fees should not result in a
second major litigation." (internal citation and quotation omitted).)

explains that it sought to distinguish this case from Linan-Faye on the grounds that: (1) the Board refused "to transfer its default into a termination for convenience"; (2) D&D allegedly performed $1.5 million of construction work for the Project; and (3) a New Jersey statute governing construction projects applied here.  (Dkt. 524 at 79–80.)[69]

### c.     Analysis

The Court finds that D&D's prosecution of Count One against the Board was not frivolous, unreasonable, or without foundation, and therefore will not award attorneys' fees on this count against D&D under Section 1988.  D&D, with respect to Count One, presented evidence before this Court to support its contention that Linan-Faye did not bar its claim.  See supra Sec.VI.B.1.b.  While the evidence and supporting legal argument was weak – at best – the issues warranted considerable legal analysis in the 12-21-07 Ruling.  See supra Sec.III.A.2.  Accordingly, the Court will not award Section 1988 attorneys' fees on this count.  Musila v. Lock Haven Univ., 970 F.Supp.2d 384, 395 (M.D. Pa. 2013) (denying fees under Section 1988 where the Court spent considerable time and effort researching the nuances of the claims); Rowe, 449 U.S. at 15–16 ("Allegations that, upon careful examination, prove legally insufficient to require a trial are not, for that reason alone, groundless or without foundation …" (internal citation and quotation omitted).)

---

[69] D&D, with respect to the third distinction, explains that the statute requires payment for school projects within "a very short period of time."  (Dkt. 524 at 80.)

2.  **Count Two: "Civil Rights – Liberty Interest, Destruction of Prequalification for Public Works Contracts Without Due Process (All Defendants)"**

a.  **The Board's Arguments**

The Board moves for attorneys' fees against D&D under Section 1988 on Count Two.  (Dkt. 499-1 at 33.)  The Board, in so moving, argues, inter alia, that D&D: (1) did not have a good faith basis to satisfy both prongs of the "stigma-plus" test; and (2) disingenuously alleged that the Board injured its prequalification status "because, in fact, D&D **deliberately concealed**" information in the procedurally-defective 6-30-03 Application.  (Id. at 31–36 (emphasis in original).)  See also supra Sec.I.B.3.b (describing the procedural deficiencies of the 6-30-03 Application).[70]  The Board contends that D&D's allegations concerning its prequalification status are meritless because discovery revealed that D&D suffered no adverse action from the governing state agencies.  (Dkt. 499-1 at 35.)  Rather, the Board points out that 3-30-12 Ruling deemed the 6-30-03 Application as voluntarily withdrawn.  (Id.)[71]  Based upon the procedural deficiencies in

---

[70] The Board addresses the procedural deficiencies in the 6-30-03 Application in great detail.  (Dkt. 499-1 at 35.)  The Board describes, for example, that the 6-30-03 Application was deemed withdrawn because it did not contain necessary signatures, notarizations, affidavits, and financial records.  (Id.)  Thus, D&D argues that the procedural deficiencies in the 6-30-03 Application are the reason that D&D did not achieve prequalification status.  (Id.)

[71] The Board goes even further, however, suggesting that D&D deliberately concealed information from the governing state agencies in the 6-30-03 Application.  (Id.)  D&D rejects that accusation, and explains the 6-30-03 Application as follows:

> The Board also attempts to argue that D&D acted intentionally in bad faith because of the clerical error in which a secretary submitted a half-filled-out prequalification extension form to the State of New Jersey.  This, however, occurred years after the onset of the litigation and cannot support a finding that the litigation was instituted in bad faith.  The secretary did so without the prior knowledge of D&D's officers (who discontinued her efforts) and without ever even notifying counsel.  The State took no action on it. This post-lawsuit misstep

the 6-30-03 Application, the Board asks this Court to find "that D&D intentionally and fraudulently concealed its adverse experience with the Board from the responsible agency …." (Id.)  The Board therefore characterizes the procedural deficiencies as sufficiently "fundamentally disingenuous" and "rooted in bad faith" to warrant an award under Section 1988.  (Id.)

### b.      D&D's Arguments

D&D argues that Count Two was neither frivolous nor unsupported by facts.  (See dkt. 510 at 15, 69.)  According to D&D, Count Two was supported by facts related to the "dramatic lockout" staged by the Board.  (Id. at 15.)  D&D likewise contends that "the Court's extensive discussion" of Count Two in the 3-30-12 Ruling did not deem the claim "knowingly frivolous, or barred by any directly on-point precedent."  (Id. at 69.)  D&D also defends the merits of Count Two on the ground that the 3-30-12 Ruling as to that count cited to "an unpublished District of New Jersey case" and an opinion by the United States Court of Appeals for the Ninth Circuit.  (Id.)[72]

---

cannot be said to be any evidence of a litigation strategy, much less a motivating force in the litigation.

(Dkt. 510 at 40.)

The Court will not revisit the material issues of fact regarding the 6-30-03 Application on this fee application.  Vice, 131 S.Ct. at 2210.

[72] D&D characterizes those two cases as "non-binding precedents."  (Dkt. 510 at 69.)  But D&D is wrong on that point.  The 3-30-12 Ruling on Count Two cited also to a non-precedential Third Circuit opinion and a published opinion of this Court – in addition to the two cases mentioned by D&D – which the Court identifies in bold font below:

The Court finds that there is an insufficiently direct causal connection between the alleged stigmatizing statements by the Board and its agents and the alleged injury of losing bonding capacity with the Surety, prequalification status with the NJEDA and/or DPMC, and the ability to work on public works projects, because

c.      Analysis

The Court will not award fees related to Count Two under Section 1988.  The

Court finds that this claim was not frivolous, unreasonable, or without foundation

because the law governing the scope of the "stigma-plus" test was in flux during the

course of this action.  Compare supra Sec.III.B.2, with Sec.III.B.3.  See also Adams v.

Teamsters Local 115, 678 F.Supp.2d 314, 322 (E.D. Pa. 2007) ("Because there was no

definitive, binding source of law at that time, I do not find that plaintiffs' claims were

legally frivolous.").  Significantly, the 3-30-12 Ruling as to Count Two also hinged upon:

(1) the evidence submitted by the parties at the close of discovery; and (2) intervening

changes in the law, discussed supra Sec.III.B.3.  Accordingly, the Court will not award

fees under Section 1988 on Count Two.  Methacton Sch. Dist., 920 F.Supp. at 80

(denying a fee award under Section 1988 where "Plaintiffs attempted to present evidence

---

… the Board is not responsible for or even capable of either granting
prequalification status or bonding D&D.  **See, e.g., Mun. Revenue Servs., Inc.
[v. McBlain], 347 Fed.Appx. [817] at 826 [3d Cir. 2009] ("[T]he loss of a
business opportunity is insufficient to establish the . . . 'plus' requirement");
Sullivan v. N.J. Div. of Gaming Enforcement, 602 F.Supp. 1216, 1222 (D.N.J.
1985) ("[T]he sine qua non of a 'stigma-plus' suit is that the 'plus' must be
the result of state action directly affecting the plaintiff's rights or status
under the law.  The fact that state action may be involved in the 'stigma' (i.e.,
defamation) is not of itself sufficient to maintain the action.");** see also Am.
Consumer Publ'g Ass'n, Inc. v. Margosian, 349 F.3d 1122, 1126 (9th Cir. 2003)
("[T]he 'stigma-plus' test requires that the defamation be accompanied by an
injury directly caused by the Government, rather than an injury caused by the act
of some third party in reaction to the Government's defamatory statements.");
Libertelli v. Parell, No. 86-2752, 1989 WL 43662, at *4 (D.N.J. Mar. 21, 1989)
("Even if plaintiff could assert some sort of liberty interest by coupling a
defamation with a loss of employment not otherwise protected, his claim must fail
. . . because any loss of employment resulted from the acts of private parties, not
the government officials. . . . [T]he 'plus' in a 'stigma-plus' suit for a deprivation
of liberty must be the direct result of state action.")

(Dkt. 442 at 44–45.)

to support their position on the Motion for Summary Judgment."); Lindquist v.
Buckingham Twp., 106 Fed.Appx. 768, 778 (3d Cir. 2004) ("In light of the fact that the
[Plaintiffs] might have been able to succeed under the standard in effect at the time they
brought their claim, we cannot say that the action was frivolous, unreasonable or without
foundation.").

### 3.   Count Three: "Civil Rights – Retaliatory Terminations for Exercise of First Amendment Rights (All Defendants)" and Count Four: "Civil Rights – First Amendment Retaliation For Seeking Redress in Federal Court (Board of Education, Vitetta, Epstein)"

#### a.   The Board's Arguments

The Board moves for attorneys' fees under Section 1988 with respect to Count
Three and Count Four.  (Dkt. 499-1 at 37.)  The Board argues that D&D: (1) had no good
faith basis to argue that it engaged in a constitutionally protected activity, because it
acknowledged that the speech in question was made in its capacity as a general
contractor, and not a citizen; (2) proffered no evidence to support the retaliation
allegations; and (3) refused to drop the counts at the Board's request, and after the Court
issued the 9-30-05 Ruling and 12-21-07 Ruling.  (Id. at 36–41.)[73]

#### b.   D&D's Arguments

The bulk of D&D's argument with respect to Count Three and Count Four
concerns this Court's prior rulings on both counts.  (Dkt. 524 at 74–77.)  D&D, for

---

[73] The Board argues that the only evidence proffered by D&D in support of Count Three and
Count Four were: (1) "discussions regarding the Project Schedules"; and (2) "several of the
default letters."  (Dkt. 499-1 at 39.)  The Board makes no mention of the "Construction
Updates," 9-25-01 Pereira Letter, or 10-3-01 Board Meeting Minutes, discussed supra
Sec.III.C.3.a.ii–iii.  Yet the Board urges the Court to find that the default letters issued "because
of D&D's performance derelictions and for no other reason."  (Dkt. 499-1 at 39.)  The Court
declines to do so on this fee application.  Vice, 131 S.Ct. at 2210.

example, points out that in the 3-30-12 Ruling, this Court revisited the 12-21-07 Ruling that had denied judgment in favor of the Board on both counts.  (Dkt. 510 at 29–30.) Thus, D&D argues that the counts cannot be deemed frivolous "because the Court reconsidered … prior rulings after completion of discovery and as a result of changes in the law."  (Id. at 30.)[74]  D&D describes the change in the law as follows:

> Ultimately, in the 2012 decision the Court noted that some new Supreme Court case abrogated the law in which D&D had been relying upon for its [F]irst [A]mendment claim, and it created a new standard.  That new Supreme Court case actually came out after D&D had filed its opposition brief.  So D&D obviously could not be frivolous for making arguments based upon the law at the time of its submission of the brief …

(Dkt. 524 at 74–75.)[75]

D&D also argues that, from an evidentiary standpoint, it provided the Court with three examples of "evidence to support its retaliation claims and to support its contention that it was acting as a citizen."  (Id. at 75.)  First, D&D submits – without citing to the procedural record – that it supplied the Court with a letter authored by Epstein, and

---

[74] D&D also argues that it cited to instructive legal authority in its opposition to D&D's final motion for summary judgment on both counts.  (Dkt. 510 at 71.)

[75] The Court has carefully reexamined its 3-30-12 Ruling – because D&D provided no citation to the Supreme Court case – and finds that D&D is misguided on this point.  With regard to Count Three and Count Four, the 3-30-12 Ruling cited to the following Supreme Court decisions that were decided during the pendency of this action:

(1) Borough of Duryea, Pa. v. Guarnieri, 131 S.Ct. 2488 (2011);

(2) Garcetti v. Ceballos, 547 U.S. 410 (2006); and

(3) Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 47 (2006)

(Dkt. 442 at 49, 50, 53–58.)

The 3-30-12 Ruling on Count Three and Count Four, however, did not exclusively rely on those cases, and also drew upon well-settled First Amendment case doctrine.  (See dkt. 442 at 47–59.)

stating that the Board would not discuss settlement unless D&D withdrew certain filings in this action.  (Id. at 76 ("We received a letter from the defendants … that said unless you withdraw your pleading in Federal Court and you go forward then I will not go forward with this settlement that had already been agreed and negotiated.").)  The second example of retaliation, in D&D's view, concerned the timeline of the issuance of the default letters.  (Id. at 77.)  See also supra Sec.I.B.2 (describing the default and termination).  D&D argued that the Board issued its first default letter after D&D vocalized concerns regarding insufficient permitting for the Project sites.  (Dkt. 524 at 77 ("We also cited … the fact that immediately upon advising the superintendent [of the Board] that we believed that D&D was being told to proceed without permits in an unpermitted plan, immediately after it had submitted that letter there was the first default notice.").)  This timeline, D&D argues, supported its retaliation claim.  (Id.)  D&D, as a third example – but with no citation to the procedural record – argues that it submitted a statement of the D&D Project Manager, Pereira, indicating that the Board suppressed media coverage of developments related to the Project.  (Id. at 77–78.)[76]

### c.    Analysis

The Court does not find that Count Three and Count Four against the Board were frivolous, unreasonable, and without foundation, and therefore will not award attorneys'

---

[76] D&D also references – again without citation – an e-mail "where the defendants themselves said that their course of conduct was a form of blackmail against D&D."  (Dkt. 524 at 78.)  Because the 3-30-12 Ruling did not discuss this e-mail, the Court finds it irrelevant to this fee application.  (See dkt. 442.)  See also Vice, 131 S.Ct. at 2210.

fees against D&D on those Counts under Section 1988.  The Court rejects the Board's

argument that D&D failed to proffer "a shred of evidence to demonstrate that the Board's

actions were taken in retaliation for D&D's exercise of First Amendment rights."  (Dkt.

499-1 at 38–39.)  That argument overlooks the evidence submitted by D&D discussed

supra Sec.III.C.3.a.iii, and impermissibly asks this Court to indulge "the understandable

temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not

ultimately prevail, his action must have been unreasonable or without foundation."

Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421–22 (1978).  Although the

"Construction Updates," the 9-25-01 Pereira letter, and the 10-3-01 Board Meeting

Minutes did not persuade this Court that D&D engaged in protected speech, the Court

nonetheless spent "considerable time and effort to research the nuances" of the First

Amendment retaliation claims.  Musila, 970 F.Supp.2d at 395.  Moreover, the Court is

not persuaded that the procedural record demonstrates that D&D "knew or should have

known" about the evidentiary deficiencies related to its claims.  Brown v. Borough of

Chambersburg, 903 F.2d 274, 277 (3d Cir. 1990).  Accordingly, the Court will not award

attorneys' fees under Section 1988 with respect to Count Three and Count Four.  Id.;

Musila, 970 F.Supp.2d at 395.

> ### 4.      Count Five: "Civil Rights – Intimidation of Witnesses (Epstein, Board of Education)"
>
> #### a.      The Board's Arguments

The Board, as to Count Five, moves for attorneys' fees under Section 1988.  (Dkt.

499-1 at 42.)  The Board argues that D&D: (1) had no good faith basis to assert a

conspiracy claim against Epstein and the Board, because the attorney-client exception

applied to Epstein; (2) failed to proffer evidence that Hawley was intimidated; and (3)

continued to prosecute the claim after the Court entered judgment in favor of the Board

on that count.  (Id. at 41–44.)  See supra Sec.III.D (describing D&D's allegations related

to Count Five.)  The Board describes this Court's disposition of Count Five as follows:

> Your Honor dismissed that count in 2007 based on the Heffernan case,
> which clearly ruled that a lawyer who is acting as a lawyer cannot conspire
> with his client, and your Honor found that the Board's lawyer was acting as
> a lawyer in speaking to this witness.

(Dkt. 524 at 15.)

The Board, with respect to the applicability of the attorney-client exception,

argues that D&D had no good faith basis to dispute that Epstein contacted Hawley in his

role as an attorney.  (Dkt. 499-1 at 42.)  See also supra Sec.III.D (describing the elements

of a Section 1985(2) conspiracy claim).  The Board also contends that D&D did not make

the requisite demonstration of an injury against it under Section 1985(2), because "no

evidence was presented that Hawley ever … was intimidated from telling the truth …."

(Dkt. 499-1 at 43–44.)

### b.    D&D's Arguments

D&D argues – with no citation to the record – that it submitted an affidavit that

suggested that Epstein approached Hawley and intimidated him.  (Dkt. 524 at 83.)  D&D

also notes that it argued that Epstein acted outside of his role as counsel for the Board

when he contacted Hawley.  (Id. at 83–84.)  D&D characterizes this Court's 12-21-07

Ruling as follows:

The Court found, and this was what it said, that it did not find that Mr. Epstein's behavior was appropriate.  It did not find that Mr. Epstein's behavior was ethical, but it did find that it was within the scope of representation.

(Id. at 83.)[77]

D&D also defended its prosecution of Count Five on the ground that it did not appeal from the 12-21-07 Ruling on that count.  (Id. at 84.)

### c.    Analysis

The Court finds that Count Five was frivolous, unreasonable, and without foundation.  Brown, 903 F.2d at 277 ("Implicit in this approach is the premise that plaintiff knew or should have known the legal or evidentiary deficiencies of his claim." (emphasis added)).  The Court, for the reasons described below, will award attorneys' fees accrued after March 26, 2007 against D&D under Section 1988.

The prosecution of Count Five was frivolous, unreasonable, and without foundation because the procedural record demonstrates that Epstein was protected under the attorney-client exception to 1985(2) liability from the outset.  See supra Sec.III.D.

---

[77] D&D mischaracterizes the 12-21-07 Ruling on this point, which stated, in relevant part:

> D&D asserts that Epstein engaged in the conspiracy to intimidate and harass Hawley by (1) calling Hawley to discuss how D&D obtained a copy of an email from Bovis to Epstein, Vitetta, and the Board, and (2) drafting an affidavit for Hawley to sign, which stated that "he had told Epstein and the Superintendent that he had not voluntarily given the email to D&D."

(Dkt. 264 at 35.)

The Court, however, expressly declined to rule as to the appropriateness of Epstein's alleged conduct.  (Id. at 36.)  Indeed, the Court held "regardless of whether Epstein's conduct was appropriate under the circumstances or Hawley felt intimidated by Epstein, Epstein's actions are exempted from a conspiracy charge under Section 1985."  (Id.)

The Board, in fact, explained this to D&D in the 3-26-07 Draft Motion, which stated, in

relevant part:

> Moreover, as argued previously, evidence of a conspiracy is a necessary
> element of any § 1985 claim.  Relevant authority makes clear, however,
> that, as a matter of law, governmental entities such as a board of education
> cannot conspire with its own agents … or its attorneys ….

(Dkt. 499-2 at 24.)  See also supra Sec.II.B.2.[78]

The procedural record indicates that both parties investigated the factual

underpinnings of Count Five. See supra Sec.III.D.  The parties disagreed, however, as to

whether Epstein contacted Hawley in his role as the Board attorney.  See supra

Sec.VI.B.4.a–b.  D&D cannot point to any evidence in the procedural record to support

the contention that Epstein acted outside of his role as an attorney when he allegedly

contacted Hawley.  Moreover, the Court finds that the 3-26-07 Draft Motion provided

ample notice to D&D of the legal deficiencies of Count Five.  See supra Sec.II.B.2.

Preliminary legal research would have informed D&D of the legal insufficiencies of its

claim – namely, the applicability of the attorney-client exception to bar Section 1985(2)

liability.  D&D nevertheless pressed on and, even after receiving the 3-26-07 Draft

Motion, continued to prosecute Count Five against the Board.

This Court granted judgment in favor of the Board on Count Five in the 12-21-07

Ruling under the same well-settled law summarized in the 3-26-07 Draft Motion.[79]  See

supra Sec.III.D.  Thus, upon reviewing the procedural record here, the Court rejects

---

[78] The Board reiterated the legal deficiencies of Count Five in the 1-13-10 Draft Motion.  (Dkt. 499-2 at 59–61.)  See also supra Sec.II.B.2.

[79] Because the amended shotgun complaint did not specify a subsection of Section 1985, however, this Court spent considerable analysis evaluating the scope and breadth of Section 1985 liability.  See supra Sec.III.D.

D&D's suggestion that "one could reasonably believe that the Court could have applied the law [governing Count Five] a different way." (Dkt. 524 at 84.)[80]  The Court, rather, finds that the prosecution of Count Five became frivolous, unreasonable, and groundless after D&D received the 3-26-07 Draft Motion, and will award those fees under Section 1988.  Vice, 131 S.Ct. at 2213; Quiroga, 934 F.2d at 503 (affirming fee award where claims "were without foundation or groundless").[81]

### 5.    Count Six: "Civil Rights – Illegal Garnishment Without Due Process of Law (All Defendants)"

#### a.    The Board's Arguments

The Board moves for attorneys' fees under Section 1988 as to Count Six.  (Dkt. 499-1 at 45.)  The Board, in support thereof, argues that, inter alia: (1) the Project

---

[80] The Court likewise rejects the following argument by D&D:

> We believe there was a good argument to be made that since Mr. Epstein was trying to defend a motion as to himself and not as to the Board, that the Court might not have found that … he was acting within the scope of his representation of the Board.

(Dkt. 524 at 83.)

D&D provides no basis – legal, factual, evidentiary, or otherwise – to support this argument. (See id.)  Nor does D&D cite to the procedural record to defend the merits of Count Five.  (Id.)

[81] The Court also finds the Barnes Factors weigh in favor of the Board on Count Five, because here:

(1) D&D failed to establish a prima facie conspiracy claim;

(2) this Court entered judgment in the Board's favor on that count well before pre-trial preparation; and

(3) the issue was not a matter of first impression before this Court.

See supra Secs.III.D; V.A; VI.B.4.

Contracts did not create a constitutionally protected property interest; and (2) D&D did not have a good faith basis to argue otherwise.  (Id. at 44–47.)  See supra Sec.III.E.

### b.   D&D's Arguments

D&D does not address the legal or factual basis for Count Six.  (See dkt. 510; dkt. 524.)

### c.   Analysis

The Court, for the reasons described below, finds the prosecution of Count Six against the Board was unreasonable, frivolous, and without foundation after April 14, 2006.  Accordingly, the Court will award Section 1988 attorneys' fees accrued after that date against D&D.

The procedural record indicates that this Court dismissed Count Six against Bovis and Vitetta in the 9-30-05 Ruling.  See supra Sec.III.E.1.  Thereafter, the Board sent D&D the 4-14-06 Proposed Consent Order, requesting, in effect, that D&D withdraw Count Six against it.  See supra Sec.II.B.1.[82]  D&D refused, and this Court granted judgment in favor of the Board on Count Six in the 12-21-07 Ruling, for the same reasons discussed in the 9-30-05 Ruling as to Bovis and Vitetta.  See supra Sec.III.E.1–2.  Indeed, the 12-21-07 Ruling expressly stated that this Court "already determined that D&D does not have a constitutionally protected property interest in either the materials purchased in connection with the Project or receiving payments pursuant to the Project contracts …"  See supra Sec.III.E.2 (emphasis added).

---

[82] The Board again challenged the merits of Count Six in the 3-26-07 Draft Motion and 1-13-10 Draft Motion.  See supra Sec.II.B.2–3.

The 12-21-07 Ruling did not address newly-raised arguments by D&D in support of its prosecution of Count Six against the Board.[83]  Nor does D&D provide any explanation as to its prosecution of this count against the Board in its arguments on this fee application.  (Dkt. 510; dkt. 524.)  The Court therefore finds that the prosecution of Count Six against the Board became frivolous, unreasonable, or groundless after D&D received the 4-14-06 Proposed Consent Order, and will award those fees under Section 1988.  Vice, 131 S.Ct. at 2213; Quiroga, 934 F.2d at 503 (affirming fee award where claims "were without foundation or groundless").[84]

## VII.   LEGAL STANDARD APPLIED HERE: RULE 11

The Board also moves for sanctions under Rule 11 with respect to all counts. (Dkt. 499-1 at 25.)  The Court has considered the arguments of the parties on the Civil Rights Counts, discussed supra Sec.VI, and general arguments that apply to all counts, discussed infra Sec.VII.A–B.[85]

### A.   Argument: Civil Rights Counts – D&D's Arguments

D&D argues that Rule 11 sanctions are not warranted here.  (Dkt. 510 at 57.) D&D defends the merits of its claims on the ground that this Court did not grant judgment in favor of D&D on all counts until the 3-31-12 Ruling.  (Id. at 57–62.)   D&D

---

[83] The Court also notes that D&D did not appeal from the 12-21-07 Ruling on Count Six to the Third Circuit.  See supra Sec.IV.B.

[84] The Court likewise finds that the Barnes Factors weigh in favor of the Board on Count Six, for the same reasons discussed supra n.81.

[85] The Court will analyze the arguments pertaining to each count, as necessary, infra Sec.VII.B. When possible, the Court will determine whether sanctions are warranted with reference to the discussion supra Sec.VI.B.

cites several cases in support of this argument.  (Id. at 57–62.)[86]  D&D also suggests that it pursued "new or novel legal theories," in this action; however, D&D provides no further explanation – much less a citation in the procedural record – as to those theories.  (Id. at 58–62.)  D&D's counsel also argues that it was bound by "an obligation of zealous representation" during the course of this action.  (Id. at 58.)

### B.    Count-by-Count Analysis: Civil Rights Counts

**1.    Count One: "Civil Rights – Fourth Amendment, Fifth Amendment, Fourteenth Amendment Seizure of Property (All Defendants)"; Count Two: "Civil Rights – Liberty Interest, Destruction of Prequalification for Public Works Contracts Without Due Process (All Defendants)"; Count Three: "Civil Rights – Retaliatory Terminations for Exercise of First Amendment Rights (All Defendants)"; and Count Four: "Civil Rights – First Amendment Retaliation For Seeking Redress in Federal Court (Board of Education, Vitetta, Epstein)"**

The Court, for the reasons discussed supra Sec.VI.B.1–3, finds that Rule 11 sanctions are not warranted on Count One, Count Two, Count Three, and Count Four.  The Court, for those reasons, is not convinced that the prosecution of those counts reached the point of "clear abuse" under Rule 11.  Kuhns, 998 F.Supp. at 577.  Nor does

---

[86] The Court has reviewed the cases cited by D&D, and finds no support for the argument that "[i]f a party has not obtained an early dismissal, its burden for obtaining fees arriving from summary judgment motions is higher."  (Dkt. 510 at 58.)   Rather, the cases cited by D&D describe the objective test that governs Rule 11 sanctions with no reference to a heightened standard.  See, e.g., Gaiardo, 835 F.2d at 484 ("For example, a defendant's answer may be in the spirit of the Rule at the time of filing, but a motion for summary judgment founded on the same theory may violate the Rule if investigation or research shows that the initial information was incorrect."); Wasmanski v. T.G.I. Friday's Inc., No. 07-6001, 2008 WL 2645357, at *5 (D.N.J. July 2, 2008) (denying Rule 11 sanctions due to: (1) ongoing discovery; and (2) the absence of "clear abuse"); Teamsters Local Union No. 430 v. Cement Express, Inc., 841 F.2d 66, 68–69 (3d Cir. 1988) (noting that, even though "Rule 11 may not be invoked because an attorney, after time for discovery, is unable to produce adequate evidence to withstand a motion for summary judgment," the "standard for testing conduct under Rule 11" remains "reasonableness under the circumstances").

the Court find sufficient evidence that: (1) those counts were frivolous; or (2) D&D prosecuted those counts for "any improper purpose, such as to harass" or "cause unnecessary delay." Fed.R.Civ.P. 11(b)(1)–(2). Accordingly, the Court will not impose Rule 11 sanctions on Count One, Count Two, Count Three, and Count Four.

### 2.   Count Five: "Civil Rights – Intimidation of Witnesses (Epstein, Board of Education)"

The Court, for the reasons discussed <u>supra</u> Sec.VI.B.4.c, will sanction counsel for D&D for prosecuting Count Five against the Board after it received the 3-26-07 Draft Motion. The Court finds that the prosecution of that due process property interest claim – after the Board explained the legal deficiencies of the claim in the 3-26-07 Draft Motion – demonstrates, at best, sanctionable "[m]istaken judgment" and "ignorance of the law." <u>Kuhns</u>, 998 F.Supp. at 577. The Court is also mindful of the obligation of D&D's counsel to: (1) ensure its claims were warranted by existing law or a good faith argument for the extension, modification, or reversal of the law; and (2) amend pleadings upon acquiring new information related to its claims. <u>Gaiardo</u>, 835 F.2d at 482.

Counsel for D&D fails to demonstrate – on this application or with respect to the lengthy procedural history on Count Five, discussed <u>supra</u> Secs.III.D; VI.B.4.b – that it offered a good faith argument for the extension, modification, or reversal of the law. The Court also finds that the 3-26-07 Draft Motion provided sufficient notice to counsel for D&D of the legal deficiencies of Count Five. Accordingly, the Court will sanction counsel for D&D under Rule 11 on Count Five, and determine the nature of the sanction in subsequent proceedings. <u>Lieb</u>, 788 F.2d at 158 ("Influenced by the particular facts of a case, the court may decide that the circumstances warrant imposition of only part of the

adversary's expenses or perhaps only a reprimand …. The compensatory, punitive, and deterrent aspects of sanctions may have varying claims to priority, depending on the nature of the case and the violation, as well as on the standing of parties and counsel.").[87]

### 3.    Count Six: "Civil Rights – Illegal Garnishment Without Due Process of Law (All Defendants)"

The Court, for the reasons discussed <u>supra</u> Sec.VI.B.5, will sanction counsel for D&D for prosecuting Count Six against the Board after April 14, 2006.  The Court finds that the prosecution of that due process property interest claim – after the Board explained the legal deficiencies of the claim in the 4-14-06 Proposed Consent Order – demonstrates sanctionable "[m]istaken judgment" and "ignorance of the law" on counsel's part.  <u>Kuhns</u>, 998 F.Supp. at 577.  The Court is also mindful of counsel's obligation to amend the pleadings upon learning new information regarding the legal sufficiency of the claims.  <u>Gaiardo</u>, 835 F.2d at 484.

This Court is not persuaded – on this application or with respect to the lengthy procedural history of Count Six – that D&D's counsel offered a good faith argument for the extension, modification, or reversal of the law related to that count.  The Court also finds that the 4-14-06 Proposed Consent Order provided sufficient notice to D&D's counsel of the legal deficiencies in the claim.  Accordingly, the Court will sanction counsel for D&D under Rule 11 on Count Six, and determine the nature of the sanctions in subsequent proceedings.  <u>Lieb</u>, 788 F.2d at 158.

---

[87] The Court, as explained in the Introduction, will determine the issues of liability here and the nature of the sanctions in subsequent proceedings.

### C.      Count-by-Count Analysis: Remaining Counts under Rule 11

#### 1.      Count Seven: "Quia Timet – New Jersey Law (All Defendants)"

##### a.      The Board's Arguments

The Board moves for Rule 11 sanctions on Count Seven.  (Dkt. 499-1 at 48.)  The

Board, in support of its motion, argues that D&D and its counsel: (1) had no good faith

basis to contend that the NJTFL created a protected trust for the benefit of D&D and its

laborers, contractors, and suppliers; (2) did not conduct a "reasonable inquiry" into the

NJTFL; and (3) refused to withdraw the claim at the Board's request.  (Id. at 48–49.)  See

also supra Sec.III.F.  The Board criticizes the merits of Count Seven in this passage:

> The NJTFL could not be clearer – a cause of action under the NJTFL only
> exists with respect to funds that have been **paid** by a state entity, not money
> allegedly owed to a contractor under a contract with a state entity …. A
> cursory review of the statute and corresponding case law would have
> informed D&D and its counsel as to the complete inapplicability of the
> NJTFL to this action.

(Id. at 49 (emphasis in original).)

##### b.      D&D's Arguments

D&D argues that Count Seven is a "very traditional claim" for financial

reimbursement in construction litigation.  (Dkt. 524 at 85.)  D&D also explains that it

cited to case law in support of this claim, and that it was an "issue of first impression"

before this Court.  (Id. at 86.)

##### c.      Analysis

The Court will impose sanctions against D&D and its counsel under Rule 11 on

Count Seven.  The 9-30-05 Ruling unequivocally held that D&D failed to state a "cause

of action under the NJTFL for money not paid by the state."  (Dkt. 86 at 18.)  See also

supra Sec.III.F.1.  D&D nevertheless declined to withdraw Count Seven against the

Board in response to the 4-14-06 Proposed Consent Order.  See supra Sec.II.B.1.  Thus, in the 12-21-07 Ruling, this Court again ruled that the NJTFL "does not provide any protection for the general contractor with respect to money the contractor is owed from the government entity."  (Dkt. 264 at 40.)

The Court finds that the prosecution of Count Seven against the Board was frivolous after counsel for D&D received the 4-14-06 Proposed Consent Order.  D&D cannot explain its evidence in support of Count Seven against the Board, much less describe the legal or factual underpinnings of that claim on this fee application.  Accordingly, the Court will sanction D&D and its counsel under Rule 11 on Count Seven, and determine the nature of the sanctions in subsequent proceedings.  Jackson v. Rohm & Haas Co., 366 Fed.Appx. 342, 347 (3d Cir. 2010) (affirming Rule 11 sanctions where claims were meritless and appellant provided "no sound arguments to the contrary"); Leuallen v. Borough of Paulsboro, 180 F.Supp.2d 615, 619 (D.N.J. 2002) (imposing Rule 11 sanctions where plaintiff failed to provide "any statutory, case law, or factual support" for its claims).

## 2.      Count Eight: "Breach of Contract (Board of Education)"
### a.      The Board's Arguments

The Board moves for Rule 11 sanctions on Count Eight.  (Dkt. 499-1 at 50.)  The Board concedes that the breach of contract claim "had an arguably good faith basis when originally filed."  (Id.; see also dkt. 524 at 20.)  According to the Board, however, "D&D had no good faith basis to dispute that the GIA assigned D&D's breach of contract

claims" to the Surety.  (Dkt. 499-1 at 50.)  See also supra Sec.III.G.1–2 (describing this Court's analysis on Count Eight in the 12-21-07 Ruling and 3-30-12 Ruling).

The Board, in support of its motion with respect to Count Eight, argues that D&D failed to: (1) establish a good faith basis to argue that the 1-19-05 Reorganization Plan trumped the GIA; and (2) proffer expert testimony concerning the Board's liability.  (Dkt. 499-1 at 49–54.)[88]  Thus, the Board deems Count Eight frivolous when: "discovery closed and D&D … had no evidence to dispute the assignment of the claim" or on "August 22, 2005, when D&D disclaimed any reliance upon liability expert testimony to support its claims."  (Id. at 50, 54.)

### b.    D&D's Arguments

D&D argues that the breach of contract claim was valid and supported by law. (Dkt. 524 at 86.)  D&D also submits that it retained two experts to support this claim. (Id. at 87; dkt. 510 at 35.)  D&D blames the Board for the default of the Project Contracts.  (Dkt. 510 at 16–18.)  D&D alleges that, as a matter of due diligence on Count Eight, it reviewed "agenda and billing records of several defendants …."  (Id. at 16.) According to D&D, those documents demonstrated that the Board, inter alia: (1) was aware of various problems that might delay the Project; (2) failed to investigate problems

---

[88] The Board argues that Count Eight was frivolous because D&D failed to retain a liability expert to support its argument that the Board breached the Project Contracts.  (Dkt. 499-1 at 51; dkt. 524 at 21–22.)   According to the Board, the voluminous record and extensive discovery established "that default letters authored by the Board's counsel were sent only after a consensus was reached with the architect and others that the letters were warranted."  (Dkt. 499-1 at 51– 53.)  Thus, the Board argues that because the default was based upon the professional judgment of the architect and construction manager, D&D was required to demonstrate that the default determinations were made either in error or in bad faith.  (Id. at 52–53.)  That demonstration, in the Board's view, required liability expert testimony.  (Id. at 52–53.)  The Court will not address this argument on this fee application.  Vice, 131 S.Ct. at 2210.

related to the Project; and (3) did not obtain the rights to begin construction for the Project.  (Id. at 16–17.)

### c.   Analysis

The Court will not impose Rule 11 sanctions with respect to Count Eight.  The procedural record on this count demonstrates that D&D engaged in considerable research and investigation related to this count.  Lingle, 847 F.2d at 94 ("To comply with these requirements [under Rule 11], counsel must conduct a reasonable investigation of the facts and a normally competent level of legal research to support the presentation." (internal citation and quotation omitted)).  That research and investigation concerned, inter alia, the Project Contracts and the construction efforts performed by D&D.  See supra Sec.III.G.  Accordingly, the Court does not find that the prosecution of Count Eight was an "exceptional circumstance" to warrant the imposition of sanctions.  Id.; see also Doering v. Union Cty. Bd. of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir. 1988) ("This Court and others have interpreted its language to prescribe sanctions, including fees [under Rule 11], only in the exceptional circumstance … where a claim or motion is patently unmeritorious or frivolous …").

### 2.   Count Ten: "Tortious Interference (All Defendants)"[89]

### a.   The Board's Arguments

The Board moves for Rule 11 sanctions on Count Ten, on the ground that, inter alia, D&D knew or should have known that the NJTCA applied and barred the Board from liability.  (Dkt. 499-1 at 54–55.)  See also supra Sec.III.H.2.

---

[89] D&D did not assert Count Nine against the Board.

### b.     D&D's Arguments

D&D argues that the tortious interference claim was backed by sufficient facts and law.  (Dkt. 524 at 87–88.)  D&D argues, for example, that it cited to statutes that it believed superseded the NJTCA.  (Id. at 88.)  Specifically, D&D references N.J.S.A. 18:18A-16, which it claims prohibited the "solicitation of bids … without an approved set of plans."  (Dkt. 510 at 13.)  D&D also contends that this Court changed its position as to the applicability of the NJTCA.  (Id. at 30.)[90]

### c.     Analysis

This Court will impose sanctions against D&D and its counsel under Rule 11 on Count Ten, beginning from the date of January 13, 2010.  As this Court previously explained, the 12-21-07 Ruling determined that the facts related to Count Ten warranted further investigation.  See supra Sec.III.H.1.  Specifically, the Court could not resolve the arguments of the parties regarding, inter alia: (1) the Surety's bonding capacity; (2) the "Construction Updates"; (3) the participation of each Defendant in drafting the "Construction Updates"; and (4) whether each Defendant acted with malice.  (See id.)

The Board, in its second motion for summary judgment on Count Ten, argued that the NJTCA barred the imputation of malice – a necessary element of a tortious interference claim – on the Board.  (Dkt. 348-8 at 54–56.)  The Board also informed D&D of the legal deficiencies of its claim in the 1-13-10 Draft Motion, which read in relevant part:

---

[90] D&D is wrong on this point, for reasons discussed in Sec.VII.C.3.c.

> Further, as set forth more fully in the Board's pending motion for summary
> judgment, even if D&D did have some evidence of malice, malice cannot
> be imputed to the Board as a matter of law.

(Dkt. 499-2 at 66.)

The Court finds that D&D's contention that it "cited several statutes [that]

superseded the Tort Claims Act" was frivolous in its opposition to: (1) the Board's

second motion for summary judgment in its favor on Count Ten; and (2) the Board's fee

application.  (Dkt. 524 at 87–88.)  Counsel for D&D did not articulate the applicability of

a single purported "superseding" statute during oral argument on this motion.  (Id.)[91]  Nor

did the Court find it necessary to address any statute cited by D&D in the 3-30-12 Ruling,

which expressly held as follows:

> The Board contends that it is entitled to judgment in its favor on count 10
> because it is entitled to unqualified immunity under the … [NJTCA] ("A
> public entity is not liable for the acts or omissions of a public employee
> constituting a crime, actual fraud, actual malice, or willful misconduct").
> The Court agrees.  Because malice is an element of tortious interference,
> and as a matter of law cannot be entertained by the Board as a public entity,
> summary judgment in favor of the Board on count 10 is appropriate.

(Dkt. 442 at 74–75.)

---

[91] Rather, counsel for D&D argued as follows:

> Our argument was that the tortious interference here …  was intentional in the
> sense that the Board intended to issue these defaults and to take these actions to
> improve its bargaining position.  That isn't necessarily scienter in the form of
> malice, and this wasn't simply, we were arguing, a matter of the Board not – or
> trying to hold the Board responsible for conduct for which it did not receive any
> benefit.  We also, once again, cited several statutes that we indicated superseded
> the Tort Claims Act immunity.

(Dkt. 524 at 88.)

The Court, upon reviewing the arguments in D&D's opposition papers, cannot discern how
D&D's cited statutes might have superseded the NJTCA.  (See, e.g., dkt. 510 at 13 (citing to
N.J.S.A. 18A:18A-16, a New Jersey statute governing the approval of plans and specifications
for public schools).)

The Court therefore finds that the 1-13-10 Draft Motion, which cited to the relevant portions of the Board's moving papers for summary judgment in its favor on Count Ten, triggered D&D's obligation under Rule 11 to investigate whether Count Ten was "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law."  Fed.R.Civ.P. 11(b)(2).  D&D, in opposition to this fee application, does not persuade this Court that its prosecution of Count Ten sought a reasonable extension or modification of existing law.  Id.; Zuk v. E. Pa. Psychiatric Inst. of Med. Coll. of Pa., 103 F.3d 294, 299 (3d Cir. 1996).  The Court finds that counsel for D&D did not make a reasonable inquiry into the law governing Count Ten after receiving the 1-13-10 Draft Motion, which provided ample notice of the legal deficiencies of the claim.  Zuk, 103 F.3d at 299.  Accordingly, the Court will impose sanctions against D&D and its counsel under Rule 11 for the prosecution of Count Ten after January 13, 2010.

### 3.    Count Eleven: "Libel and Slander (All Defendants)"

#### a.    The Board's Arguments

The Board moves for Rule 11 sanctions on Count Eleven.  (Dkt. 499-1 at 56–57.) The Board contends that Count Eleven was frivolous because preliminary legal research would have demonstrated that the NJTCA barred D&D's libel and slander claim against the Board.  (Id.)

#### b.    D&D's Arguments

D&D does not provide an argument to support its prosecution on Count Eleven. (See dkt. 510; dkt. 524.)

### c.      Analysis

The Court will not impose Rule 11 sanctions with respect to Count Eleven.  The
record in this action indicates that D&D submitted evidence related to "Construction
Updates" and default letters.  See supra Sec.III.I.  D&D also, from a legal standpoint,
asked this Court to apply a lower negligence standard on Count Eleven.  See id.  The
Court therefore finds that D&D made a reasonable – but not exemplary – investigation
into the facts and law related to Count Eleven sufficient to survive Rule 11 review.

### 5.      Count Twelve: "Conversion (Board of Education, Bovis)"

### a.      The Board's Arguments

The Board moves for Rule 11 sanctions on Count Twelve.  (Dkt. 499-1 at 57–
58.)[92]  The Board, with respect to Count Twelve, argues that the underlying claims were
frivolous because: (1) the 9-30-05 Ruling dismissed Count Twelve against Bovis as
barred by the economic loss doctrine; and (2) D&D "never advanced an argument
colorably justifying the claim under the economic loss rule."  (Id. at 57–58.)[93]  The Board
argues that D&D failed to refute the applicability of the economic loss doctrine in
opposition to the Board's motion for judgment in its favor on Count Twelve.  (Id. at 58.)

### b.      D&D's Arguments

D&D describes its prosecution of Count Twelve as follows:

----

[92] The Court notes that the Board does not indicate whether it moves for Defense Costs with
respect to Count Twelve under Section 1988, Rule 11, or both.  Because Count Twelve was a
state law claim, the Court will analyze this issue under Rule 11.  See also supra n.59.

[93] The Board, for reasons discussed infra, oversimplifies the 9-30-05 Ruling.  Although Bovis
argued that D&D's conversion claim failed as a matter of law, the Court found that D&D
surrendered its conversion claim against Bovis because D&D did not oppose Bovis's motion to
dismiss that count.

The conversion case … was that [the Board] knew they had to keep money from being paid to D&D from the Board's funds if they wanted additional contracts to themselves.  Well, our argument is, okay, well, maybe they were just looking to get paid, but the Board was responsible for the correct distribution of the funds, and, so, we felt that there was -- might not have been the strongest case, but it certainly was not a frivolous case to think that the Court might hold the public body, which was responsible for the funds, to a higher standard than third-party contractors competing to get paid.

(Dkt. 524 at 89.)

#### c.    Analysis

This Court finds that D&D failed to conduct a reasonable inquiry as to the merits of Count Twelve after it received the 1-13-10 Draft Motion.  The Court, for the reasons stated below, will impose sanctions under Rule 11 against D&D and its counsel for the prosecution of Count Twelve after January 13, 2010.

The Board did not request that D&D withdraw Count Twelve against it in the 4-14-06 Proposed Consent Order.  (Dkt. 499-2 at 12–14 (requesting that the Board, in effect, withdraw Count One, Count Two, Count Six, and Count Seven, insofar as those counts were asserted against it).)  The Board did, however, challenge the merits of Count Twelve in the 1-13-10 Draft Motion, which stated, in relevant part:

In its motion for summary judgment, the Board seeks to dismiss D&D's claim for conversion, on [the] bases that: (a) all of the materials at issue were turned over to D&D's Surety, for use in completing the Somerset project, and (b) the conversion claim is duplicative of the breach of contract claim and thus is barred by the economic loss doctrine.  For these same reasons, D&D's conversion claim is improperly brought and should result in the imposition of sanctions.

(Id. at 69.)

D&D nevertheless continued to prosecute Count Twelve against the Board.  The Court finds that the 1-13-10 Draft Motion served as a warning to D&D to "Stop, Think, Investigate, and Research" the legal basis for Count Twelve.  Gaiardo, 835 F.2d at 482. The Court, from an objective standpoint, finds no reasonable basis for D&D's continued prosecution of Count Twelve after it received the 1-13-10 Draft Motion.  Moreover, the Court finds that D&D failed to provide "a good faith argument for the extension, modification, or reversal" of the law governing the economic loss doctrine.  Cement Express, Inc., 841 F.2d at 68; see also Fed.R.Civ.P. 11(b)(2).  Indeed, the disposition of Count Twelve required little analysis in the 3-30-12 Ruling, which stated, in relevant part:

> Because D&D has not alleged or shown that it is entitled to "funds due and owing" it on anything but a contractual basis, the Board is entitled to judgment in its favor on the conversion claim on that basis as well.  Adv. Enters. Recycling, Inc. v. Bercaw, 869 A.2d 468, 472 (N.J. App. Div. 2005).

(Dkt. 442 at 91.)

The Court, for the reasons above, will impose sanctions against D&D and its counsel under Rule 11 for the prosecution of Count Twelve after January 13, 2010.

### 6. Count Thirteen: "Fraudulent Inducement (Board of Education, Epstein, Vitetta)" and Count Fourteen: "Fraudulent Inducement, Rescission of Performance Bonds (Board of Education, Epstein, Vitetta)"

#### a. The Board's Arguments

The Board moves for Rule 11 sanctions on Count Thirteen and Count Fourteen on the ground that the underlying claims were unsupported by fact and law.  (Dkt. 499-1 at

58–59.)[94]  According to the Board, both counts were legally frivolous because D&D had

"no plausible basis to meet the scienter requirement for fraud claims against the Board."

(Dkt. 518 at 39.)  Moreover, the Board contends that D&D failed to proffer "a shred of

evidence of fraudulent intent by the Board."  (Dkt. 499-1 at 59.)

### b.    D&D's Arguments

D&D argues that Count Thirteen and Count Fourteen were not frivolous because it

believed that the Board had withheld material information related to the Project.  (Dkt.

524 at 89–90.)  D&D also contends that the Board falsely represented that it had obtained

permits and approval related to the Project in violation of a New Jersey statute.  (Id.)[95]

### c.    Analysis

The Court will impose sanctions against D&D and its counsel under Rule 11 on

Count Thirteen and Count Fourteen, beginning from the date of January 13, 2010.  The

Board, in the 1-13-10 Draft Motion, stated the following:

> D&D's fraud claims are frivolous because (a) the claims require proof of
> fraudulent intent by Board officials, and D&D never had a good faith basis
> for asserting that any Board official ever acted fraudulently, with a specific

---

[94] The Board does not indicate whether it moves under Section 1988, Rule 11, or both on Count
Thirteen and Count Fourteen.  (Dkt. 499-1 at 58–59; dkt. 518 at 39.)  Because both counts were
state law claims, the Court will analyze the issues under Rule 11.  See supra n.59.

[95] D&D articulated those arguments as follows:

> The fraudulent inducement rescission claim, that had to do with trying to tell
> D&D and representing to D&D that the permits and the plans for the contract had
> been approved, which is a precondition under very old state law for even a public
> body -- a school district even issuing bids, much less awarding them, and we
> thought that because they had withheld that information there could be an
> argument as to fraudulent inducement at least to the extent of [rescission].

(Dkt. 524 at 89–90.)

intent to deceive D&D, and (b) such intent cannot be imputed to the Board as a matter of law.

(Dkt. 499-2 at 70.)

This Court, in the 3-30-12 Ruling granted summary judgment in favor of the Board on both counts, on the ground that "under New Jersey law, the scienter necessary to a fraud claim cannot be imputed to a public entity, which the parties do not dispute the Board is." (Dkt. 442 at 93.)  With respect to D&D's statutory arguments, the Court found that nothing in New Jersey statutes cited by D&D was "in conflict with the principle of law relied upon by the Board." (Id. at 94.)

The Court finds that the 1-13-10 Draft Motion provided D&D with ample notice of the legal deficiencies of Count Thirteen and Count Fourteen.  D&D nevertheless continued to prosecute Count Thirteen and Count Fourteen, even though neither count was "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law ...."  Fed.R.Civ.P. 11(b)(2); see also Cement Express, Inc., 841 F.2d at 68; Zuk, 103 F.3d at 299.  Accordingly, the Court will impose Rule 11 sanctions against D&D and its counsel on Count Thirteen and Count Fourteen, beginning from the date of January 13, 2010.

### 7.    Count Fifteen: "Civil Conspiracy (Board of Education, Epstein, Vitetta, Bovis)"

#### a.    The Board's Arguments

The Board moves for Rule 11 sanctions on Count Fifteen.  (Dkt. 499-1 at 60.) According to the Board, the prosecution of this claim was "tantamount to a finding of frivolousness" because D&D: (1) failed to state a viable conspiracy claim between the Board and its agents; (2) proffered vague and conclusory allegations – rather than

evidence – in support of this claim; and (3) continued to assert that the Board acted

conspiratorially after the Court entered summary judgment in favor of the Board as to

Count Fifteen.  (Dkt. 524 at 24; see also dkt. 499-1 at 60–62.)

### b.  D&D's Arguments

D&D argues that Count Fifteen was not frivolous because it required extensive

discovery.  (Dkt. 524 at 90–91.)  D&D articulates this argument as follows:

> [A]s the Court might recall even at the time of the summary judgement …
> the Court ultimately ruled that we were entitled to more documents.  That,
> by the way, was another reason why we felt that we were non-frivolous in
> proceeding is the court thought that we had shown enough merit to try to
> obtain these additional documents.  So from the point of view as we looked
> at the beginning of the case and the point of view that we never got what
> we would have wanted, which is a definitive statement one way or another
> as to which defendants were acting as part of the Board's decision-making
> process and policy, and when they were acting on their own, that the
> conspiracy counts were -- particularly in the very unusual circumstances of
> this case -- were not frivolous as stated at the beginning.

(Id. at 91.)

### c.  Analysis

The Court will impose sanctions against D&D and its counsel on Count Fifteen

under Rule 11 for the period after counsel received the 3-26-07 Draft Motion, which

explained the legal deficiencies related to this count as follows:

> D&D's allegations with regard to Count Fifteen (Conspiracy) are also
> frivolous because they lack legal and factual support.  For one thing,
> D&D's allegation of conspiracy is so vague and indefinite as to be
> insufficient on its face.
>
> ….
>
> Moreover, case law clearly states that no conspiracy can exist between a
> school board and its employees or attorneys …. Any claims for conspiracy
> must hinge on conduct between the Board and some other party.  D&D has

not alleged that any person unrelated to the Board is involved in a conspiracy.  Because a person cannot conspire with itself, there is no factual or legal basis for a conspiracy claim.

(Dkt. 499-2 at 27–28.)

The Court finds that the 3-26-07 Draft Motion provided sufficient notice to D&D of the legal deficiencies of Count Fifteen.  Yet D&D continued to prosecute this claim, in the absence of legal or factual support.  Leuallen, 180 F.Supp.2d at 619–20 (imposing sanctions where claim was not supported by evidence or "any statutory, case law, or factual support" for the claims).  Accordingly, this Court will impose sanctions against D&D and its counsel under Rule 11 on Count Fifteen from March 26, 2007.  Gaiardo, 835 F.2d at 482 ("Possible sanctions include requiring the … lawyer … to pay all or part of the adversary's counsel fees incurred as a result of the violation.  This sanction combines the concepts of deterrence and reimbursement for the wronged party."); Kuhns, 998 F.Supp. at 577 ("The purpose of Rule 11 is to deter plaintiffs and defendants from filing papers in court which lack factual or legal support in order to save innocent parties and the courts from dealing with frivolous lawsuits.").

### 8.      Count Sixteen: "Malicious Abuse of Process (Board of Education, Epstein)"

#### a.      The Board's Arguments

The Board moves for Rule 11 sanctions on Count Sixteen.  (Dkt. 499-1 at 63.) The Board, in support thereof, argues that D&D: (1) had no good faith basis to establish the malicious prosecution claim, because D&D could not colorably satisfy the first and fourth elements of the tort; (2) had no good faith basis to establish the malicious prosecution claim, because the NJTCA barred the imputation of malice on the Board; and

(3) continued to prosecute this claim after this Court issued the 12-21-07 Ruling.  (<u>Id.</u> at 63–65.)  <u>See also</u> <u>supra</u> Sec.III.M.[96]  The Board also criticizes D&D for its failure to withdraw Count Sixteen after it received the 3-26-07 Draft Motion.  (Dkt. 518 at 40.)[97]

### b.    D&D's Arguments

D&D describes that Count Sixteen was related to mandatory arbitration proceedings.  (Dkt. 524 at 91–92.)  According to D&D, the Board wrongfully attempted to institute arbitration proceedings against it that were "dominated by the Board and its counsel."  (<u>Id.</u>)  D&D contends that it was never subject to mandatory arbitration proceedings under the Project Contracts.  (Dkt. 510 at 15.)[98]

### c.    Analysis

The Court will impose sanctions against D&D and its counsel under Rule 11 on Count Sixteen for the period after March 26, 2007.  The Court, as described below, finds that the 3-26-07 Draft Motion provided sufficient notice of the legal deficiencies of Count Sixteen:

> Count Sixteen of [the] Amended Complaint (Malicious Abuse of Process claim) likewise is frivolous.  The basis of D&D's claim is that the Board's "threat" of arbitration is sufficient to support an abuse of process claim and that the mere naming of D&D as a third-party defendant in a case entitled

---

[96] The Board cites to a section of D&D's proposed pretrial order entitled "Abuse of Process and Efforts to Deny D&D Any Legal Recourse" in support of the argument that D&D continued to prosecute this claim.  (Dkt. 499-2 at 79–95.)

[97] The Board does note, however, that "D&D's only answer … mischaracterizes the Court's rulings by stating: 'The Court dismissed Count 16, for malicious prosecution, but only because it was considered essentially moot.'"  (Dkt. 518 at 40.)  The Court agrees that D&D mischaracterizes the 12-21-07 Ruling.

[98] The parties did, however, attempt to mediate this action.  (Dkt. 510 at 28; <u>see also</u> dkt. 286, dkt. 287.)  D&D criticizes the Board for having failed to procure settlement authority, as required by Court order, during the course of the mediation proceeding.  (Dkt. 510 at 28.)

> P.J. Smith Electrical Contractors, Inc. v. North Plainfield Board of Educ. …
> also constitutes an abuse of process.  There is no legal basis for these
> assertions …. The law in this regard is well settled, but D&D and its
> counsel have refused to concede even this obviously baseless claim.
> Sanctions should be imposed.

(Dkt. 499-2 at 28.)

This Court, for the reasons discussed supra Sec.III.M, determined that Count

Sixteen was not supported by fact or law in the 12-21-07 Ruling.  The Court likewise

finds here that Count Sixteen had no basis in law or fact, and will impose sanctions under

Rule 11 against D&D and its counsel, beginning from the date of March 26, 2007.

Balthazar v. Atl. City Med. Ctr., 279 F.Supp.2d 574, 594 (D.N.J. 2003) (imposing Rule

11 sanctions where claims had "no basis in law or fact"), aff'd, 137 Fed.Appx. 482 (3d

Cir. 2005); Jackson, 366 Fed.Appx. at 347 (affirming sanction where claims were

meritless and appellant provided "no sound arguments to the contrary"); Gaiardo, 835

F.2d at 482.

## VIII.  LEGAL STANDARD APPLIED HERE: SECTION 1927 AND THE COURT'S INHERENT POWERS

### A.    The Board's Arguments

#### 1.    Examples of Bad Faith Litigation

The Board moves for sanctions under Section 1927 against D&D's counsel, and

under the Court's inherent powers against both D&D and its counsel, on the ground that

bad faith permeated D&D's claims.  (Dkt. 499-1 at 65.)  The Board, upon viewing the

record as a whole, provides four examples of bad faith litigation.  (Id.)  The Board first

contends that D&D engaged in bad faith conduct by pursuing claims that it knew or

should have known were frivolous when filed, and also became so during the course of

litigation.  (Id.)  The Board, in support of this contention, argues that the "continued

prosecution of claims in the utter absence of legal or factual support, and after this Court

dismissed the same claims against other parties, is evidence of counsel's bad faith."  (Id.

at 69.)  Second, the Board characterizes the claims against Epstein as a "bad faith effort

to harass the Board's counsel."  (Id.)  In support of this argument, the Board asserts that

D&D took the following actions in bad faith: (1) named Epstein personally in this action;

and (2) pursued claims against Epstein as part of an "animus-fueled vendetta" to "harass

and vex Epstein."  (Id. at 76–79.)

        The Board's third example of bad faith litigation concerns D&D's constitutional

claims.  (Id. at 70.)  The Board asks this Court to "infer from the record that D&D's civil

rights claims, and the resulting eleven years of intensive litigation in federal court, were

in part motivated by counsel's bad faith effort to recover D&D's counsel fees under

[Section] 1988, because of that statute's liberal fee-shifting provisions in favor of

prevailing civil rights plaintiffs."  (Id.)  The Board's final example of bad faith litigation

concerns representations made by D&D in this action.  (Id. at 71–72.)  According to the

Board, D&D made unfounded allegations regarding, inter alia: (1) criminal overspending

by the Board; and (2) the Board's obligations under the Project Contracts.  (Id. at 71–

75.)[99]

---

[99] The Board also argues that D&D prosecuted its claims related to its prequalification status in
bad faith because the 6-30-03 Application was ultimately deemed withdrawn.  (Id. at 75.)  See
also supra Sec.I.B.3.b (describing the 6-30-03 Application).  The Board contends that discovery
revealed "D&D was not debarred from any state agency and suffered no adverse action of any
kind from the agency responsible for prequalifying contractors."  (Dkt. 499-1 at 75.)  See also
supra Sec.I.B.3.b.  The Court, for the reasons discussed supra n.71, will not revisit material
issues of fact on this fee application.

## 2.   Hallmarks of Bad Faith Litigation

The Board contends that three "hallmarks" of bad faith litigation are present here. (Dkt. 524 at 25–26.)  The first hallmark is the "degree of frivolousness" of the claims underlying each count.  (Id. at 25.)  The Board urges the Court to deem the prosecution of the counts as frivolous in light of the professional experience of counsel for D&D.  (Id.)  According to the Board, D&D's counsel "claimed to be experts in the area of asserting civil rights claims and other kinds of claims on behalf of construction contracts" and had professional experience prosecuting the same.  (Id.)

The Board argues that the second hallmark to support a finding of bad faith litigation was counsel's refusal to withdraw claims against the Board after this Court deemed those claims meritless against other defendants.  (Id. at 26.)  By the Board's account, counsel for D&D engaged in this conduct to harass its opponents.  (Id.)  According to the Board, counsel for D&D "multiplied this litigation for the improper purpose of exacting revenge against the Board's counsel, whom they viewed as the primary impetus behind the default …."  (Id.)

The Board contends that the third hallmark that supports a finding of bad faith litigation concerned the factual misrepresentations that counsel for D&D made during the course of litigation.  (Id. at 26.)  The Board cites several examples in support of this argument.  (Id. at 26–29.)  For example, the Board argues that counsel for D&D lodged "false allegations" about the funding for the Project.  (Id. at 27.)  Those representations

were particularly egregious, the Board argues, because D&D failed to provide any evidence to support its allegations.  (Id. at 27.)[100]

## B.   D&D's Arguments

D&D contends that Section 1927 sanctions are not warranted here, because "[a]s a matter of law, the filing of a single complaint cannot be held to have multiplied the proceedings unreasonably and vexatiously .…"  (Dkt. 510 at 66.)  D&D also supports the validity of its claims on the ground that it "made a sufficient showing to withstand two prior summary judgment motions and bring the case to the pretrial stage."  (Id. at 63.)[101] D&D also describes the 6-30-03 Application as follows:

> The Board identified a document, which showed that a D&D clerical worker, concerned that D&D not allow a deadline to lapse and without consulting counsel or its President, submitted a partial application to the State of New Jersey for D&D's continued prequalification.  D&D's clerical worker left blank the space to list D&D's surety, but otherwise copied information from the original application.  The Department of Education informed D&D that the application was incomplete, and the end result was that D&D's President did not further respond.

(Id. at 17.)

## C.   Analysis

The Court finds that D&D and its counsel engaged in unreasonable and vexatious conduct in bad faith.  The Court will: (1) award attorneys' fees against counsel for D&D under Section 1927; and (2) impose sanctions on D&D itself pursuant to the inherent powers of the Court.  Veneziano, 238 F.Supp.2d at 690–92; LaSalle Nat'l Bank, 287 F.3d at 288; Quiroga, 934 F.2d at 505.  Viewing the record as a whole, the Court finds that

---

[100] The Court will not revisit issues of material fact on this fee application.  See supra n.71.

[101] D&D also denies litigating this action "with enmity towards the Board."  (Id. at 39.)

D&D's overbroad shotgun complaint – which, after this Court's lengthy analysis of the procedural history in this action, is better characterized as a scatter-shot amended complaint – resulted in abusive litigation.[102]  Indeed, the Memorandum Opinions that accompanied the 9-30-05 Ruling, 12-21-07 Ruling, and 3-30-12 Ruling exceeded over two hundred pages.  (Dkt. 86; dkt. 264; dkt. 442.)[103]

The Court rejects D&D's suggestion that the Court's lengthy analysis in its prior rulings supports the merits of D&D's claims.  (See, e.g., dkt. 510 at 19 ("All the summary judgment motions were of such complexity (and often involved volumes of factual evidence and exhibits) that they were not decided until December of 2007, the following year.  At that time, the Court issued a complex set of rulings, dismissing some, but not all of D&D's claims.  It found that D&D had provided sufficient proof of the remainder of its claims to present a triable case.").)[104]  Those rulings, rather, discarded each of D&D's claims based upon: (1) the state of the law at the time of each ruling; and (2) the evidence

---

[102] The 12-21-07 Ruling characterized the amended complaint as follows:

> D&D's amended complaint is a "shotgun complaint".  Such complaints "usually create[] a task that can be quite onerous for courts".  Opdycke v. Stout, 233 Fed.Appx. 125, 127 (3d Cir. 2007); see Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1259 (11th Cir. 2002) (explaining that "[t]he typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts … contain irrelevant factual allegations and legal conclusions ... [and] the trial court must sift out the irrelevancies, a task that can be quite onerous").

(Dkt. 264 at 1 n.1.)

[103] The 3-30-12 Ruling, discussed supra Sec.II.A, required over ninety pages of analysis, yet D&D did not prevail on any of its claims against the Board.

[104] The Court, for the reasons discussed in the Memorandum Opinion deciding the motion for attorneys' fees filed by Epstein, also finds no basis for D&D's prosecution of this action against Epstein in his individual capacity.  (See dkt. 528)

submitted by the parties.  (See generally dkt. 86; dkt. 264; dkt. 442.)  See also supra Sec.III.  This lawsuit – which has amounted to over 500 docket entries – has caused an inexcusable squandering of judicial time and effort.  The Court is a sturdy workhorse, but it should not be transformed into a beast of burden.[105]

The Court finds that the above-described conduct, viewed in light of this Court's analysis supra Secs.VI–VII, demonstrates willful bad faith by counsel for D&D. Alphonso v. Pitney Bowes, Inc., 356 F.Supp.2d 442, 452 (D.N.J. 2005) ("Sanctions under Section 1927 do not depend upon a finding that the lawsuit itself was filed in bad faith. Instead, sanctions attach under Section 1927 when an attorney continues the suit, or some aspect of it, after the attorney learns that it lacks merit."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 278 F.3d 175, 188 (3d Cir. 2002) ("Indications of this bad faith are findings that the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment."  (internal citation and quotation omitted)).  Accordingly, based upon the totality of the procedural record, the Court will award the aforementioned relief against D&D (under its inherent powers) and against D&D's counsel (under Section 1927), for the intransigent prosecution of this litigation against the Board.

The Court notes that it is not addressing whether sanctions in this regard should also be imposed against D&D's counsel under its inherent powers, because the Court has awarded relief in this regard against counsel under Section 1927.  See In re Prudential,

---

[105] The Court, however, makes no finding as to whether D&D or its counsel prosecuted this case to benefit from the fee shifting scheme under Section 1985.  That type of inference would be difficult to discern from the docketed procedural history and the evidence submitted by the Board on this motion.

278 F.3d at 189 (stating "resort to these inherent powers is not preferred when other remedies are available," such as statutory or rules-based sanctions); see also Hillburn v. Bayonne Parking Auth., 562 Fed.Appx. 82, 86 (3d Cir. 2014) (finding Section 1927 award was adequate, rather than reliance on inherent powers).

## CONCLUSION

The Court, for the reasons stated, hereby concludes that the Board is entitled to:

(1) attorneys' fees on Count Five accrued after March 26, 2007, under 42 U.S.C. § 1988, to be paid by D&D itself;[106]

(2) attorneys' fees on Count Six accrued after April 14, 2006, under 42 U.S.C. § 1988, to be paid by D&D itself;[107]

(3) sanctions against counsel for D&D on Count Five for the period after March 26, 2007, under Rule 11;

(4) sanctions against counsel for D&D on Count Six for the period after April 14, 2006, under Rule 11;

(5) sanctions against D&D and its counsel on Count Seven, Count Ten, Count Twelve, Count Thirteen, Count Fourteen, Count Fifteen, and Count Sixteen under Rule 11;

(6) attorneys' fees against counsel for D&D under 28 U.S.C. § 1927; and

(7) sanctions against D&D under the inherent powers of the Court.

---

[106] The Court will address the matter of costs to be awarded, in addition to attorneys' fees, when it addresses the nature and amount of fees and sanctions.

[107] Having determined that D&D is liable to the Board for attorneys' fees on Count Five and Count Six under Section 1988, the Court will not address whether sanctions under Rule 11 should also be imposed on D&D on those same counts. The counts following Count Five and Count Six are not federal civil rights claims subject to Section 1988. Therefore, the Court has analyzed the motion as to D&D under Rule 11 (and the inherent powers of the Court) as to the remaining counts.

The Court will issue an appropriate Order on this motion.  The Board is hereby granted leave to move for determination of the nature and amount of fees, costs, and/or sanctions pursuant to the above-cited authorities.


    s/ Mary L. Cooper_____
**MARY L. COOPER**
United States District Judge

**Dated:** December 10, 2015